**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| In re:<br><br>**HEALTH DIAGNOSTIC LABORATORY, INC.**, *et al.*,<br><br>Debtors.[1] | **Chapter 11**<br><br>**Case No. 15-[    ] (___)**<br><br>**(Joint Administration Requested)** |

**DECLARATION OF MARTIN MCGAHAN, CHIEF RESTRUCTURING OFFICER OF HEALTH DIAGNOSTIC LABORATORY, INC., IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS[2]**

Martin McGahan declares and says:

1.     I am the Chief Restructuring Officer of Health Diagnostic Laboratory, Inc. ("HDL Inc."), a corporation headquartered in Richmond, Virginia.   While I just recently have been

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Health Diagnostic Laboratory, Inc. (0119), Central Medical Laboratory, LLC (2728) and Integrated Health Leaders, LLC (7832).

[2]     The financial information provided in this Declaration has been prepared by the Debtors and their advisors for illustrative purposes only.  Such information is unaudited and subject to material change based on certain contingencies.  While this financial information is presented with numerical specificity, the Debtors caution that no representations or guarantee can be made as to the accuracy of this information.   The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
Tyler P. Brown (VSB No. 28072)
Jason W. Harbour (VSB No. 68220)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

*Proposed Counsel to the Debtors
and Debtors in Possession*

appointed the position of Chief Restructuring Officer, I and others from Alvarez and Marsal ("A&M") have been advising HDL since November, 2014.  I am familiar with the day-to-day operations, business, and financial affairs of the Debtors (as defined below).

2.      I am also a Managing Director and Co-Head of A&M's Healthcare Industry Group.  I have over 10 years of experience advising and working with operationally and financially challenged organizations in the health care industry.  I have been involved in major corporate restructuring projects throughout the United States, representing both debtors and creditors.  Some of my notable client engagements include Physiotherapy Holdings, Inc, Church Street Health Management, LLC, Sunwest Management, Inc., Medical Staffing Network, St. Vincent Catholic Medical Centers, Orthodontic Centers of America, Inc., and World Health Alternatives.

3.      I submit this declaration (i) in support of the petitions of the Debtors for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), (ii) pursuant to 28 U.S.C. § 1746 in support of the Debtors' petitions and contemporaneously-filed requests for relief in the form of motions and applications (the "First Day Motions"), and (iii) to assist the Court and other interested parties in understanding the circumstances giving rise to the commencement of these chapter 11 cases.  I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' business and to the Debtors' reorganization.

4.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by

2

executive officers of HDL, Inc., employees of the organization and outside professional advisors of the business, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors and the diagnostic laboratory field of healthcare as a whole. If called upon to testify, I would testify competently to the facts set forth in this declaration. Unless otherwise indicated, the financial information contained herein is unaudited and provided on a consolidated basis.

### Commencement of Reorganization Proceedings

5.       On June 7, 2015 (the "Petition Date"), HDL Inc., and certain of its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors", "HDL" or the "Company"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.       Part I of this declaration describes the Debtors' businesses, Part II describes the circumstances giving rise to the commencement of these chapter 11 cases, Part III describes the Debtors' prepetition restructuring initiatives, and Part IV sets forth the relevant facts in support of the First Day Motions.

### I.

### The Debtors' Businesses

**A.       Diagnostic Laboratory and Advisory Services**

7.       HDL began as a start-up laboratory in Richmond, Virginia, and in the approximately six years since processing its first samples in 2009, HDL has matured into a

significant participant in the diagnostic laboratory field of healthcare.  As discussed below, the Company in an accredited, full-service clinical laboratory that offers comprehensive testing for biomarkers that can indicate risk for cardiovascular disease, diabetes, and related diseases.  By utilizing HDL's services, physician can offer patients a personalized overview of risk factors and assistance from clinical health consultants to promote healthy, longer-lasting lifestyles.  The Company offers comprehensive testing and wellness services to employers and is a partner for value-based, integrated care models and health systems.  HDL's primary mission is to prevent and reverse heart disease and diabetes one patient at a time through its laboratory testing and advisory services coordinated through the primary care physician of each patient.

8.    HDL offers what it believes may be the most comprehensive test of biomarkers for cardiovascular, diabetes, and related diseases currently available in the industry.  Since January 2010, HDL has handled over 3 million patient samples.  The Company currently runs about 2,000 tests daily through its two facilities.  HDL headquarters is located in the Bio-Technology Park in Richmond, Virginia, and a smaller specialized facility operates and is located in De Soto, Kansas.  From these two facilities, the Company serves approximately 10,000 physicians located in forty-five (45) states plus the District of Colombia. HDL's menu of laboratory tests provides a basis for early detection, effective treatment, and reversal of a number of diseases.  The advanced testing offered by HDL provides a far broader and deeper picture of patient health than traditional testing.  HDL's laboratory testing, which is at the forefront of modern medical science, gives physicians the tools to detect major health issues in patients before such events occur that are potentially life-threatening to the patient and financially burdensome to the healthcare system.

9.      The Company is also a leader in harnessing the power of technology to deliver test results to providers with more access and efficiency, including through its recent rollout of myHDL, an iOS app that allows the company's provider partners to view and manage lab results and patient cases from the convenience of an iPhone or iPad.  In addition, HDL offers an online patient portal that provides interactive reports, live coaching help, patient engagement videos, and lifestyle tracking tools.

10.     Through its company-owned and leased partner outpatient locations, HDL provides access to sites where providers can refer patients for advanced testing for heart disease, diabetes, and other conditions.  These state-of-the-art facilities allow for access to phlebotomy services, clinical health consultants, community programs and links to certified community physicians.  HDL's patient centers also offer on-site health and wellness resources, walk-in service, and contemporary furnishings that create a unique lab experience and differentiate HDL from other laboratory diagnostic companies.

