IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| **In re:** <br><br> **HEALTH DIAGNOSTIC LABORATORY, INC.,** *et al.*, <br><br> **Debtors.**[1] | Chapter 11 <br><br> Case No. 15-32919 (___) <br><br> **(Joint Administration Requested)** |

**MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF
INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO USE
CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), by their undersigned proposed special conflicts counsel, hereby move (the "**Motion**") the Court for entry of interim and final orders, each substantially in the form attached hereto as **Exhibit A** (the "**Interim Order**"), pursuant to sections 105, 361, and 363 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**") and Rule 4001 of the Federal

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Health Diagnostic Laboratory, Inc. (0119), Central Medical Laboratory, LLC (2728) and Integrated Health Leaders, LLC (7832).

Robert S. Westermann (VSB No. 43294)
Rachel A. Greenleaf (VSB No. 83938)
HIRSCHLER FLEISCHER, P.C.
The Edgeworth Building
2100 East Cary Street
Post Office Box 500
Richmond, Virginia 23218-0500
Telephone:     804.771.9500
Facsimile:      804.644.0957
E-mail:  rwestermann@hf-law.com
             rgreenleaf@hf-law.com

*Proposed Special Conflicts Counsel for the Debtors*

Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") authorizing the Debtors to use cash collateral and granting certain adequate protection. In support of the Motion, the Debtors rely on the Declaration of Martin McGahan, Chief Restructuring Officer of Health Diagnostic Laboratory, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings (the "**McGahan Declaration**"). In further support of the Motion, the Debtors submit as follows:

## I. Preliminary Statement

1. To address their working capital needs and fund their reorganization efforts, the Debtors require immediate authorization to continue to use cash collateral. The Debtors' ability to immediately use the cash collateral also is critical to reassure their employees, trade vendors, and other constituencies that the Debtors will be in a position to meet their obligations during the pendency of these cases. Absent immediate access to the cash collateral, the Debtors almost certainly will experience business disruptions and, moreover, their ability to reorganize will be damaged irreparably to the direct detriment of all creditors and parties in interest.

2. In accordance with Bankruptcy Rule 4001, the following is a concise statement and summary of the proposed material provisions regarding the Debtors' proposed use of cash collateral.[1]

---

[1] This summary is qualified in all respects by reference to the Interim Order and to the extent of any inconsistency between the Motion and the Interim Order, the Interim Order shall govern.

| Material Terms | Summary of Material Terms[1] |
|---|---|
| **Parties with Interest in Cash Collateral**<br><br>**FRBP 4001(b)(1)(B)(i)** | Branch Banking and Trust Company ("**BB&T**") and BB&T Equipment Finance Corporation ("**BB&T Equipment Finance**").  See Interim Order at Introduction. |
| **Purpose and Use of Cash Collateral and Material Terms**<br><br>**FRBP 4001(b)(1)(B)(ii), (iii)** | The Debtors will use the cash collateral, in accordance with the Budget attached hereto as **Exhibit B**, to operate their businesses and effectuate a reorganization of their businesses.  See Interim Order at ¶ 2. |
| **Adequate Protection Obligations**<br><br><br><br>**FRBP 4001(b)(1)(B)(iv)** | The Debtors shall grant BB&T and BB&T Equipment Finance respectively, as security to the extent of the diminution in the value of the cash collateral, a valid, perfected, and enforceable security interest (the "**Replacement Lien**") in and upon the cash collateral (i) to the extent the cash collateral is used by the Debtors, and (ii) to the same extent, nature, and priority held by BB&T and BB&T Equipment Finance, respectively, as of the Petition Date.  See Interim Order at ¶ 3. |

## II.    Jurisdiction, Venue, and Predicates for Relief

3.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 28 U.S.C. § 1334(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. §157 (b)(2).

4.    The predicates for the relief requested herein are sections 105, 361, and 363 of the Bankruptcy Code and Bankruptcy Rule 4001.

---

[1]    Except as otherwise defined in the Motion, all capitalized terms used in the Motion (including in this Summary of Material Terms) have the meaning ascribed to them in the Interim Order, with any inconsistencies resolved by reference to the Interim Order.

