# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (RICHMOND DIVISION)

| | |
|---|---|
| In re:<br><br>HEALTH DIAGNOSTIC LABORATORY INC. *et. al.*,[1]<br><br>          Debtors. | Chapter 11<br><br>Case No. 15-32919 (KRH)<br><br>(Jointly Administered) |

## JOINT MOTION OF DEBTORS, CREDITORS' COMMITTEE AND PROPOSED LIQUIDATING TRUSTEE FOR AN ORDER (A) ENFORCING AND/OR EXTENDING THE AUTOMATIC STAY TO PROTECT THE ESTATE PARTIES FROM THIRD-PARTY SUBPOENAS SEEKING PRODUCTION OF DOCUMENTS OR TESTIMONY, AND (B) GRANTING RELATED RELIEF UNDER SECTION 105(a)

**TO THE HONORABLE KEVIN R. HUENNEKENS,**
**UNITED STATES BANKRUPTCY JUDGE:**

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Health Diagnostic Laboratory, Inc. (0119), Central Medical Laboratory, LLC (2728), and Integrated Health Leaders, LLC (2434).

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
Tyler P. Brown (VSB No. 28072)
Jason W. Harbour (VSB No. 68220)
Henry P. (Toby) Long, III (VSB No. 75134)
Shannon E. Daily (VSB No. 79334)

*Counsel to the Debtors*
*and Debtors-in-Possession*

COOLEY LLP
One Freedom Square │Reston Town Center
11951 Freedom Drive
Reston, Virginia 20190-5656
Telephone: (703) 456-8019
Facsimile: (703) 456-8100
Douglas P. Lobel (Va. Bar No. 42329)

1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Richard S. Kanowitz (admitted pro hac vice)
Jay R. Indyke (admitted pro hac vice)
Jeremy H. Rothstein (admitted pro hac vice)

*Counsel to the Official Committee of*
*Unsecured Creditors of Health Diagnostic*
*Laboratory, Inc., et al., and the Liquidating*
*Trustee, Richard Arrowsmith*

Health Diagnostic Laboratory, Inc. and its affiliated debtors and debtors-in-possession (the "Debtors" or "HDL"), the Official Committee of Unsecured Creditors (the "Committee") of HDL, and Richard Arrowsmith, the current Chief Restructuring Officer and proposed initial Liquidating Trustee under the Debtors' confirmed Second Amended Plan of Liquidation (the "Plan")[2] (collectively, the Debtors, Committee, and Mr. Arrowsmith, are the "Estate Parties"), hereby jointly move this Court pursuant to sections 105(a), 362(a), and 541 of the Bankruptcy Code for entry of an order substantially in the form annexed hereto as **Exhibit A**, (a) enforcing and/or extending the automatic stay to protect the Estate Parties from third-party subpoenas seeking production of documents or testimony, and (b) granting related relief under section 105(a) of the Bankruptcy Code.  In support of this Motion, the Estate Parties rely upon and fully incorporate herein by reference the *Declaration of Sarah diFrancesca* (the "diFrancesca Decl."), which is annexed hereto as **Exhibit B**, and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Estate Parties file this motion to address a third-party subpoena duces tecum dated April 8, 2016 (the "Subpoena"), issued to HDL by the United States Department of Justice (the "DOJ"), which the DOJ served upon HDL on April 29, 2016.  Although the Estate Parties intend to comply with the Subpoena, the DOJ's refusal to narrow the broad scope of the Subpoena, grant the Estate Parties sufficient time to respond, and/or agree to bear the costs and expenses associated with HDL's compliance with the Subpoena has forced the Estate Parties to seek relief from this Court.  Accordingly, to preserve the estates' limited resources at this critical stage of the bankruptcy cases, the Estate Parties seek entry of an order of this Court granting the following relief:

---

[2]      The Plan was confirmed on March 29, 2016.  Entry of the confirmation order and the written opinion supporting same is to be issued by the Court.  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

- Enforcing and extending the automatic stay to protect the Debtors, their property, and property of the estates, wherever located and by whomever held, from all third-party subpoenas that have been served or will in the future be served on any Estate Party, such that no Estate Party shall be obligated to respond or comply with any now or pending third-party subpoenas or other discovery requests (collectively, the "Third-Party Subpoenas"), except as follows:

  o Any person seeking any form of discovery (the "Proponent") from an Estate Party in any action or proceeding where an Estate Party is not a plaintiff, defendant, movant and/or respondent, shall meet and confer with the Estate Party before the service of any form of discovery to determine and agree upon the scope of such discovery and the cost and/or expense of any proposed production and/or compliance.

  o At such meet and confer, the Proponent and the Estate Party shall attempt to agree upon the scope of discovery, the response deadline, the cost and/or expense to be borne by the Proponent and/or the Estate Party, as the case may be, and that discovery agreement shall govern compliance with discovery requests issued to an Estate Party without further order of the Court.

  o In the event the Proponent and the Estate Party do not agree at the meet and confer, the Estate Party shall seek, subject to the Bankruptcy Court's availability, an expedited hearing, for the Bankruptcy Court to rule upon such discovery dispute.

2.    The DOJ's Subpoena was issued as part of a consolidated qui tam action arising under the federal False Claims Act and analogous state laws, pending in the United States District Court for the District of South Carolina, captioned *United States ex rel. Dr. Michael Mayes, et al. v. Berkeley HeartLab, Inc., et al.*, and bearing docket number 9:14-cv-00230 (the "South Carolina Action").  HDL was previously a defendant in the South Carolina Action, but the claims asserted therein against HDL were resolved pursuant to a global settlement agreement dated March 31, 2015 (as discussed below).  Prior to entry into the settlement agreement, HDL produced over one-hundred thousand (100,000) documents to the DOJ in response to a prior subpoena *duces tecum*.  Many of the requests in the Subpoena are substantively duplicative of those from the prior subpoena.

3.      The DOJ served HDL with the Subpoena on the evening of April 29, 2016, and initially demanded a response by May 10, 2016, at 10:00 a.m.[3]  The Subpoena is undeniably broad, containing 51 separate demands seeking documents and information from January 1, 2008, through April 29, 2016.[4]  The Estate Parties estimate that there are hundreds of thousands, if not millions, of potentially responsive documents, although the Estate Parties do not have an accurate estimate due to the timing involved with the Subpoena and the limitations involved with accessing the data.  The Estate Parties attempted to resolve issues related to the Subpoena with the DOJ, but those efforts have not been successful to date.

4.      Absent the relief requested herein, the Estate Parties' compliance with the Subpoena would impose a significant burden on the Estate Parties and the bankruptcy estates and strain the estates' already limited resources.  The monumental task of collecting, processing, reviewing, and producing responsive documents would require, among other things, the engagement of an e-discovery vendor, the hiring of contract attorneys, and months of attorney review.  The Estate Parties estimate that the cost of responding to the Subpoena is excessive and could climb into the *millions of dollars*.

5.      The Estate Parties' request for an order regulating third-party discovery is supported by sections 105 and 362 of the Bankruptcy Code and case law.  In *In re Residential Capital*, 480 B.R. 529 (Bankr. S.D.N.Y. 2012) the court held that section 105 of the Bankruptcy Code empowers a bankruptcy court to extend the automatic stay of Bankruptcy Code section 362 and protect a debtor from burdensome third-party discovery.  The court created a six-factor test

---

[3]      The DOJ agreed to initially extend HDL's time to respond to the Subpoena to May 24, 2016.

[4]      The Subpoena seeks information related to claims against certain former officers and directors of HDL as well as its former marketing consultant.  Many of those parties may be the subjects of actions brought by the Liquidating Trustee under the Plan.

4

to determine whether and on what terms to limit third-party discovery.[5]  As discussed below, the

*Residential Capital* factors all militate in favor of granting HDL protection from the Subpoena.[6]

6.      This Court is uniquely positioned to consider the impact of the Subpoena on the

Debtors' bankruptcy estates.  On the other hand, a United States District Court in the District of

Columbia has jurisdiction over any motions related to the Subpoena because the Subpoena's

place of compliance under Federal Rule of Civil Procedure 45(g) is Washington, D.C.  However,

that court would have no familiarity with the parties, their economic condition or the subject

matter to properly rule upon the scope, context, need, timing, burden, and expense of the

requested discovery.

7.      In reliance on *Residential Capital*, and based upon the severe disruption that the

Subpoena would have upon the Debtors' bankruptcy cases, the Estate Parties seek an order

pursuant to 11 U.S.C. § 105(a) enforcing and/or extending the automatic stay to all third-party

discovery as set forth herein.[7]

## PROCEDURAL BACKGROUND, JURISDICTION AND STATUTORY PREDICATES

8.      On June 7, 2015 (the "Petition Date"), each of the Debtors filed a voluntary

petition with this Court for relief under chapter 11 of the Bankruptcy Code.  During the chapter

11 proceedings, the Debtors managed their properties as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.  On June 9, 2015, the Court entered an order

authorizing the joint administration of these chapter 11 cases.

---

[5]      The six factors are scope, context, need, timing, burden, and expense.

[6]      The Estate Parties are not seeking an injunction prohibiting all discovery requested under the Subpoena.
Rather, following *Residential Capital*'s model, the Estate Parties respectfully request entry of an order
regulating all third-party discovery, including the Subpoena.  The Estate Parties expressly reserve the right
to supplement their arguments and/or offer additional evidence in support of this Motion, as well as in
opposition to any future motions for stay relief.

[7]      Estate Parties have been informed by the DOJ that they should expect to receive additional third-party
discovery demands from other parties to the South Carolina Action.

9.      On June 16, 2015, the Office of the United States Trustee (the "U.S. Trustee") for the Eastern District of Virginia appointed the Committee, consisting of the following seven members:  (i) Oncimmune (USA) LLC; (ii) Aetna, Inc.; (iii) Pietragallo Gordon Alfano Bosick & Raspanti, LLP; (iv) Mercodia, Inc.; (v) Numares GROUP Corporation; (vi) Kansas Bioscience Authority; and (vii) Diadexus, Inc.  On September 23, 2015, Oncimmune (USA) LLC resigned from the Committee and, on November 3, 2015, the U.S. Trustee appointed Cleveland Heart Lab, Inc. to the Committee.  No trustee or examiner has been appointed.

10.      Following an auction and subsequent hearing, on September 17, 2015 the Court entered an order authorizing the sale of the Debtors' assets to True Health Diagnostics, LLC [Docket No. 512].  The transaction closed on September 29, 2015.  Upon closing, the Debtors no longer had any lab operations or any day-to-day employees.

11.      At a hearing held on March 29, 2016, the Court orally confirmed the Plan [Docket No. 1012].  Pursuant to the Plan, Richard Arrowsmith will be retained as the initial Liquidating Trustee by the Liquidating Trust formed for the benefit of HDL's creditors.

12.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief requested herein are sections 105(a), 362 and 541 of the Bankruptcy Code and Bankruptcy Rule 4001.

A.      **The South Carolina Action and HDL's Prior Document Production**

13.      The South Carolina Action arises under the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, and analogous state laws.[8]  The gravamen of the complaint relates to clinical laboratory testing carried out by HDL and its former officers and directors.  The qui tam relator

---

[8]      The South Carolina Action was originally filed on June 30, 2011, under docket number 11-cv-01593, but was later consolidated with another related qui tam action.

plaintiffs alleged that HDL, in conspiracy with its former marketing consultant, BlueWave Healthcare Consultants, Inc. ("BlueWave"), illegally provided financial inducements to physicians in exchange for referrals of patients for laboratory testing. The plaintiffs also alleged that HDL's former officers and directors directed and supervised the alleged illegal conduct.

14.    While the South Carolina Action was pending, the DOJ issued subpoena duces decum No. 2:2013 on January 7, 2013 (the "2013 Subpoena") to HDL as part of parallel criminal and civil investigations instituted by the DOJ and the Office of Inspector General of the United States Department of Health and Human Services. A copy of the 2013 Subpoena is annexed hereto as **Exhibit C**.

15.    The 2013 Subpoena contained 37 broad document requests covering the time period January 1, 2008, to "present," which HDL's counsel at the time negotiated to mean January 2013. *See* diFrancesca Decl. at ¶ 6. The 37 requests in the 2013 Subpoena generally related to corporate organizational documents, external and internal communications, internal legal reviews and reports, financial statements and records, detailed billing and financial records and analyses, copies of contracts and agreements, and other business records. *Id*. HDL produced over 100,000 documents to the DOJ between 2013 and early 2015. *Id.* at ¶ 7.

16.    HDL produced documents related to the 2013 Subpoena pursuant to a Confidentiality Agreement, dated May 2013, and an Agreement of Limited Privilege Waiver in Connection with the Government's Investigation of Health Diagnostic Laboratory, Inc., dated April 28, 2014. During discussions with the DOJ concerning the Subpoena, the DOJ has indicated that as a result of these agreements, the documents produced in response to the 2013 Subpoena have limited evidentiary value to the DOJ. Accordingly, the DOJ has suggested that the Estate Parties could comply with a substantial portion of the requests in the Subpoena by re-

producing the documents produced in response to the 2013 Subpoena. This suggestion demonstrates a fundamental misunderstanding of what would be required to comply with the Subpoena. As an initial matter, the Estate Parties do not have the actual documents produced in response to the 2013 Subpoena. To obtain such documents in a processed and readily identifiable format from the vendor in possession of such documents would cost approximately $145,000, an amount the estates should not be required to pay. In addition, such documents would need to be reviewed for responsiveness and privilege, which would incur further costs and expenses. Moreover, the Subpoena requests documents substantial quantities of documents that were not collected, processed or produced in response to the 2013 Subpoena, and there are additional documents outside the scope of the 2013 Subpoena. These categories of documents also would need to be reviewed for responsiveness and privilege, such that the total cost of responding to the Subpoena would be excessive, and could easily reach and exceed $1 million.

17.     Even if compliance with the Subpoena were not an overly burdensome proposition for the Estate Parties, the Estate Parties face potential and material prejudice in connection with responding to the Subpoena. This is because the defendants in the South Carolina Action also may be defendants in causes of action brought by the Liquidating Trustee under the Plan. Therefore, the Estate Parties must have the ability to safeguard the confidential and privileged nature of the estates' documents.

**B.     DOJ's Intervention in the South Carolina Action and Settlement with HDL**

18.     On April 9, 2015, the DOJ intervened in the South Carolina Action. On the same date, the Debtors entered into a settlement agreement (the "Settlement Agreement")[9] with the

---

[9]     The Settlement Agreement is annexed to the DOJ's proof of claim [Claim No. 1335] which was filed on December 22, 2015 in the amount of $94,144,852. The Estate Parties respectfully ask the Court to take judicial notice of the DOJ proof of claim and the Settlement Agreement attached thereto.

DOJ and the various qui tam relators that resolved all outstanding allegations made against HDL in connection with the DOJ's investigation into historical practices involving the payment of physician processing and handling fees, among other activities.

19.    As part of the Settlement Agreement, the DOJ agreed to release HDL from any civil or administrative claims that the DOJ had or may have had that arose under, inter alia, the False Claims Act.    The DOJ also agreed to dismiss the pending civil actions against HDL, including the South Carolina Action.    The Honorable Richard M. Gergel, U.S.D.J., dismissed the South Carolina Action as to HDL by order dated June 2, 2015.

20.    On April 8, 2016, the DOJ issued, but did not serve, the Subpoena.[10]    A copy of the Subpoena is annexed hereto as **Exhibit D**.    The Subpoena was issued under the caption of the South Carolina Action in the District of South Carolina, but states that the place of compliance is "Michael E. Shaheen, Trial Attorney, Department of Justice, Civil Frauds, 601 D. Street., N.W., Washington, D.C. 20004."

21.    The Subpoena contains 51 separate requests and seeks documents and information from January 1, 2008, through April 29, 2016 (the date of service of the Subpoena on HDL), including corporate organizational documents, external and internal communications, internal legal reviews and reports, financial statements and records, detailed billing and financial records and analyses, copies of contracts and agreements, and other business records.    Although the subject matter of the Subpoena includes the relationship between HDL and BlueWave, the Subpoena also broadly seeks certain documents and information between HDL and "any" third-parties, including health care providers, consultants, sales representatives, or agents.    *See* Ex. C at ¶¶ 11, 17-23, 28, 37, 40-41, 48, and 51.

---

[10]    The Subpoena was served by email after 5:30 p.m. on April 29, 2016, and sent to counsel for the Debtors and the Committee who each accepted service of the Subpoena with a full reservation of rights, other than raising service by email.

22.    The Subpoena is largely duplicative of the time period covered in the 2013 Subpoena, as the Subpoena and the 2013 Subpoena each relate back to January 1, 2008, and cover the same January 2008 through January 2013 time period. The Subpoena also covers January 2013 through April 29, 2016. *See* diFrancesca Decl. at ¶ 11.

23.    The Subpoena also is substantively duplicative in large part to the 2013 Subpoena. Specifically, 36 of the 37 requests in the 2013 Subpoena also are included in the Subpoena. *Id.* at ¶ 12.

24.    Although the Subpoena was dated April 8, 2016, the DOJ did not initially serve the Subpoena after Richard Arrowsmith requested that the DOJ wait until after the confirmation order was entered and the Plan went effective.  However, on April 29, 2016, the DOJ requested that the Estate Parties consent to service of the Subpoena via e-mail.  The Estate Parties agreed to accept service via e-mail, but reserved all other rights.  Based on a meet and confer with counsel to the Committee, the DOJ agreed to initially extend HDL's time to respond to the Subpoena to May 24, 2016.

25.    Concurrently with the filing of this Motion, the Estate Parties served the DOJ with written objections to the Subpoena pursuant to Federal Rule of Civil Procedure 45(d)(2)(B).  A copy of the Estate Parties' written objections is annexed hereto as **Exhibit E**.

