IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| IN RE: | HEALTH DIAGNOSTIC LABORATORY, INC., *et al.*, | Case No. 15-32919 |
| | | Chapter 11 |
| | | (Jointly Administered) |
| | Debtors. | |

## MEMORANDUM OPINION

On June 7, 2015 (the "Petition Date"), Health Diagnostic Laboratory, Inc. ("HDL") and two of its subsidiaries (the "Debtors")[1] commenced these bankruptcy cases by filing separate voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code")[2] in the United States Bankruptcy Court for the Eastern District of Virginia (the "Court"). Throughout the case, the Debtors have continued to manage their properties and operate their businesses as debtors in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases. On June 9, 2015, the Court entered an order authorizing the joint administration of these chapter 11 cases. On June 16, 2015, the United States Trustee for the Eastern District of Virginia appointed the statutory committee of unsecured creditors (the "Committee").[3]

Now before the Court is the Debtors' Modified Second Amended Plan of Liquidation (the "Liquidating Plan"). On March 29, 2016, the Court conducted a hearing (the "Confirmation Hearing") to consider confirmation of the Debtors' Liquidating Plan. At issue were three

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Health Diagnostic Laboratory, Inc. (0119), Central Medical Laboratory, LLC (2728), and Integrated Health Leaders, LLC (2434).

[2] All further references to the Bankruptcy Code are to the Bankruptcy Code as codified at 11 U.S.C. §§ 101 *et seq.*

[3] Section 1103 of the Bankruptcy Code sets forth the powers and duties of a committee under chapter 11 of the Bankruptcy Code.

objections (the "Objections") filed by (i) Russell Warnick ("Warnick"); (ii) BlueWave Health

Care Consultants, Inc. ("BlueWave"); and (iii) Dennis Ryan ("Ryan").  At the conclusion of the

Confirmation Hearing, the Court announced that it would overrule the Objections and approve

the Liquidating Plan.  This Memorandum Opinion sets forth the Court's findings of fact and

conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.[4]

### Jurisdiction and Venue

The Court has subject matter jurisdiction over this contested matter pursuant to 28 U.S.C.

§§ 157 and 1334 and the General Order of Reference from the United States District Court for

the Eastern District of Virginia dated August 15, 1984.  This is a core proceeding under 28

U.S.C. § 157(b)(2)(L).  Venue is appropriate in this Court pursuant to 28 U.S.C. § 1408.

### Factual Background

HDL was a privately held company with its headquarters in Richmond, Virginia.  As of

the Petition Date, HDL was governed by a five member Board of Directors (the "Board").[5]  HDL

operated an accredited, full service clinical laboratory that provided testing of biomarkers for the

indication of risk for cardiovascular disease, diabetes, and other illnesses.  HDL's testing

services offered physicians the ability to detect major health issues in patients before potentially

life-threatening events occurred.  Under HDL's pre-petition business model, physicians would

send biological samples to HDL and ask that HDL perform certain tests on the samples.  HDL

would, in most cases, bill the patient's private insurance company or the public Medicare and

---

[4] The Objections to confirmation of the Debtors' Liquidating Plan are contested matters governed by Rule 9014 of the Federal Rules of Bankruptcy Procedure.  *See* Fed. R. Bankr. P. 3020(b).  Rule 7052 applies to contested matters. *See* Fed. R. Bankr. P. 7014(c).  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052.

[5] The five members of the Board were: (i) Joseph P. McConnell; (ii) Warnick; (iii) Ryan; (iv) Satyanarain Rangarajan; and (v) John Young.

Medicaid programs for the testing services it provided.  HDL would then reimburse the referring physicians for the cost of collecting, processing, and handling the blood samples that they had sent to HDL for testing.  HDL employed BlueWave as its outside sales contractor to market HDL's testing services.  The Debtors experienced a meteoric rise from a startup company in 2009 to a company with $375 million in net revenue and EBITDA[6] of $45.2 million for the fiscal year ending December 31, 2013.

In 2013, the Department of Justice (the "DOJ") began investigating the Debtors and BlueWave in connection with HDL's business practices including its payment of process and handling fees to the referring physicians.  The Debtors' fortunes began to decline precipitously after the Office of the Inspector General for the Department of Health and Human Services issued a special fraud alert on June 25, 2014 (the "Special Fraud Alert").  The Special Fraud Alert concluded that the payment of processing and handling fees to referring physicians could violate certain federal anti-kickback laws.  HDL thereafter ceased paying process and handling fees to physicians.  As a result, its net revenues in the third and fourth quarter of 2014 declined by more than 47%.  A number of lawsuits and a string of bad publicity ensued that put considerable liquidity pressure on the Debtors.  On October 15, 2014, Cigna filed a complaint against HDL in the United States District Court for the District of Connecticut, seeking $84 million in damages (the "Cigna Action").[7]  On April 10, 2015, Aetna filed a complaint against several defendants including HDL, BlueWave, and LaTonya Mallory ("Mallory"), the Debtors'

---

[6] EBITDA is a commonly used measure of a company's ability to produce income on its operations in a given year. It is shorthand for earnings before interest, taxes, depreciation, and amortization. *See* David L. Scott, Wall Street Words: An A to Z Guide to Investment Terms for Today's Investor (3d. ed. 2003).

[7] *See* Complaint, *Connecticut General Life Insurance Company, et al. v. Health Diagnostic Laboratory, Inc.*, No. 14-01519 (D. Conn. Oct. 15, 2014) (ECF No. 1).

former CEO,[8] in the United States District Court for the Eastern District of Pennsylvania (the "Aetna Action").[9]

On April 9, 2015, the DOJ announced a settlement with HDL whereby HDL agreed to pay $47 million to settle all the government claims against it in connection with the referral fees.[10]  By this time, HDL's relationship with its pre-petition secured lender, Branch Banking and Trust Company ("BB&T"), had deteriorated badly.[11]  Following a series of defaults under its BB&T loan facilities, BB&T discontinued HDL's borrowing ability and cut off HDL's access to its existing accounts.  With no ability to access its cash and with no alternative sources of financing immediately available, HDL was forced to file for protection under chapter 11 of the Bankruptcy Code.