11.     HDL also offers advisory services to physicians and patients through its clinical health consultants, a team of registered dietitians, exercise physiologists, certified diabetes educators, tobacco cessation specialists, and certified lipid specialists.  They provide a myriad of counseling and educational support opportunities, including personal health plans, dietary plans, custom exercise regimens, tobacco cessation treatment plans, stress reduction counseling, educational support concerning any medication prescribed, and consultant-to-physician progress reports.  HDL additionally offers a web-based portal for patient and provider access to personal health records.  HDL also provides educational programs and comprehensive information about advanced diagnostic testing matters to physician customers.

12.     HDL's laboratory testing platform has proven to be successful in reducing the cost of care for certain patients whose physicians utilize HDL's services.  According to a study conducted by the health services research company HealthCore, physicians utilizing HDL's services for their patients observed a 23% reduction in total patient cost of care and improved lipid profiles.  To date, HDL is the only clinical laboratory to demonstrate proven cost savings using its integrated approach to diagnostic health care.

13.     The Debtors employ approximately six hundred and forty-five (645) people in full-time and part-time positions.  These employees include laboratory technicians, registered dieticians, certified diabetes educators, registered nurses, certified tobacco treatment specialists, exercise physiologists and IT specialists that build and maintain proprietary software systems.

14.     The Company recognizes revenue when the sample testing process is complete and test results are reported to an ordering physician.  Revenues are billed and collected typically from three types of payers—clients, patients and third-parties, such as health insurance companies, Medicare and Medicaid.  Client revenues are recorded on a fee-for-service basis, which uses a list price for a sample test, less any negotiated discount.  Patient revenues are recorded using the Company's patient fee schedule, net of any discounts negotiated with physicians on behalf of their patients.  Finally, HDL bills third-party payers primarily in two ways:  as "fee-for-service" and under in-network reimbursement agreements.  Third-party payers are billed at the Company's standard fee schedule amount, and third-party revenue is recorded net of contractual discounts and adjusted periodically based upon historical account collection experience with specific payers for particular services, industry reimbursement trends, and other relevant factors.

6

15.     For the fiscal year ending December 31, 2013, the Debtors had $375 million in net revenue (adjusted for uncollectible accounts) and EBITDA of $45.2 million.  During 2013, HDL processed on average about 3,600 samples per day.  For the fiscal year ending December 31, 2014, the Company had estimated revenue of $320 million and EBITDA of $15.3 million. During 2014, HDL processed on average about 3,120 samples per day.

**B.       Government Regulation and Compliance**

16.     Clinical laboratory companies, such as HDL, are subject to regulation and oversight by various federal, state, and local government agencies.   Most notably, these regulations concern licensure and operation of clinical laboratories, payment for laboratory services, health care fraud and abuse, as well as quality and environmental and occupational safety.   In addition, certain state and federal statutes, including the qui tam provisions of the federal False Claims act, permit private parties to bring "whistleblower" suits against clinical laboratory companies on behalf of government payers, private payers and/or patients alleging inappropriate billing practices, or violations of state and federal law, including the Anti-Kickback statute and the federal Ethics in Patient Referral Act (the "Stark Law").  These statutes apply to virtually all companies doing business in the health care services industry.  The Anti-Kickback statute prohibits, among other things, the offer, payment, solicitation or receipt of any form of remuneration in return for the referral of Medicare and Medicaid patients.  The Stark Law prohibits, with limited exceptions, financial relationships between ancillary service providers and referring physicians.

17.     Moreover, the Medicare, Medicaid, and TRICARE programs, in which HDL participates, are highly regulated.  Compliance with the laws and regulations governing these

programs is not only costly, but is subject to ongoing governmental review and interpretation. Changes in the regulations governing these programs, as well as shifts in review protocol and government interpretation, can have material impacts on the Company's business.

18.     In response to these regulations, HDL maintains a company-wide Code of Conduct and Business Ethics Compliance Program, aimed at ensuring that the Company's employees act ethically at all times and comply with all applicable laws, regulations and company policies.

19.     It is my understanding that since late 2012, and before the disclosure of an industry-wide review of certain industry practices, HDL had been conducting a significant internal compliance review and analysis to ensure that its activities were and continue to be in compliance with various Federal and state laws regulating laboratory services.

20.     It is further my understanding that as part of the settlement discussions with the federal government, HDL sought to negotiate the termination of its sales agreement with BlueWave Healthcare Consultants ("BlueWave").  Following months of discussion, HDL elected to terminate the agreement with BlueWave, which it did on January 9, 2015.

21.     Since the termination of the BlueWave contract, HDL has focused on creating an internal sales force and a customer-centric model that links sales and marketing of HDL's services with its clinical health consultants and customer service initiatives.  The Company anticipates that the termination of its relationship with a contracted, outside sales force may result in an estimated $24 million in cost savings to HDL in 2015, and will ensure more transparency in customer communications and consistent application of HDL policies.

C.      **Corporate Structure**

22.      HDL Inc. is a privately-held company and was incorporated in Virginia as an S-Corporation in November 2008.  Effective January 1, 2015, HDL converted to a C-Corporation. HDL Inc. is the direct or indirect parent of each of the other Debtors.    A corporate organizational chart is attached hereto as Exhibit A, indicating which of HDL Inc.'s subsidiaries are Debtors in these chapter 11 cases.

23.      HDL Inc. and its debtor and non-debtor subsidiaries own interests in several affiliated entities and joint ventures, some of which are discussed below.

24.      Non-debtor subsidiary HDL Properties, LLC ("HDL Properties"), a Virginia limited liability company, owns an approximate 58.9% interest in non-debtor Biotech 8, LLC ("Biotech 8"), a Virginia limited liability company, which owns the headquarters that HDL Inc. leases in Bio-Technology Park in Richmond, Virginia.