### III. Background

A. **Chapter 11 Cases**

5. On the date hereof (the "**Petition Date**"), the Debtors filed with the Court their respective voluntary petitions for relief under Chapter 11 of Title 11 of the Bankruptcy Code, commencing the above-captioned Chapter 11 cases. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. No creditors' committee has been appointed in these cases. No trustee or examiner has been appointed.

7. Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their Chapter 11 cases.

8. A full description of the Debtors' business operations, corporate structures, capital structures, and reasons for commencing these cases is set forth in full in the McGahan Declaration, which was filed contemporaneously with the Motion and which is incorporated herein by reference. Additional facts in support of the specific relief sought herein are set forth below.

B. **The Debtors' Business**

9. Founded in 2008, debtor Health Diagnostic Laboratory Inc. ("**HDL**"), which is based in Richmond, Virginia, is a leader in health management with one mission: prevent and reverse heart disease and diabetes, one patient at a time. HDL's initial mission was to provide blood test diagnostic services to physicians. HDL now offers a panel of lab tests that allow early detection of cardiovascular disease, diabetes, and related diseases. HDL's systematic approach

4

identifies factors contributing to disease and provides a basis for effective treatment, allowing healthcare providers to more effectively manage their patients.

10. In addition to lab testing, HDL offers patients a personalized overview of risk factors and assistance from expert clinical health consultants to promote healthy, longer-lasting lifestyles. HDL also provides comprehensive testing and wellness services to employers and is a partner for value-based, integrated care models and health systems. HDL recently introduced a new smartphone and tablet application, "myHDL", for physicians to view and track patient lab results.

11. Since its inception, HDL has grown from a handful of employees to approximately 659 people, including 626 full-time and 33 part-time employees.

    **C.    Pre-Petition Date Secured Obligations**

12. HDL is the borrower under three loan facilities with BB&T (collectively, the "**BB&T Loans**").

13. On or about June 28, 2012, HDL entered into that loan agreement, as amended by the First Amendment to Amended and Restated Loan Agreement, dated February 24, 2014 (as amended, supplemented, modified, or amended and restated from time to time, the "**ABL Loan Agreement**"), with BB&T, as lender. Pursuant to the ABL Loan Agreement, BB&T provided a revolving loan to HDL in the amount of $20,000,000 (as amended, supplemented, modified, or amended and restated from time to time, the "**ABL Loan**"). Pursuant to a letter from BB&T dated January 28, 2015, the maximum principal amount of the ABL Loan was reduced to $12,000,000.00. The ABL Loan is evidenced by a Promissory Note dated January 13, 2012, as

amended by the Note Modification Agreement dated January 9, 2014 and the Note Modification Agreement dated February 24, 2014, in the maximum principal amount of $20,000,000. Upon information and belief, the amount outstanding on the ABL Loan as of the Petition Date is approximately $3,284,371.34.

14. By a BB&T Security Agreement dated January 13, 2012, the ABL Loan is secured by a first priority lien on HDL's accounts, inventory, and non-purchase-money equipment. The ABL Loan is secured by a second priority lien on HDL's purchase-money equipment.

15. On or about June 29, 2012, HDL entered into that loan agreement, as amended by the First Amendment to Loan Agreement, dated March 27, 2014 (as amended, supplemented, modified, or amended and restated from time to time, the "**Equipment Term Loan Agreement**"), with BB&T, as lender. Pursuant to the Equipment Term Loan Agreement, BB&T provided a term loan to HDL in the original principal amount of $5,500,000 (as amended, supplemented, modified, or amended and restated from time to time, the "**Equipment Term Loan**"). The Equipment Term Loan is evidenced by a Promissory Note dated June 29, 2012 and a Security Agreement, dated June 29, 2012. Upon information and belief, the amount outstanding on the Equipment Term Loan as of the Petition Date is approximately $1,567,207.

16. The Equipment Term Loan is secured by a first priority purchase-money security interest on substantially all of HDL's equipment. The Equipment Term Loan is also secured by a second priority lien on HDL's accounts, inventory, and non-purchase-money equipment.