C.    **The Burden Presented by the Subpoena and the Estates' Limited Resources**

26.    As set forth in the diFrancesca Decl., absent the relief requested herein, the Estate Parties' compliance with the Subpoena would strain the estates' limited resources and result in undue burden and significant expense.

27.    In order to respond to the Subpoena, the Estate Parties would be required to collect, process, search, review, and produce a significant quantity of documents responsive to

the 51 broad requests in the Subpoena.  *See* diFrancesca Decl. at ¶ 13.  This would require, at a

minimum: (i) identification of all electronic and paper data sources that may contain documents

or information potentially responsive to the Subpoena; (ii) the retrieval, forensic imaging and

transfer of electronic and paper documents from various third-party vendors and storage

locations; (iii) processing and gathering electronic data into searchable databases for

interrogation and dynamic inquiries, including the application of Boolean search terms,

uploading into an electronic review platform; (iv) digital scanning and processing of paper and

other data not in "native" format, including the application of Boolean search terms, and

uploading into an electronic review platform; (v) months of attorney review, which likely will

require the Estate Parties to hire a large team of contract attorneys; and (vi) preparing responsive

documents for electronic production.  *Id*.

28.    The data sources that include documents and information potentially responsive to

the Subpoena include, but are not limited to, electronic mail servers, shared network drive

servers, and employee laptops and other physical equipment.  HDL's electronic mail server alone

is believed to contain over *twenty-three million* employee emails.  *Id.* at ¶ 14.

29.    The Estate Parties also estimate there may be over 600 employee laptops and

other pieces of physical equipment that currently exist.  *Id.* at ¶ 15.  The Estate Parties are still in

the process of identifying other potentially available and relevant document sources.  This

process is a distraction to the current Chief Restructuring Officer, Richard Arrowsmith, and

places a strain on HDL's limited resources.  *Id*.

30.    Based upon the hundreds of thousands, if not millions, of documents that the

Estate Parties would be required to review, it is not unreasonable to assume that the process of

responding to the Subpoena could climb into the millions of the dollars to fully respond.  *Id.* at

11

¶¶ 16-17. Without employees to assist HDL in responding to the Subpoena, HDL will require outside counsel, contract attorney reviewers, a third-party e-discovery vendor, and other litigation support vendor assistance, placing a substantial financial burden on the estates. *Id.*.

31.     Many aspects of HDL's business necessarily involved legal input and advice, and any documents to be produced by the Estate Parties would have to be reviewed so that the Estate Parties can preserve the attorney-client and other applicable privileges. *Id.* at ¶ 19. Such review and production is costly and time-consuming. *Id.*

32.     Committee counsel telephonically met and conferred with the DOJ's counsel on May 6, 2016, but the DOJ has not agreed to narrow the scope of the Subpoena or to bear any of the compliance costs.

## LEGAL STANDARD

**A.      The Court Has Jurisdiction Over Property of the Estates to Grant the Relief Requested, and Section 362 Protects Such Property.**

33.     This Court has "exclusive jurisdiction of all of the property, wherever located, of [HDL] as of the commencement of [the] case, and of property of the estate . . . ."  28 U.S.C. § 1334(e)(1).

34.     The term "property of the estate" is broadly defined under the Bankruptcy Code to include all of HDL's legal and equitable interests in property as of the commencement of these cases, all proceeds, product, or offspring of or from property of the estate, and any interest in property that the bankruptcy estate acquires after the commencement of the case, wherever located and by whomever held.  11 U.S.C. § 541(a).  HDL's books and records sought in the Subpoena are "property of the estate" within the meaning of section 541 of the Bankruptcy Code.

35.     Section 362 of the Bankruptcy Code imposes a broad and automatic stay of all actions against a debtor and its property. *See Strumpf v. Strumpf*, 37 F.3d 155, 159 (4th Cir.

1994) ("The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws." (citation omitted)).

36.    In particular, section 362(a)(3) of the Bankruptcy Code stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  In order for the protections of section 362(a)(3) to apply, HDL need only possess or control the documents.  *See 48th Street Steakhouse, Inc. v. Rockefeller Center, Inc. (In re 48th Street Steakhouse, Inc.),* 61 B.R. 182, 187 (Bankr. S.D.N.Y. 1986) (citing legislative history in support of holding that section 362(a)(3) protects property "over which the estate has control or possession"), *aff'd,* 835 F.2d 427 (2d Cir. 1987).

37.    HDL's books and records that are sought in the Subpoena are considered property of the estate within the meaning of section 541(a) and are therefore protected by the automatic stay.  *See, e.g.*, *In re Integrated Resources, Inc.*, No. 91-1310, 1992 WL 8335 (S.D.N.Y. Jan. 14, 1992) (affirming bankruptcy court's holding that a debtor's books and records are property of the estate and denying a motion for relief from the automatic stay); *In re Greenlife, Inc.*, No. 88-00825, 1990 WL 10091748, at *3 (Bankr. E.D. Va. July 16, 1990) (acknowledging that a debtor's books and records are protected by the automatic stay and stating that "the party seeking issuance or enforcement of a subpoena would be precluded from taking further action in the absence of relief from the stay").

**B.**    **The Court Should Grant Relief Under Section 105(a) of the Bankruptcy Code**

38.    This Court is empowered by section 105(a) of the Bankruptcy Code to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code].  11 U.S.C. § 105(a).

13

39.    In addressing third-party subpoenas served on debtors, the Bankruptcy Court for the Southern District of New York relied upon section 105(a) to extend the automatic stay to protect a debtor from unduly burdensome third-party discovery requests.  480 B.R. at 529.[11]

40.    The Estate Parties submit that the *Residential Capital* decision represents the model approach for addressing the Subpoena in these cases.  In deciding to stay all third-party discovery against a debtor, the *Residential Capital* court synthesized six relevant factors from Rules 26 and 45 of the Federal Rules of Civil Procedure and case-law regarding the extension of the automatic stay to non-debtors.  As to factors (1) scope, (2) context, and (3) need, the court placed the evidentiary burden on the third-party seeking discovery.  As to factors (4) burden, and (5) expense, the debtor bore the burden.  Finally, as to factor (6) timing, the court found that both the debtor and the third-party shared the burden.  *Residential Capital*, 480 B.R. at 544-50.

41.    The Estate Parties respectfully submit that an initial balancing of the six *Residential Capital* factors demonstrates the need for the extension of the automatic stay to the Subpoena:

i.    **Scope.**  The scope of the Subpoena is undeniably broad and supports issuance of an injunction. The 51 requests (not including subparts) seek documents and information from January 1, 2008, through April 29, 2016 (the date of service of the Subpoena on HDL), including corporate organizational documents, external and internal communications, internal legal reviews and reports, financial statements and records, detailed billing and financial records and analyses, copies of contracts and agreements, and other business records. The Estate Parties estimate that there are hundreds of thousands, if not millions, of potentially responsive documents, although the Estate Parties do not have an accurate estimate due to the timing

---

[11]    The *Residential Capital* court determined that a motion to extend the automatic stay under section 105(a) did not require the filing of an adversary complaint because the relief sought related to the administration of the bankruptcy case.  *See Residential Capital*, 480 B.R. at 539.

involved with the Subpoena and the limitations involved with accessing the data.  The Subpoena

is not narrowly tailored to minimize the burden on HDL – a nonparty to the South Carolina

Action – and therefore contravenes Federal Rule of Civil Procedure 45(d)(1)'s requirement that

the DOJ take "reasonable steps to avoid imposing undue burden or expense" on nonparties.  The

Estate Parties and the DOJ conferred, but the DOJ was unwilling to limit or reduce the number of

requests.

        ii.        **Context.**  The context of the South Carolina Action supports the issuance

of an injunction.  The impact on the DOJ's case is minimal because the South Carolina Action

can proceed without the documents and information requested in the Subpoena, as substantially

all of the information can be obtained from parties to the South Carolina Action.  Additionally,

HDL already produced over 100,000 documents to the Department of Justice in response to

similar requests in the 2013 Subpoena. Prompt discovery and an immediate trial are also not

requested in the South Carolina Action.  In contrast, responding to the Subpoena would have a

severe impact on the administration of the bankruptcy cases and the liquidation of estate assets.

        iii.        **Need.**  The DOJ does not have an imminent need for the documents and

information requested in the Subpoena because the discovery deadline is currently set for

February 6, 2017, and the DOJ can obtain substantially all of the same information and

documents from parties to the litigation.  As a nonparty to the South Carolina Action, special

consideration must be given to the undue burden imposed on HDL.  *Cf. North Carolina Right to

Life, Inc. v. Leake*, 231 F.R.D. 49, 52 (D.D.C. 2005).

        iv.        **Timing.**  The timing and procedural posture of the bankruptcy cases

strongly support issuance of an injunction. HDL has no remaining employees and substantially

all of its business assets, including its core businesses, have been liquidated.  Pursuant to the

Plan, Mr. Arrowsmith will be retained as the initial Liquidating Trustee by the Liquidating Trust

formed for the benefit of HDL's creditors.   The Liquidating Trustee is responsible for

implementing applicable provisions of the Plan, including the distribution of the proceeds of all

remaining assets to creditors.   If the Estate Parties are forced to expend the already limited time

and resources of the estates in responding to the Subpoena, the bankruptcy cases will be delayed.

Any delay in implementing the Plan and in the Liquidating Trustee's pursuit of causes of action

under the Plan will harm HDL's creditors.

v.   **Burden.**   Responding to the Subpoena would impose a heavy burden on

HDL and could result in estimated costs of millions of dollars to fully respond. The Estate

Parties estimate that the monumental task of collecting, processing, searching, reviewing, and

producing the significant quantity of documents responsive to the 51 broad requests in the

Subpoena would require, at a minimum: (i) identification of all electronic and paper data sources

that may contain documents or information potentially responsive to the Subpoena; (ii) the

retrieval, forensic imaging and transfer of electronic and paper documents from various third-

party vendors and storage locations; (iii) processing and gathering electronic data into searchable

databases for interrogation and dynamic inquiries, including the application of Boolean search

terms, uploading into an electronic review platform; (iv) digital scanning and processing of paper

and other data not in "native" format, including the application of Boolean search terms, and

uploading into an electronic review platform; (v) months of attorney review, which likely will

require the Estate Parties to hire a large team of contract attorneys; and (vi) preparing responsive

documents for electronic production.   Because HDL has no employees, this process will take

many months and significantly strain the estates' limited resources. Additionally, the documents

and data that fall within the scope of the Subpoena encompass an expansive quantity of data,

16

including email data sources, structured data sources, proprietary databases, and hardware devices, all of which demand a high level of resources by the Estate Parties to identify, preserve, process, host, search, review and produce.  HDL's electronic mail server alone is believed to contain over twenty-three million employee emails.

vi.    **Expense.**  The Estate Parties estimate that the cost of responding to the Subpoena is excessive and could climb into the millions of the dollars to fully respond.  HDL does not have the infrastructure in place to undertake the arduous task of responding to the Subpoena.  As a result, the Estate Parties will need to retain a third-party e-discovery vendor and other litigation support vendors, as well as incur attorney's fees and contract review attorney fees, to identify, preserve, host, search, review and produce the documents and data potentially responsive to the Subpoena.

42.    Any party requesting burdensome third-party discovery from the Estate Parties should agree to reimburse all or some of the Estate Parties' cost of compliance.  *See, e.g., Linder v. Calero-Portocarrero*, 183 F.R.D. 314, 322-23 (D.D.C. 1998) ("[w]hen nonparties are forced to pay the costs of discovery, the requesting party has no incentive to deter it from engaging in fishing expeditions for marginally relevant material. Requesters forced to internalize the costs of discovery will be more inclined to make narrowly-tailored requests reflecting a reasonable balance between the likely relevance of the evidence that will be discovered and the costs of compliance.").

43.    The fact that the United States government issued the Subpoena does not render the DOJ immune from cost-shifting.  *See United States v. Blue Cross Blue Shield of Michigan*, No. 10-CV-14155, 2012 WL 4838987 (E.D. Mich. Oct. 11, 2012) (shifting certain costs of producing documents in response to a subpoena from nonparties to the United States Department

of Justice, despite the public importance of the underlying litigation and the fact that the

nonparties were large, well-funded corporations).

44.    Finally, this Court is best-positioned to consider the unique burdens associated

with the Debtors' compliance with a third-party subpoena.  Although the Subpoena was issued as

part of the South Carolina Action, the United States District Court for the District of South

Carolina does not have jurisdiction over the Subpoena under Federal Rule of Civil Procedure 45.

*See* Fed. R. Civ. Proc. 45(g) (stating that a motion regarding non-compliance with a third-party

subpoena must be filed in "the court for the district where compliance is required"); Fed. R. Civ.

Proc. 37(a)(2) (a "motion for an order to a nonparty must be made in the court where the

discovery is or will be taken.").

45.    Rather, because the Subpoena's stated place of compliance is Washington, D.C.,

the United States District Court for the District of Columbia has jurisdiction over the

enforcement of the Subpoena, as the "court for the district where compliance is required."[12] *See,*

*e.g.*, *Hollis v. Aerotek, Inc.*, No. 14-2494, 2015 U.S. Dist. LEXIS 144174 (D. Kan., Oct. 23,

2015) (holding that where subpoena stated that the place of compliance was Kansas City,

Missouri, the plaintiff was required to file a motion to compel in the District Court for the

Western District of Missouri and not in the district where the underlying action was pending).

46.    This Court is well-versed in the 2004 investigation being conducted by the

Committee, the various causes of action the Estate Parties may bring, the prepetition litigations

---

[12]    The Estate Parties also note that the Subpoena is facially invalid because the place of compliance,
Washington, D.C., is more than 100 miles from Richmond, Va.  *See* Fed. R. Civ. Proc. 45(c)(2) ("A
subpoena may command:

(A) production of documents, electronically stored information, or tangible things at a place within
100 miles of where the person resides, is employed, or regularly transacts business in person . . .
."); *Friedberg v. Madison Realty Invs., Inc.*, No. 15-mc-0011, 2015 U.S. Dist. LEXIS 116511
(S.D. Ohio, Sept. 1, 2015) (quashing third-party subpoena under Fed. R. Civ. Proc. 45(c)(2)(A)
because subpoenaed party lived more than 100 miles from the place of compliance).

instituted against the Debtors, and the assets of the estates. In contrast, the District Court for the District of Columbia would have no familiarity with the South Carolina Action, the bankruptcy cases, or the estates' assets and liabilities. Moreover, only this Court has the ability and expertise to consider the unique impact of third-party subpoenas on HDL's estate and creditors. Granting the relief requested herein concerning third-party discovery also is consistent with the bankruptcy policy of centralizing litigation against a debtor.

## CONCLUSION

47.     For the reasons discussed in this Motion, the Court should enter an order granting the Motion, (a) enforcing and/or extending the automatic stay to protect the Debtors from third-party subpoenas seeking production of documents or testimony, and (b) granting related relief under section 105(a) of the Bankruptcy Code.

## NOTICE

48.     Notice of this Motion has been provided in accordance with the Notice, Case Management and Administrative Procedures [Docket No. 40] approved by this Court on June 9, 2015. In addition, notice of the Motion has been given to the DOJ.

## NO PRIOR REQUEST AND RESERVATION OF RIGHTS

49.     No previous request for the relief sought herein has been made to this Court or any other court. The Estate Parties reserve the right to apply to the Court to seek additional discovery in connection with these matters.

## LOCAL RULE 7026-1(H) CERTIFICATION OF
## ATTEMPTS TO RESOLVE DISCOVERY DISPUTE

50.     The undersigned counsel for the Estate Parties certify that certain of the Estate Parties and/or their counsel conferred, unsuccessfully, with counsel for the DOJ in an attempt to resolve issues concerning the Subpoena.

**WHEREFORE**, the Estate Parties respectfully request that this Court enter an order granting the Motion, (a) enforcing and/or extending the automatic stay to protect the Estate Parties from third-party subpoenas seeking production of documents or testimony, (b) granting related relief under section 105(a) of the Bankruptcy Code, and (c) providing for such other and further relief as this Court deems just and proper.

Date:   May 10, 2016

*/s/ Jason W. Harbour*
Tyler P. Brown (VSB No. 28072)
Jason W. Harbour (VSB No. 68220)
Henry P. (Toby) Long, III (VSB No. 75134)
Shannon E. Daily (VSB No. 79334)
**HUNTON & WILLIAMS LLP**
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
Email: tpbrown@hunton.com
Email: jharbour@hunton.com
Email: hlong@hunton.com
Email: sdaily@hunton.com

*Counsel to the Debtors and Debtors-in-Possession*

*/s/ Douglas P. Lobel*
Douglas P. Lobel (Va. Bar No. 42329)
**COOLEY LLP**
One Freedom Square │Reston Town Center
11951 Freedom Drive
Reston, Virginia 20190-5656
Telephone: (703) 456-8019
Facsimile: (703) 456-8100
Email: dlobel@cooley.com

-and-

Richard S. Kanowitz (admitted pro hac vice)
Jay R. Indyke (admitted pro hac vice)
Jeremy H. Rothstein (admitted pro hac vice)
**COOLEY LLP**
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Email: rkanowitz@cooley.com
Email: jindyke@cooley.com
Email: jrothstein@cooley.com

*Counsel to the Official Committee of
Unsecured Creditors of Health Diagnostic
Laboratory, Inc., et al., and the Liquidating
Trustee, Richard Arrowsmith*

**EXHIBIT A**

**<u>Proposed Order</u>**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(RICHMOND DIVISION)**

In re:

HEALTH DIAGNOSTIC LABORATORY
INC. *et. al.*,[1]

Debtors.