### Chapter 11 Case

The Debtors engaged Alvarez & Marsal Healthcare Industry Group, LLC ("A&M") to assist with the restructuring efforts and to help maximize the value of the Debtors' bankruptcy estates.  A&M provided the Debtors with a chief restructuring officer ("CRO") and additional support personnel.  Richard Arrowsmith ("Arrowsmith") assumed the CRO position effective September 21, 2015.

---

[8] Mallory was a co-founder of HDL and acted as its Chief Executive Officer up until her resignation in September 2014.

[9] Complaint, *Aetna Inc. v. Health Diagnostic Laboratory, Inc., et al.*, No. 15-01868 (E.D. Penn. April 10, 2015) (ECF No. 1).

[10] On August 7, 2015, the United States of America filed a complaint in intervention in a consolidated whistleblower suit against several defendants including BlueWave and Mallory (the "DOJ Action").  Complaint in Intervention, *United States of America ex rel. v. Berkeley Heartlab, Inc.*, No. 14-00230 (D.S.C. Aug. 7, 2015) (ECF No. 75).

[11] HDL was the borrower under three secured loan facilities with BB&T.  The first was an equipment loan in the maximum principal amount of $5.5 million.  The second was a revolving asset-based line of credit in the maximum principal amount of $20 million.  The last was an irrevocable standby letter of credit facility in the amount of $4 million.  In January of 2015, BB&T reduced the maximum principal amount of the revolving asset-based line of credit to $12 million.

BB&T declined to provide post-petition financing to the Debtors following the Petition Date.[12]  The Debtors were thereby forced to rely solely on cash flow to fund their day-to-day operations.  Despite its unwillingness to lend to the Debtors, BB&T initially consented to the use of its cash collateral so that the Debtors could keep the their business afloat.  At a hearing to consider the continued use of cash collateral on July 30, 2015, BB&T informed the Debtors that it would not consent to the Debtors' use of cash collateral beyond August 4, 2015.

Faced with the deadline imposed by BB&T, on August 2, 2015, the Debtors filed a motion to approve a post-petition secured, super-priority financing facility from an outside lender (the "Post-petition DIP Financing").  The Post-petition DIP Financing, subject to certain carve outs, granted the new post-petition lender a super-priority lien over all of the Debtors' assets, thereby priming BB&T's pre-petition first-priority liens.  BB&T vigorously objected to the proposed Post-petition DIP Financing on the principal basis that the priming liens from the new post-petition lender impaired BB&T's security interest such that it was no longer "adequately protected" as required by § 364(d)(1)(B) of the Bankruptcy Code.  On August 4, 2015, the Court conducted a hearing on the contested Post-petition DIP Financing motion.  The Court found that a significant equity cushion in the Debtors' assets adequately protected BB&T's security interest and approved the Post-petition DIP Financing.  An interim order approving the Post-petition DIP Financing was entered on August 7, 2015 (the "Interim DIP Order").  *See In re Health Diagnostic Laboratory, Inc.*, No. 15-32919, 2015 Bankr. LEXIS 4471 (Bankr. E.D. Va. Aug. 17, 2015).

---

[12] As of the Petition Date, the outstanding balance due to BB&T had been reduced to $1,567,207 on the equipment loan and $3,284,371 on the revolving asset-based line of credit.  The full amount of the letter of credit had been honored by BB&T, leaving a balance outstanding under the letter of credit facility of $4 million.

BB&T immediately filed a motion to stay the Interim DIP Order pending BB&T's appeal to the United States District Court for the Eastern District of Virginia (the "District Court"). On August 17, 2015 the Court denied BB&T's motion to stay the Interim DIP Order. *See In re Health Diagnostic Laboratory*, No. 15-32919, 2015 Bankr. LEXIS 2731 (Bankr. E.D. Va. Aug. 17, 2015). After an expedited briefing process, the District Court denied BB&T's interlocutory appeal of the Interim DIP Order on August 21, 2015. *See BB&T Equip. Fin. Corp. v. Health Diagnostic Laboratory*, No. 15cv465 2015 U.S. Dist. LEXIS 177403 (E.D. Va. Aug. 21, 2015). On August 24, 2015, the Court entered a final order approving the Post-petition DIP Financing on an uncontested basis.

*The True Health Sale*

With adequate funding in place to see the case forward, the Debtors instituted proceedings for a going concern sale of substantially all of their assets under § 363 of the Bankruptcy Code. A number of the members of the Debtors' Board were interested in participating in the purchase of the Debtors' business operations, so a special transaction subcommittee of the Board was created to consider potential bids (the "Special Transaction Committee"). The Special Transaction Committee was comprised of directors Joseph McConnell and John Young.

By order entered July 15, 2015, the Court approved certain strategic transaction bidding procedures for conducting the sale without a stalking horse bidder. An auction was held on September 10, 2015 in accordance therewith. The Debtors' Special Transaction Committee, working with the Debtors' restructuring advisors and the Committee, considered two separate competing bids. The first was advanced by True Health Diagnostics LLC, ("True Health"); the second was received from Ningbo, a Chinese company spearheaded by Warnick. The key

6

feature that differentiated the two bids was a provision in the Ningbo bid calling for a complete release of all claims of the estate against Warnick.  The Committee believed that the estate held avoidance actions of significant value against Warnick under chapter 5 of the Bankruptcy Code on account of certain alleged pre-petition transfers.[13]  Although the True Health bid also contained a release provision, the Committee believed the claims identified in the True Health bid to be of *de minimis* value against low-level True Health employees.[14]  In assessing the competing bids, Ningbo's bid had to be significantly discounted due to the value of the requested Warnick release.  The Debtors selected True Health as the successful bidder for their business operations.  On September 17, 2015, the Court entered an order approving an asset purchase agreement (the "APA") between the Debtors and True Health.