25.      Non-debtor subsidiary HDL USA Holdings, LLC ("HDL Holdings"), a Virginia limited liability company, owns a 49.5% interest in non-debtor Global Genomics Group, LLC ("G3"), a Delaware limited liability company.  G3's business model focuses on developing confidential intellectual property.

26.      HDL Holdings previously owned a 33% interest in non-debtor Innovative Diagnostic Laboratory, LLP ("IDL").  IDL performs testing for detection of colon cancer at its lab in Richmond, Virginia.  In May 2015, HDL USA sold its ownership interest in IDL.

27.      In October 2013, the Company acquired substantially all of the assets of Oncimmune USA, LLC ("Oncimmune USA"), a subsidiary of Oncimmune Ltd., an entity based in the United Kingdom, which develops, patents and commercializes a simple physician-ordered

blood test to aid in the risk assessment and early detection of lung cancer.  The assets of Oncimmune USA are primarily located in De Soto, Kansas, and are owned by debtor subsidiary Central Medical Laboratories, LLC ("CML"), a Virginia limited liability company.

28.    Debtor subsidiary Integrated Health Leaders, LLC ("IHL"), a Virginia limited liability company, owns certain intellectual property acquired in 2011.

**D.    Capital Structure[3]**

i.    *BB&T Loan Facilities*

29.    HDL Inc. is the borrower under three loan facilities with Branch Banking and Trust Company ("BB&T").

30.    Pursuant to the Amended and Restated Loan Agreement, dated June 28, 2012, as amended by the First Amendment to Amended and Restated Loan Agreement, dated February 24, 2014 (as amended, the "ABL Loan Agreement"), by and between BB&T and HDL Inc., and the Promissory Note, dated January 13, 2012, in the maximum principal amount of $20,000,000, made by HDL Inc. and payable to BB&T, as amended by the Note Modification Agreement, dated January 9, 2014, and the Note Modification Agreement, dated February 24, 2014 (as amended, the "ABL Note"), BB&T made a revolving asset-based line of credit available to HDL Inc. in the maximum principal amount of $20,000,000 (the "ABL Loan Facility").    A BB&T Security Agreement, dated January 13, 2012 (the "ABL Security Agreement"), addresses securing the obligations of HDL Inc. under the ABL Loan Facility. Pursuant to a letter from BB&T, dated January 28, 2015, the maximum principal amount of the

---

[3]    The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules and exhibits.

ABL Loan Facility was reduced to $12,000,000.  As of the Petition Date, the outstanding amount owed under the ABL Loan Facility is $3,284,371.

31.     Pursuant to the Loan Agreement, dated June 29, 2012, as amended by the First Amendment to Loan Agreement, dated March 27, 2014 (as amended, the "Equipment Term Loan Agreement"), by and between BB&T and HDL Inc., and the Promissory Note, dated June 29, 2012, in the maximum principal amount of $5,500,000, made by HDL Inc. and payable to BB&T (the "Equipment Term Loan Note"), BB&T made a term loan to HDL Inc. in the maximum principal amount of $5,500,000 (the "Equipment Term Loan Facility").  A BB&T Security Agreement, dated June 29, 2012 (the "Equipment Term Loan Security Agreement"), addresses securing the obligations of HDL Inc. under the Equipment Term Loan Facility.  As of the Petition Date, the outstanding amount owed under the Equipment Term Loan Facility is $1,567,207.

32.     Pursuant to the Loan Agreement, dated June 28, 2012, as amended by a First Amendment to Loan Agreement, dated March 27, 2014 (as amended, the "L/C Loan Agreement"), by and between BB&T and HDL Inc., and the Application and Agreement for Irrevocable Standby Letter of Credit, dated June 28, 2012 (the "L/C Application"), by and between BB&T and HDL Inc., BB&T issued (i) Irrevocable Standby Letter of Credit No. 953-2476922/00003, dated June 28, 2012, in the amount of $4,000,000, in favor of Biotech 8, LLC, which was subsequently cancelled, and (ii) Irrevocable Standby Letter of Credit No. 953-2476922/00004, dated June 26, 2013, in the amount of $4,000,000, in favor of Fulton Bank, N.A. (collectively, the "L/C Loan Facility").  A BB&T Security Agreement, dated June 28, 2012 (the "L/C Security Agreement"), addresses securing the obligations of HDL Inc. under the L/C Loan

Facility.  As of the Petition Date, there are no borrowed amounts outstanding under the L/C Loan Facility.

    ii.    *Entity Guaranties*

    33.    On or about February 24, 2014, (i) HDL Properties; (ii) IHL; (iii) HDL Holdings; and (iv) CML (collectively, the "Entity Guarantors"), each entered into a separate Guaranty Agreement in favor of BB&T pursuant to which the Entity Guarantors guaranteed HDL's obligations to BB&T (collectively, the "Entity Guaranties").[4]

    iii.    *Individual Guaranties*

    34.    On or about March 11, 2015, Joseph P. McConnell ("McConnell") and G. Russell Warnick ("Warnick"; together with McConnell, the "Individual Guarantors"), each entered into a separate Guaranty Agreement in favor of BB&T pursuant to which the Individual Guarantors guaranteed HDL's obligations to BB&T up to $1,500,000.

    iv.    *Forbearance Agreement*

    35.    Pursuant to the Forbearance Agreement, dated March 11, 2015 (the "Forbearance Agreement"), by and among, HDL Inc., the Entity Guarantors, the Individual Guarantors, and BB&T, among other things, BB&T agreed to forbear from taking certain actions concerning the ABL Loan Facility, the Equipment Term Loan Facility and the L/C Loan Facility (collectively, the "BB&T Loan Facilities").