17. Pursuant to the Loan Agreement, dated June 28, 2012, as amended by a First Amendment to Loan Agreement, dated March 27, 2014 (as amended, the "**L/C Loan Agreement**"), by and between BB&T and HDL Inc., and the Application and Agreement for Irrevocable Standby Letter of Credit, dated June 28, 2012, by and between BB&T and HDL Inc., BB&T issued (i) Irrevocable Standby Letter of Credit No. 953-2476922/00003, dated June 28, 2012, in the amount of $4,000,000, in favor of Biotech 8, LLC, which was subsequently cancelled, and (ii) Irrevocable Standby Letter of Credit No. 953-2476922/00004, dated June 26, 2013, in the amount of $4,000,000, in favor of Fulton Bank, N.A. (collectively, the "**L/C Loan**"). A BB&T Security Agreement, dated June 28, 2012 addresses securing the obligations of HDL Inc. under the L/C Loan Facility. As of the Petition Date, there are no borrowed amounts outstanding under the L/C Loan Facility.

18. HDL is the borrower under a loan facility with BB&T Equipment Finance. Pursuant to (i) the Loan and Security Agreement, dated March 22, 2013, by and between BB&T Equipment Finance and HDL (the "**Equipment Finance Loan Agreement**"); (ii) Promissory Note No. 01, dated March 22, 2013, in the original principal amount of $4,779,808.61, by HDL in favor of BB&T Equipment Finance; (iii) Promissory Note No. 02, dated May 15, 2013, in the original principal amount of $1,136,134.39, by HDL in favor of BB&T Equipment Finance; (iv) Promissory Note No. 03, dated May 31, 2013, in the original principal amount of $1,687,955.56, by HDL in favor of BB&T Equipment Finance; and (v) Promissory Note No. 04, dated July 5, 2013, in the original principal amount of $2,000,000, by HDL in favor of BB&T Equipment Finance, BB&T Equipment Finance made equipment loans to HDL (the "**Equipment**

**Finance Loan Facility**"). The Equipment Finance Loan Facility is secured by purchase-money security interests in various of HDL's equipment as well as a second-priority lien upon HDL's accounts and inventory. As of the Petition Date, the outstanding amount owed under the Equipment Finance Loan Facility is $5,827,318.

19. To the best of the Debtors' knowledge, BB&T and BB&T Equipment Finance are the only creditors with alleged liens upon the cash collateral.

20. As a result of the events described in the McGahan Declaration, the Debtors fell out of compliance with certain financial covenants required by the various BB&T Loans at the end of the third quarter of 2014, resulting in the occurrence of events of default under such Loans.

21. As described in paragraph 13 supra, by letter on January 28, 2014, BB&T notified HDL that BB&T was reducing the maximum principal amount of the ABL Loan from $20 million to $12 million, and indicated its unwillingness to extend the term of the ABL Loan past the set maturity date of March 15, 2015.

22. As more fully described in the McGahan Declaration, on March 11, 2015, HDL, various guarantors of the BB&T Loans, and BB&T, entered into a forbearance agreement with BB&T, pursuant to which, among other things, BB&T agreed to forbear from taking certain actions concerning the BB&T Loan Facilities and to extend the maturity of the loans to July 10, 2015.

23. On May 28, 2015, BB&T discontinued the ability of HDL to borrow under the ABL Loan and issued a notice of default (the "**Notice of Default**"). BB&T also refused to honor

previously sent checks and refused to allow HDL access to the funds in any of HDL's accounts with BB&T, including without limitation, funds received into such accounts after the issuance of the Notice of Default. Discontinuing borrowing under the ABL Loan and freezing HDL's accounts with BB&T significantly impaired HDL's ability to pay suppliers and continue its business for any significant period of time.

### IV. Relief Requested

24. By the Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to use cash collateral, pursuant to the budget attached hereto as **Exhibit B** (the "**Budget**"), as working capital for the Debtors' operating expenses, and (ii) granting certain adequate protection to BB&T.

25. The Debtors also request that this Court authorize and approve the Debtors' use of cash collateral for the payment of any fees and expenses owed to professionals employed by them upon the entry of an order from this Court authorizing the payment of such professional expenses.