Chapter 11

Case No. 15-32919 (KRH)

(Jointly Administered)

**ORDER ON JOINT MOTION OF DEBTORS, CREDITORS' COMMITTEE AND
PROPOSED LIQUIDATING TRUSTEE FOR AN ORDER (A) ENFORCING AND/OR
EXTENDING THE AUTOMATIC STAY TO PROTECT THE ESTATE PARTIES
FROM THIRD-PARTY SUBPOENAS SEEKING PRODUCTION OF DOCUMENTS OR
TESTIMONY, AND (B) GRANTING RELATED RELIEF UNDER SECTION 105(a)**

Upon the joint motion (the "Motion");[2] of the Debtors, the Committee, and the

Liquidating Trustee (collectively, the "Estate Parties"), for entry of an order, (i) enforcing and/or

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification
number, are: Health Diagnostic Laboratory, Inc. (0119), Central Medical Laboratory, LLC (2728), and
Integrated Health Leaders, LLC (2434).

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
Tyler P. Brown (VSB No. 28072)
Jason W. Harbour (VSB No. 68220)
Henry P. (Toby) Long, III (VSB No. 75134)
Shannon E. Daily (VSB No. 79334)

*Counsel to the Debtors*
*and Debtors-in-Possession*

COOLEY LLP
One Freedom Square │ Reston Town Center
11951 Freedom Drive
Reston, Virginia 20190-5656
Telephone: (703) 456-8019
Facsimile: (703) 456-8100
Douglas P. Lobel (Va. Bar No. 42329)

1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Richard S. Kanowitz (admitted pro hac vice)
Jay R. Indyke (admitted pro hac vice)
Jeremy H. Rothstein (admitted pro hac vice)

*Counsel to the Official Committee of*
*Unsecured Creditors of Health Diagnostic*
*Laboratory, Inc., et al., and the Liquidating*
*Trustee, Richard Arrowsmith*

extending the automatic stay to protect the Estate Parties from third-party subpoenas seeking production of documents or testimony, and (ii) granting related relief under section 105(a) of the Bankruptcy Code; the Court finds that: (a) it has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. §§ 105(a), 362(a) and 541; (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (c) venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (d) the relief requested in the Motion is in the best interests of the Debtors, their estates and creditors; (e) proper and adequate notice of the Motion and the hearing requested thereon has been given and no other or further notice is necessary; and (f) upon the record herein, and after due deliberation thereon, good and sufficient cause exists for the granting of the relief as set forth herein.  Therefore,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is **GRANTED** as set forth herein.

2.      The automatic stay is hereby enforced and extended to protect the Debtors, their property, and property of the estates, wherever located and by whomever held, from all third-party subpoenas that have been served or will in the future be served on any Estate Party such that  no Estate Party shall be obligated to respond or comply with any now or pending third-party subpoenas or other discovery requests (collectively, the "Third-Party Subpoenas"), except as set forth herein.

3.      Any person seeking any form of discovery (the "Proponent") from an Estate Party in any action or proceeding where an Estate Party is not a plaintiff, defendant, movant and/or respondent, shall meet and confer with the Estate Party before the service of any form of discovery to determine and agree upon the scope and cost and/or expense of any proposed production and/or compliance.

2

4.      At such meet and confer, the Proponent and the Estate Party shall attempt to agree upon the scope of discovery, the response deadline, the cost and expense to be borne by the Proponent and/or the Estate Party, as the case may be, and that agreement shall govern compliance with discovery requests issued to an Estate Party without further order of the Court.

5.      In the event the Proponent and the Estate Party do not agree at the meet and confer, the Estate Party shall seek, subject to the Court's availability, an expedited hearing, for the Court to rule upon such discovery dispute.

6.      Notwithstanding any Bankruptcy Rule or Local Bankruptcy Rule that might otherwise delay the effectiveness of this Order, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

7.      This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order

8.      The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is hereby waived.

9.      The Estate Parties are authorized and empowered to take all actions necessary to implement the relief requested in this Order.

Dated: _____, 2016          _____
Richmond, Virginia                             KEVIN R. HUENNEKENS
                                               UNITED STATES BANKRUPTCY JUDGE

3

We ask for this:

*/s/ Jason W. Harbour*
Tyler P. Brown (VSB No. 28072)
Jason W. Harbour (VSB No. 68220)
Henry P. (Toby) Long, III (VSB No. 75134)
Shannon E. Daily (VSB No. 79334)
**HUNTON & WILLIAMS LLP**
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
Email: tpbrown@hunton.com
Email: jharbour@hunton.com
Email: hlong@hunton.com
Email: sdaily@hunton.com

*Counsel to the Debtors and Debtors-in-Possession*

*/s/ Douglas P. Lobel*
Douglas P. Lobel (Va. Bar No. 42329)
**COOLEY LLP**
One Freedom Square │Reston Town Center
11951 Freedom Drive
Reston, Virginia 20190-5656
Telephone: (703) 456-8000
Facsimile: (703) 456-8019
Email: dlobel@cooley.com

Richard S. Kanowitz (admitted pro hac vice)
Jay R. Indyke (admitted pro hac vice)
Jeremy H. Rothstein (admitted pro hac vice)
**COOLEY LLP**
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Email: rkanowitz@cooley.com
Email: jindyke@cooley.com
Email: jrothstein@cooley.com

*Counsel to the Official Committee of Unsecured
Creditors of Health Diagnostic Laboratory, Inc., et al. and
the Liquidating Trustee, Richard Arrowsmith*

4

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Jason W. Harbour
Jason W. Harbour


/s/ Douglas P. Lobel
Douglas P. Lobel

**EXHIBIT B**

**<u>diFrancesca Declaration</u>**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| In re: | |
| HEALTH DIAGNOSTIC LABORATORY INC. *et. al.*,[1] | Chapter 11 |
| Debtors. | Case No. 15-32919 (KRH) |
| | (Jointly Administered) |

## DECLARATION OF SARAH K. DIFRANCESCA

I, Sarah K. diFrancesca, declare under penalty of perjury:

1.      I am an associate in the Health Care & Life Sciences Regulatory group of Cooley

LLP, 1114 Avenue of the Americas, New York, NY 10036 (the "Firm").

2.      The Firm is retained in the above-captioned matter as counsel to the Official

Committee of Unsecured Creditors (the "Committee") of Health Diagnostic Laboratory, Inc., and

its affiliated debtors and debtors-in-possession (the "Debtors" or "HDL") and is proposed counsel

---

[1]      The Debtors, along with the last four digits of each Debtor's federal tax identification number, are: Health Diagnostic Laboratory, Inc. (0119), Central Medical Laboratory, LLC (2728), and Integrated Health Leaders, LLC (2434).

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
Tyler P. Brown (VSB No. 28072)
Jason W. Harbour (VSB No. 68220)
Henry P. (Toby) Long, III (VSB No. 75134)
Shannon E. Daily (VSB No. 79334)

*Counsel to the Debtors
and Debtors-in-Possession*

COOLEY LLP
One Freedom Square │ Reston Town Center
11951 Freedom Drive
Reston, Virginia 20190-5656
Telephone: (703) 456-8019
Facsimile: (703) 456-8100
Douglas P. Lobel (Va. Bar No. 42329)

1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Richard S. Kanowitz (admitted pro hac vice)
Jay R. Indyke (admitted pro hac vice)
Jeremy H. Rothstein (admitted pro hac vice)

*Counsel to the Official Committee of
Unsecured Creditors of Health Diagnostic
Laboratory, Inc., et al., and the Liquidating
Trustee, Richard Arrowsmith*

to Richard Arrowsmith as initial Liquidating Trustee[2] of HDL in responding to the Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (the "Subpoena") dated April 8, 2016, issued by the Department of Justice ("DOJ") to HDL on April 29, 2016, in *United States ex rel Dr. Michael Mayes, et al. v. Berkeley HeartLab, Inc., et al.*, Case No. 9:14-cv-00230 (D.S.C.) (the "South Carolina Action"). The Debtors, Committee, and Mr. Arrowsmith are collectively referred to herein as the "Estate Parties."

3.       I personally have been involved in these chapter 11 proceedings since August 2015. I have contributed substantially to several critical portions of the chapter 11 cases involving various health regulatory matters of HDL. My work has included, among other things, obtaining substantial familiarity with, and reviewing key documents from, among other things, the Committee's 2004 investigation of various targets and the South Carolina Action. I also am counsel assisting with the response to the Subpoena.

4.       I make this declaration to provide background concerning the Subpoena and to describe in more detail the specific impact on the Estate Parties of the discovery requested by the DOJ in the South Carolina Action.

### DOJ Subpoena Issued to HDL in January 2013

5.       The DOJ previously issued a Subpoena Duces Tecum to HDL dated January 7, 2013 (the "2013 Subpoena"). HDL responded to the 2013 Subpoena through its counsel at the time, Ropes & Gray, LLP.

6.       The 2013 Subpoena contained thirty-seven broad document requests covering the time period January 1, 2008 to "present", which Ropes & Gray, LLP negotiated to mean January 2013. The thirty-seven requests in the 2013 Subpoena generally related to corporate

---

[2]       On March 29, 2016, this court confirmed the Second Amended Plan of Liquidation (the "Plan"). The confirmation order and written opinion supporting confirmation have not been entered; thus, the Plan is not yet effective.

2

organizational documents, external and internal communications, internal legal reviews and reports, financial statements and records, detailed billing and financial records and analyses, copies of contracts and agreements, and other business records.

7.      In response to the 2013 Subpoena, HDL produced over 100,000 documents to the DOJ between 2013 and early 2015.

8.      Ultimately, HDL resolved the matter by entering into a Settlement Agreement with the United States of America, acting through the DOJ and on behalf of various participating federal agencies, and the various *qui tam* relators effective March 31, 2015, in which HDL agreed to pay up $100 million to settle various civil allegations under the False Claims Act. Subsequently, HDL filed for Chapter 11 bankruptcy. The DOJ filed a proof of claim in the amount of $94,144,852.52 plus interest based on the Settlement Agreement. *See* Proof of Claim No. 1335.

The Current Subpoena from the DOJ

9.      The Subpoena issued to HDL on April 29, 2016 contains fifty-one broad requests (plus subparts) (the "Requests") covering the time period January 1, 2008 through April 29, 2016. The Requests generally relate to corporate organizational documents, external and internal communications, internal legal reviews and reports, financial statements and records, detailed billing and financial records and analyses, copies of contracts and agreements, and other business records.

10.      During a teleconference with Assistant U.S. Attorneys Elizabeth Strawn, Michael Shaheen and James Laventis on May 5, 2016 ("May 5th DOJ Teleconference"), it was represented to me and another attorney at the Firm that the purpose of this discovery is obtain evidentiary information in the possession, custody or control of HDL to be used against certain remaining parties in the South Carolina Action, all of which are targets of the Committee's 2004

3

investigation.

11.     The Subpoena is largely duplicative of the time period covered in the 2013 Subpoena, as the Subpoena and the 2013 Subpoena each relate back to January 1, 2008 and cover the same January 2008 through January 2013 time period. The Subpoena also covers January 2013 through April 29, 2016.

12.     Similarly, the Subpoena is substantively duplicative in large part to the 2013 Subpoena. Specifically, thirty-six of the thirty-seven requests in the 2013 Subpoena also are included in the Subpoena. The following chart summarizes the overlapping Requests between the Subpoena and 2013 Subpoena to HDL:

| REQUEST | SUBPOENA | 2013 SUBPOENA |
|---|---|---|
| All documents regarding the legal and organizational structure of HDL | Request 1 | Request 1 |
| Internal organization charts, employee lists, and other documents sufficient to identify current and former HDL officers, directors, executive management, employees, and agents | Request 2 | Request 2 |
| Financial statements, audited and unaudited | Request 3 | Request 3 |
| Board of Director's meeting minutes and notes. | Request 4 | Request 4 |
| All reports or communications between HDL managements and the Board of Directors | Request 5 | N/A |
| All reports and communications between HDL managements and HDL's shareholders | Request 6 | N/A |
| All reports or communications between HDL's Board of Directors and BlueWave, BlueWave employees, or independent contractors associated with BlueWave | Request 7 | N/A |
| All documents related to HDL's compliance program(s) and individuals with responsibilities related to compliance. Identify any changes in HDL's compliance program(s) and the dates of any such changes | Request 8 | N/A |
| All documents related to internal or external reviews or analysis of any statute, regulation, or guidance or other law relating to: (a) P&H fees; (b) zero balance billing; (c) the provision of health care providers of a phlebotomist, phlebotomy services, a dietician, diabetic services, or the funding of such positions or services; (d) the lease, sublease or purchase of equipment, real or personal property from healthcare providers; (e) any other remuneration provided to a health care provider; or (f) any remuneration provided to any BlueWave employee, contractor, or | Request 9 | N/A |

4

| REQUEST | SUBPOENA | 2013 SUBPOENA |
|---|---|---|
| subcontractor | | |
| All documents related to internal or external reviews or analysis of any statute, regulation, guidance or other law relating to contract provisions concerning commission-based payments by a lab to an independent contractor in exchange for the independent contractors' arranging for and recommending that health care providers refer business to the lab | Request 10 | N/A |
| All contracts, agreements and arrangements between HDL and/or BlueWave and any health care providers including, but not limited to, the collection, handling, processing and shipping of patient specimens or samples | Request 11 | Request 7 |
| All documents related to internal or external reviews or analysis of the legal ramifications of the provisions contained in any and all sales agreements HDL entered into with BlueWave | Request 12 | N/A |
| All communications and documents showing any compensation, and the calculation of that compensation, that was paid to BlueWave and any independent contractors associated with BlueWave | Request 13 | N/A |
| All communications and documents discussing or describing sales incentives and/or benefits provided to BlueWave and any independent contractors associated with BlueWave | Request 14 | N/A |
| All communications and documents discussing or describing sales incentives and/or benefits provided to HDL's sales representatives | Request 15 | Request 6 |
| All communications and documents showing any compensation paid to HDL's sales representatives and the calculation of that compensation | Request 16 | Request 5 |
| A list of all compensation, rewards, incentives and/or gifts provided to any health care provider by individual entity and year | Request 17 | Request 8 |
| Any analyses, reports, guidance, or studies related to the compensation, rewards, incentives and/or gifts provided to any health care providers | Request 18 | Request 9 |
| All external or internal written policies, procedures, instructions, or guidance regarding compensation, rewards, incentives and/or gifts provided to any health care providers | Request 19 | Request 10 |
| Any analyses, evaluations, studies or reports regarding the financial impact of HDL's and/or BlueWave's compensation, rewards, incentives and/or gifts to any health care providers | Request 20 | Request 11 |
| All internal communications relating to HDL's compensation, rewards, incentives and/or gifts to any health care providers | Request 21 | Request 12 |
| All communications between HDL and/or BlueWave and any third party | Request 22 | Request 13 |
| Financial records identifying the compensation, rewards, incentives and/or gifts paid by HDL to any health care providers | Request 23 | Request 23 |
| Financial records identifying the compensation, rewards, incentives and/or gifts paid by HDL to BlueWave or independent | Request 24 | Request 25 |

| REQUEST | SUBPOENA | 2013 SUBPOENA |
|---|---|---|
| contractors associated with BlueWave | | |
| All communications and documents related to processing and handling fees | Request 25 | N/A |
| Documents identifying all provider names, addresses, and identification numbers such as the National Provider Identifiers (NPI's) that HDL used in submitting claims for payment to any federal funded health care program | Request 26 | Request 15 |
| One copy of each different version of HDL's lab requisition form, including any customized or modified lab requisition forms, prepared for any health care providers who received any compensation from HDL | Request 27 | Request 16 |
| Any documents related to the customization or modification of HDL's standard lab requisition forms of any health care providers including, but not limited to, the authorization to customize or modify HDL's standard laboratory panels from any health care providers | Request 28 | Request 17 |
| All internal policies, procedures, instructions, or guidance related to the medical necessity or appropriateness of the coding and billing of all tests included in each individual panel, profile, or bundle for services | Request 29 | Request 18 |
| All documents related to any guidelines or procedures for BlueWave employees or contractors regarding recommendations or communications to a health care provider regarding the number, types, and frequency of tests that patients could or should receive | Request 30 | N/A |
| All communications, guidance, instructions, or training to HDL, and/or BlueWave and/or their agents or representatives related to how to facilitate the grouping, bundling, or adding of certain tests on HDL's standard lab requisition form | Request 31 | Request 19 |
| All documents explaining, evaluating, or discussing the profitability of any specific tests and/or panels, profiles, or bundles of services performed by HDL or BlueWave | Request 32 | Request 20 |
| All documents related to HDL's requests, recommendations, guidelines, or suggestions about what tests should be included in a baseline, follow-up or advanced panel | Request 33 | N/A |
| All documents explaining, evaluating, discussing, or relating to appropriate reimbursable IDC-9 codes for specific tests performed by HDL | Request 34 | Request 21 |
| All documents explaining, evaluating, discussing, or relating to appropriate reimbursable CPT codes for specific tests performed by HDL | Request 35 | Request 22 |
| Documents showing the reimbursement rates paid to HDL by any federally funded health care program for all tests included in each individual panel, profile or bundle for services | Request 36 | Request 23 |
| All contracts, agreements, or arrangements between HDL and BlueWave or any other similar company | Request 37 | Request 24 |