The sale closed on September 29, 2015 (the "True Health Sale").  True Health paid the bankruptcy estate approximately $27 million at closing of the True Health Sale for the purchase of the Debtors' business.  True Health also assumed certain liabilities of the Debtors, and it executed a promissory note that obligated True Health to pay an additional principal amount of $10 million plus other contingent principal.[15]  True Health paid the initial principal amount of $10 million due on the promissory note prior to year-end.  The negotiated release of the Debtors' claims against certain low level employees of True Health who were identified on schedule 3.1

---

[13]  It was reported that the Debtors had distributed $119 million to 16 individual shareholders between 2011 and 2013.  Almost half of this amount allegedly went to three co-founders of the Debtors, which included Warnick.  A full account of the alleged pre-petition transfers is set forth in the Committee's motion for Rule 2004 examinations. *See* Motion for 2004 Examination, *In re Health Diagnostic Laboratory*, No. 15-32919 (Bankr. E.D. Va. Sept. 30, 2015) (ECF No. 541).

[14]  The Court had previously approved the Debtors' motion for Rule 2004 examinations of True Health and several of its officers.  True Health competed with the Debtors, and the Debtors alleged in their Rule 2004 motion that True Health had interfered with a number of HDL's business relationships.  Certain principals of True Health had previously worked for BlueWave.

[15]  The calculation of the additional contingent principal depended upon the percentage of purchased accounts receivable that True Health was able to collect.

of the APA (the "True Health Releases") was part of the consideration exchanged between the parties at closing of the True Health Sale.[16]  Schedule 3.1 was fully disclosed to the Court at a hearing on the True Health Sale.

Completing the True Health Sale was a significant achievement in this bankruptcy case. Only two months earlier, the Debtors had stood on the brink of collapse after their long fight with BB&T.  The True Health Sale capped off a remarkable turnaround for the Debtors by bringing over $37 million into the bankruptcy estate.  The True Health Releases were a necessary (albeit minimal) cost of closing this critically important deal.  In this context, approval of the True Health Releases was a reasonably calculated decision exercised in the sound business judgment of the Debtors' Board.  The proceeds realized from the True Health Sale enabled the Debtors to repay the Post-petition DIP Financing loan and BB&T in full.  The going concern sale preserved approximately 400 jobs.  The medical testing services that HDL had pioneered remained available to medical patients across the country.  The unsecured creditors were positioned to receive a meaningful distribution upon confirmation of the Debtors' plan.

*The D&O Insurance Policies*

Following the True Health Sale, the Committee filed a motion seeking broad authority to conduct Rule 2004 examinations (the "Rule 2004 Motion")[17] in order to investigate a litany of

---

[16] Many of the released individuals were former sales contractors for BlueWave who had gone on to work for True Health.  It was alleged that some of the released individuals may have aided and abetted a breach of fiduciary duty by the officers and directors of HDL  The Committee was heavily involved in drafting and negotiating schedule 3.1. The Committee wanted to ensure that only claims of *de minimis* value were included on the schedule.  The Committee had determined that BlueWave's sales force had been structured in such a manner that many of the sales people were employed by separate LLCs that then entered into contracts with BlueWave.  None of the LLCs were released under schedule 3.1.  The Committee was satisfied that the consideration paid by True Health for the Debtors' business more than compensated the estate for the release of the claims against the individuals listed on schedule 3.1.

[17] Rule 2004 of the Federal Rules of Bankruptcy Procedure allows for the examination of any entity relating to "the acts, conduct, or property, or to the liabilities and financial condition of the debtor, or to any matter which may

pre-petition transactions involving the directors, shareholders, and officers of HDL and certain of its affiliated entities, such as BlueWave (the "Committee's Investigation").[18]    Counsel for Warnick appeared at the hearing thereon in opposition to the Committee's Rule 2004 Motion. The Court overruled the objections and allowed the Committee's Investigation to proceed.  The Committee sent eight current or former officers, directors and employees of HDL, which included Warnick, a letter demanding payment on behalf of the bankruptcy estates in excess of $400 million for alleged wrongdoings.   The Committee's Investigation sparked a dispute between the Debtors and the directors and officers who had been targeted by the Committee's Investigation regarding rights of access to available proceeds under two insurance policies providing officer and director liability coverage (the "Insurance Policies") that the Debtors had obtained pre-petition from National Union Fire Insurance Company of Pittsburgh, Pa. (the "Insurer").

The Insurance Policies provide coverage for the employees, officers, and directors of the Debtors on account of claims made against them (the "Individual Insureds") as well as coverage for the Debtors on account of wrongful acts that occur during the policy period.[19]   A "wrongful act" is defined broadly to include any "breach of duty, neglect, error, misstatement, misleading

---

affect the administration of the debtor's estate, or the debtor's right to discharge." Fed. R. Bankr. P. 2004.  A Rule 2004 examination is an investigative tool that parties in interest may use to investigate claims associated with the bankruptcy proceeding.  Courts have long held that the scope of a Rule 2004 examination is very broad.  *See In re Nucletron Mfg. Corp.*, No. 93-34486S, 1994 WL 16191611, at *2 (Bankr. E.D. Va. Mar. 17, 1994).

[18] The pre-petition transactions are described in the Rule 2004 Motion.  *See supra* note 13.

[19] The full policies are attached as Exhibit A and Exhibit B to Mallory's request for access to the insurance proceeds. *See* Motion For Determination of Inapplicability of Automatic Stay, *In re Health Diagnostic Laboratory*, No. 15-32919 (Bankr. E.D. Va. Oct. 2, 2015) (ECF No. 557).

statement, omissions."[20]  A total of $10 million is available under each of the Insurance Policies.

Both Insurance Policies are "claims made" policies that cover any claim made against any

insured during the policy period.[21]  The Insurance Policies provide that the Debtors and the

Individual Insureds may not act in any way "that prejudices the rights of any Insured or the

Insurer with respect to [a] Claim."  There is an order of payments provision in each of the

Insurance Policies that provides once any loss exceeds the $10 million policy limit, the Insurer

shall pay coverage to the Individual Insureds before it pays for any coverage to the Debtors.

By a motion filed on October 2, 2015, HDL's former chief executive officer, Mallory,

sought to access certain proceeds available under the Insurance Policies in order to pay defense

costs she had incurred in connection with the Aetna Action, the DOJ Action, and the

Committee's Investigation.  The Debtors and the Committee objected to Mallory's motion on the

grounds that the Debtors had equal rights to the proceeds available under the Insurance Policies.