---

[4]    In addition, on or about February 24, 2014, non-debtor Henrico Family Physicians, LLC, which formally dissolved in the first quarter of 2015, entered into a similar Guaranty Agreement in favor of BB&T.

v.    *BB&T Equipment Finance Loan Facility*

36.    HDL Inc. is the borrower under a loan facility with BB&T Equipment Finance Corporation ("BB&T Equipment Finance").  Pursuant to (i) the Loan and Security Agreement, dated March 22, 2013, by and between BB&T Equipment Finance and HDL Inc. (the "Equipment Finance Loan Agreement"); (ii) Promissory Note No. 01, dated March 22, 2013, in the original principal amount of $4,779,808.61, by HDL Inc. in favor of BB&T Equipment Finance; (iii) Promissory Note No. 02, dated May 15, 2013, in the original principal amount of $1,136,134.39, by HDL Inc. in favor of BB&T Equipment Finance; (iv) Promissory Note No. 03, dated May 31, 2013, in the original principal amount of $1,687,955.56, by HDL Inc. in favor of BB&T Equipment Finance; and (v) Promissory Note No. 04, dated July 5, 2013, in the original principal amount of $2,000,000, by HDL Inc. in favor of BB&T Equipment Finance, BB&T Equipment Finance made equipment loans to HDL Inc. (the "Equipment Finance Loan Facility"). The Equipment Finance Loan Agreement addresses securing the obligations of HDL Inc. under the Equipment Finance Loan Facility.  As of the Petition Date, the outstanding amount owed under the Equipment Finance Loan Facility is $5,827,318.

vi.    *PNC Loan Facility*

37.    HDL Inc. is the borrower under a loan facility with PNC Equipment Finance, LLC ("PNC").  Pursuant to the Term Note, dated March 25, 2014, in the original principal amount of $5,000,000, by HDL Inc. in favor of PNC, as amended by the Addendum to Term Note, dated March 25, 2014, and as further amended by the Amendment to Loan Documents, dated June 20, 2014 (as amended, the "PNC Note"), PNC made an equipment loan to HDL Inc. (the "PNC Loan Facility").  A Security Agreement, dated March 25, 2014 (as amended by the

Amendment to Loan Documents, dated June 20, 2014, the "PNC Security Agreement"),
addresses securing the obligations of HDL Inc. under the PNC Loan Facility. As of the Petition
Date, the outstanding amount owed under the PNC Loan Facility is $3,965,990.

      vii.     *Bank of the West Loan Facility*

     38.     HDL Inc. is the obligor under a loan facility with Bank of the West. Pursuant to
the Installment Payment Contract – Security Agreement, dated September 23, 2014 (the "Bank
of the West Agreement"), Bank of the West made an equipment loan to HDL Inc. in the original
principal amount of $2,536,477.28 (the "Bank of the West Loan Facility"). The Bank of the
West Agreement addresses securing the obligations of HDL Inc. under the Bank of the West
Loan Facility. As of the Petition Date, the outstanding amount owed under the Bank of the West
Loan Facility is $2,069,231.

      viii.     *KBA Loan Facility*

     39.     HDL Inc. is the borrower under a loan facility with the Kansas Bioscience
Authority, a body politic and corporate and independent instrumentality of the State of Kansas
(the "KBA"). In connection with the acquisition of substantially all of the assets of Oncimmune
USA, pursuant to that certain Novation and Assumption Agreement, dated February 5, 2014 (the
"Novation Agreement"), HDL Inc. became the borrower under (a) the Loan and Security
Agreement, dated February 5, 2007, by and between Oncimmune USA and the KBA, as
amended by the First Amendment to Loan and Security Agreement and Promissory Note, dated
July 11, 2011, and the Acknowledgement and Waiver Letter Agreement, dated October 10, 2013
(as amended, the "KBA Loan Agreement"), and (b) the Promissory Note, dated February 5, 2007,
by Oncimmune USA in favor of the KBA, as amended by the First Amendment to Loan and

14

Security Agreement and Promissory Note, dated July 11, 2011, the Second Amendment to Promissory Note, dated August 7, 2013, and the Acknowledgement and Waiver Letter Agreement, dated October 10, 2013 (as amended, the "KBA Note"; together with the Novation Agreement and the KBA Loan Agreement, the "KBA Loan Documents"). As of the Petition Date, the outstanding amount owed under the KBA Loan Documents is $1,589,875.

## II.

## Events Leading to the Chapter 11 Cases

### A.    DOJ Investigation and Settlement

40.    On January 7, 2013, the Company received a subpoena from the United States Department of Justice ("DOJ") broadly soliciting information with respect to the Company's business practices and activities. The request primarily concerned a long-standing, industry wide practice of paying fees to physicians in connection with drawing blood and the processing and handling of blood samples that were sent to HDL for testing.

41.    On June 25, 2014, the Office of Inspector General for the Department of Health and Human Services issued a special fraud alert (the "Special Fraud Alert") concerning laboratory payments to referring physicians. Through the Special Fraud Alert, the government for the first time issued new guidance stating that the payment of processing and handling fees to physicians in connection with collecting, processing and packaging blood specimens presented a potential risk of liability under the Anti-Kickback statute. Following receipt of the Special Fraud Alert, it is my understanding that even though HDL believed that its payments represented fair-market-value compensation for handling blood samples, HDL immediately ceased its practice of paying physician processing and handling fees.

15

42.     On September 8, 2014, the Wall Street Journal published an article that described the Special Fraud Alert and presented a negative view of the long-standing business practice in the diagnostic laboratory industry of paying fees to physicians in connection with blood draws and the processing and shipment of samples.  The Wall Street Journal article specifically focused on HDL's payment practices.  The Company strongly disagreed with many of the purported facts that the Wall Street Journal included in its article.  Shortly after the Wall Street Journal ran the article, the Company's founder and then Chief Executive Officer resigned her position as an officer the Company.