26. The Debtors also do not concede that any party has a perfected security interest in the cash collateral. For purposes of the Motion and the immediate hearing thereon, however, the Debtors will presume that BB&T and BB&T Equipment Finance have perfected security interests.

### V. Basis for Relief Requested

#### A. Use of the Cash Collateral Should be Approved

27. Section 363(c)(2) of the Bankruptcy Code governs the Court's approval of the use of cash collateral and provides that a debtor-in-possession may not use cash collateral without

the consent of the secured party or approval by the Court. 11 U.S.C. § 363(c)(2). By obtaining approval from the Court to use cash collateral, however, a debtor can continue to operate its business and maintain and enhance the value of its lenders' collateral. See, e.g., In re Constable Plaza Assocs., L.P., 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991); In re T.H.B. Corp., 85 B.R. 192, 195 (Bankr. D. Mass. 1988).

28.    To the extent the Debtors' cash on hand represents "cash collateral", it is subject to the use restriction set forth in section 363(c)(2) of the Bankruptcy Code. The Debtors, therefore, seek to use the cash collateral, pursuant to the Budget, to operate their businesses. Specifically, the Debtors require the cash collateral to permit them to pay vendors, meet their payroll and benefit obligations to their employees, satisfy deposit and payment obligations to utilities and other providers, maintain their insurance policies, preserve and protect their assets, and to generally and otherwise pay obligations critical to continuing the operation of their businesses.

29.    Additionally, the Debtors believe that following the commencement of these cases, the Debtors will need cash on hand to timely pay various of their vendors. Failure to pay for such items on a timely basis may require the Debtors to close down all operations entirely, which would result in irreparable harm to the Debtors and eliminate any ability to effectively reorganize. The Debtors believe their value as a going concern is significantly greater than the liquidation value of their assets. As a consequence, the Debtors' unsecured creditors are likely to receive substantially less if the Debtors cease operations than they would if the Debtors are authorized to use cash collateral and remain in business.

30. Without authorization from the Court to immediately use cash collateral, the Debtors submit that they will be left without a source of working capital and will be unable to operate their businesses and thereby preserve the value of their estates for the benefit of all creditors and parties-in-interest.

31. It is well established that a Bankruptcy Court, where possible, should resolve issues in favor of preserving the business of the debtor as a going concern.

> A debtor, attempting to reorganize a business under Chapter 11, clearly has a compelling need to use cash collateral in its effort to rebuild. Without the availability of cash to meet daily operating expenses such as rent, payroll, utilities etc., the congressional policy favoring rehabilitation over economic failure would be frustrated.

Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.), 727 F.2d 1017, 1019 (11th Cir. 1984).

32. Accordingly, courts authorize the use of cash collateral to enhance or preserve the debtor's going concern value. For example, in Stein v. U.S. Farmers Home Admin. (In re Stein), 19 B.R. 458 (Bankr. E.D. Pa. 1982), the Court allowed a debtor to use cash collateral where the secured party was under-secured, finding that the use of cash collateral was necessary to the debtor's continued operations and the creditor's secured position can only be enhanced by the continued operation of the debtor's business. Id. at 460; see also Fed. Nat'l Mortg. v. Dacon Bolingbrook Assoc. L.P., 153 B.R. 204, 204 (N.D. Ill. 1993) (security interest protected to extent debtor reinvested rents in operation and maintenance of the property); In re Constable Plaza Assoc., 125 B.R. at 105 (debtor's reinvestment of rents to maintain and operate office building will serve to preserve or enhance the value of the building which, in turn, will protect the

11

collateral covered by [the] mortgage); In re Dynaco Corp., 162 B.R. 389, 395-96 (Bankr. D.N.H. 1983) (finding that the alternative to the debtor's use of cash collateral, termination of its business, would doom reorganization and any chance to maximize value for all creditors); In re Karl A. Neise, Inc., 16 B.R. 602 (Bankr. S.D. Fla. 1981) (marginally secured creditor adequately protected by lien on post-petition property acquired by debtor and debtor can use cash collateral in the normal operation of its business).