6

| REQUEST | SUBPOENA | 2013 SUBPOENA |
|---|---|---|
| All documents and communications related to contracts, agreements or arrangements between HDL and BlueWave | Request 38 | N/A |
| All documents and communications related to contracts, agreements or arrangements between BlueWave and Singulex | Request 39 | N/A |
| Any contracts, agreements or arrangements between HDL and any other laboratory company | Request 40 | Request 26 |
| Financial records relating to any compensation, rewards, incentives, and/or gifts between HDL and any other laboratory company | Request 41 | Request 27 |
| All marketing materials relating to HDL's tests included in panels, profiles, and bundles for services | Request 42 | Request 28 |
| All internal communications, instructions, directives, training materials, policies, or procedures related to HDL's compliance with the Stark Law (42 U.S.C. §1395nn), the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), and the federal health care program coding and billing requirements | Request 43 | Request 29 |
| All documents and communications regarding any complaint, concern, inquiry, investigation or review related to a possible violation by HDL of any federal statute or regulation including, but not limited to, the Stark Law (42 U.S.C. §1395nn), the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), and the federal health care program coding and billing requirements | Request 44 | Request 30 |
| Any opinions, guidance or advisories received from any source including HHS, CMS or its contractors, relating to HDL's compensation, rewards, incentives and/or gifts to any health care providers | Request 45 | Request 31 |
| Any opinions, guidance, or advisories received from any source including HHS, CMS or its contractors, relating to federal health care program coding and billing, the Stark Law (42 U.S.C. §1395nn), and the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)) | Request 46 | Request 32 |
| All internal communications, instructions, directives, training, policies or procedures relating to waivers of insurance co-payments or deductibles | Request 47 | Request 33 |
| All communications between HDL and any third party relating to waivers of insurance co-payments and deductibles | Request 48 | Request 34 |
| Any analyses, evaluations, studies, or reports regarding the financial impact of waivers of insurance co-payment or deductible amounts on HDL's business | Request 49 | Request 35 |
| All documents that reflect or relate to any proposal by HDL, BlueWave or their agents or representatives to place a phlebotomist in the office of health care provider | Request 50 | Request 36 |
| All documents related to any fair market valuation of the P&H fees paid by HDL, or on HDL's behalf, to any health care provider | Request 51 | N/A |
| Documents describing or demonstrating HDL's relationship with | N/A | Request 37 |

| REQUEST | SUBPOENA | 2013 SUBPOENA |
|---|---|---|
| any health foundations or non-profit organizations | | |

Substantial Demands on HDL's Limited Resources

13.     In order to respond to the Subpoena, the Estate Parties would be required to collect, process, search, review, and produce a significant quantity of documents responsive to the fifty-one broad Requests in the Subpoena. This would require, at a minimum: (i) identification of all electronic and paper data sources that may contain documents or information potentially responsive to the Subpoena; (ii) the retrieval, forensic imaging and transfer of electronic and paper documents from various third party vendors and storage locations; (iii) processing and gathering electronic data into searchable databases for interrogation and dynamic inquiries, including the application of Boolean search terms, uploading into an electronic review platform; (iv) digital scanning and processing of paper and other data not in "native" format, including the application of Boolean search terms, and uploading into an electronic review platform; (v) months of attorney review, which likely will require the Estate Parties to hire a large team of contract attorneys; and (vi) preparing responsive documents for electronic production.

14.     The data sources that include documents and information potentially responsive to the Subpoena include, but are not limited to, electronic mail servers, shared network drive servers, and employee laptops and other physical equipment. HDL's electronic mail server alone is believed to contain over *twenty-three million* employee emails.

15.     Additionally, I believe over six hundred employee laptops and other pieces of physical equipment currently exist. The Firm is still in the process of identifying other potentially available and relevant document sources. This process is a distraction to the current Chief Restructuring Officer, Richard Arrowsmith, and places a strain on HDL's limited resources.

16.     Based on the information currently known, it is not unreasonable to estimate that

responding to the Subpoena likely will involve the review and production of hundreds of thousands, if not millions, of documents.

17.     It also is not unreasonable for HDL to assume that the process of responding to the Subpoena could climb into the millions of the dollars to fully respond. Without employees to assist HDL in responding to the Subpoena, HDL will require outside counsel, contract attorney reviewers, a third party e-discovery vendor, and other litigation support vendor assistance, placing a substantial financial burden on the estates.

18.     During the May 5th DOJ Teleconference, the Assistant U.S. Attorneys informed the Firm that the South Carolina Action is on very tight discovery timelines, which may place further pressure on HDL to incur attorney and vendor support costs in order to respond.

19.     Many aspects of HDL's business necessarily involved legal input and advice, and any documents to be produced by the Estate Parties would have to be reviewed so that the Estate Parties can preserve the attorney-client and other applicable privileges. Such review and production is costly and time-consuming.

20.     For these reasons, HDL's response to the Subpoena and Requests places a substantial burden on HDL and threatens to interfere significantly with HDL's efforts to liquidate for the benefit of general unsecured creditors.

I declare under penalty of perjury, pursuant to 28 U.S.C. §1746, that the foregoing is true to the best of my knowledge, information, and belief.

Executed on May 10, 2016, at Cincinnati, OH.

Sarah K. diFrancesca

9

**EXHIBIT C**

**<u>2013 Subpoena</u>**

# UNITED STATES OF AMERICA
## DEPARTMENT OF JUSTICE

### SUBPOENA DUCES TECUM
No. 2:2013

TO:   **Health Diagnostic Laboratory, Inc.**
**c/o Custodian of Records**
**737 N. 5th Street, Suite 103**
**Richmond, VA 23219**

YOU ARE HEREBY COMMANDED TO APPEAR  BEFORE Assistant U.S. Attorney Rhett Dehart, an official of the U.S. Department of Justice, and you are hereby required to bring with you the <u>records as stated in the attachment</u> which are necessary in the performance of the responsibility of the U.S. Department of Justice to  investigate Federal health care offenses,  defined in 18 U.S.C. § 24(a) to mean violations of, or conspiracies to violate: 18 U.S.C. §§669, 1035, 1347, or 1518; and 18 U.S.C. §§ 287, 371, 664, 666, 1001, 1027, 1341, 1343, or 1954 if the violation or conspiracy relates to a health care benefit program (defined in 18 U.S.C. § 24(b)). **Please see the attachment for the specific records requested.**

<u>In lieu of making a personal appearance, you may mail the records by certified mail to</u> Rhett Dehart, Assistant United States Attorney, 151 Meeting Street, Suite 200, Charleston, South Carolina 29401, on or before the <u>22nd</u> day of <u>February, 2013</u>, at 9 a.m.

Failure to comply with the requirements of this subpoena will render you liable to proceedings in the district court of the United States to enforce obedience to the requirements of this subpoena, and to punish default or disobedience.

Issued under authority of Sec. 248 of the Health Insurance
Portability & Accountability Act of 1996, Public Law No. 104-91
(18 U.S.C. § 3486)



*IN TESTIMONY WHEREOF*

*RHETT DEHART, ASSISTANT U.S. ATTORNEY ,*
*the undersigned official of the U.S. DEPARTMENT*
*OF JUSTICE, has hereunto set his/her hand this* <u>7TH</u>
*day of January 2013 .*

Rhett Dehart
Assistant U.S. Attorney

FORM CRM-180
MAR. 97

RES00030804

UNITED STATES OF AMERICA
DEPARTMENT OF JUSTICE

SUBPOENA DUCES TECUM

Subpoena No.: 2 -2013

*Upon contumacy or refusal to obey, this subpoena shall be enforceable by order of the appropriate United States District Court.*

## RETURN OF SERVICE

I, being a person over 18 years of age, hereby certify that a copy of this subpoena was duly served on the person named herein by means of --

1. personal delivery to an individual, to wit:

_____
*(Address)*

2. personal delivery to an address, to wit:

_____
*(Description of premises)*

_____
*(Address)*

_____

3. registered or certified mailing to:

at ___p.m. on _____
*(Signature)*
Special Agent Su Kim, U.S. Department of
Health and Human Services
*(Title)*

RES00030805

ATTACHMENT TO SUBPOENA ISSUED TO:

HEALTH DIAGNOSTIC LABORATORY, INC. (HDL)

For the years: **January 2008 to the Present**

1.      All documents regarding the legal and organizational structure of Health Diagnostic
Laboratory, Inc. (HDL), including but not limited to:

   a.      papers filed with the Securities and Exchange Commission, including annual
reports, prospectuses, and 10-K filings;

   b.      organizational or corporate papers filed with the appropriate state agencies and
any amendments thereto, to include articles of incorporation and bylaws;

   c.      documents that describe HDL's organizational structure and the reporting
responsibilities of HDL's personnel by name and position;

   d.      to the extent nothing is provided in response to specifications 1.a through 1.c
above, all documents regarding ownership and management of HDL and any
changes thereto;

2.      Internal organization charts, employee lists, and other documents sufficient to identify
current and former HDL officers, directors, executive management, employees, and
agents to include the following: (a) positions, (b) dates of employment, (c) Social
Security numbers, (d) dates of birth, (e) home address, (f) telephone numbers, and
(g) other contact information;

3.      All financial statements, audited and unaudited;

4.      All Board of Director's meeting minutes and notes;

5.      All communications and documents showing any compensation paid to HDL's sales
representatives and the calculation of that compensation;

6.      All communications and documents discussing or describing sales incentives and/or
benefits provided to HDL's sales representatives;

7.      All contracts, agreements, and arrangements between HDL and/or BlueWave Healthcare
Consultants, Inc. (BlueWave) and physicians, physicians' practices, employees of
physicians' practices, or any other health care providers, including, but not limited to, the
collection, handling, and shipping of patient specimens or samples;

RES00030806

8.    A list of all compensation, rewards, incentives and/or gifts provided to physicians, physicians' practices, employees of physicians' practices or any other health care provider by individual entity and year;

9.    Any analyses, reports, guidance, or studies related to the compensation, rewards, incentives and/or gifts provides to physicians, physicians' practices, employees of physicians' practices or any other health care providers;

10.   All internal written policies, procedures, instructions, or guidance regarding compensation, rewards, incentives and/or gifts to physicians, physicians' practices, employees of physicians' practices, or any other health care providers;

11.   Any analyses, evaluations, studies, or reports regarding the financial impact of HDL's and/or BlueWave's compensation, rewards, incentives and/or gifts to physicians, physicians' practices, employees of physicians' practices, or any other health care providers, including but not limited to: (a) return on investment analyses; (b) studies showing the impact or correlation between the compensation and the number of tests ordered by the providers; and (c) studies showing the impact on or correlation between the compensation and changes in revenues and profits;

12.   All internal communications relating to HDL's compensation, rewards, incentives and/or gifts to physicians, physicians' practices, employees of physicians' practices, or any other health care providers, including but not limited to, communications regarding the policies and procedures of HDL's competitors related to compensation, rewards, incentives and/or gifts to physicians, physicians' practices, employees of physicians' practices, or any other health care provider;

13.   All communications between HDL and/or BlueWave and any third party including, but not limited to, physicians, physicians' practices, employees of physicians' practices, any other health care providers, consultants, sales representatives, or agents relating to compensation to physicians, physicians' practices, any other health care providers, consultants, sales representatives, or agents;

14.   Financial records identifying the compensation , rewards, incentives and/or gifts paid by HDL to physicians, physicians' practices, or any other health care providers, including but not limited to, any financial reports or analyses showing the total number and dollar payments for any compensation, rewards, incentives and/or gifts provided by HDL by entity and year;

15.   Documents identifying all provider names, addresses, and identification numbers such as the National Provider Identifiers (NPI's) that HDL used in submitting claims for payment to any federally funded health care program;

RES00030807

16.     One copy of each different version of HDL's lab requisition form. including any
        customized or modified lab requisition forms, prepared for any physician, physicians'
        practice, or any other health care provider who received any compensation from HDL;

17.     Any documents related to the customization or modification of HDL's standard lab
        requisition forms for any physicians, physicians' practices, or any other health care
        provider, including, but not limited to, the authorization to customize or modify HDL's
        standard laboratory panels from any physician, physicians' practice, or any other health
        care provider;

18.     All internal policies, procedures, instructions, or guidance regarding the medical
        necessity or appropriateness of the coding and billing of all tests included in each
        individual panel, profile, or bundle for services;

19.     All communications, guidance, instructions, or training to HDL, and/or BlueWave and/or
        their agents or representatives regarding how to facilitate the grouping, bundling, or
        adding of certain tests on HDL's standard lab requisition form;

20.     All documents explaining, evaluating, or discussing the profitability of any specific tests
        and/or panels, profiles, or bundles for services performed by HDL or BlueWave;

21.     All documents explaining, evaluating, discussing, or relating to appropriate reimbursable
        ICD-9 codes for specific tests performed by HDL;

22.     All documents explaining, evaluating, discussing, or relating to appropriate reimbursable
        CPT codes for specific tests performed by HDL;

23.     Documents showing the reimbursement rates paid to HDL by any federally funded health
        care program for all tests included in each individual panel, profile, or bundle for
        services;

24.     All contracts, agreements, or arrangements between HDL and BlueWave or any other
        similar company;

25.     Financial records relating to any compensation, rewards, incentives and/or gifts between
        HDL and BlueWave, or any similar company;

26.     Any contracts, agreements, or arrangements between HDL and any other laboratory
        company;

27.     Financial records relating to any compensation, rewards, incentives and/or gifts between
        HDL and any other laboratory company;

28.     All marketing materials relating to HDL's tests included in panels, profiles, and bundles
        for services;

RES00030808

29.   All internal communications, instructions, directives, training materials, policies, or procedures regarding HDL's compliance with the Stark Law (42 U.S.C. § 1395nn), the Anti-Kickback statute (42 U.S.C. § 1320a-7b(b)), and federal health care program coding and billing requirements;

30.   All documents and communication regarding any complaint, concern, inquiry, investigation, or review regarding a possible violation by HDL of any federal statue or regulation, including, but not limited to, the Stark Law (42 U.S.C. § 1395nn), the Anti-Kickback statute (42 U.S.C. § 1320a-7b(b)), and federal health care program coding and billing requirements;

31.   Any opinions, guidance, or advisories received from any source including HHS, CMS or its contractors, relating to HDL's compensation, rewards, incentives and/or gifts to physicians, physicians' practices, or any other health care providers;

32.   Any opinions, guidance, or advisories received from any source including HHS, CMS or its contractors, relating to federal health care program coding and billing, the Stark Law (42 U.S.C. § 1395nn), and the Anti-Kickback statute (42 U.S.C. § 1320a-7b(b));

33.   All internal communications, instructions, directives, training, policies, guidance or procedures relating to waivers of insurance co-payments or deductibles;

34.   All communications between HDL and any third party, including but not limited to, physicians, physicians' practices, employees of physicians' practices, any other health care providers, consultants, sales representatives, or agents relating to waivers of insurance co-payments and deductibles;

35.   Any analyses, evaluations, studies, or reports regarding the financial impact of waivers of insurance co-payment or deductible amounts on HDL's business, including but not limited to, (a) return on investment analyses; (b) studies showing the impact on or correlation between waivers and the number of tests ordered by providers; and (c) studies showing the impact or correlation between waivers and changes in HDL's revenues and profits;

36.   All documents that reflect or relate to any proposal by HDL, BlueWave or their agents or representatives to place a phlebotomist in the office of a physician or other health care provider, including, but not limited to, any proposal for HDL, BlueWave or their agents or representatives to rent space from a physician or other health care provider for a phlebotomist.

37.   Documents describing or demonstrating HDL's relationship (e.g., partner, supporter, donor, sponsor) with any health foundations or non-profit organizations, including but not limited to the company's relationships with the FH Foundation and the Foundation for Health Improvement and Technology (FHIT).

RES00030809

Please provide the documents in electronic format.

RES00030810

*November 2012*

### Specifications for Production of ESI and Digitized ("Scanned") Images
### ("Production Specifications")

**Collection of Electronically Stored Information** (ESI)
Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process.

1.  **Specification Modifications**
    Any modifications or deviations from the Production Specifications may be done only with the express permission of the government.  Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

2.  **Production Format of ESI and Imaged Hard Copy**
    Responsive ESI and imaged hard copy shall be produced in the format outlined below.  All ESI, except as outlined below in sections 9 – 19, shall be produced to type TIFF image format, and accompanied by a Concordance® Image Cross Reference file. All applicable metadata (see section 3 below) shall be extracted and provided in Concordance® load file format.

    a.    **Image File Format:** All images, paper documents scanned to images, or rendered ESI, shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression).  Documents should be uniquely and sequentially Bates numbered with an endorsement burned into each image.
    *   All TIFF file names shall include the unique Bates number burned into the image.
    *   Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page.
    *   All TIFF image files shall be stored with the ".tif" extension.
    *   Images shall be OCR'd using a standard COTS products.
    *   All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.
    *   No image folder shall contain more than 2000 images.

    b.    **Concordance® Image Cross Reference file:** Images should be accompanied by a Concordance® Image Cross Reference file that associates each Bates number with its corresponding single-page TIFF image file.  The Cross Reference file should also contain the image file path for each Bates numbered page.
    *   Image Cross Reference Sample Format:

        ABC00000001,OLS,D:\DatabaseName\Images\001\ ABC00000001.TIF,Y,,,
        ABC00000002,OLS,D:\DatabaseName\Images\001\ ABC00000002.TIF,,,,
        ABC00000003,OLS,D:\DatabaseName\Images\001\ ABC00000003.TIF,,,,
        ABC00000004,OLS,D:\DatabaseName\Images\001\ ABC00000004.TIF,Y,,,

    c.    **Concordance® Load File**: Images should also be accompanied by a "text load file" containing delimited text that will populate fields in a searchable, flat database environment.  The file should contain the required fields listed below in section 3.