The Court encouraged the parties to reach a consensual resolution that would ensure equal access

among all the Individual Insureds and the Debtors.  All of the parties except Warnick eventually

agreed to the terms of a protocol order whereby the automatic stay was lifted to allow the

Individual Insureds to access up to $400,000 of coverage under the Insurance Policies for

reimbursement of costs incurred defending claims, with an additional $400,000 available if a

civil action were initiated against any Individual Insured (the "Protocol Order").[22]  An aggregate

---

[20] Individual Insureds are provided coverage under both Sides A and B(ii) of the Insurance Policies for losses incurred in connection with any wrongful acts.  The Debtors are provided coverage under Side B(i) of the Insurance Policies for claims made against the company, Side C for certain crisis management claims, and Side D for costs associated with any derivative demand by shareholders.

[21] The Insurance Policies define the term "claim" to include "a written demand for monetary or non-monetary relief."

[22] Warnick, for the first time, raised an issue about whether the Debtors and the Individual Insureds might not be entitled to any coverage under the Insurance Policies because the Debtors had executed the True Health Releases in

cap of $4 million was established for all payments to Individual Insureds under the Protocol Order. The Debtors were also permitted to file claims under the Insurance Policies up to a cap of $800,000. The Court overruled all of the objections to the Protocol Order at a hearing conducted on December 10, 2015.[23] Under the terms of the Court approved Protocol Order, any insured party is permitted to submit a request for payment under the Insurance Policies in accordance with the protocol subject to the right of any other interested party to raise an objection to the requested payment.

On January 6, 2016, the Debtors noticed their intent to make a claim for $779,070.39 under the approved Protocol Order for costs the Debtors had incurred in connection with the Cigna Action. The Insurer was prepared to pay $551,000 immediately upon Court approval. Warnick objected to the Debtors' request for payment, as was his right under the Protocol Order. Warnick asked the Court to defer ruling on his objection and refer all such requests for payment to mediation. The Court denied Warnick's request for mediation and authorized the Insurer to make the payment under the Insurance Policies to the Debtors.[24]

---

connection with the True Health Sale without getting the Insurer's permission. Warnick suggested that the True Health Releases might have eliminated a potential subrogation claim for the Insurer that may have given the Insurer a basis to deny coverage to himself and the Debtors. Warnick thereafter initiated an adversary proceeding against the Debtors and True Health seeking a declaratory judgment that the True Health Releases were not enforceable against him.

[23] The order of payments provision in the Insurance Policies applies only in the instance that an actual loss exceeds the policy limits. As the claims to date do not exceed the policy limits, no insured is prohibited from applying for coverage under the Insurance Policies. Warnick and Ryan want the Plan to be amended so as to require the Liquidating Trust to reserve any proceeds the Debtors might receive under the Insurance Policies. The Court declines to do so as it would prejudice the Debtors' clear rights under the policy to access the policy proceeds until there is an *actual* loss that exceeds the policy limits.

[24] The mediation requirement contained in the Insurance Policies applies to disputes with the Insurer and not to disputes among the insured parties.

11

**Liquidating Plan**

The Debtors filed their Liquidating Plan on February 9, 2016.  The Debtors' Liquidating

Plan, as ultimately approved by the Debtors' Board on a 4 to 1 vote, was the product of a highly

negotiated agreement among the Debtors and the Creditors' Committee.  The Liquidating Plan

provides the means for the Debtors to distribute their assets (including but not limited to the net

proceeds from the True Health Sale) to the holders of allowed claims.  The Liquidating Plan is

premised on the substantive consolidation of the Debtors' estates for the purposes of voting,

confirmation and distribution,[25] as expressly permitted by § 1123(a)(5)(C) of the Bankruptcy

Code.[26]  The Debtors will be dissolved.  All estate assets will be transferred into a single

liquidating trust (the "Liquidating Trust"). The Liquidating Trust will be operated pursuant to a

liquidating trust agreement (the "Liquidating Trust Agreement").  A designated liquidating

trustee will be responsible for distributing cash or other consideration to the holders of allowed

claims in accordance with the Liquidating Trust Agreement (the "Liquidating Trustee").[27] A

nine-member liquidating trust oversight committee will oversee the conduct of the Liquidating

Trustee (the "Liquidating Trustee Oversight Committee").

---

[25] The substantive consolidation of the Debtors' estates will result in (i) the consolidation of the assets and liabilities of the Debtors; (ii) the elimination of intercompany claims, subsidiary equity ownership interests, multiple and duplicative creditor claims, joint and several liability claims and guarantees; and (iii) the payment of allowed claims from a common fund.  *See In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005); *FDIC v. Colonial Realty Co.*, 966 F.2d 57, 58–59 (2d Cir. 1992); *Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988).

[26] *See Schnelling v. Crawford (In re James River Coal Co., Inc.)*, 360 B.R. 139, 148 n.1 (Bankr. E.D. Va. 2007) (noting that "it is not unusual for bankruptcy courts to confirm plans of reorganization to call for the 'substantive consolidation' of the different corporate entities comprising the corporate group"); *In re Stone & Webster, Inc.*, 286 B.R. 532, 546 (Bankr. D. Del. 2002) ("§ 1123(a)(5)(C) clearly authorizes a bankruptcy court to confirm a Chapter 11 plan containing a provision that substantively consolidates the estates of two or more debtors."); *see also Owens Corning*, 419 F.3d at 210 (holding that 11 U.S.C. § 105(a), empowers a bankruptcy court to authorize substantive consolidation); *In re Augie/Restivo*, 860 F.2d at 518 n.1; *In re The Leslie Fay Cos., Inc.*, 207 B.R. 764, 779 (Bankr. S.D.N.Y. 1997); *Moran v. HSBC (In re Deltacorp, Inc.)*, 179 B.R. 773, 777 (Bankr. S.D.N.Y. 1995).

[27] Arrowsmith will serve as the Liquidating Trustee for an interim period of 210 days.

*Plan Solicitation*

The Court conducted an evidentiary hearing on February 11, 2016, to consider approval of the Debtors' disclosure statement (the "Disclosure Statement" and the "Disclosure Statement Hearing," respectively).[28]   The day before the Disclosure Statement Hearing, the dissenting Board member, Warnick, filed an emergency motion to compel discovery and for a continuance of the Disclosure Statement Hearing.