43.     On April 9, 2015, the Company announced a settlement with the DOJ.  The settlement resolved all outstanding allegations made against the Company in connection with the DOJ's industry wide investigation into historical practices involving the payment of physician processing and handling fees.  Importantly, following the settlement, the Company continued to participate in all federal healthcare programs, including Medicare, Medicaid and TRICARE.  As part of the settlement, the Company will further develop and strengthen its compliance program in accordance with a five-year corporate integrity agreement with the Office of Inspector General of the U.S. Department of Health and Human Services.

**B.     Impact of the Special Fraud Alert, DOJ Investigation and Settlement**

44.     The events described in the preceding paragraphs occurred within a relatively short period of time.  The confluence of these events and associated media coverage, as well as certain payer issues and changes in billing practices in certain states that affected the fees earned by HDL from each sample test, caused significant disruption to the Company's business and negatively impacted HDL's recent financial performance.

16

45.    During the third quarter of 2014, following the issuance of the Special Fraud Alert and the cessation of the payment of processing and handling fees, average daily sample volume ordered by physicians fell by nearly 20%.  Average daily sample volumes fell an additional 5.5% in the fourth quarter of 2014.  Net revenue during this period fell by more than 47%.

46.    In the first quarter of 2015, revenues continued to decline and the average daily sample volume declined to approximately 50% of the volumes in 2013.  Since the first quarter of 2015, average daily sample volumes have stabilized; however, the significant drop in revenue, and certain other non-recurring costs described below, have contributed to the liquidity crisis the Debtors now face.

## C.    The BB&T Loan Facilities

47.    As a result of the events described above, the Debtors fell out of compliance with certain financial covenants in the BB&T Loan Facilities at the end of the third quarter of 2014. This resulted in the occurrence of events of default under the BB& T Loan Facilities.

48.    On January 28, 2015, BB&T notified HDL Inc. that it was reducing the maximum principal amount of the ABL Loan Facility from $20 million to $12 million, and indicated its unwillingness to extend the term of the ABL Loan Facility past the maturity date of March 15, 2015.

49.    On March 11, 2015, HDL Inc., the Entity Guarantors, the Individual Guarantors, and BB&T, entered into the Forbearance Agreement, pursuant to which, among other things, BB&T agreed to forbear from taking certain actions concerning the BB&T Loan Facilities and to extend the maturity of the loans to July 10, 2015.

50.     On May 28, 2015, BB&T discontinued the ability of HDL Inc. to borrow under the ABL Loan Facility and issued a notice of default (the "Notice of Default").  BB&T also refused to honor previously sent checks and refused to allow HDL Inc. access to the funds in any of HDL Inc.'s accounts with BB&T, including without limitation, funds received into such accounts after the issuance of the Notice of Default.  In the Notice of Default, BB&T alleged that since the entry into the Forbearance Agreement, additional events of defaults had occurred under the BB&T Loan Facilities, including without limitation, as a result of failure to comply with certain financial covenants as of March 31, 2015.[5]  Discontinuing borrowing under the ABL Loan Facility and freezing HDL Inc.'s accounts with BB&T significantly impaired HDL's ability to pay suppliers and continue its business for any significant period of time.

**D.     Related Litigation Matters**

51.     Following the commencement of the DOJ investigation and the issuance of the Special Fraud Alert, several lawsuits seeking large damages against the Company were filed. The defense of these lawsuits and the filing of certain counterclaims have significantly increased non-recurring costs for the Debtors and exacerbated the liquidity crisis brought on by the decline in revenue.

52.     In October 2014, Cigna Health and Life Insurance Co. ("Cigna") filed a lawsuit against HDL in U.S. District Court in Connecticut, alleging fraud in connection with HDL's billing practices and seeking $84 million in damages.  HDL has filed a counterclaim against

---

[5]     The Debtors have disputed the occurrence of certain events of default BB&T alleged in the Notice of Default.

Cigna, and affiliate Connecticut General Life Insurance Co., asserting that Cigna owes HDL at least $66 million for tests that were provided for the benefit of patients that Cigna has not paid.

53.    Shortly following HDL's termination of the BlueWave contract in January 2015, BlueWave filed suit against HDL in the U.S. District Court for the Eastern District of Virginia seeking about $204.8 million in payments that BlueWave claims it is owed.  That lawsuit subsequently was dismissed but another similar complaint was filed by BlueWave against HDL in May 2015 in the U.S. District Court for the Northern District of Alabama.

54.    Separately, the Company filed a lawsuit against the founders of BlueWave in January 2015, seeking injunctive relief preventing the founders from competing with HDL.  That lawsuit was resolved through the entry of a consent judgment prohibiting, among other things, the founders of BlueWave from competing with HDL while the founders remained stockholders of HDL.

55.    In April 2015, Aetna Inc. filed a lawsuit against HDL and BlueWave in the U.S. District Court for the Eastern District of Pennsylvania, alleging that it was the subject of a fraudulent billing scheme and seeking damages in excess of $150,000.

## III.

## Prepetition Restructuring Efforts

56.    Since at least September 2014, the Company has been engaged in the process of implementing strategic initiatives aimed at returning the Company to growth and continued profitability.   Specifically, HDL has eliminated certain non-core business initiatives and streamlined the company's workforce.  As part of that effort, on January 9, 2015, as discussed above, the Company announced a transition to a new national network of directly-employed

sales representatives and the termination of its contract with the independent sales organization BlueWave.  The Company believes that the transition to a direct-employed sales force will result in substantial savings to the Company and allow the Company to better service its clients.

57.     On or about November 17, 2014, the Company retained Alvarez & Marsal ("A&M") to assist the Company in its effort to restructure its operations.  Specifically, A&M has focused on exploring cost reductions initiatives, possible strategic transactions and business expansion opportunities to alleviate the company's liquidity issues on a short-term basis and return HDL to profitability for the long-term.

58.     On or about October 11, 2013, the Company retained Cain Brothers & Company, LLC ("Cain Brothers") to provide investment banking services, which included, but was not limited to efforts to raise debt and equity capital to address the Company's liquidity needs.