33. Accordingly, to avoid immediate and irreparable harm, the Debtors require immediate use of cash collateral for the payment of necessary business expenses and to continue to operate their businesses in accordance with the Budget.

### B.    The Proposed Adequate Protection Should be Approved

34. Section 363(e) of the Bankruptcy Code provides that upon request of an entity that has an interest in property to be used by a debtor, the court shall prohibit or condition such use as is necessary to provide "adequate protection" of such interest. 11 U.S.C. §363(e). The Bankruptcy Code does not explicitly define "adequate protection," but does provide a non-exclusive list of the means by which a debtor may provide adequate protection, including providing a "replacement lien" to the extent that use of cash collateral results in a decrease in the value of such entity's interest in the cash collateral. See 11 U.S.C. § 361(c).

35. What constitutes adequate protection must be evaluated on a case-by-case basis. See Resolution Trust Corp. v. Swedeland Dev. Grp. Inc. (In re Swedeland Dev. Grp. Inc.), 16 F.3d 552, 564 (3rd Cir. 1994) (citing MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396-97 (10th Cir. 1987)); Martin v. Prod. Credit Ass'n of Fargo, N.D. (In re

Martin), 761 F.2d 472, 474 (8th Cir. 1985). Adequate protection is meant to ensure that the secured lender receives the value for which it originally bargained. See In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (citing In re Swedeland Dev. Grp. Inc., 16 F.3d at 564) ("The purpose of 'adequate protection' for a creditor 'is to insure that the creditor receives the value for which he bargained prebankruptcy'"). Courts have noted that "[t]he essence of adequate protection is the assurance of the maintenance and continued recoverability of the lien value during the interim between the filing . . . and the confirmation." In re Arriens, 25 B.R. 79, 81 (Bankr. D. Or. 1982); In re O.P. Held, Inc., 74 B.R. 777, 782 (Bankr. N.D.N.Y. 1987). The focus of the requirement is to protect a secured creditor from diminution in value during the use period. See In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990); In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988).

36. "In determining whether a creditor is adequately protected, "[u]nder the 'equity cushion' theory, if a debtor has equity in a property sufficient to shield the creditor from either the declining value of the collateral or an increase in the claim from accrual of interest or expenses, then the creditor is adequately protected."

> Case law has almost uniformly held that an equity cushion of 20% or more constitutes adequate protection . . . . Case law has almost as uniformly held that an equity cushion under 11% is insufficient to constitute adequate protection . . . . Case law is divided on whether a cushion of 12% to 20% constitutes adequate protection . . . .

Equitable Life Assurance Society v. James River Assocs. (In re James River Assocs.), 148 B.R. 790, 796 (E.D. Va. 1992); Principal Mut. Life Ins. Co. v. Atrium Dev. Co. (In re Atrium Dev. Co.), 159 B.R. 464, 471 (Bankr. E.D. Va. 1993).

37. Here, the adequate protection proposed by the Debtors will fully protect BB&T and BB&T Equipment Finance. To the extent BB&T and BB&T Equipment Finance have perfected interests in the cash collateral, the Debtors propose to provide BB&T and BB&T Equipment Finance, respectively, with replacement liens to the same extent of any pre-Petition Date liens. The Debtors propose that the replacement liens will be granted only to secure an amount equal to the actual amount of cash collateral used by the Debtors pursuant to the Budget. The Debtors further propose that such replacement liens will be perfected, enforceable, and effective without the necessity of either BB&T or BB&T Equipment Finance taking any further actions with respect thereto.

29. Upon information and belief, the Debtors will provide evidence that there is an equity cushion well in excess of 20 percent. As such, the equity cushion, by itself, provides sufficient adequate protection to BB&T and BB&T Equipment Finance. See In re James River Assocs., 148 B.R. at 796; In re Atrium Dev. Co., 159 B.R. at 471.