    *   ASCII text delimited load files are defined using the following delimiters:

        | | |
        |---|---|
        | *Field Separator* | *^ or Code 094* |
        | *Text Qualifier* | *ǀ or Code 124* |
        | *Substitute Carriage Return or New Line* | *() or Code 013* |

1

RES00030811

*November 2012*

## Specifications for Production of ESI and Digitized ("Scanned") Images
## ("Production Specifications")

- The text file should also contain hyperlinks to applicable native files, such as Microsoft Excel or PowerPoint files.
- There should be one line for every record in a collection.
- The load file must contain a field map/key listing the metadata/database fields in the order they appear within the data file.  For example, if the data file consists of a First Page of a Record (starting Bates), Last Page of a Record (ending Bates), Document ID, Document Date, File Name, and a Title, then the structure may appear as follows:

|BEGDOC#|^|ENDDOC#|^|DOCID|^|DOCDATE|^|FILENAME|^|TITLE|

- The extracted/OCR text for each document should be provided as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

3.    **Required Metadata/Database Fields**

- A "✓" denotes that the indicated field should be present in the load file produced.
- "Other ESI" includes non-email or hard copy documents, including but not limited to data discussed in sections 6-9, and 12-19 below.

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-Mail | Other ESI |
|---|---|---|---|---|---|---|
| COMPANY | Company/Organization submitting data | Full Text | Unlimited | ✓ | ✓ | ✓ |
| BOX# | Submission/volume/box number | Note Text | 10 | ✓ | ✓ | ✓ |
| CUSTODIAN | Custodian(s)/Source(s) - format: Last, First or ABC Dept | Multi-Entry | Unlimited | ✓ | ✓ | ✓ |
| AUTHOR | Creator of the document | Note Text | 160 | | | ✓ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Note Text | 60 | ✓ | ✓ | ✓ |
| ENDDOC# | End Bates (including prefix) - No spaces | Note Text | 60 | ✓ | ✓ | ✓ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Note Text | 60 | ✓ | ✓ | ✓ |
| PGCOUNT | Page Count | Integer | 10 | ✓ | ✓ | ✓ |
| PARENTID | Parent's DOCID or Parent's Start Bates (for EVERY document including all Child documents) | Note Text | 60 | ✓ | ✓ | ✓ |
| ATTACHIDs | Child document list; Child DOCID or Child Start Bates | Multi-Entry | 60 | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment Bates numbers | Multi-Entry | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of first attachment | Note Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last | Note Text | 60 | ✓ | ✓ | ✓ |

2

RES00030812

*November 2012*

**Specifications for Production of ESI and Digitized ("Scanned") Images
("Production Specifications")**

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-Mail | Other ESI |
|---|---|---|---|---|---|---|
| | attachment | Text | | | | |
| PROPERTIES | Privilege notations, Redacted, Document Withheld Based On Privilege | Multi-Entry | Unlimited | ✓ | ✓ | ✓ |
| RECORD TYPE | File, E-mail, Attachment, or Hard Copy | Note Text | 60 | ✓ | ✓ | ✓ |
| FROM | Author - format: Last name, First name | Note Text | 160 | | ✓ | ✓ |
| TO | Recipient- format: Last name, First name | Multi-Entry | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients - format: Last name, First name | Multi-Entry | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients - format: Last name, First name | Multi-Entry | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject/Document Title | Note Text | Unlimited | | ✓ | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Note Text | Unlimited | | ✓ | |
| DOCDATE | Document Date/Date Sent - Format YYYY/MM/DD | Date Keyed | YYYY/MM/DD | | | ✓ |
| BODY | E-mail body, Other Electronic Document Extracted text, or OCR | Full Text | Unlimited | ✓ | ✓ | ✓ |
| TIMESENT | Time e-mail was sent | Time | 10 | | ✓ | |
| DATECRTD | Date Created | Date | YYYY/MM/DD | | ✓ | ✓ |
| DATESVD | Date Saved | Date | YYYY/MM/DD | | ✓ | ✓ |
| DATEMOD | Date Last Modified | Date Keyed | YYYY/MM/DD | | ✓ | ✓ |
| DATERCVD | Date Received | Date | YYYY/MM/DD | | ✓ | |
| DATEACCD | Date Accessed | Date | YYYY/MM/DD | | ✓ | ✓ |
| FILESIZE | File Size | Note Text | 10 | | | ✓ |
| FILENAME | File name - name of file as it appeared in its original location | Full Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Note Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc; .pdf; .wpd) | Note Text | 10 | | ✓ | ✓ |
| FILEPATH | Data's original source full folder path | Full Text | Unlimited | | ✓ | ✓ |
| NATIVELINK | Current file path location to the native file | Full Text | Unlimited | | ✓ | ✓ |
| FOLDERID | E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. | Full Text | Unlimited | ✓ | ✓ | |

3

RES00030813

*November 2012*

## Specifications for Production of ESI and Digitized ("Scanned") Images
## ("Production Specifications")

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-Mail | Other ESI |
|---|---|---|---|---|---|---|
| | Folder or binder name) | | | | | |
| PARAGRAPH | Subpoena/request paragraph number to which the document is responsive | Multi-Entry | Unlimited | ✓ | ✓ | ✓ |
| HASH | Hash value (used for deduplication or other processing) (e-mail hash values must be run with the e-mail and all of its attachments) | Note Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | Email header.  Can contain IP address | Full Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments to an email | Note Text | 10 | | ✓ | |
| FILETYPE | Identifies the application that created the file | Note Text | 160 | | ✓ | ✓ |
| COMMENTS | Identifies whether the document has comments associated with it | Note Text | 10 | | ✓ | ✓ |

4.  **De-duplication, Near-Duplicate Identification, Email Conversation Threading and Other Culling Procedures**

   De-duplication of exact copies within a custodian's data may be done, but all "filepaths" must be provided for each duplicate document.  The recipient shall not use any other procedure to cull, filter, group, separate or de-duplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near dupe ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields.

5.  **Hidden Text**

   All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file.  For files that cannot be expanded the native files shall be produced with the image file.

6.  **Embedded Files**

   All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

7.  **Image-Only Files**

   All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool [and other] screenshots, etc., as well as all other images that contain text) shall be produced with associated OCR text and metadata/database fields identified in section 3 for "Other ESI."

8.  **Hard Copy Records**

   a.  All hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID). Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder.) The first document in the collection represents the parent document and all other documents will represent the children.

4

RES00030814

## Specifications for Production of ESI and Digitized ("Scanned") Images
## ("Production Specifications")

    b.  All documents shall be produced in black and white TIFF format unless the image requires color. An image "requires color" when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image. Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.

    c.  All objective coding (e.g., document date or document author) should be discussed and produced to the government as additional metadata/database fields.

9.    **Production of Spreadsheets and Presentation Files.** All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format). *See* section 18 below. The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata. No alteration shall be made to file names or extensions for responsive native electronic files.

10.    **Production of Email Repositories**
    Email repositories, also known as email databases (e.g., Outlook .PST, Lotus .NSF, etc.), can contain a variety of items, including: messages, calendars, contacts, tasks etc. For purposes of production, responsive items shall include the "Email" metadata/database fields outlined in section 3, including but not limited to all parent items (mail, calendar, contacts, tasks, notes, etc.) and child files (attachments of files to email or other items) with the parent/child relationship preserved. Email databases from operating systems other than Microsoft Exchange shall be produced after consultation with and written consent of the government about the format for the production of such databases.

11.    **Production of Items Originally Generated in E-Mail Repositories but Found and Collected Outside of Email Repositories, i.e., "Stand-alone" Items**
    Any parent email or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of email repositories (e.g., items having extensions like .MSG, .HTM, .MHT, etc.), shall be produced items with the "Email" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

12.    **Production of Instant Messenger (IM), Voicemail Data, Audio Data, Video Data, etc.**
    The responding party shall identify, collect, and produce any and all data which is responsive to the requests which may be stored in audio or video recordings, cell phone/PDA/Blackberry/smart phone data, tablet data, voicemail messaging data, instant messaging, text messaging, conference call data, video/audio conferencing (e.g. GoTo Meeting, WebEx), and related/similar technologies. However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

13.    **Social Media**
    Prior to any production of responsive data from Social Media (e.g., Twitter, Facebook, Google+, LinkedIn, etc.)the producing party shall first discuss with the government the potential export formats before collecting the information.

14.    **Productions of Structured Data**
    Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, etc.), the producing party shall first provide the database dictionary and a list of all reports that can be generated from the structured database. The list of reports shall be provided in native Excel (.xls) format.

15.    **Productions of Structured Data from Proprietary Applications**
    Prior to any production of structured data from proprietary applications (e.g., proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint etc.) the producing party shall first provide the database

RES00030815

### Specifications for Production of ESI and Digitized ("Scanned") Images
### ("Production Specifications")

dictionary and a list of all reports that can be generated from the structured database. The list of reports shall be produced in native Excel (.xls) format.

16. **Production of Photographs with Native File or Digitized ESI**
Photographs shall be produced as single-page .JPG files with a resolution equivalent to the original image as it was captured/created. All .JPG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

17. **Images from which Text Cannot be OCR Converted**
An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the electronic Bates, Document Id or Bates number(s) corresponding to each such image.

18. **Format of ESI from Non-PC or Windows-based Systems**
If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

19. **Production of Native Files (When Applicable Pursuant to These Specifications)**
Productions of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3.

    a. ESI shall be produced in a manner which is functionally useable by the government. The following are examples:
- AutoCAD data, e.g., .DWG, .DXF, shall be processed/converted and produced as single-page .JPG image files and accompanied by a Concordance® Image formatted load as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.
- GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.
- Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

20. **Bates Number Convention**
All images should be assigned Bates numbers before production to the government. The numbers should be "endorsed" (or "burned in") on the actual images. Native files should be assigned a single bates number for the entire file. The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique name/number common to each page (when assigned to an image) or to each document (when assigned to a native file). If the government agrees to a rolling production, the naming/numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

| | |
|---|---|
| PREFIX0000001 | PREFIX0000003 |
| PREFIX0000001.001 | PREFIX0000003.001 |
| PREFIX0000001.002 | PREFIX0000003.002 |

6

RES00030816

*November 2012*

## Specifications for Production of ESI and Digitized ("Scanned") Images
## ("Production Specifications")

21.    **Media Formats for Storage and Delivery of Production Data**
Electronic documents and data shall be delivered on any of the following media:
   a.    CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications.
   b.    External hard drives [USB 2.0 (or better) or eSATA, formatted to NTFS format specifications] or flash drives.
   c.    Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
   d.    Media should be labeled with the case name, production date, Bates range, and producing party.

22.    **Virus Protection and Security for Delivery of Production Data**
Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. No encryption software shall be used without the written consent of the government.

23.    **Compliance and Adherence to Generally Accepted Technical Standards**
Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

24.    **Read Me Text File**
All deliverables shall include a read me text file at the root directory containing: total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths and formats. The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

25.    **Exception Log**
An Exception Log shall be included documenting any production anomalies utilizing the electronic Bates number (document id or control numbering) assigned during the collection, processing and production phases.

-XXX-

RES00030817

AUTHORIZED INVESTIGATIVE DEMAND                    SUBPOENA NO.   2-2013

<u>CERTIFICATE OF SERVICE</u>

_____ , do hereby state that I am the
       (Name)

_____ , and am the authorized records
       (Title)

custodian for the purposes of responding to the Authorized Investigative Demand directed to:

       **Health Diagnostic Laboratory, Inc.**
       **c/o Custodian of Records**
       **737 N. 5th Street, Suite 103**
       **Richmond, VA 23219**

returnable at the Offices of the United States Attorney, Rhett Dehart, Assistant United States Attorney, 151 Meeting Street, Suite 200, Charleston, South Carolina 29401, on or before February 22, 2013.

      To the best of my knowledge and belief, as authorized records custodian, the records which I hereby produce to the United States Attorney for the District of South Carolina were made and maintained as a regular practice, and were made and maintained during the regular course of business.

      I hereby certify that I have caused the appropriate records to be searched and to the best of my knowledge, all of the records required by the aforesaid subpoena are contained in the attached sealed envelope/container.

_____          _____
      (Date)                                        (Signature of Records Custodian

RES00030818

**EXHIBIT D**

**2016 Subpoena**

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of South Carolina

| | |
|---|---|
| United States ex rel. Dr. Michael Mayes, et al. | ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No. 9:14-cv-00230 |
| Berkeley HeartLab, Inc., et al. | ) |
| | ) |
| _Defendant_ | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                    Health Diagnostic Laboratory, Inc.

_____
_(Name of person to whom this subpoena is directed)_

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment

| Place: Michael E. Shaheen, Trial Attorney, Department of Justice, Civil Frauds, 601 D. Street., N.W., Washington, D.C. 20004 | Date and Time: 05/10/2016 10:00 am |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 4/8/16

| CLERK OF COURT | | |
|---|---|---|
| _____ | OR | _____ |
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_    United States
_____, who issues or requests this subpoena, are:
Michael E. Shaheen, michael.e.shaheen@usdoj.gov 202.353.0506 & James Leventis, james.leventis@usdoj.gov

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   9:14-cv-00230

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____.

❐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00    .

I declare under penalty of perjury that this information is true.

Date: _____                  _____
                                                *Server's signature*

                                         _____
                                                *Printed name and title*

                                         _____
                                                *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

ATTACHMENT TO SUBPOENA ISSUED TO:

HEALTH DIAGNOSTIC LABORATORY, INC. (HDL)


## DEFINITIONS

These definitions and instructions apply to each and every request as if specifically set

forth therein.

1.  Unless specified otherwise, the terms "Health Diagnostic Laboratory, Inc.," "HDL,"
    "You," or "Your" means Health Diagnostic Laboratory, Inc., and any entity names
    and any variations thereof, and any and all predecessors, successors, parent
    organizations, subsidiaries, affiliates, branches, divisions, units or offices of such
    entity, officers, directors, employees, or agents.

2.  Unless specified otherwise, the term "BlueWave" means BlueWave Healthcare
    Consultants, Inc., any entity names and any variations thereof, and any and all
    predecessors, successors, parent organizations, subsidiaries, affiliates, independent
    contractors, subcontractors, consultants, branches, divisions, units or offices of such
    entity, officers, directors, employees or agents.

3.  The terms "and" and "or" shall be construed conjunctively or disjunctively as
    necessary to make each particular request inclusive rather than exclusive.

4.  The terms "any" and "all" shall be construed conjunctively or disjunctively as
    necessary to make each particular request inclusive rather than exclusive.

5.  The terms "relate to" or "related to" shall mean in whole or in part, directly or
    indirectly identifying, explaining, describing, constituting, regarding, evidencing,
    reflecting, analyzing, evaluating, concerning, showing, referring to, discussing,
    connected with, relating to, responding to, commenting on, tending to prove or
    disprove, copying or supporting.

6.  The singular form of a noun or pronoun shall be considered to include within its
    meaning the plural form as well and vice versa.

7.  All present tenses of verbs or verb forms shall be considered to include within their
    meaning the future and past tenses as well and vice versa.

8.    The term "document" shall be interpreted in the broad and liberal sense including, but not limited to, emails, contracts, agreements, SMS text, all items identified in Rule 34(a)(1) of the Federal Rules of Civil Procedure, and necessarily means, without limitation: written, typed, printed, recorded, computer stored or generated, graphic or photographic matter or any other medium upon which intelligence or information can be recorded, stored, or retrieved, however produced or reproduced, of any kind and description, and whether an original, master, duplicate or copy including, but not limited to, paper, notes, accounts, books, journals, advertisements, catalogs, manuals, publications, correspondence, memoranda, letters, communications, including interoffice and intra-office communications, reports, studies, analyses, pamphlets, calculations, projections, charts, graphs, plans, specifications, drawings, sketches, working papers, corporate records, minutes of board of directors or committee meetings, books of account, ledger books, notebooks, vouchers, bank checks, cashier's checks, receipts for cashier's checks, canceled checks, check stubs, bills, receipts, invoices, time sheets, calendars, photographs, computer printouts, computer databases, information stored on computer, computer disks or other magnetic disks, minutes, transcriptions or sound recordings of any conversations, negotiations, meetings or conferences, conducted either in person or by telephone or by videoconference, or things similar to any of the foregoing and all other papers, writings or physical things containing information, including data compilations from which information can be obtained by detection devices, and including preliminary drafts of or marginal notes appearing on any document, however denominated or described.

9.    The terms "processing and handling fee," and "P&H fee" shall refer to remuneration given to health care providers to reimburse health care providers for the costs associated with the collection of blood specimens including, but not limited to, venipuncture fees, packaging and handling fees, processing & handling fees, packaging fees, draw fees, or any fees related to the collection, handling, and shipping of patient specimens or samples.

10.    The term "remuneration" shall be interpreted broadly and includes anything of value including, but not limited to a salary, wage, bonus, commission, or P&H fee.

11.    The term "zero balance billing" shall refer to the waiver, in part or in whole, of copays, deductibles or other obligations owed by patients including, but not limited to, patients with private insurance.

12.    The term "health care provider" shall be interpreted broadly to include a physician, nurse, physician practice, employees of a physician practice, hospital, clinic or any other health care provider or employee, partner, agent or representative of a health care provider.

## INSTRUCTIONS

These instructions apply to each and every request as if specifically set forth therein.

1.    The Relevant Time Period, unless otherwise stated in any specific document request, calls for the production of all documents dated, created, revised or referred to at any time from January 1, 2008 through the date of service of this Subpoena.

2.    Except as otherwise provided in these instructions (including, but not limited to, the limitation contained in Instruction 6 with respect to privileges), this request requires the production of all documents responsive to one or more of the specifications set out below which are in the possession, custody or control of HDL or any entity associated therewith, regardless of where located.