The Court denied Warnick's motion to compel because he had not given the Debtors sufficient time as provided under the rules of court to respond to his discovery request.   There was simply nothing outstanding for the Court to compel.   Given the inordinate delay that had already occurred since the True Health Sale in the plan approval process, the Court declined to continue the Disclosure Statement Hearing.   Warnick proceeded at the Disclosure Statement Hearing as the sole objector to the adequacy of the information contained in the Disclosure Statement.   Warnick advanced the theory that the Debtors' bankruptcy estates owned a malpractice claim against certain of the Debtors' retained professionals in the bankruptcy case because they had allowed the True Health Sale to close without obtaining the Insurer's consent to the True Health Releases.   Warnick maintained that his malpractice allegation should be disclosed.   Counsel for Warnick examined Arrowsmith at the Disclosure Statement Hearing about the True Health Releases.   Arrowsmith testified at the Disclosure Statement Hearing in response to questioning from Warnick's counsel regarding the True Health Releases that he believed the malpractice theory advanced by Warnick was a non-issue from the estate's

---

[28] *See Momentum Mfg. Corp. v. Employee Creditors' Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) (finding that § 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).   Acceptance or rejection of a plan may not be solicited until a court approved, written disclosure statement containing adequate information has been transmitted to the creditors.   *See* 11 U.S.C. § 1125(b).

perspective and that Warnick was purposefully constructing roadblocks to impede the progress

of the bankruptcy case.  Warnick offered no evidence in opposition.  The Court overruled

Warnick's objection, finding that the inclusion of Warnick's malpractice theory would cause the

dissemination of misleading information.  On February 11, 2016, the Court entered its order

approving the Debtors' Disclosure Statement.[29]

The Debtors then commenced their solicitation of votes to accept or reject the

Liquidating Plan.  The Disclosure Statement and Plan, together with the additional solicitation

materials approved by the Court in the Disclosure Statement Order, were transmitted to each

creditor entitled to vote on the Liquidating Plan.  Additionally, certain non-voting materials that

had been approved by the Court were provided to holders of claims and interests that were not

entitled to vote on the Plan.  The voting deadline was March 22, 2016.

*Plan Acceptance*

The Liquidating Plan designates four classes of claims against and one class of interests

in the Debtors based upon differences in the legal nature and priority of such claims and

interests in accordance with § 1122 of the Bankruptcy Code.[30]  Administrative Claims, Priority

---

[29] *See* Order (I) Approving the Disclosure Statement; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan, Including (A) Approving Form and Manner of Solicitation Procedures, (B) Approving Form and Notice of the Confirmation Hearing, (C) Establishing Record Date and Approving Procedures for Distribution of Solicitation Packages, (D) Approving Forms of Ballots, (E) Establishing Deadline for Receipt of Ballots and (F) Approving Procedures for Vote Tabulations; (III) Establishing Deadline and Procedures for Filing Objections to Confirmation of the Plan; and (IV) Granting Related Relief (the "Disclosure Statement Order").  *In re Health Diagnostic Laboratory*, No. 15-32919 (Bankr. E.D. Va. Oct. 2, 2015) (ECF No. 892)

[30] The Liquidating Plan separately classifies the claims into classes because each claim holder in a designated class has rights against the Debtors' estates that are legally dissimilar to the rights of the claim holders in the other designated classes.  *See Olympia & York Fla. Equity Corp. v. Bank of New York (In re Holywell Corp.)*, 913 F.2d 873, 880 (11th Cir. 1990) (holding that the plan proponent is allowed considerable discretion to classify claims and equity interests according to the facts and circumstances of the case so long as the classification scheme does not violate priority rights or manipulate class voting).

Tax Claims, and Fee Claims (collectively, the "Unclassified Claims") are not classified and are separately treated in Article II of the Liquidating Plan.[31]  The classes are designated as follows:

- ▪ <u>Class 1</u>:  Priority Non-Tax Claims

- ▪ <u>Class 2</u>:  Secured Claims

- ▪ <u>Class 3</u>:  General Unsecured Claims

- ▪ <u>Class 4</u>:  Subordinated Claims

- ▪ <u>Class 5</u>:  Equity Interests

The Liquidating Plan specifies that Classes 1 and 2 are unimpaired and Classes 3, 4, and 5 are impaired.  The Liquidating Plan accords the same treatment to each of the respective claims within the three impaired classes as required by 11 U.S.C. § 1123(a)(4).

The impaired classes entitled to vote on the Liquidating Plan are Classes 3 and 4.  As Classes 1 and 2 are unimpaired they are conclusively presumed to have accepted the Liquidating Plan.  While Class 5 is impaired, the members of Class 5 are not expected to receive any distributions under the Liquidating Plan; accordingly, they are deemed to have rejected the Liquidating Plan.  Consequently, Classes 1, 2, and 5, were not entitled to vote to accept or reject the Liquidating Plan.  *See* 11 U.S.C. § 1126(a), (f), (g).

The creditors voted overwhelmingly to accept the Liquidating Plan.[32]  Creditors in Class 3 holding 93.5% of the claims in number and 78.3% in dollar amount voted to accept the Liquidating Plan.  Mallory later withdrew her vote to reject the Liquidating Plan.  With Mallory's negative vote withdrawn, less than 1% in dollar amount of all voting Class 3 claimants

---

[31] *See In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159 (Bankr. D. Del. 2006) (§ 1123(a)(1) of the Bankruptcy Code does not require a plan to classify classes of administrative claims and priority tax claims).

[32] "A class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan."  11 U.S.C. § 1126(c)

voted to reject the Liquidating Plan.  No holders of claims in Class 4 voted on the Liquidating

Plan.

### Section 1129(b)

Although the members of Classes 4 and 5 did not accept the Liquidating Plan, the Court

may, nevertheless, confirm the Liquidating Plan under § 1129(b) of the Bankruptcy Code[33] so

long as the Liquidating Plan does not "discriminate unfairly" and is "fair and equitable" with

respect to the dissenting classes.  11 U.S.C. 1129(b)(1); s*ee In re Armstrong World Indus., Inc.*,

432 F.3d 507, 512 (3d Cir. 2005); *Travelers Ins. Co. v. Bryson Props., XVIII (In re Bryson*

*Props., XVIII)*, 961 F.2d 496, 503 (4th Cir. 1992); *see also In re Dura Auto Sys., Inc.*, 379 B.R.