59.     The Company received two terms sheets for a replacement credit facility in February 2015.  However, with liquidity continuing to deteriorate in the first quarter of 2015, it became apparent that the Company would need a source of additional liquidity in order to continue operations in the near term prior to putting in place a longer-term replacement facility. Shifting its focus to addressing its liquidity needs in the short term, the Company, with the assistance of its professional advisors, explored various options for raising capital, including divesting non-core assets, a strategic transaction, an equity raise, and a bridge loan from insiders.

60.     In order to allow for sufficient time to secure a commitment for a replacement credit facility, HDL met with BB&T on May 7, 2015, with a request for an extension of the maturity date of the ABL Loan Facility and forbearance from exercising any rights in connection with certain events of default.

61.    The Company was successful in adding incremental liquidity through the sale of IDL in May 2015, which resulted in receipt of approximately $2 million in unencumbered cash proceeds.   However, the Company was unsuccessful in raising additional needed capital to alleviate short-term liquidity concerns.

62.    When it became apparent that additional short-term capital likely would be unavailable, HDL began to anticipate the need to pursue a restructuring under chapter 11.   The Debtors approached BB&T, the current working capital lender, about the possibility of offering or participating in a debtor-in-possession ("DIP") financing both at the May 7, 2015 meeting and on May 26, 2017.   The Debtor further relayed to BB&T that, with the assistance of its advisors, it was working to complete revised DIP cash flow forecasts and revised budgets.   The Debtor also advised BB&T that it was approaching other lenders that could provide DIP financing.

63.    On May 28, 2015, while the Debtors were in the midst of completing the revised projections and pursuing sources of DIP financing, BB&T sent the Notice of Default, discontinued the ability of HDL Inc. to borrow under the ABL Loan Facility, refused to honor previously sent checks, and refused to allow HDL Inc. access to the funds in any of HDL Inc.'s accounts with BB&T.   As the overwhelming majority of HDL Inc.'s receivables are paid directly into HDL Inc.'s accounts with BB&T, BB&T's actions prevented HDL Inc. from receiving funds based on its receivables and effectively shut off HDL's revenue stream.

64.    In light of BB&T's actions, the Company projected that it would be unable to pay its suppliers, its employees or continue its business operations for any significant period of time. Despite the Company conveying its disagreement that certain of the events of default identified by BB&T had actually occurred, informing BB&T that its actions could disrupt or delay access

to any potential DIP financing with another lender, as well as potentially jeopardize hundreds of jobs and the realization of significant value for the Company's stakeholders, BB&T refused to fund under the ABL Loan Facility or allow the HDL Inc. access to the funds in HDL Inc.'s accounts with BB&T.

65.    Following receipt of the Notice of Default, the Company, with the assistance of and its professional advisors, engaged in further discussions with potential DIP lenders with increased urgency.  Although the Company has received three term sheets from potential debtor-in-possession lenders, it became apparent that the Debtors would not be able to finalize the terms of a DIP financing facility with any of the potential lenders before the Debtors ran out of funds. In addition, I believe that other potential DIP lenders have not had the time to provide term sheets for possible DIP financing, limiting the Debtors' options.

66.    Consequently, the Debtors concluded that relief under chapter 11 is the best option to obtain access to the Debtors' cash receipts, preserve the Debtors' liquidity for a sufficient period of time to finalize and close a DIP facility, and then pursue alternative strategies available in bankruptcy to maximize value for the Debtors' stakeholders.  All options are still under consideration at this point.

## IV.

### First Day Motions

67.    The Debtors filed the First Day Motions concurrently with the filing of their chapter 11 petitions.  The Debtors requests that each of the First Day Motions be granted, as each constitutes a critical element in achieving a successful transition to chapter 11.

68.     For a more detailed description of the relief requested in the First Day Motions, the Debtors respectfully refer the Court, creditors and other parties in interest to the respective First Day Motion.  To the extent that there are any inconsistencies between this Declaration and the First Day Motions, the First Day Motions should control.  Capitalized terms that are used in this Part IV but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

**A.     Administrative Motions**

> i.     *Motion of the Debtors and Debtors in Possession for an Order Directing Joint Administration of Their Related Chapter 11 Cases (the "Joint Administration Motion")*

69.     The Debtors seek entry of an order directing joint administration of these cases for procedural purposes only, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules").  Specifically, the Debtors request that the Court maintain one file and one docket for all of the chapter 11 cases under the lead case, Health Diagnostic Laboratory, Inc.  Further, the Debtors request that an entry be made on the docket of each of the chapter 11 cases of the Debtors to indicate the joint administration of the estates.

70.     Given the provisions of the Bankruptcy Code and the Debtors' affiliation, joint administration of these cases is warranted.  Joint administration will avoid the preparation, replication, service and filing, as applicable, of duplicative notices, applications and orders, thereby saving the Debtors considerable expense and resources.  The Debtors' financial affairs and business operations are closely related.  Many of the motions, hearings and orders in these

23

chapter 11 cases will affect each Debtor and their respective estates.  The rights of creditors will not be adversely affected, as this Motion requests only administrative, and not substantive, consolidation of the estates.  Moreover, each creditor can still file its claim against a particular estate.  In fact, all creditors will benefit by the reduced costs that will result from the joint administration of these chapter 11 cases.  The Court also will be relieved of the burden of entering duplicative orders and maintaining duplicative files.  Finally, supervision of the administrative aspects of these chapter 11 cases by the United States Trustee for the Eastern District of Virginia will be simplified.

71.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be granted.

ii.     *Motion of the Debtors and Debtors in Possession for Entry of an Order Approving the Form and Manner of Notice of Commencement of the Chapter 11 Cases (the "Notice of Commencement Motion")*

72.     The Debtors seek entry of an order approving the Debtors' proposed form and manner of the notice of commencement of the Debtors' chapter 11 cases.