30. The Debtors respectfully submit that the proposed replacement liens are reasonable, appropriate, and sufficient to satisfy the legal standard of "adequate protection." Such protections will serve to maintain the value of the cash collateral during the pendency of these cases and allow the Debtors to maximize the value of those assets for the benefit of all stakeholders. Thus, the Debtors request that the Court approve the protections proposed in the

14

Interim Order as adequately protecting any interest BB&T and BB&T Equipment Finance may have in the cash collateral. Based on the foregoing, the Debtors submit that the proposed adequate protection will fully protect BB&T and BB&T Equipment Finance from any diminution in the value of its interest in the cash collateral, and is fair, reasonable, and sufficient to satisfy the requirements of the Bankruptcy Code. Furthermore, the Debtors agree to provide to BB&T and BB&T Equipment Finance a budget variance report and the financial reporting to which BB&T and BB&T Equipment Finance is entitled under their respective pre-Petition Date loan documents. Accordingly, the adequate protection proposed herein and in the Interim Order is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code. Moreover, Bankruptcy Courts in Virginia have granted similar relief in other recent Chapter 11 cases. See, e.g., In re Virginia United Methodist Homes of Williamsburg, Inc., Case No. 13-31098-KRH (Bankr. E.D. Va. Mar. 1, 2013) (interim order); In re Virginia Broadband, LLC, Case No. 12-62535-WEA (Bankr. W.D. Va. Nov. 21, 2012) (interim order); In re AMF Bowling Worldwide, Inc., Case No. 12-36495-KRH (Bankr. E.D. Va. Nov. 14, 2012) (interim order); In re RoomStore, Inc., Case No. 11-37790-DOT (Bankr. E.D. Va. Dec. 14, 2011) (interim order); In re The Glebe, Inc., Case No. 10-71553-RWK (Bankr. W.D. Va. July 2, 2010) (interim order); In re Movie Gallery, Inc., Case No. 10-30696-DOT (Bankr. E.D. Va. Feb 3, 2010) (interim order); In re Circuit City, Inc., Case No. 08-35653-KRH (Bankr. E.D. Va. Nov. 10, 2008) (interim order).

**C.    The Requirements of Bankruptcy Rules 4001(b)(2) and 6003(b) Have Been Satisfied**

31.    Pursuant to Bankruptcy Rule 4001(b)(2), a minimum of 14 days' notice is required before a final hearing on the Motion may take place.  The same rule, however, also provides that the Court "may conduct a preliminary hearing before such 14-day period expires, but the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2).

32.    In addition, Bankruptcy Rule 6003(b) provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition," grant relief upon "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate." Fed. R. Bankr. P. 6003(b).

33.    As set forth above, the Debtors have an immediate and urgent need to use cash collateral.  Absent the use of cash collateral, the Debtors will not be able to meet their working capital and liquidity needs, and their estates and creditors will suffer immediate and irreparable harm. Accordingly, the Debtors submit that the requirements of Bankruptcy Rules 4001(b)(2) and 6003(b) have been satisfied.

**D.    Request for Final Hearing**

34.    Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors request that the Court schedule a final hearing on the Motion.

35.    The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon

the Notice Parties listed below. The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## VI. Notice

36. The Debtors have served notice of the Motion on (a) the U.S. Trustee; (b) counsel for BB&T and BB&T Equipment Finance; (c) all known creditors holding secured claims against the Debtors' estates; and (d) those creditors holding the 30 largest unsecured claims against the Debtors' estates on a consolidated basis.

## VII. Waiver of Memorandum of Law

37. The Debtors respectfully request that this Court treat the Motion as a written memorandum of points and authorities or waive any requirement that the Motion be accompanied by a written memorandum of points and authorities as described in Local Bankruptcy Rule 9013-1(G).

## VIII. No Previous Request

38. No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just and proper.

[*Remainder of Page Intentionally Left Blank*]

Dated: June 7, 2015                                  Respectfully submitted,

                                                          /s/  Robert S. Westermann
Robert S. Westermann (VSB No. 43294)
Rachel A. Greenleaf (VSB No. 83938)
HIRSCHLER FLEISCHER, P.C.
The Edgeworth Building
2100 East Cary Street
Post Office Box 500
Richmond, Virginia 23218-0500
Telephone:  (804) 771-9500
Facsimile:   (804) 644-0957
E-mail: rwestermann@hf-law.com
         rgreenleaf@hf-law.com

*Proposed Special Conflicts Counsel for the Debtors*