3.    To the extent that documents responsive to this Subpoena once were, but no longer are, in the possession, custody or control of HDL, this Subpoena requires production of all existing indices, lists or documents in HDL's possession, custody or control that reflect the transfer or destruction of, or references to, such documents.

4.    If no documents exist that are responsive to a specific document request, a written statement to that effect shall be provided at the time of production.

5.    To the extent that documents responsive to this Subpoena are in the possession, custody, or control of third parties, this Subpoena requires a written statement to that effect at the time of production, specifically providing the name, address, telephone number and principal contact of the third party, and shall further identify those documents in said third party's possession.

6.    Where a claim of privilege is asserted in response to any document requested by this Subpoena, and such document, or any part thereof, is not produced on the basis of such claim, for each document or part thereof that is not produced, please provide a privilege log wherein HDL refers to the specific paragraph of this Subpoena to which the document is responsive and identify the type of document being withheld (*e.g.*, letter, memorandum, handwritten notes, email), a description of its contents, its

author(s), all actual and intended recipients of the document, its date, and the specific privilege being asserted, all with sufficient particularity so as to allow the government, and potentially a court, to assess the validity of the claim of privilege.

7.   All documents withheld on the basis of an asserted privilege should be preserved and maintained in their original format.

8.   All documents produced pursuant to this Subpoena are to be organized in such a manner that all documents relating to a particular specification are grouped together and identified as being responsive to that specification.

9.   All documents produced in response to this Subpoena shall comply with the following instructions:

   a.   HDL shall conduct a search for responsive documents in a manner sufficient to identify the source and location where each responsive document is found.

   b.   All documents produced in response to this Subpoena shall be segregated and labeled to show the document request to which the documents are responsive and the source and location where the document was found.

   c.   To the extent that documents are found in file folders, computer disks, hard drives or other storage media that have labels or other identifying information, the documents shall be produced with such file folder and label information intact.

   d.   To the extent that documents are found attached to other documents, by means of paper clips, staples, or other means of attachment, physical or electronic, such documents shall be produced together in their condition when found.

10.   Provide a list of any non-standard abbreviations used in any of the documents or responses being provided.

11.   Every document requested in this Subpoena must be produced in the manner in which it is or has been maintained in the ordinary course of business. To facilitate the handling, return and identification of the submitted documents, please mark each page with an identifying logo that includes: (1) a minimum of three letters that clearly identify the entity or individual from whose possession, custody or control the document is being produced; and (2) sequential numbering of each page, beginning with "0000001." The marks should be placed in the lower right hand corner of each page, but should not obscure any information on the document. All documents

should be produced in enclosures bearing HDL's name, the date of the Subpoena and the paragraphs of the Subpoena to which the documents respond.

12.    The preferred method of production is for all documents to be produced according to the most recent Department of Justice "Specifications for Production of ESI and Digitized ("Scanned") Images." The August 2015 version is attached hereto.

## REQUESTS

1.    All documents regarding the legal and organizational structure of HDL including but not limited to:

   a.    papers filed with the Securities and Exchange Commission, including annual reports, prospectuses, and 10-K filings;

   b.    organizational or corporate papers filed with the appropriate state agencies and any amendments thereto, to include articles of incorporation and bylaws;

   c.    documents that describe HDL's organizational structure and the reporting responsibilities of HDL's personnel by name and position; and

   d.    documents regarding ownership and management of HDL and any changes thereto.

2.    Internal organization charts, employee lists, and other documents sufficient to identify current and former HDL officers, directors, executive management, employees, and agents to include the following: (a) positions, (b) dates of employment, (c) Social Security numbers, (d) dates of birth, (e) home addresses, (f) telephone numbers, and (g) other contact information.

3.    All financial statements, audited and unaudited.

4.    All Board of Director's meeting minutes and notes.

5.    All reports or communications between HDL management and the Board of Directors.

6.    All reports or communications between HDL management and HDL's shareholders.

7.    All reports or communications between HDL's Board of Directors and BlueWave, BlueWave employees, or independent contractors associated with BlueWave.

8.      All documents related to HDL's compliance program(s) and individuals with
        responsibilities related to compliance. Identify any changes in HDL's compliance
        program(s) and the dates of any such changes.

9.      All documents related to internal or external reviews or analyses of any statute,
        regulation, guidance or other law relating to: (a) P&H fees; (b) zero balance billing; (c)
        the provision to health care providers of a phlebotomist, phlebotomy services, a dietician,
        dietetic services, or the funding of such positions or services; (d) the lease, sublease or
        purchase of equipment, real or personal property from healthcare providers; (e) any other
        remuneration provided to a health care provider; or (f) any remuneration provided to any
        BlueWave employee, contractor, or subcontractor.

10.     All documents related to internal or external reviews or analyses of any statute,
        regulation, guidance or other law relating to contract provisions concerning commission-
        based payments by a lab to an independent contractor in exchange for the independent
        contractors' arranging for and recommending that health care providers refer business to
        the lab.

11.     All contracts, agreements, and arrangements between HDL and/or BlueWave and any
        health care providers including, but not limited to, the collection, handling, processing,
        and shipping of patient specimens or samples.

12.     All documents related to internal or external reviews or analyses of the legal
        ramifications of the provisions contained in any and all sales agreements HDL entered
        into with BlueWave.

13.     All communications and documents showing any compensation, and the calculation of
        that compensation, that was paid to BlueWave and any independent contractors
        associated with BlueWave.

14.     All communications and documents discussing or describing sales incentives and/or
        benefits provided to BlueWave and any independent contractors associated with
        BlueWave.

15.     All communications and documents discussing or describing sales incentives and/or
        benefits provided to HDL's sales representatives.

16.     All communications and documents showing any compensation paid to HDL's sales
        representatives and the calculation of that compensation.

17.     A list of all compensation, rewards, incentives and/or gifts provided to any health care
        provider by individual entity and year.

18.    Any analyses, reports, guidance, or studies related to the compensation, rewards, incentives and/or gifts provided to any health care providers.

19.    All external or internal written policies, procedures, instructions, or guidance regarding compensation, rewards, incentives and/or gifts provided to any health care providers.

20.    Any analyses, evaluations, studies, or reports regarding the financial impact of HDL's and/or BlueWave's compensation, rewards, incentives and/or gifts to any health care providers including, but not limited to: (a) return on investment analyses; (b) studies showing the impact or correlation between the compensation and the number of tests ordered by providers; (c) studies showing the impact on or correlation between the compensation and changes in revenues and profits; and (d) analyses regarding the legality of the compensation, rewards, incentives, and/or gifts to health care providers.

21.    All internal communications relating to HDL's compensation, rewards, incentives and/or gifts to any health care providers including, but not limited to, communications regarding the policies and procedures of HDL's competitors related to compensation, rewards, incentives and/or gifts to any health care providers.

22.    All communications between HDL and/or BlueWave and any third party including, but not limited to, any health care providers, consultants, sales representatives, or agents relating to compensation to any health care providers, consultants, sales representatives, or agents.

23.    Financial records identifying the compensation, rewards, incentives and/or gifts paid by HDL to any health care providers including, but not limited to, any financial reports or analyses showing the total number and dollar payments for any compensation, rewards, incentives and/or gifts provided by HDL by entity and year.

24.    Financial records identifying the compensation, rewards, incentives and/or gifts paid by HDL to BlueWave or independent contractors associated with BlueWave including, but not limited to, any financial reports or analyses showing the total number and dollar payments for any compensation, rewards, incentives and/or gifts provided by HDL each year.

25.    All communications and documents related to processing and handling fees.

26.    Documents identifying all provider names, addresses, and identification numbers such as the National Provider Identifiers (NPI's) that HDL used in submitting claims for payment to any federally funded health care program.

27.   One copy of each different version of HDL's lab requisition form, including any customized or modified lab requisition forms, prepared for any health care providers who received any compensation from HDL.

28.   Any documents related to the customization or modification of HDL's standard lab requisition forms for any health care providers including, but not limited to, the authorization to customize or modify HDL's standard laboratory panels from any health care providers.

29.   All internal policies, procedures, instructions, or guidance related to the medical necessity or appropriateness of the coding and billing of all tests included in each individual panel, profile, or bundle for services.

30.   All documents related to any guidelines or procedures for BlueWave employees or contractors regarding recommendations or communications to a health care provider regarding the number, types, and frequency of tests that patients could or should receive.

31.   All communications, guidance, instructions, or training to HDL, and/or BlueWave and/or their agents or representatives related to how to facilitate the grouping, bundling, or adding of certain tests on HDL's standard lab requisition form.

32.   All documents explaining, evaluating, or discussing the profitability of any specific tests and/or panels, profiles, or bundles for services performed by HDL or BlueWave.

33.   All documents related to HDL's requests, recommendations, guidelines, or suggestions about what tests should be included in a baseline, follow-up, or advanced panel.

34.   All documents explaining, evaluating, discussing, or relating to appropriate reimbursable ICD-9 codes for specific tests performed by HDL.

35.   All documents explaining, evaluating, discussing, or relating to appropriate reimbursable CPT codes for specific tests performed by HDL.

36.   Documents showing the reimbursement rates paid to HDL by any federally funded health care program for all tests included in each individual panel, profile, or bundle for services.

37.   All contracts, agreements, or arrangements between HDL and BlueWave or any other similar company.

38.   All documents and communications related to contracts, agreements, or arrangements between HDL and BlueWave.

39.     All documents and communications related to contracts, agreements, or arrangements between BlueWave and Singulex, Inc.

40.     Any contracts, agreements, or arrangements between HDL and any other laboratory company.

41.     Financial records relating to any compensation, rewards, incentives, and/or gifts between HDL and any other laboratory company.

42.     All marketing materials relating to HDL's tests included in panels, profiles, and bundles for services.

43.     All internal communications, instructions, directives, training materials, policies, or procedures related to HDL's compliance with the Stark Law (42 U.S.C. § 1395nn), the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), and federal health care program coding and billing requirements.

44.     All documents and communication regarding any complaint, concern, inquiry, investigation, or review related to a possible violation by HDL of any federal statue or regulation including, but not limited to, the Stark Law (42 U.S.C. § 1395nn), the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), and federal health care program coding and billing requirements.

45.     Any opinions, guidance, or advisories received from any source including HHS, CMS or its contractors, relating to HDL's compensation, rewards, incentives and/or gifts to any health care providers.

46.     Any opinions, guidance, or advisories received from any source including HHS, CMS or its contractors, relating to federal health care program coding and billing, the Stark Law (42 U.S.C. § 1395nn), and the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)).

47.     All internal communications, instructions, directives, training, policies, guidance or procedures relating to waivers of insurance co-payments or deductibles.

48.     All communications between HDL and any third party including, but not limited to, any health care providers, consultants, sales representatives, or agents relating to waivers of insurance co-payments and deductibles.

49.     Any analyses, evaluations, studies, or reports regarding the financial impact of waivers of insurance co-payment or deductible amounts on HDL's business including, but not limited to: (a) return on investment analyses; (b) studies showing the impact on or correlation between waivers and the number of tests ordered by providers; (c) studies showing the impact or correlation between waivers and changes in HDL's revenues and

profits; and (d) analyses regarding the legality of waiving insurance co-payment or deductible amounts.

50.    All documents that reflect or relate to any proposal by HDL, BlueWave or their agents or representatives to place a phlebotomist in the office of a health care provider including, but not limited to, any proposal for HDL, BlueWave or their agents or representatives to rent space from a health care provider for a phlebotomist.

51.    All documents related to any fair market valuation of the P&H fees paid by HDL, or on HDL's behalf, to any health care provider.

*August 2015*

## Specifications for Production of ESI and Digitized ("Scanned") Images ("Production Specifications")

### Collection of Electronically Stored Information (ESI)

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process.

**1.      Specification Modifications**

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form.  Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

**2.      Production Format of ESI and Imaged Hard Copy**

Responsive ESI and imaged hard copy shall be produced in the format outlined below.  All ESI, except as outlined below in sections 5 – 20, shall be rendered to TIFF image format, and accompanied by a Concordance® Image Cross Reference file. All applicable metadata (see section 3 below) shall be extracted and provided in Concordance® load file format.

**a.**      Image File Format:

All images, paper documents scanned to images, or rendered ESI, shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression). Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

- All TIFF file names shall include the unique Bates number burned into the image.
- Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page.
- All TIFF image files shall be stored with the ".tif" extension.
- Images shall be OCR'd using standard COTS products.
  - An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images.  The report shall include the DOCID or Bates number(s) corresponding to each such image.
- All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.
- No image folder shall contain more than 2000 images.

**b.      Concordance® Image Cross Reference file:** Images should be accompanied by a Concordance® Image Cross Reference file that associates each Bates number with its corresponding single-page TIFF image file.  The Cross Reference file should also contain the image file path for each Bates numbered page.

- Image Cross Reference Sample Format:

1

*August 2015*

## Specifications for Production of ESI and Digitized ("Scanned") Images
## ("Production Specifications")

ABC00000001,OLS,D:\DatabaseName\Images\001\ ABC00000001.TIF,Y,,,
ABC00000002,OLS,D:\DatabaseName\Images\001\ ABC00000002.TIF,,,,
ABC00000003,OLS,D:\DatabaseName\Images\001\ ABC00000003.TIF,,,,
ABC00000004,OLS,D:\DatabaseName\Images\001\ ABC00000004.TIF,Y,,,

    c.    **Concordance® Load File**: Images should also be accompanied by a "text load file" containing delimited text that will populate fields in a searchable, flat database environment. The file should contain the required fields listed below in section 3.

- Text delimited load files are defined using the standard Concordance delimiters. For example:

  | | |
  |---|---|
  | *Field Separator* | ¶ *or Code 020* |
  | *Text Qualifier* | þ *or Code 254* |

- The text file should also contain hyperlinks to applicable native files, such as Microsoft Excel or PowerPoint files.
- There should be one line for every record in a collection.
- The load file must contain a field map/key listing the metadata/database fields in the order they appear within the data file. For example, if the data file consists of a First Page of a Record (starting Bates), Last Page of a Record (ending Bates), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAMEþ¶þTITLEþ

    d.    **The extracted/OCR text** for each document should be provided as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

    e.    **Directory and folder structure:** The directory structure for productions should be:

\\*CaseName*\\**LoadFiles**
\\*CaseName*\\**Images** < For supporting images (can include subfolders as needed)
\\*CaseName*\\**Natives** <Native Files location (can include subfolders as needed)
\\*CaseName*\\**Text** <Extracted Text files location (can include subfolders as needed)

3.    **Required Metadata/Database Fields**

- A "✓" denotes that the indicated field should be present in the load file produced.
- "Other ESI" includes data discussed in sections 5 – 20 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), and imaged hard copy material (section 9). Email, email repositories, and "stand

*August 2015*

## Specifications for Production of ESI and Digitized ("Scanned") Images ("Production Specifications")

alone" materials (section 12) should comply with "Email" column below. Imaged hard copy materials should comply with the "Hard Copy" column.

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | ✓ | ✓ | ✓ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | ✓ | ✓ | ✓ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | ✓ | ✓ | ✓ |
| AUTHOR | Creator of the document | Text | 500 | | | ✓ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | ✓ | ✓ | ✓ |
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of first attachment | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| PROPERTIES | Privilege notations, Redacted, Document Withheld Based On Privilege | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |

3

*August 2015*

## Specifications for Production of ESI and Digitized ("Scanned") Images
## ("Production Specifications")

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other. If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Author - format: Last name, First name. | Text | 160 | | ✓ | ✓ |
| TO | Recipient - format: Last name, First name. | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients - format: Last name, First name. | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients - format: Last name, First name. | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line/Document Title | Text | Unlimited | | ✓ | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent. | Date | MM/DD/YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date Sent (USE TIME ZONE OF COLLECTION LOCALITY) | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |

4

*August 2015*

## Specifications for Production of ESI and Digitized ("Scanned") Images
## ("Production Specifications")

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| FILE SIZE | Native File Size in bytes | Number | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | ✓ |
| PARAGRAPH REQUEST NUMBER | Subpoena/request paragraph number to which the document is responsive. Use semicolon to delimit multiple entries. | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| MD5 HASH | MD5 Hash value (used for deduplication or other processing) (e-mail hash values must be run with the e-mail and all of its attachments) | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. Can contain IP address | Text | Unlimited | | ✓ | |

5

*August 2015*

## Specifications for Production of ESI and Digitized ("Scanned") Images ("Production Specifications")

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |
| FILE TYPE | Identifies the application that created the file Type of file, not to be confused with file extension | Text | 160 | | ✓ | ✓ |
| COMMENTS | Identifies whether the document has comments associated with it | Text | 10 | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | For PDFs Only | Text | 600 | | ✓ | ✓ |

**4.    Search, De-Duplication, Near-Duplicate Identification, E-mail Conversation Threading and Other Culling Procedures**

De-duplication of exact copies <u>within</u> a custodian's data may be done, but all file paths and custodians must be provided for each duplicate document in an exception report in .csv format. The recipient shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The recipient will not employ analytic software or technology to search identify, or review potentially responsive material, including but not limited to technology assisted review (TAR) or predictive coding, without first discussing with the government.

**5.    Hidden Text**

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. For files that cannot be expanded the native files shall be produced with the image file.

**6.    Embedded Files**

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

**7.    Image-Only Files**

All image-only files (non-searchable .pdfs, multi-page .tiffs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with associated OCR text and metadata/database fields identified in section 3 for "Other ESI."

*August 2015*

## Specifications for Production of ESI and Digitized ("Scanned") Images
## ("Production Specifications")

**8.    Encrypted Files**

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

**a.**    The unencrypted text shall be extracted and provided per section 2.c. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b.  The unencrypted native file shall be produced pursuant to sections 10-20.