257, 270 (Bankr. D. Del. 2007) (discussing unfair discrimination); *In re Catron*, 186 B.R. 194,

197 (Bankr. E.D. Va. 1995).  The Court finds that the Liquidating Plan does not "discriminate

unfairly" and is "fair and equitable" with respect to Class 4 and Class 5.

A plan unfairly discriminates in violation of § 1129(b) of the Bankruptcy Code only if

similar claims are treated differently without a reasonable basis for the disparate treatment, or a

class of claims receives consideration of a value that is greater than the amount of its allowed

claims.  *See In re Kennedy*, 158 B.R. 589, 599 (Bankr. D.N.J. 1993); *In re Buttonwood Partners,*

*Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990); *In re Future Energy Corp.*, 83 B.R. 470, 492–93

(Bankr. S.D. Ohio 1988); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986),

*aff'd in part, rev'd in part*, 78 B.R. 407 (S.D.N.Y. 1987).  As between two classes of claims or

---

[33] Section 1129(b)(1) provides:

Notwithstanding section 510(a) of [the Bankruptcy Code], if all of the applicable requirements of
[section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section
1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the
court, on request of the proponent of the plan, shall confirm the plan notwithstanding the
requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable,
with respect to each class of claims or interests that is impaired under, and has not accepted, the
plan.

two classes of interests, there is no unfair discrimination if the classes are comprised of dissimilar claims or interests. *See In re Johns-Manville*, 68 B.R. at 636. The Liquidating Plan does not "discriminate unfairly" because all holders of claims in Class 4 are treated the same under the Liquidating Plan, and all holders of interests in Class 5 are treated the same under the Liquidating Plan.

A plan is "fair and equitable" with respect to a class of unsecured claims or to a class of interests if it complies with the "absolute priority rule." 11 U.S.C. § 1129(b)(2)(B), (C). No holder of a claim or interest that is junior to the Class 4 claims will receive or retain any property under the Liquidating Plan on account of their junior claim or interest unless the Class 4 claims are paid in full. Similarly, no holder of any interest that is junior to the Class 5 interests will receive or retain any property under the Liquidating Plan on account of their junior interest. Accordingly, the Liquidating Plan is "fair and equitable" with respect to holders of Class 4 claims and Class 5 interests. The Liquidating Plan satisfies the requirements of § 1129(b) of the Bankruptcy Code.

### Objections to Confirmation

Three Objections were filed in opposition to confirmation of the Liquidating Plan. It came as no surprise that each was lodged by a target of the Committee's Investigation. The first of the Objections came from Warnick. He marshaled many of the same arguments that he had previously advanced when he (i) opposed the Rule 2004 Motion, (ii) objected to the Protocol Order, (iii) filed his adversary proceeding, and (iv) objected to the Disclosure Statement. Warnick's principal contention was that the exculpation provision contained in the Liquidating Plan was too broad. Warnick believed that the Committee and estate professionals should not be exculpated from his legal malpractice allegations so that this potentially valuable cause of action

17

might be preserved for the benefit of the Debtors' estates.   Next, Warnick questioned the appointment of Arrowsmith as the interim Liquidating Trustee and disapproved of the liability limitation provided to the Liquidating Trustee.   Finally, Warnick argued that the Liquidating Trust should be required to reserve funds in the event that the Insurance Policies are exhausted and the order of payments provision becomes applicable.

Ryan, a director on the Debtors' Board and an Individual Insured under the Debtors' Insurance Policies, joined Warnick's objection solely in respect to the reservation of funds argument.

BlueWave objected to the Debtors' Liquidating Plan on the grounds that the Liquidating Plan: (i) strips BlueWave of its setoff and recoupment rights; (ii) includes overly broad exculpation provisions, and (iii) impermissibly broadens the Debtors' right to estimate claims. At the conclusion of the Confirmation Hearing, the Court stated that it would overrule the Objections and confirm the Liquidating Plan.

Section 1129(a)(3) of the Bankruptcy Code requires that the "plan [be] proposed in good faith and not by any means forbidden by applicable law."   11 U.S.C. § 1129(a)(3).   Warnick asserts *inter alia* that the exculpation provision contained in the Liquidating Plan violates this subsection of 1129, because it is impermissibly broad in violation of applicable law in this district.

The exculpation provision in the Liquidating Plan provides that the directors and officers of the Debtors, the estate professionals, the Committee professionals, and the Board of directors (the "Exculpated Parties") will not be liable to any entity for any post-petition conduct related to the bankruptcy case unless the conduct constitutes gross negligence, bad faith, or willful misconduct.   The exculpation provision also captures pre-petition conduct to the limited extent

18

that such conduct is related to the filing of the Debtors' bankruptcy cases.  Essentially, the exculpation provision eliminates any cause of action the Debtors currently have against the Exculpated Parties in connection with the bankruptcy cases unless the cause of action rises to the level of gross negligence.  Warnick argues that the Committee and estate professionals should not be released from liability for his alleged malpractice claims.

The genesis of Warnick's malpractice theory derives from the True Health Sale.  Warnick contends that the execution of the True Health Releases without the Insurer's consent violated the Insurance Policies by impairing subrogation rights of the Insurer.  Warnick contends that this impairment may have created a coverage defense for the Insurer that otherwise would not have existed under the Insurance Policies had consent been obtained.  Warnick asserts that the Debtors have an actionable malpractice claim against the Committee's professionals and the estates' professionals on account thereof.  Warnick's malpractice claims are specious.