73.     I believe that the relief requested in the Notice of Commencement Motion will provide adequate notice of these cases to the Debtors' creditors and all other parties in interest and is critical to achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Notice of Commencement Motion should be granted.

24

iii.    *Motion of the Debtors and Debtors in Possession for Entry of an Order Appointing American Legal Claims Services, LLC as Claims, Noticing and Balloting Agent (the "Claims Agent Retention Application")*

74.    The Debtors seek entry of an order appointing American Legal Claims Services, LLC to act as the claims and noticing agent in order to assume full responsibility for, among other things, the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' chapter 11 cases.  I believe that ALCS's rates are competitive and reasonable given ALCS's quality of services and expertise.   Accordingly, on behalf of the Debtors, I respectfully submit that the Claims Agent Retention Application should be granted.

iv.    *Motion of the Debtors and Debtors in Possession for Entry of an Order Authorizing Debtors to (I) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (II) File a Consolidated List of Debtors' 30 Largest Unsecured Creditors (the "Consolidated Creditors List Motion")*

75.    The Debtors seek entry of an order authorizing the Debtors to: (a) prepare a list of creditors in lieu of submitting a formatted mailing matrix as required by Rule 1007-1 of the Local Bankruptcy Rules and (b) file a consolidated list of the Debtors' 30 largest unsecured creditors.

76.    I believe that the relief requested in the Consolidated Creditors List Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Consolidated Creditors List Motion should be granted.

v.    *Motion of the Debtors and Debtors in Possession for Entry of an Order Establishing Certain Notice, Case Management and Administrative Procedures (the "Case Management Motion")*

25

77.     The Debtors seek entry of an order to implement certain procedures in connection with the administration of the chapter 11 cases, including procedures to: (i) establish requirements for the filing and service of notices, motions, applications, documents filed in support thereof and objections and responses thereto; (ii) delineate standards for notices of hearing and agendas, (iii) articulate mandatory guidelines for the scheduling of hearings (including periodic omnibus hearings), objection deadlines, reply deadlines and evidentiary hearings, (iv) limit matters that are required to be heard by the Court; (v) authorize electronic service of documents and (vi) authorize the Debtors to establish a website (to provide interested parties with access to certain documents filed in these chapter 11 cases).

78.     The Debtors believe that the requested relief will maximize the efficiency and orderliness of the administration of these chapter 11 cases and reduce the costs associated with traditional case management procedures.   The Debtors also believe that granting the relief requested will limit the administrative burdens and costs associated with preparing for hearings and serving and mailing documents.  In addition, the relief requested will assist the Debtors and their personnel and professionals in organizing and prioritizing the numerous tasks attendant to these cases.

79.     I believe that the relief requested in the Case Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Case Management Motion should be granted.

vi.      *Motion of the Debtors and Debtors in Possession for Entry of an Order (I)
Extending the Time to File Schedules and Statements of Financial Affairs and (II)
Extending the Time to Schedule the Meeting of Creditors (the "Schedules
Extension Motion")*

80.     The Debtors seek entry of an order granting additional time to file their schedules and statements of financial affairs and additional time to schedule the meeting of creditors.  Due to the complexity of their operations, the large number of contracts to which the Debtors are party and the numerous other matters that the Debtors must attend to in connection with filing these cases, the Debtors will not be able to complete the schedules of assets and liabilities, schedules of current income and expenditures, statements of executory contracts and unexpired leases and statements of financial affairs in the fourteen days provided under Bankruptcy Rule 1007(c).  To facilitate this extension, the Debtors also seek entry of an order authorizing the U.S. Trustee to schedule the Section 341 meeting after the 40-day deadline imposed by Bankruptcy Rule 2003(a).

81.     Given the many critical operational matters that the Debtors' accounting and legal personnel must address in the early days of these chapter 11 cases, I believe that with the extension requested, the Debtors will be able to focus their attention to business operations to maximize the value of the Debtors' estates during the first critical post-petition months.  I believe this will help the Debtors make a smooth transition into chapter 11 and, therefore, maximize the value of the Debtors' estates to the benefit of creditors and all parties in interest.

82.     I believe that the relief requested in the Schedules Extension Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules Extension Motion should be granted.

27

B.    **Operational Motions Requesting Immediate Relief**

i.    *Motion of Debtors and Debtors in Possession for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Wages, Salaries and Benefits; (II) Authorizing Debtors to Continue Employee Benefit Programs in the Ordinary Course of Business; (III) Authorizing Current and Former Employees to Proceed with Workers Compensation Claims; and (IV) Directing Applicable Financial Institutions to Honor and Process Related Checks and Transfers (the "Wages and Benefits Motion")*

83.    The Debtors seek entry of an order (a) authorizing, but not requiring, them to pay the Prepetition Wages and Benefits, including approximately $34,770.98 owed to ten (10) Employees in excess of the $12,475 priority under section 507(a)(4) of the Bankruptcy Code and the Sales Commissions accruing during the 91-day period from April 1, 2015, through June 30, 2015, owed to approximately thirty-two (32) of the Debtors' Employees, (b) authorizing the Debtors to continue and pay certain associated amounts, including costs and expenses, under the Debtors' Employee Benefit Programs, (c) permitting the Debtors to continue paying and/or contesting in good faith all amounts related to the Workers' Compensation Programs and (d) authorizing applicable banks and other financial institutions to receive, process and pay any and all checks drawn on the Debtors' payroll and general disbursement accounts and other transfers to the extent that those checks or transfers relate to any of the foregoing.

84.    If the requested relief is not granted, the Debtors' relationships with their Employees would be adversely impacted and there could well be irreparable harm to the Employees' morale, dedication, confidence and cooperation.  The Debtors' business hinges on their relationships with their employees and, in turn, the relationship with the Debtors' clients. The Employees' support for the Debtors' efforts is critical to the success of these chapter 11 cases.  At this early stage, the Debtors simply cannot risk the substantial damage to their

businesses that would inevitably attend any decline in their Employees' morale attributable to the

Debtors' failure to pay wages and commissions, salaries, benefits and other similar items.