**b.**    If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 26) and shall include all available metadata associated with the data, including custodian information.

**9.    Production of Imaged Hard Copy Records**

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

**a.**    Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).

**b.**    The first document in the collection represents the parent document and all other documents will represent the children.

**c.**    All documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.  Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.

**d.**    All objective coding (e.g., document date or document author) should be discussed and produced to the government as additional metadata/database fields.

**10.    Production of Spreadsheets and Presentation Files**

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image. *See* section 18 below.  The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.  No alteration shall be made to file names or extensions for responsive native electronic files.

**11.    Production of E-mail Repositories**

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF, etc.), can contain a variety of items, including: messages, calendars, contacts, tasks, etc.  For purposes of production, responsive items shall include the "E-mail" metadata/database fields outlined in section 3, including but not limited to all parent items (mail, calendar, contacts, tasks, notes, etc.) and child files (attachments of files to e-mail or other items) with the parent/child relationship preserved. Our preferred format for e-mail productions is PST.  E-mail should NOT be provided in X400 or X500 format.  E-mail databases from systems other than Microsoft Exchange shall be

7

*August 2015*

## Specifications for Production of ESI and Digitized ("Scanned") Images ("Production Specifications")

produced after consultation with and written consent of the government about the format for the production of such databases.

**12.     Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items**

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

**13.     Production of Instant Messenger (IM), Voicemail Data, Audio Data, Video Data, etc.**

The responding party shall identify, collect, and produce any and all data which is responsive to the requests which may be stored in audio or video recordings, cell phone/PDA/Blackberry/smart phone data, tablet data, voicemail messaging data, instant messaging, text messaging, conference call data, video/audio conferencing (e.g., GoTo Meeting, WebEx), and related/similar technologies. However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

**14.     Production of Social Media**

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, Google+, LinkedIn, etc.) the producing party shall first discuss with the government the potential export formats before collecting the information.

**15.     Production of Structured Data**

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, etc.), the producing party shall first identify the database type and version number, provide the database dictionary and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. The list of reports shall be provided in native Excel (.xls or .xlsx) format.

**16.     Production of Structured Data from Proprietary Applications**

Prior to any production of structured data from proprietary applications (e.g., proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint etc.) the producing party shall first provide the database dictionary and a list of all reports that can be generated from the structured database.  The list of reports shall be produced in native Excel (.xls or .xlsx) format.

**17.     Production of Photographs with Native File or Digitized ESI**

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created.  All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

8

*August 2015*

## Specifications for Production of ESI and Digitized ("Scanned") Images
## ("Production Specifications")

### 18.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 19.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 20.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3.

ESI shall be produced in a manner which is functionally usable by the government. The following are examples:

>    **a.**    AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.
>    **b.**    GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.
>    **c.**    Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

### 21.    Bates Number Convention

All images should be assigned Bates numbers before production to the government. The numbers should be endorsed on the actual images. Native files should be assigned a single Bates number for the entire file. The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given to each page (when assigned to an image) or to each document (when assigned to a native file). If the government agrees to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

>    PREFIX0000001              PREFIX0000003
>    PREFIX0000001.001         PREFIX0000003.001
>    PREFIX0000001.002         PREFIX0000003.002

### 22.    Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

*August 2015*

### Specifications for Production of ESI and Digitized ("Scanned") Images
### ("Production Specifications")

**a.** CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
**b.** External hard drives (USB 3.0 or higher, Firewire or eSATA, formatted to NTFS format specifications) or flash drives.
**c.** Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
**d.** Media should be labeled with the case name, production date, Bates range, and producing party.

### 23.    Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. No encryption software shall be used without the written consent of the government.

### 24.    Compliance and Adherence to Generally Accepted Technical Standards

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

### 25.    Read Me Text File

All deliverables shall include a "read me" text file at the root directory containing: total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats. The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

### 26.    Exception Report

An exception report, in .csv format, shall be included, documenting any production anomalies utilizing the electronic Bates number (DOCID or control numbering) assigned during the collection, processing, and production phases.

### 27.    Transmittal Letter to Accompany Deliverables

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates number range produced.

-XXX-

**EXHIBIT E**

**<u>Objections and Responses</u>**

# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## BEAUFORT DIVISION

|  |  |
|---|---|
| The United States of America and the States of North Carolina, California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Michigan, Minnesota, New Jersey, New York, Tennessee, Texas, Virginia and Wisconsin, *ex rel.* Scarlett Lutz, Kayla Webster, Dr. Michael Mayes and Chris Reidel, | : : : Case No. 9:14-cv-00230-RMG : (Consolidated with 9:11-cv-1593-RMG : and 9:15-cv-2485-RMG) : : : : : |
| Plaintiffs, | : : : |
| v. | : : |
| Berkeley Heartlab, Inc., BlueWave Healthcare Consultants, Inc., Latonya Mallory, Floyd Calhoun Dent, III and Robert Bradford Johnson, | : : : : : |
| Defendants. | : : |

## HEALTH DIAGNOSTIC LABORATORY, INC.'S RESPONSES AND OBJECTIONS TO SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

Pursuant to Rule 45(d)(2)(B) of the Federal Rules of Civil Procedure, Health Diagnostic Laboratory, Inc. ("HDL"),[1] as a nonparty to the above-captioned case, hereby objects to the Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (the "Subpoena") issued by the United States of America (the "Plaintiff") as follows:

## GENERAL OBJECTIONS

---

[1] These Responses and Objections are submitted on behalf of HDL by the Official Committee of Unsecured Creditors of Health Diagnostic Laboratory, Inc., et al., and Richard Arrowsmith, the Chief Restructuring Officer for Health Diagnostic Laboratory, Inc., and its affiliated debtors and debtors-in-possession (the "Debtors") and the initial Liquidating Trustee for the Liquidating Trust to be created upon the effective date of the Debtors' Plan (as defined herein). The Plan was confirmed on March 29, 2016. Entry of the confirmation order and the written opinion supporting same is to be issued by the bankruptcy court.

HDL asserts the following General Objections (the "General Objections") to the Subpoena, each of which is hereby incorporated by reference into the response to each individual request for production (each a "Request" and collectively, the "Requests") below. From time to time, and for purpose of emphasis, HDL may restate one or more of the General Objections as specific objections to individual Requests. Such restatement, or the failure to restate, should not be taken as a waiver of any General Objection not restated.

1.     HDL objects to the Subpoena and the Requests on the grounds they violate the automatic stay imposed by the filing of the Debtors' consolidated chapter 11 bankruptcy cases pending in the United States Bankruptcy Court for the Eastern District of Virginia under Case No. 15-32919 (KRH) (collectively, the "Bankruptcy Cases"). The automatic stay provisions of 11 U.S.C. § 362(a) stay "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). In order for the protections of section 362(a)(3) to apply, HDL need only possess or control the documents. *See 48th Street Steakhouse, Inc. v. Rockefeller Center, Inc. (In re 48th Street Steakhouse, Inc.),* 61 B.R. 182, 187 (Bankr. S.D.N.Y. 1986) (citing legislative history in support of holding that section 362(a)(3) protects property "over which the estate has control or possession"), *aff'd,* 835 F.2d 427 (2d Cir. 1987). HDL's books and records that are sought in the Subpoena are considered property of the estate within the meaning of section 541(a) and are therefore protected by the automatic stay. *See, e.g., In re Integrated Resources, Inc.,* No. 91-1310, 1992 WL 8335 (S.D.N.Y. Jan. 14, 1992) (affirming bankruptcy court's holding that a debtor's books and records are property of the estate and denying a motion for relief from the automatic stay); *In re Greenlife, Inc.,* No. 88-00825, 1990 WL 10091748, at *3 (Bankr. E.D. Va. July 16, 1990) (acknowledging that a debtor's books and records are protected by the automatic

stay and stating that "the party seeking issuance or enforcement of a subpoena would be precluded from taking further action in the absence of relief from the stay").

2.      HDL objects to the Subpoena and the Requests based upon the bankruptcy court's equitable power under 11 U.S.C. § 105(a) to stay HDL from responding to the Subpoena. In *In re Residential Capital, LLC*, 480 B.R. 529 (Bankr. S.D.N.Y. 2012), the bankruptcy court  stayed nonparty document and deposition subpoenas  issued to the debtors by the Federal Home Loan Mortgage Corporation as part of securities fraud litigation pending in the district court.  The court identified six relevant factors as to whether discovery should be stayed against a debtor: (i) scope; (ii) context; (iii) need; (iv) timing; (v) burden; and (vi) expense.   Substantially contemporaneously herewith, HDL is filing a motion with the United States Bankruptcy Court for the Eastern District of Virginia seeking an injunction staying its obligation to respond to the Subpoena and the Requests pursuant to 11 U.S.C. § 105(a) (the "Motion").   The Motion is incorporated herein as if set forth in full.

3.      Because all six factors militate in favor of HDL, the bankruptcy court likely will stay HDL's obligation to respond to the Subpoena and the Requests.   Each factor is briefly discussed below:

i.      **Scope**.  The scope of the Subpoena and the Requests is undeniably broad and supports issuance of an injunction. The 51 Requests (not including subparts) seek documents and information from January 1, 2008 through April 29, 2016 (the date of service of the Subpoena on HDL), including corporate organizational documents, external and internal communications, internal legal reviews and reports, financial statements and records, detailed billing and financial records and analyses, copies of contracts and agreements, and other business records. HDL estimates that there are hundreds of thousands, if not millions, of potentially

responsive documents, although HDL does not have an accurate estimate due to the timing involved with the Subpoena and the limitations involved with accessing the data. The Subpoena and the Requests are not narrowly tailored to minimize the burden on HDL – a nonparty to the litigation – and therefore contravene Federal Rule of Civil Procedure 45(d)(1)'s requirement that the Plaintiff take "reasonable steps to avoid imposing undue burden or expense" on nonparties.

ii.    **Context**.    The context of the litigation supports the issuance of an injunction. The impact on the Plaintiff's case is minimal because the litigation can proceed without the documents and information requested in the Subpoena, as substantially all of the information can be obtained from parties to the litigation. Additionally, HDL already produced over 100,000 documents to the Department of Justice in response to a Subpoena Duces Tecum dated January 7, 2013. Prompt discovery and an immediate trial are also not requested in the litigation. In contrast, responding to the Subpoena and the Requests would have a severe impact on the administration of the Bankruptcy Cases and the liquidation of estate assets.

iii.    **Need**.    Plaintiff does not have an imminent need for the documents and information requested in the Subpoena because the discovery deadline is currently set for February 6, 2017, and the Plaintiff can obtain substantially all of the same information and documents from parties to the litigation. As a nonparty to the litigation, special consideration must be given to the undue burden imposed on HDL. *Cf. North Carolina Right to Life, Inc. v. Leake*, 231 F.R.D. 49, 52 (D.D.C. 2005)

iv.    **Timing**.    The timing and procedural posture of the Debtors' Bankruptcy Cases strongly support issuance of an injunction. HDL has no remaining employees and substantially all of its assets, including its core businesses, have been liquidated. On March 29, 2016, the Honorable Kevin R. Huennekens, U.S.B.J., orally confirmed the Second Amended

Plan of Liquidation (the "Plan").[2]  Pursuant to the Plan, Richard Arrowsmith will be retained as the initial Liquidating Trustee by the Liquidating Trust formed for the benefit of certain of HDL's creditors.  The Liquidating Trustee is responsible for implementing applicable provisions of the Plan, including the distribution of the proceeds of the liquidation of all remaining assets to creditors.  If HDL is forced to expend its already limited time and resources responding to the Subpoena and the Requests, the Bankruptcy Cases will be delayed.  Any delay in implementing the Plan and in the Liquidating Trustee's pursuit of causes of action under the Plan will harm HDL's creditors.

v.    **Burden**.  Responding to the Subpoena and the Requests would impose a heavy burden on HDL and could result in estimated costs of millions of dollars to fully respond.  HDL estimates that the monumental task of collecting, processing, searching, reviewing, and producing the significant quantity of documents responsive to the 51 broad Requests in the Subpoena would require, at a minimum: (i) identification of all electronic and paper data sources that may contain documents or information potentially responsive to the Subpoena and Requests; (ii) the retrieval, forensic imaging and transfer of electronic and paper documents from various third-party vendors and storage locations; (iii) processing and gathering electronic data into searchable databases for interrogation and dynamic inquiries, including the application of Boolean search terms, uploading into an electronic review platform; (iv) digital scanning and processing of paper and other data not in "native" format, including the application of Boolean search terms, and uploading into an electronic review platform; (v) months of attorney review, which likely will require HDL to hire a large team of contract attorneys; and (vi) preparing responsive documents for electronic production.  Because HDL has no employees, this process

---

[2] The Plan has not been formally entered by Judge Heunnekens because he is preparing a written opinion approving the Plan.

will take many months and significantly strain HDL's limited resources. Additionally, the documents and data that fall within the scope of the Subpoena encompass an expansive quantity of data, including email data sources, structured data sources, proprietary databases, and hardware devices, all of which demand a high level of resources by HDL to identify, preserve, process, host, search, review and produce.

vi.       **Expense**.  HDL estimates that the cost of responding to the Subpoena and the Requests is excessive and could climb into the millions of the dollars to fully respond.  HDL does not have the infrastructure in place to undertake the arduous task of responding to the Subpoena and the Requests.  As a result, HDL will need to retain a third-party e-discovery vendor and other litigation support vendors, as well as incur attorney's fees and contract review attorney fees, to identify, preserve, host, search, review and produce the documents and data potentially responsive to the Subpoena.

4.       HDL objects to the Subpoena and the Requests because they subject a nonparty to the litigation to significant expense and undue burden.  HDL no longer exists as an active corporation and does not have full-time employees that could be tasked with responding to the Subpoena and the Requests.  HDL reserves the right to seek full reimbursement of all expenses incurred in responding to the Subpoena and the Requests pursuant to Rule 45(d)(2)(B)(ii) of the Federal Rules of Civil Procedure.  *See, e.g.*, *United States v. Blue Cross Blue Shield of Mich.*, No. 10-CV-14155, 2012 WL 4838987 (E.D. Mich. Oct. 11, 2012) (shifting a portion of the cost of producing documents in response to a subpoena from nonparties to the United States Department of Justice, despite the public importance of the underlying litigation and the fact that the nonparties were large, well-funded corporations).

5.      HDL objects to the Subpoena and the Requests to the extent that they fail to comply with Rule 45 of the Federal Rules of Civil Procedure.

6.      HDL objects to the Subpoena and the Requests, and any implied or express instruction or direction set forth therein, including without limitations instruction numbers 2, 6, 8, 9, and 12 that imposes or seeks to impose burdens greater than those imposed by the Federal Rules of Civil Procedure.

7.      HDL objects to the Subpoena and the Requests because they fail to allow HDL with reasonable time to comply.  The Subpoena was served by the Plaintiff on the evening of Friday, April 29, 2016, and demands a response by May 24, 2016, at 10:00 a.m.[3]  The response period is an unreasonable and untenable amount of time to comply with the Subpoena and Requests based upon the voluminous number of documents requested from a company not in operation with no employees.

8.      HDL objects to the Subpoena and the Requests because the place of compliance exceeds the geographic limitations set forth in Rule 45(c) of the Federal Rules of Civil Procedure.  Washington, D.C., is more than 100 miles from Richmond, Virginia.

9.      HDL objects to the Subpoena and the Requests to the extent they seek information that is overbroad, unduly burdensome, vague and ambiguous, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

10.      HDL objects to the Subpoena and the Requests to the extent they seek information that is either publicly available or already in the possession, custody or control of the parties to this litigation.

---

[3]      The Plaintiff extended the response deadline from the original date of May 10, 2016.

7

11.     HDL objects to the Subpoena and the Requests to the extent they seek disclosure of proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations.

12.     HDL objects to the Subpoena and the Requests to the extent they seek information or documents protected from disclosure by the attorney-client privilege, the work-product doctrine, the privacy privilege, the joint-defense privilege or any other privilege or immunity, and refuse to produce any such document(s).  HDL does not intend by these objections to waive any claim of privilege or immunity.  HDL's objections are conditioned specifically on the understanding that the provision of information or documents for which any claim of privilege is applicable shall be deemed inadvertent and not a waiver of the claim of privilege.

13.     HDL reserves all objections as to the competence, relevance, materiality, admissibility or privileged status of any information provided in response to the Subpoena and the Requests.

14.     HDL objects to the Subpoena and the Requests to the extent that they seek documents protected by U.S. and international privacy laws, including, but not limited to the Health Information Portability and Accountability Act.

15.     HDL objects to the definitions of "You" and "Your" as set forth in the Subpoena and the Requests to the extent that they require HDL to provide documents on behalf of third-party entities and/or individuals who are likewise non-parties to the litigation.

16.     HDL objects to the Subpoena and the Requests to the extent they require production of documents in the possession, custody, or control of former directors, officers, employees, agents, partners, representatives, and attorneys of HDL and/or their subsidiaries.

Documents such persons might possess are not within the possession, custody, or control of HDL.

17.    HDL objects to the Subpoena and the Requests to the extent they seek to impose burdens greater than those imposed by Rule 45(e) of the Federal Rules of Civil Procedure with respect to the production of electronically stored information. HDL will not produce electronically stored information that is not reasonably accessible because of undue burden or cost.

18.    Inadvertent production of any document that is privileged or otherwise immune from discovery shall not constitute, and is not intended as, a waiver of any privilege or any other ground for objecting to such Request with respect to such document or any other document, the subject matter thereof, the information contained therein, or the right of HDL to object to the use of any such document, or the information contained therein or derived therefrom, during any subsequent proceeding.