Warnick's own efforts to purchase the Debtors' business (and obtain a release on his own account) failed when the Debtors' Special Transaction Committee selected the offer of True Health over the bid he had advanced.  Since that failed effort to acquire substantially all of the Debtors' assets, Warnick has used his position as a member of the Debtors' Board to frustrate the advancement of this case in an effort to forestall any legal actions that may ensue from the Committee's Investigation.   Warnick has employed inflammatory language such as "malpractice," "secret releases," and "negligence" to divert attention away from himself and focus it instead on others he has accused of wrongdoing.  To be clear, the professionals involved in this case have performed admirably.  They skillfully shepherded this case away from the verge of administrative insolvency to the point where a successful resolution is within immediate prospect by securing the Post-petition DIP Financing facility, closing the going concern sale for

the Debtors' business with True Health, and obtaining broad consensus on the terms of the Liquidating Plan. The True Health Sale was the singular achievement in this trilogy. Not only did it salvage the Debtors' business enterprise and save over 400 jobs, but it also paved the way for the proposed Liquidating Plan and a meaningful distribution to the estates' unsecured creditors. None of this would have been accomplished without the extraordinary efforts of the estate professionals.

The True Health Releases, with which Warnick has taken issue, were an integral part of the True Health Sale. The True Health Releases were carefully negotiated by both parties to the sale transaction. The Committee was actively involved in that effort. The Debtors' Special Transaction Committee specifically approved the True Health Releases. The True Health Releases were fully disclosed to the Court and approved as part of the True Health Sale after notice and a hearing.[34] Warnick did not object to any aspect of the True Health Sale and voted for its approval in his capacity as a member of the Board. The order approving the True Health Sale is now final and not appealable.[35]

Moreover, the Insurer has not raised the True Health Releases as a defense to coverage. The uncontroverted testimony at the Confirmation Hearing was that the Debtors had recently received a check from the Insurer for the claim they had submitted pursuant to the Protocol Order on account of their covered pre-petition defense costs. The payment was not received under any reservation of rights. The Insurer has not notified the Debtors that any forthcoming payments under the Insurance Policies would be issued under any such reservation.

---

[34] Arrowsmith testified consistently throughout this case that he believes the released claims to be "immaterial." The release of an immaterial claim cannot prejudice an insurer. *See, e.g.*, *Gibbs v. Hawaiian Eugenia Corp.*, 966 F.2d 101, 106 (2d Cir. 1992) ("If the insurer has not been prejudiced, it may not deny recovery nor may it recover any amount paid on the policy because of a release or settlement.").

[35] *See* 11 U.S.C. § 363(m).

20

But even if a sound legal and factual basis for Warnick's malpractice claim did exist, the Debtors are fully entitled to adjust that claim as part of a chapter 11 plan as they have proposed in the Liquidating Plan. *See* 11 U.S.C. § 1123(b)(3)(A). Exculpation provisions in chapter 11 plans are not uncommon and "generally are permissible, so long as they are properly limited and not overly broad." *In re Nat'l Heritage Found., Inc.*, 478 B.R. 216, 233 (Bankr. E.D. Va. 2012) (citing *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d. Cir. 2000)). The practical effect of a proper exculpation provision is not to provide a release for any party, but to raise the standard of liability of fiduciaries for their conduct during the bankruptcy case. *See In re PWS Holding Corp.*, 228 F.3d at 247 (noting an exculpation provision "sets forth the appropriate standard of liability"); *In re Friedman's Inc.*, 356 B.R. 758, 763-64 (Bankr. S.D. Ga. 2005) (explaining that exculpation provision will "affirm the scope of their [the professionals'] liability or non-liability"). Exculpation is appropriate when it is solely limited to fiduciaries who have served a debtor through a chapter 11 proceeding. *See In re Enron Corp.*, 326 B.R. 497 (S.D.N.Y. 2005) (affirming a similar exculpation provision for fiduciaries); *In re Washington Mutual*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) ("The exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers."). Indeed, this Court has approved exculpation provisions in a number of chapter 11 cases.[36]

Warnick argues, as a final measure, that exculpation is improper because the Liquidating Plan is providing the Debtors' and the Committee's professionals with non-debtor releases.

---

[36] *See, e.g.*, *In re James River Coal Co.*, No. 14-31848 (Bankr. E.D. Va. Mar. 21, 2016) (ECF No. 1704); *In re Patriot Coal Corp.*, No. 15-32450 (Bankr. E.D. Va. Oct. 9, 2015) (ECF No. 1615); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (Bankr. E.D. Va. June 25, 2013) (ECF No. 1049); *In re Circuit City Stores, Inc.*, No. 08-35653 (Bankr. E.D. Va. Sept. 14, 2010 (ECF No. 8555); *In re LandAmerica Fin. Grp., Inc.*, No. 08-35994 (Bankr. E.D. Va. Nov. 23, 2009) (ECF No. 2664).

Warnick observes that § 524(e) of the Bankruptcy Code prohibits the "discharge of a debt of the debtor [from] affecting the liability of any other entity." 11 U.S.C. § 524(e). Warnick maintains that he is a non-consenting creditor to the release of the non-debtor professional parties. Accordingly, Warnick concludes that the test for approving such non-debtor releases recently adopted in *National Heritage Foundation v. Highbourne Foundation* is applicable to this case.[37] 760 F.3d 344 (4th Cir. 2014).

Warnick glosses over an important distinction between the case at bar and *National Heritage*. The question for the court in *National Heritage* was whether the debtor could involuntarily affect the release of its officers and directors from claims held by certain creditors of the debtor who did not consent to a release of their claims. In *National Heritage*, it was the objecting creditor that owned the claim that was going to be the subject of the release. *See In re Nat'l Heritage Found. Inc.*, 478 B.R. at 232 (explaining how the creditor's claims were extinguished). In this case, the Debtors are merely providing exculpation for claims that they own. No claim held by Warnick is being released or exculpated under the Liquidating Plan. The exacting standard of *National Heritage* for non-debtor releases does not apply to this case simply because the Debtors are the entities that are providing exculpation for claims held by the estate.[38]

---

[37] In *National Heritage* the Fourth Circuit considered a challenge from a non-consenting creditor to the release of non-debtors, specifically the debtor's directors and officers. 760 F.3d 344 (4th Cir. 2014). The *National Heritage* court applied a six factor *Dow Corning* test from the Court of Appeals for the Sixth Circuit that asked whether:

> (1) There is an identity of interests between the debtor and the third party . . . ; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization . . . ; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; [and] (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full.

*Id.* at 347 (quoting *Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648 (6th Cir. 2002)).