85.     I believe that the relief requested in the Wages and Benefits Motion is in the best

interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a

critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on

behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be

granted.

ii.     *Motion of the Debtors and Debtors in Possession for Entry of an Order Authorizing (I) Debtors to Pay Certain Prepetition Taxes and Fees and (II) Financial Institutions to Honor and Process Related Checks and Transfers (the "Taxes and Fees Motion")*

86.     The Debtors seek entry of an order (i) authorizing, but not requiring, the Debtors,

in their sole discretion, to pay any Sales and Use Taxes and Business License Fees, whether

asserted prior to or after the Petition Date, and (ii) authorizing the Debtors' financial institutions

to receive, process, honor and pay checks or wire transfers used by the Debtors to pay such taxes

and fees.

87.     In connection with the normal operations of their businesses, the Debtors collect

sales and use taxes and many local governments require the Debtors to obtain a business license

and pay fees associated with such license.  The taxes and fees are remitted by the Debtors

through checks and electronic transfers that are processed through their banks and other financial

institutions, and certain checks that were issued on account of the Sales and Use Taxes and

Business License Fees may not have cleared the Debtors' banks prior to the Petition Date .

88.     I believe that the relief requested in the Taxes and Fees Motion is in the best

interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a

29

critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be granted.

    iii.    *Motion of the Debtors and Debtors in Possession for Entry of an Order (I) Authorizing Debtors to Maintain Existing Bank Accounts and Business Forms and Continue to Use Existing Cash Management System, (II) Granting Administrative Expense Status for Intercompany Claims, and (III) Waiving the Requirements of Section 345(b) of the Bankruptcy Code (the "<u>Cash Management Motion</u>")*

89.    The Debtors seek entry of an order authorizing the Debtors to (a) maintain the existing Bank Accounts and business forms and continue to use their existing Cash Management System, (b) granting administrative priority to intercompany claims and (c) waiving the requirements of section 345(b) of the Bankruptcy Code.   Without the requested relief, the Debtors may suffer undue disruption to the Debtors' business operations..

90.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.

    iv.    *Motion of Debtors and Debtors in Possession for Entry of an Order Authorizing (I) Debtors to Continue and Renew their Liability, Property, Casualty and Other Insurance Programs and Honor All Obligations in Respect Thereof and (II) Financial Institutions to Honor and Process Related Checks and Transfers (the "<u>Insurance Program Motion</u>")*

91.    The Debtors seek entry of an order authorizing (i) the Debtors to maintain, continue and renew, in their sole discretion, the Insurance Programs on an uninterrupted basis and in accordance with the same practices and procedures as were in effect before the Petition Date and (ii) their banks and other financial institutions to receive, process, honor and pay related checks or wire transfers.   This relief requested in the Insurance Motion includes (a)

paying all Insurance Obligations, whether due and payable before or after the Petition Date and (b) renewing or obtaining new insurance policies as needed in the ordinary course of business.

92.     The Debtors maintain liability, casualty, property and other insurance and reinsurance and risk control programs in the ordinary course of their businesses through several private insurance carriers.  If the requested relief is not granted and the Insurance Programs lapse or terminate, the Debtors may well be unable to continue large portions of their operations, thereby endangering the value of the Debtors' assets and substantially harming all creditors.  The Debtors believe that all material amounts related to the Insurance Programs that were due and payable on or prior to the Petition Date have been fully paid but, out of an abundance of caution and to avoid irreparable harm to their businesses, the Debtors seek authority to satisfy any such prepetition obligations through the Insurance Motion.

93.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be granted.

iv.     *Motion of Debtors and Debtors in Possession for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (II) Deeming Utility Companies Adequately Assured of Future Performance and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "Utilities Motion")*

94.     The Debtors seek entry of interim and final orders (i) determining that the Debtors' proposed offer of deposits, as set forth in the Utilities Motion, provides Utility Companies with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (ii) approving procedures for resolving requests by Utility Companies for

31

additional or different assurances beyond those set forth in the Utilities Motion and (iii) prohibiting the Utility Companies from altering, refusing or discontinuing any Utility Services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance. Uninterrupted Utility Services are essential to the Debtors' ongoing operations.  Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' operations could be severely disrupted.  The impact of this disruption on the Debtors' day-to-day business operations and revenue would be extremely harmful and could jeopardize the value of the Debtors' assets.

95.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be granted.

96.     I respectfully request that all of the relief requested in the First Day Motions, and such other further relief as may be just and proper, be granted.

I, the undersigned Chief Restructuring Officer of HDL, declare under penalty of perjury that the foregoing is true and correct.

Dated: June 7, 2015

/s/ Martin McGahan
Martin McGahan

**<u>EXHIBIT A</u>**

# Health Diagnostic Laboratory, Inc.
## Corporate Organization Chart

**Health Diagnostic Laboratory, Inc. (Virginia)**

- **HDL Properties, LLC (Virginia) 100%**
- **Integrated Health Leaders, LLC (Virginia) 100%**
- **HDL USA Holdings, LLC (Virginia) 100%**
- **HDL Europe, Ltd. (foreign) (dormant) 100%**

Under HDL USA Holdings, LLC:
- **Central Medical Laboratory, LLC (Virginia) 100%**
- **Global Genomics Group, LLC (Virginia) 49.5%**
- **Henrico Family Physicians, LLC (Virginia) (dissolved)**

Under HDL Properties, LLC:
- **Biotech 8, LLC (Virginia) 58.9%**

Under Global Genomics Group, LLC:
- **Global Institute for Research, LLC (Virginia) 100%**

= Debtor