19.    HDL reserves the right to produce only the responsive portions of documents where such documents also contain information that is not relevant to the subject matter of the Request, is not reasonably calculated to lead to the discovery of admissible evidence, is privileged or is otherwise protected for disclosure.

20.    HDL generally objects to producing multiple copies of the same document, and the same document in multiple formats (*e.g.* hard copy and computer disk record).  Where multiple copies or multiple formats exist, HDL will produce only one copy or format of the same document.

21.    It should not be inferred from the form or substance of any objection herein that documents responsive to any individual Request exist.

22.     HDL objects to the Subpoena to the extent the requests contained therein are duplicative, overlapping, or cumulative of one another or of discovery that has been or can be taken of individuals or entities other than HDL.

23.     HDL does not admit, adopt, or acquiesce in any factual or legal contention, assertion, characterization, or implication contained in the Subpoena.

24.     HDL objects to Plaintiff's request for "all documents dated, created, revised or referred to at any time from January 1, 2008 through the date of service of this Subpoena." This request is overly broad and unduly burdensome because it seeks documents that have little or no probative value in the litigation.

25.     HDL reserves the right to move to quash and/or modify the subpoena and assert additional objections to the Subpoena and the Requests and any further discovery requested in this matter as appropriate, and to supplement its responses and objections. The disclosure of any information pursuant to the Subpoena and the Requests is not a waiver of these rights. HDL reserves the right to assert additional objections arising from matters discovered during the course of this proceeding.

## SPECIFIC RESPONSES AND OBJECTIONS TO DOCUMENT REQUESTS

The foregoing General Objections are incorporated by reference in each of HDL's responses below to each and every specific document request as if fully set forth therein.

**REQUEST FOR PRODUCTION NO. 1:**

All documents regarding the legal and organizational structure of HDL including but not limited to:

a.      papers filed with the Securities and Exchange Commission, including annual reports, prospectuses, and 10-K filings;

b.      organizational or corporate papers filed with the appropriate state agencies and any amendments thereto, to include articles of incorporation and bylaws;

     c.     documents that describe HDL's organizational structure and the reporting responsibilities of HDL's personnel by name and position; and

     d.     documents regarding ownership and management of HDL and any changes thereto.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 1:

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.**

## REQUEST FOR PRODUCTION NO. 2:

Internal organization charts, employee lists, and other documents sufficient to identify current and former HDL officers, directors, executive management, employees, and agents to include the following: (a) positions, (b) dates of employment, (c) Social Security numbers, (d) dates of birth, (e) home addresses, (t) telephone numbers, and (g) other contact information.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 2:

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation**

## REQUEST FOR PRODUCTION NO. 3:

All financial statements, audited and unaudited.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 3:

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's**

business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.

**REQUEST FOR PRODUCTION NO. 4:**

All Board of Director's meeting minutes and notes.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.

**REQUEST FOR PRODUCTION NO. 5:**

All reports or communications between HDL management and the Board of Directors.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as seeking privileged information, and as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations.

**REQUEST FOR PRODUCTION NO. 6:**

All reports or communications between HDL management and HDL's shareholders.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as seeking privileged information, and as seeking

proprietary and/or confidential information regarding HDL's business, financial and/or

legal matters or operations.

**REQUEST FOR PRODUCTION NO. 7:**

> All reports or communications between HDL's Board of Directors and BlueWave, BlueWave employees, or independent contractors associated with BlueWave.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

In addition to the General Objections, HDL specifically objects to this request as

overly broad and unduly burdensome, as seeking privileged information, as seeking

proprietary and/or confidential information regarding HDL's business, financial and/or

legal matters or operations, and as seeking information that is either publicly available or

already in the possession, custody or control of the parties to this litigation.

**REQUEST FOR PRODUCTION NO. 8:**

> All documents related to HDL's compliance program(s) and individuals with responsibilities related to compliance.  Identify any changes in HDL's compliance program(s) and the dates of any such changes.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

In addition to the General Objections, HDL specifically objects to this request as

overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged

information, and as seeking proprietary and/or confidential information regarding HDL's

business, financial and/or legal matters or operations.

**REQUEST FOR PRODUCTION NO. 9:**

> All documents related to internal or external reviews or analyses of any statute, regulation, guidance or other law relating to: (a) P&H fees; (b) zero balance billing; (c) the provision to health care providers of a phlebotomist, phlebotomy services, a dietician, dietetic services, or the funding of such positions or services; (d) the lease, sublease or purchase of equipment, real or personal property from healthcare providers;

(e) any other remuneration provided to a health care provider; or (f) any remuneration provided to any BlueWave employee, contractor, or subcontractor.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, and as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations.**

**REQUEST FOR PRODUCTION NO. 10:**

All documents related to internal or external reviews or analyses of any statute, regulation, guidance or other law relating to contract provisions concerning commission-based payments by a lab to an independent contractor in exchange for the independent contractors' arranging for and recommending that health care providers refer business to the lab.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, and as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations.**

**REQUEST FOR PRODUCTION NO. 11:**

All contracts, agreements, and arrangements between HDL and/or BlueWave and any health care providers including, but not limited to, the collection, handling, processing, and shipping of patient specimens or samples.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters**

or operations, and as seeking information that is either publicly available or already in the

possession, custody or control of the parties to this litigation.

**REQUEST FOR PRODUCTION NO. 12:**

All documents related to internal or external reviews or analyses of the legal ramifications of the provisions contained in any and all sales agreements HDL entered into with BlueWave.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, and as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations.**

**REQUEST FOR PRODUCTION NO. 13:**

All communications and documents showing any compensation, and the calculation of that compensation, that was paid to Blue Wave and any independent contractors associated with BlueWave.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.**

**REQUEST FOR PRODUCTION NO. 14:**

All communications and documents discussing or describing sales incentives and/or benefits provided to BlueWave and any independent contractors associated with BlueWave.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.

**REQUEST FOR PRODUCTION NO. 15:**

All communications and documents discussing or describing sales incentives and/or benefits provided to HDL's sales representatives.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation, and as seeking documents that are not relevant to the claims or defenses of any party to the litigation.

**REQUEST FOR PRODUCTION NO. 16:**

All communications and documents showing any compensation paid to HDL's sales representatives and the calculation of that compensation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged

information, as seeking proprietary and/or confidential information regarding HDL's

business, financial and/or legal matters or operations, as seeking information that is either

publicly available or already in the possession, custody or control of the parties to this

litigation, and as seeking documents that are not relevant to the claims or defenses of any

party to the litigation.

**REQUEST FOR PRODUCTION NO. 17:**

A list of all compensation, rewards, incentives and/or gifts provided to any health care provider by individual entity and year.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

In addition to the General Objections, HDL specifically objects to this request as

overly broad and unduly burdensome, as vague and ambiguous, as seeking proprietary

and/or confidential information regarding HDL's business, financial and/or legal matters

or operations, and as seeking information that is either publicly available or already in the

possession, custody or control of the parties to this litigation.

**REQUEST FOR PRODUCTION NO. 18:**

Any analyses, reports, guidance, or studies related to the compensation, rewards, incentives and/or gifts provided to any health care providers.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

In addition to the General Objections, HDL specifically objects to this request as

overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged

information, as seeking proprietary and/or confidential information regarding HDL's

business, financial and/or legal matters or operations, and as seeking information that is

either publicly available or already in the possession, custody or control of the parties to

this litigation.

17

**REQUEST FOR PRODUCTION NO. 19:**

All external or internal written policies, procedures, instructions, or guidance regarding compensation, rewards, incentives and/or gifts provided to any health care providers.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.

**REQUEST FOR PRODUCTION NO. 20:**

Any analyses, evaluations, studies, or reports regarding the financial impact of HDL's and/or BlueWave's compensation, rewards, incentives and/or gifts to any health care providers including, but not limited to: (a) return on investment analyses; (b) studies showing the impact or correlation between the compensation and the number of tests ordered by providers; (c) studies showing the impact on or correlation between the compensation and changes in revenues and profits; and (d) analyses regarding the legality of the compensation, rewards, incentives, and/or gifts to health care providers.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.

**REQUEST FOR PRODUCTION NO. 21:**

All internal communications relating to HDL's compensation, rewards, incentives and/or gifts to any health care providers including, but not limited to, communications regarding the policies and procedures of HDL's competitors related to compensation, rewards, incentives and/or gifts to any health care providers.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.

**REQUEST FOR PRODUCTION NO. 22:**

All communications between HDL and/or Blue Wave and any third party including, but not limited to, any health care providers, consultants, sales representatives, or agents relating to compensation to any health care providers, consultants, sales representatives, or agents relating to compensation to any health care providers, consultants, sales representatives or agents.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 22:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.

19

**REQUEST FOR PRODUCTION NO. 23:**

Financial records identifying the compensation, rewards, incentives and/or gifts paid by HDL to any health care providers including, but not limited to, any financial reports or analyses showing the total number and dollar payments for any compensation, rewards, incentives and/or gifts provided by HDL by entity and year.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.**

**REQUEST FOR PRODUCTION NO. 24:**

Financial, records identifying the compensation, rewards, incentives and/or gifts paid by HDL to BlueWave or independent contractors associated with BlueWave including, but not limited to, any financial reports or analyses showing the total number and dollar payments for any compensation, rewards, incentives and/or gifts provided by HDL each year.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.**

**REQUEST FOR PRODUCTION NO. 25:**

All communications and documents related to processing and handling fees.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.**

**REQUEST FOR PRODUCTION NO. 26:**

Documents identifying all provider names, addresses, and identification numbers such as the National Provider Identifiers (NPI's) that HDL used in submitting claims for payment to any federally funded health care program.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.**

**REQUEST FOR PRODUCTION NO. 27:**

One copy of each different version of HDL's lab requisition form, including any customized or modified lab requisition forms, prepared for any health care providers who received any compensation from HDL.

21

**RESPONSE TO REQUEST FOR PRODUCTION NO. 27:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.

**REQUEST FOR PRODUCTION NO. 28:**

Any documents related to the customization or modification of HDL's standard lab requisition forms for any health care providers including, but not limited to, the authorization to customize or modify HDL's standard laboratory panels from any health care providers.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 28:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.

**REQUEST FOR PRODUCTION NO. 29:**

All internal policies, procedures, instructions, or guidance related to the medical necessity or appropriateness of the coding and billing of all tests included in each individual panel, profile, or bundle for services.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 29:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged

information, as seeking proprietary and/or confidential information regarding HDL's

business, financial and/or legal matters or operations, and as seeking information that is

either publicly available or already in the possession, custody or control of the parties to

this litigation.

**REQUEST FOR PRODUCTION NO. 30:**

    All documents related to any guidelines or procedures for BlueWave employees or
contractors regarding recommendations or communications to a health care provider
regarding the number, types, and frequency of tests that patients could or should receive.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**

    **In addition to the General Objections, HDL specifically objects to this request as**

**overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged**

**information, as seeking proprietary and/or confidential information regarding HDL's**

**business, financial and/or legal matters or operations, and as seeking information that is**

**either publicly available or already in the possession, custody or control of the parties to**

**this litigation.**

**REQUEST FOR PRODUCTION NO. 31:**

    All communications, guidance, instructions, or training to HDL, and/or BlueWave and/or
their agents or representatives related to how to facilitate the grouping, bundling, or
adding of certain tests on HDL's standard lab requisition form.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 31:**

    **In addition to the General Objections, HDL specifically objects to this request as**

**overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged**

**information, as seeking proprietary and/or confidential information regarding HDL's**

**business, financial and/or legal matters or operations, and as seeking information that is**

either publicly available or already in the possession, custody or control of the parties to this litigation.

**REQUEST FOR PRODUCTION NO. 32:**

All documents explaining, evaluating, or discussing the profitability of any specific tests and/or panels, profiles, or bundles for services performed by HDL or BlueWave.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 32:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.

**REQUEST FOR PRODUCTION NO. 33:**

All documents related to HDL's requests, recommendations, guidelines, or suggestions about what tests should be included in a baseline, follow-up, or advanced panel.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 33:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, and as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations.

**REQUEST FOR PRODUCTION NO. 34:**

All documents explaining, evaluating, discussing, or relating to appropriate reimbursable ICD-9 codes for specific tests performed by HDL.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 34:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.

**REQUEST FOR PRODUCTION NO. 35:**

All documents explaining, evaluating, discussing, or relating to appropriate reimbursable CPT codes for specific tests performed by HDL.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 35:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.

**REQUEST FOR PRODUCTION NO. 36:**

Documents showing the reimbursement rates paid to HDL by any federally funded health care program for all tests included in each individual panel, profile, or bundle for services.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 36:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's

**business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.**

**REQUEST FOR PRODUCTION NO. 37:**

All contracts, agreements, or arrangements between HDL and BlueWave or any other similar company.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 37:**

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.**

**REQUEST FOR PRODUCTION NO. 38:**

All documents and communications related to contracts, agreements, or arrangements between HDL and BlueWave.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 38:**

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.**

**REQUEST FOR PRODUCTION NO. 39:**

All documents and communications related to contracts, agreements, or arrangements between BlueWave and Singulex, Inc.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 39:**

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, and as seeking documents that are not relevant to the claims or defenses of any party to the litigation.**

**REQUEST FOR PRODUCTION NO. 40:**

Any contracts, agreements, or arrangements between HDL and any other laboratory company.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 40:**

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation, and as seeking documents that are not relevant to the claims or defenses of any party to the litigation.**

**REQUEST FOR PRODUCTION NO. 41:**

Financial records relating to any compensation, rewards, incentives, and/or gifts between HDL and any other laboratory company.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 41:**

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's**

27

business, financial and/or legal matters or operations, as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation, and as seeking documents that are not relevant to the claims or defenses of any party to the litigation.

**REQUEST FOR PRODUCTION NO. 42:**

All marketing materials relating to HDL's tests included in panels, profiles, and bundles for services.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 42:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.

**REQUEST FOR PRODUCTION NO. 43:**

All internal communications, instructions, directives, training materials, policies, or procedures related to HDL's compliance with the Stark Law (42 U.S.C. § 1395nn), the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), and federal health care program coding and billing requirements.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 43:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is

either publicly available or already in the possession, custody or control of the parties to

this litigation.

**REQUEST FOR PRODUCTION NO. 44:**

All documents and communication regarding any complaint, concern, inquiry, investigation, or review related to a possible violation by HDL of any federal statue or regulation including, but not limited to, the Stark Law (42 U.S.C. § 1395nn), the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), and federal health care program coding and billing requirements.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 44:**

In addition to the General Objections, HDL specifically objects to this request as

overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged

information, as seeking proprietary and/or confidential information regarding HDL's

business, financial and/or legal matters or operations, and as seeking information that is

either publicly available or already in the possession, custody or control of the parties to

this litigation.

**REQUEST FOR PRODUCTION NO. 45:**

Any opinions, guidance, or advisories received from any source including HHS, CMS or its contractors, relating to HDL's compensation, rewards, incentives and/or gifts to any health care providers.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 45:**

In addition to the General Objections, HDL specifically objects to this request as

overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged

information, as seeking proprietary and/or confidential information regarding HDL's

business, financial and/or legal matters or operations, and as seeking information that is

either publicly available or already in the possession, custody or control of the parties to

this litigation.

**REQUEST FOR PRODUCTION NO. 46:**

Any opinions, guidance, or advisories received from any source including HHS, CMS or its contractors, relating to federal health care program coding and billing, the Stark Law (42 U.S.C. § 1395nn), and the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 46:**

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.**

**REQUEST FOR PRODUCTION NO. 47:**

All internal communications, instructions, directives, training, policies, guidance or procedures relating to waivers of insurance co-payments or deductibles.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 47:**

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.**

**REQUEST FOR PRODUCTION NO. 48:**

All communications between HDL and any third party including, but not limited to, any health care providers, consultants, sales representatives, or agents relating to waivers of insurance co-payments and deductibles.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 48:**

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.**

**REQUEST FOR PRODUCTION NO. 49:**

Any analyses, evaluations, studies, or reports regarding the financial impact of waivers of insurance co-payment or deductible amounts on HDL's business including, but not limited to: (a) return on investment analyses; (b) studies showing the impact on or correlation between waivers and the number of tests ordered by providers; (c) studies showing the impact or correlation between waivers and changes in HDL's revenues and profits; and (d) analyses regarding the legality of waiving insurance co-payment or deductible amounts.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 49:**

**In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.**

**REQUEST FOR PRODUCTION NO. 50:**

All documents that reflect or relate to any proposal by HDL, BlueWave or their agents or representatives to place a phlebotomist in the office of a health care provider including, but not limited to, any proposal for HDL, BlueWave or their agents or representatives to rent space from a health care provider for a phlebotomist.

31

**RESPONSE TO REQUEST FOR PRODUCTION NO. 50:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations, and as seeking information that is either publicly available or already in the possession, custody or control of the parties to this litigation.

**REQUEST FOR PRODUCTION NO. 51:**

All documents related to any fair market valuation of the P&H fees paid by HDL, or on HDL's behalf, to any health care provider.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 51:**

In addition to the General Objections, HDL specifically objects to this request as overly broad and unduly burdensome, as vague and ambiguous, as seeking privileged information, and as seeking proprietary and/or confidential information regarding HDL's business, financial and/or legal matters or operations.

Dated: May 10, 2016

**COOLEY LLP**

By: _Richard Kanowitz / By Scott Francis_
Richard S. Kanowitz
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 479-6000
Email: rkanowitz@cooley.com

*Counsel to the Official Committee of
Unsecured Creditors of Health Diagnostic
Laboratory, Inc., et al., and Richard
Arrowsmith, the Chief Restructuring Officer
and Proposed Liquidating Trustee for
Health Diagnostic Laboratory, Inc., et al.*