[38] Applying the *Dow Corning* factors adopted in *National Heritage* to these facts yields an awkward result and further illustrates that the test is inapplicable to a claim owned by a debtor. *National Heritage* was not meant to be

The exculpation provision contained in the Liquidating Plan does not alter or release claims held by third parties against non-debtors in contravention of § 524(e) of the Bankruptcy Code.  *Cf. In re PWS Holding Corp.*, 228 F.3d at 245-46.

The Court finds that the exculpation provision at issue in the Liquidating Plan is narrowly tailored, and appropriate under the circumstances of this case.  The exculpation provisions are a vital part of the Liquidating Plan.  The liability protections were necessary for plan negotiations.  The estate professionals have created substantial value for the estates through their efforts in these cases and they should not be subjected to future litigation involving such frivolous claims as those that have been suggested by Warnick.  The estates will remain appropriately protected by the reasonable carve out set forth in the Liquidating Plan for claims involving willful misconduct and gross negligence.

The Warnick Objection also takes issue with the protection from liability afforded the Liquidation Trustee under the proposed Liquidating Trust Agreement.  Warnick contends that it is inappropriate to immunize the Liquidating Trustee from liability for actions taken with the consent or approval of the Liquidating Trust Oversight Committee.  The Liquidating Trust Agreement provides that members of the Liquidating Trust Oversight Committee will have fiduciary duties consistent with those owed by the members of the Committee appointed under § 1102 of the Bankruptcy Code.  The Court is satisfied that an aggrieved party will have appropriate recourse against the Liquidating Trust Oversight Committee under the provisions of the Liquidating Trust Agreement.

---

applied to an exculpation provision.  In fact, the Fourth Circuit approved the exculpation provisions set forth in the *National Heritage* plan.  *See In re Nat'l Heritage Found., Inc.*, 478 B.R. 216, 233 (Bankr. E.D. Va. 2012).

Both the Warnick and Ryan Objections want the Liquidating Plan amended to require the Debtors to escrow any proceeds the Debtors receive from the Insurance Policies.  The order of payments provision in the Insurance Policies applies only in the instance that an actual loss exceeds the policy limits.  Prior to exceeding the remaining available limits of coverage under the Insurance Policies, the Insurer is required to provide coverage for all insureds under the Insurance Policies.  As the claims to date do not exceed the policy limits, the Debtors' current right to proceeds under the insurance Policies is not subordinated to that of the Individual Insureds.

There is no provision in the Insurance Policies that would require the Debtors to reimburse the Individual Insureds if the policy proceeds are subsequently insufficient to cover claims.  The disgorgement clause upon which Warnick and Ryan rely is unrelated to the order of payments provision.  Rather, the disgorgement clause addresses the right of the Insurer to be repaid proceeds in the event that a policy exclusion is found to disallow coverage after a payment has been made.

It is the intent of the Debtors and all of the other Individual Insureds that the terms of the Court's Protocol Order continue to govern the rights of the Debtors and the Individual Insureds after Plan confirmation.  No modification to the Liquidating Plan is required by § 1129 of the Bankruptcy Code to address Warnick's concern.  The Liquidating Plan could have implemented alternative arrangements, but it did not.  It is inappropriate to lodge an Objection to confirmation to a plan provision that has the support of all of the other constituencies in this case and otherwise complies with the provisions of § 1129 of the Bankruptcy Code.

BlueWave raises two Objections to the Liquidating Plan in addition to its Objection directed at exculpation.  The Court has already addressed the exculpation provision, finding it to

24

be narrowly tailored and appropriate to conduct relating to this bankruptcy case.   BlueWave

argues next that the Liquidating Plan strips it of its setoff and recoupment rights in violation of

§ 553 of the Bankruptcy Code.   Setoff and recoupment are both affirmative defenses.   *See*

*Durham v. SMI Indus. Corp.*, 882 F.2d 881, 883 (4th Cir. 1989) (noting setoff is an affirmative

defense); *see also Dowell v. G&G Motorcycles Inc.*, No. 3:14cv263, 2014 WL 6712893, at *4

(E.D. Va. Nov. 24, 2014).   Section 7.4 of the Liquidating Plan preserves BlueWave's affirmative

defenses, stating that the Plan injunction shall not "bar any Entity from asserting any defense in

an action commenced by or on behalf of any of the Debtors or the Liquidating Trust."

Accordingly, this Objection of BlueWave is of no moment.

BlueWave also objected to § 6.3(i) of the Liquidating Plan.   That section allows the

Liquidating Trustee to estimate certain claims in order to reserve an appropriate amount of funds

throughout the distribution process.   BlueWave complains that this provision impermeably

broadens the Debtors' ability to estimate contingent or unliquidated claims under § 502(c) of the

Bankruptcy Code.   It does not.   It has nothing to do with estimation of claims for allowance

purposes.   The provision deals only with estimations for purposes of establishing appropriate

reserve amounts.   The Court finds that § 6.3(i) is not only permissible but necessary as it allows

the Trustee to protect the interests of all creditors in order to maintain adequate reserve amounts

throughout the claim approval process.

## Conclusion

A court should approve a proposed chapter 11 plan if it complies with the requirements

of § 1129 and the other applicable provisions of the Bankruptcy Code.   The Court finds that the

Liquidating Plan in this case has been proposed in good faith.   The Liquidating Plan provides for

the payment of all administrative expenses and secured creditors in full.   The claims are

classified in a manner that complies with the Bankruptcy Code.   Unsecured creditors, in both

number and dollar amount who are impaired, have overwhelmingly voted in favor of the

Liquidating Plan, thus satisfying § 1129(a)(10) of the Bankruptcy Code.   The Liquidating Plan

does not unfairly discriminate against the two dissenting classes of creditors.   The Liquidating

Plan is feasible, fair, and in the best interest of the creditors of the bankruptcy estates.   The Court

has overruled the Objections of Warnick, Ryan and BlueWave.   The Court finds that the Plan can

be confirmed, as it complies with all the applicable provisions of the Bankruptcy Code.

      A separate order with additional findings relating to § 1129 of the Bankruptcy Code shall

issue.

ENTERED: _May 12, 2016_____

                    _____/s/ Kevin R. Huennekens_____
                    UNITED STATES BANKRUPTCY JUDGE

                    Entered on Docket:  May 12, 2016