**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(RICHMOND DIVISION)**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 15-32919 (KRH) |
| HEALTH DIAGNOSTIC LABORATORY INC. *et. al.*,[1] | (Jointly Administered) |
| Debtors. | |
| RICHARD ARROWSMITH, LIQUIDATING TRUSTEE OF THE HDL LIQUIDATING TRUST, | Adv. Proc. No. _____ |
| Plaintiff, | |
| vs. | |
| LATONYA S. MALLORY, SCOTT MALLORY, JANET MALLORY CURTIN, IN HER CAPACITY AS TRUSTEE OF THE LATONYA MALLORY 2012 IRREVOCABLE TRUST, JOSEPH P. MCCONNELL, PAULA SUE BOWMAN, IN HER CAPACITY AS | |

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Health Diagnostic Laboratory, Inc. (0119), Central Medical Laboratory, LLC (2728), and Integrated Health Leaders, LLC (2434).

TRUSTEE OF THE JOSEPH P. MCCONNELL 2012
IRREVOCABLE TRUST, GEORGE RUSSELL
WARNICK, KARL F. WARNICK, KRISTAN
WARNICK, AND GEORGE RUSSELL WARNICK,
IN THEIR CAPACITY AS TRUSTEES OF THE
WARNICK FAMILY 2012 IRREVOCABLE TRUST,
THE WARNICK FAMILY, LLC, WARNICK
MANAGEMENT, LLC, ROBERT BRADFORD
JOHNSON, FLOYD CALHOUN DENT, III, NOEL L.
BARTLETT, JR., ROBERT S. GALEN, GALEN
ASSOCIATES, INC., TIPTON GOLIAS, HELENA
LABORATORIES CORPORATION, JOSEPH
GOLIAS, DONALD GOLIAS, KARLA FALGOUT,
TIPTON GOLIAS, IN HIS CAPACITY AS TRUSTEE
OF THE WYNDELL L. GOLIAS VOTING TRUST,
ERIC PETERSEN, DAVID MAYES, JOHN
TESSLER, PAMELA OATES, SATYANARAIN
RANGARAJAN, BLUEWAVE HEALTH CARE
CONSULTANTS, INC., DENNIS M. RYAN,
HISWAY OF SOUTH CAROLINA, INC., ROYAL
BLUE MEDICAL INC., REMEMBER PEMBER INC.,
RBLIV CONSULTING, INC., MRT HEALTH
CONSULTANTS INC., SOUTHHILL CONSULTING
GROUP, INC., SOUTHEAST HEALTHCARE
CONSULTANTS LLC, DISEASE TESTING &
MANAGEMENT LLC, COFFMAN ENTERPRISES
INC., CHRISTO CONSULTING CORP., JP
CORNWELL INC., LOCKHARDT CONSULTING
INC., MEDCENTRIC LLC, MED-CON-EC LLC,
MEADE MEDICAL GROUP, LLC, LABYRINTH
LLC, JBH MARKETING, INC., ADVANCED
MEDICAL CONSULTING LLC, PARAMOUNT
MEDICAL CONSULTANTS INC.,
ADVANCED MEDICAL SALES, L.L.C., QUASI
MATURI LLC, OCEAN DIAGNOSTICS &
CONSULTING, LLC, M. LOONEY CONSULTING
INC., SOUTHERN COAST CONSULTANTS, LLC,
EL MEDICAL CONSULTING INC., DX SALES,
LLC, METTA CONSULTING INC., WCBLUE LAB
LLC, BEYOND MEDICINE LLC, MML
EQUIPMENT INC., BIO-MATRIX HEALTHCARE
CONSULTANTS, LLC, NIBAR HEALTH
CONSULTANTS, INC., INFINITY MEDICAL
CONSULTING LLC, EELLS CONSULTING INC.,
COBALT HEALTHCARE CONSULTANTS INC.,
AROC ENTERPRISES LLC, RIVERLAND PINES

LLC, CROSSPOINT PROPERTIES LLC, HELM-
STATION INVESTMENTS LLLP, LAKELIN PINES
LLC, TRINI "D" ISLAND LLC, CAE PROPERTIES
LLC, BLUE EAGLE FARM, LLC, BLUE EAGLE
FARMING LLC, FORSE MEDICAL INC., FORSE
INVESTMENTS, LLC, EAGLE RAY
INVESTMENTS LLC, WAR-HORSE PROPERTIES,
LLLP, H J FARMING, LLC, BLUE SMASH
INVESTMENTS, LLC, LEAH BOUTON , THOMAS
CARNAGGIO, KEVIN CARRIER, JERRY
CARROLL, JOHN COFFMAN, PATRICK
COLBERG, JEFFREY "BOOMER" CORNWELL,
KRISTIN DUKES, JASON DUPIN, SENECA
GARRETT, LEIGHA GREENWOOD, ERIKA
GUEST, JULIE HARDING, ROBERT B. "BURT"
LIVELY, HEATHER LOCKHARDT, COURTNEY
LOVE, CHARLES MAIMONE, KYLE MARTEL,
DAVID PEMBER, LEE ROBERTS, MICHAEL H.
SAMADANI, JENNIFER SPEER, NICOLE TICE,
ROBERT E. YOUNGER, AND DOES 1-50,

                    Defendants.

## COMPLAINT

Douglas P. Lobel (VSB No. 42329)
**COOLEY LLP**
11951 Freedom Drive
Reston, VA  20190-5656
Telephone: (703) 456-8000
Direct: (703) 456-8019
Email: dlobel@cooley.com

Richard S. Kanowitz (admitted pro hac vice)
**COOLEY LLP**
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Email: rkanowitz@cooley.com

*Counsel to Plaintiff Richard Arrowsmith,*
*Liquidating Trustee of the HDL Liquidating Trust*

Cullen D. Speckhart (VSB No. 79096)
**WOLCOTT RIVERS GATES**
919 E. Main Street, Ste. 1040
Richmond, VA 23219
200 Bendix Road, Ste. 300
Virginia Beach, VA 23452
Telephone: (757) 497-6633
Direct: (757) 470-5566
Email: cspeckhart@wolriv.com

*Counsel to Plaintiff Richard Arrowsmith,*
*Liquidating Trustee of the HDL Liquidating Trust*

## TABLE OF CONTENTS

Page

I.        NATURE OF THE ACTION ............................................................. 1

    A.    From The Start, HDL's Founders Conspired With BlueWave To Sell
          HDL's Tests Through Improper And Illegal Business Practices ................... 1

    B.    HDL Relied On Three Improper And Illegal Business Practices ................... 3

    C.    Although HDL's Scheme Allowed It To Reap Hundreds Of Millions
          Of Dollars, HDL Was Never Actually Solvent Or Profitable ......................... 4

    D.    HDL's Practices Drew Inevitable Scrutiny ..................................... 5

    E.    HDL's Management Engaged In Wasteful And Self-Dealing
          Transactions ................................................................. 7

    F.    HDL's Business Eventually Collapsed ......................................... 8

    G.    To Recover The Losses Suffered By Creditors, Plaintiff Brings Dozens
          Of Causes Of Action Against A Wide Range Of Defendants ..................... 11

II.       JURISDICTION AND VENUE ........................................................ 12

III.      PARTIES ............................................................................. 12

    A.    Plaintiff .......................................................................... 12

    B.    Defendants ...................................................................... 12

        1.    Directors, Officers, and Shareholders ................................... 12

        2.    BlueWave Independent Sales Contractors And Transferees ............ 18

        3.    Doe Defendants ......................................................... 34

IV.       FACTUAL ALLEGATIONS ........................................................... 34

    A.    Formation of HDL .............................................................. 34

    B.    The Legal and Regulatory Environment of HDL's Laboratory
          Business ........................................................................ 35

    C.    Process and Handling Payments ............................................... 38

        1.    Despite Repeated Red Flags, The D&O Defendants and
              Rangarajan Implemented And Continued An Improper And
              Illegal P&H Program, Aided And Abetted By The BlueWave
              Defendants And Others ................................................... 38

        2.    The D&O Defendants And Rangarajan Ignored Numerous
              Warnings That The P&H Program Was Illegal And Improper ....... 41

    D.    The BlueWave Agreement ..................................................... 46

        1.    HDL Negotiated And Executed An Illegal And Improper
              Agreement With BlueWave, Paying BlueWave More Than
              $220 Million ............................................................. 46

i

<u>TABLE OF CONTENTS</u>
(continued)

Page

2.      **By Entering Into The BlueWave Agreement, The D&O Defendants, Aided And Abetted By The BlueWave Defendants And Others, Put HDL On A Collision Course With The Government** ........................................................................ 48

E.      **HDL's Improper And Fraudulent Billing Practices** ........................................ 50

1.      **HDL Routinely Failed To Collect Patient Co-Payments, Co-Insurance, and Deductibles** .................................................... 50

2.      **By Implementing The Patient Responsibility Collection Practice, The D&O Defendants and Rangarajan, Aided And Abetted By The BlueWave Defendants And Others, Exposed HDL To A Crippling Government Investigation, Enormous Settlement Obligations, And Huge Damages From Payer Lawsuits** .......................................................................... 51

F.      **HDL Paid Millions Of Dollars To Berkeley HeartLab To Settle Claims Based On Warnick's And Mallory's Conduct** .................................. 53

G.      **Tipton Golias, Already HDL's Largest Stockholder, Invested Additional Equity Amounts In HDL Mischaracterized As A Loan** .............. 55

H.      **HDL Engaged In Medically Unnecessary And Improper CYP2C19 Testing** ........................................................................................................ 58

I.      **The Defendants Made Improper Payments To Doctors Through A Medical Advisory Board And Other Practices** .............................................. 60

J.      **At The D&O Defendants' Direction, HDL Squandered More Than $18 Million Forming And Funding Global Genomics Group** ...................... 61

K.      **Mallory Breached Her Fiduciary Duties Of Loyalty And Due Care By Usurping The Opportunity To Purchase GeneNews Limited Stock For Her Own Personal Gain And By Directing HDL To Fund Millions Of Dollars Into Innovative Diagnostic Laboratory, A Money Losing Joint Venture With GeneNews Limited** ........................................................ 65

L.      **At The D&O Defendants' Direction, HDL Wasted Millions Of Dollars On Its Investment In C3Nexus, LLC** ............................................................ 69

M.      **At The D&O Defendants' Direction, HDL Squandered Millions Of Dollars Through Inappropriate Corporate Sponsorships And Large Charitable Gifts** ............................................................................................ 73

N.      **At All Relevant Times, HDL Was Insolvent, Had Unreasonably Small Capital For Its Business, And Incurred Or Should Have Known It Was Incurring Debts That It Lacked The Ability To Pay** ............................ 74

<u>TABLE OF CONTENTS</u>
(continued)

Page

O.    At All Relevant Times, HDL Was Under the Domination and Control
      Of The D&O Defendants, In Conspiracy With The BlueWave
      Defendants ........................................................................................... 77

P.    The D&O Defendants Made Or Directed Intentional
      Misrepresentations To HCPs, Payers, And Other Creditors About
      The Nature And Propriety Of HDL's Business Practices .............................. 78

Q.    HDL Made Massive Distributions To Shareholders ................................... 79

R.    HDL Entered Into Employment Agreements With Mallory,
      McConnell, Warnick, And Ryan And Paid Excessive, And Increasing,
      Salaries, Bonuses, And Other Compensation ........................................... 81

S.    HDL Entered Into A Buyout Agreement With Rangarajan, Paying
      Him Millions To Repurchase His HDL Stock On Top Of An Excessive
      Bonus .................................................................................................... 83

T.    HDL Entered Into A Separation Agreement With Mallory, Agreeing
      to Pay Her More Than $2 Million In Unnecessary Severance ...................... 84

U.    The DOJ Investigation, Settlement, and Complaint-in-Intervention .......... 85

V.    Claims By Insurance Companies ............................................................. 86

W.    McConnell, Warnick, Galen and Bartlett Failed To Obtain A Tolling
      Agreement From Individual LeClairRyan Attorneys ................................. 88

X.    HDL's Bankruptcy Proceeding, Confirmation Of Plan Of
      Liquidation, And Creation Of Liquidating Trust ....................................... 89

Y.    Assignments Of Creditor Causes Of Action ............................................. 91

COUNT 1    (Avoidance of Transfer of Distributions to Shareholders and
           Recovery of Value Under 11 U.S.C. §§548 and 550; Against the
           Shareholder Defendants, the Mallory Trust, the Warnick Entity
           Defendants, and the Doe Defendants – Actual Fraud) .................... 92

COUNT 2    (Avoidance of Transfer of Distributions to Shareholders and
           Recovery of Value Under 11 U.S.C. §§548 and 550; Against the
           Shareholder Defendants, the Mallory Trust, the Warnick Entity
           Defendants, and the Doe Defendants – Constructive Fraud) ....... 93

COUNT 3    (Avoidance of Transfer of Distributions to Shareholders and
           Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as
           applicable, 28 U.S.C. § 3304; Against the Shareholder Defendants,
           the Mallory Trust, the Warnick Entity Defendants, and the Doe
           Defendants – Actual Fraud) ...................................................... 94

iii

<u>TABLE OF CONTENTS</u>
(continued)

<u>Page</u>

**COUNT 4**  (Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, 28 U.S.C. § 3304; Against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants – Constructive Fraud) ................................................... 96

**COUNT 5**  (Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Va. Code § 55–80; Against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants – Actual Fraud) ........................................... 97

**COUNT 6**  (Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Va. Code § 55–81; Against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants – Insolvency) ................................................. 99

**COUNT 7**  (Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Texas Bus. & Com. Code §§ 24.001 et seq., Georgia Code §§ 18-2-70 et seq., Alabama Code §§ 8-9A-1 et seq., West Virginia Code §§ 40-1A-1 et seq., Revised Code of Washington § 19.40.011 et seq., and Minnesota Statutes §§ 513.41 et seq.; Against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants – Actual Fraud) ................................ 100

**COUNT 8**  (Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Texas Bus. & Com. Code §§ 24.001 et. seq., Georgia Code §§ 18-2-70 et seq., Alabama Code §§ 8-9A-1 et seq., West Virginia Code §§ 40-1A-1 set seq., Revised Code of Washington § 19.40.011 et seq. and Minnesota Statutes §§ 513.41 et seq.; Against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants – Constructive Fraud) .................... 102

**COUNT 9**  (Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, S.C. Code § 27-23-10; Against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants – Actual Fraud) ............................................. 104

**COUNT 10**  (Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, S.C. Code § 27-23-10; Against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants – Constructive Fraud) ................................ 105

iv

TABLE OF CONTENTS
(continued)

Page

**COUNT 11**    **(Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, New York Debtor and Creditor Law § 276; Against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants – Actual Fraud – Conveyances Made with Intent to Defraud)** ............................................................ 107

**COUNT 12**    **(Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, New York Debtor and Creditor Law §§ 273 and 274; Against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants – Constructive Fraud)** ......... 108

**COUNT 13**    **(Avoidance of Transfers of Compensation to Insiders and Recovery of Value Under 11 U.S.C. §§548 and 550; Against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants – Actual Fraud)** .......................................................................... 110

**COUNT 14**    **(Avoidance of Transfers of Compensation to Insiders and Recovery of Value Under 11 U.S.C. §§548 and 550; Against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants – Constructive Fraud)** ........................................................................ 111

**COUNT 15**    **(Avoidance of Transfers of Compensation to Insiders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, 28 U.S.C. § 3304; Against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants – Actual Fraud)** .................................. 113

**COUNT 16**    **(Avoidance of Transfers of Compensation to Insiders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, 28 U.S.C. § 3304; Against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants – Constructive Fraud)** .................................. 115

**COUNT 17**    **(Avoidance of Transfers of Compensation to Insiders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Va. Code §§ 55–80; Against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants – Actual Fraud)** .......................................... 116

**COUNT 18**    **(Avoidance of Transfers of Compensation to Insiders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Va. Code §§ 55–81; Against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants – Insolvency)** ............................................. 118

## TABLE OF CONTENTS
### (continued)

Page

**COUNT 19** **(Avoidance of Transfers of Compensation to Insiders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Revised Code of Washington § 19.40.011 et seq. and Minnesota Statutes §§ 513.41 et seq.; Against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants – Actual Fraud)**...........................................119

**COUNT 20** **(Avoidance of Transfers of Compensation to Insiders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Revised Code of Washington § 19.40.011 et seq. and Minnesota Statutes §§ 513.41 et seq.; Against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants – Constructive Fraud)**...............................121

**COUNT 21** **(Avoidance of Transfers to Insiders Under Employment Contracts Outside of the Ordinary Course of Business and Recovery of Value Under 11 U.S.C. §§548(a)(1)(B)(i) and (ii)(IV) and 550; Against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants — Insider Employment Contract Payments)**...................................122

**COUNT 22** **(Avoidance of the Mallory Separation Amount Obligation Under 11 U.S.C. §§548(a)(1)(B)(i) and (a)(1)(B)(ii)(I), (ii)(II), (ii)(III) and (ii)(IV) and Recovery of Value Under 11 U.S.C. § 550; Against Mallory and the Mallory Trust – Insider Employment Contract Obligation Outside of the Ordinary Course of Business and Constructive Fraud)**...................................123

**COUNT 23** **(Avoidance of Transfer of the Rangarajan Buyout Payments and Recovery of Value Under 11 U.S.C. §§548 and 550; Against Rangarajan – Actual Fraud)**...................................125

**COUNT 24** **(Avoidance of Transfer of the Rangarajan Buyout Payments to Rangarajan and Recovery of Value Under 11 U.S.C. §§548 and 550; Against Rangarajan – Constructive Fraud)**...................................126

**COUNT 25** **(Avoidance of Transfer of the Rangarajan Buyout Payments to Rangarajan and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, 28 U.S.C. § 3304; Against Rangarajan – Actual Fraud)**...................................127

**COUNT 26** **(Avoidance of Transfer of the Rangarajan Buyout Payments to Rangarajan and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, 28 U.S.C. § 3304; Against Rangarajan – Constructive Fraud)**...................................129

## TABLE OF CONTENTS
(continued)

Page

**COUNT 27**   **(Avoidance of Transfer of the Rangarajan Buyout Payments to Rangarajan and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Va. Code § 55–80; Against Rangarajan – Actual Fraud)**...................................................................................130

**COUNT 28**   **(Avoidance of Transfer of the Rangarajan Buyout Payments to Rangarajan and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Va. Code § 55–81; Against Rangarajan – Insolvency)** ..............................................................................132

**COUNT 29**   **(Recharacterization Of March 1, 2010 Note And the Golias Double Payment As Equity; Against Tipton Golias)**..................................132

**COUNT 30**   **(Avoidance of Transfer of the Golias Double Payment and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, 28 U.S.C. § 3304; Against Tipton Golias – Constructive Fraud)** ...................133

**COUNT 31**   **(Avoidance of Transfer of the Golias Double Payment and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Va. Code § 55–81; Against Tipton Golias – Constructive Fraud)** ...................135

**COUNT 32**   **(Avoidance of Transfer of the Golias Double Payment to Tipton Golias and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Texas Bus. & Com. Code §§ 24.001 et. seq., Against Tipton Golias – Constructive Fraud)**............................................................135

**COUNT 33**   **(Avoidance of Transfer of the Golias Double Payment and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, New York Debtor and Creditor Law §§ 273 and 274; Against Tipton Golias – Constructive Fraud)** ..................................................137

**COUNT 34**   **(Recharacterization Of February 4, 2014 Note And Mallory Payment As Equity; Against Mallory and the Mallory Trust)** ................138

**COUNT 35**   **(Avoidance of Transfer of the Mallory Payment and Recovery of Value Under 11 U.S.C. §§548 and 550; Against Mallory and the Mallory Trust – Constructive Fraud)**............................................139

**COUNT 36**   **(Avoidance of Transfer of Mallory Payment and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Va. Code § 55–81; Against Mallory and/or the Mallory Trust – Insolvency)** ...................140

**COUNT 37**   **(Avoidance of Transfer of BlueWave Payments and Recovery of Value Under 11 U.S.C. §§548 and 550; Against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants – Actual Fraud)** .........................................................141

TABLE OF CONTENTS
(continued)

Page

**COUNT 38**    (Avoidance of Transfer of BlueWave Payments and Recovery of Value Under 11 U.S.C. §§548 and 550; Against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants – Constructive Fraud)...................................................142

**COUNT 39**    (Avoidance of Transfer of BlueWave Payments and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, 28 U.S.C. § 3304; Against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants – Actual Fraud)............144

**COUNT 40**    (Avoidance of Transfer of BlueWave Payments and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, 28 U.S.C. § 3304; Against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants – Constructive Fraud)........................................................................145

**COUNT 41**    (Avoidance of Transfer of the BlueWave Payments and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, the Virginia Code Annotated § 55–80; Against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants – Actual Fraud) ..........................................................147

**COUNT 42**    (Avoidance of Transfer of the BlueWave Payments and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, the Virginia Code Annotated § 55–81; Against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants – Insolvency) ................................................................149

**COUNT 43**    (Avoidance of Transfer of BlueWave Payments and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Texas Bus. & Com. Code §§ 24.001 et seq., Georgia Code §§ 18-2-70 et seq., Alabama Code §§ 8-9A-1 et seq., West Virginia Code §§ 40-1A-1 et seq.; Against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants – Actual Fraud)................................150

**COUNT 44**    (Avoidance of Transfer of the BlueWave Payments and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Texas Bus. & Com. Code §§ 24.001 et. seq., Georgia Code §§ 18-2-70 et seq., Alabama Code §§ 8-9A-1 et seq., West Virginia Code §§ 40-1A-1 set seq.; Against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants – Constructive Fraud)........................................................................152

**COUNT 45**    (Avoidance of Transfer of the BlueWave Payments and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, S.C. Code § 27-23-10; Against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants – Actual Fraud)............153

<u>TABLE OF CONTENTS</u>
(continued)

Page

**COUNT 46**    **(Avoidance of Transfer of BlueWave Payments and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, S.C. Code § 27-23-10; Against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants – Constructive Fraud)** .................................................................................................. 155

**COUNT 47**    **(Avoidance of Obligations Under BlueWave Agreement Under 11 U.S.C. §544(b) and, as applicable, 28 U.S.C. § 3304; Against BlueWave – Actual Fraud)** .............................................................. 157

**COUNT 48**    **(Avoidance of Obligations Under BlueWave Agreement Under 11 U.S.C. §544(b) and, as applicable, 28 U.S.C. § 3304; Against BlueWave – Constructive Fraud)** ................................................. 158

**COUNT 49**    **(Avoidance of Obligations Under BlueWave Agreement Under 11 U.S.C. §544(b) and, as applicable, the Virginia Code Annotated § 55–80; Against BlueWave – Actual Fraud)** ........................................ 159

**COUNT 50**    **(Avoidance of Obligations Under BlueWave Agreement Under 11 U.S.C. §544(b) and, as applicable, the Virginia Code Annotated § 55–81; Against BlueWave – Constructive Fraud)** ............................ 161

**COUNT 51**    **(Avoidance and Recovery of Preferential Transfers Under 11 U.S.C. §§547 and 550; Against the D&O Defendants, the Galen Defendants, Bartlett, the Mallory Trust, the Warnick Entity Defendants, the Shareholder Defendants, Helena Laboratories, and the Doe Defendants)** ................................................................................ 162

**COUNT 52**    **(Avoidance and Recovery of Preferential Transfers Under 11 U.S.C. §§547 and 550; Against the D&O Defendants, the Galen Defendants, Bartlett, the Mallory Trust, the Warnick Entity Defendants, the BlueWave Defendants, the BlueWave Transferee Defendants, Tipton Golias, Helena Laboratories, and the Doe Defendants)** ............................... 163

**COUNT 53**    **(Breach of Statutory Fiduciary Duty – Va. Code § 13.1-690; Against the D&O Defendants, Rangarajan, Galen, and Bartlett)** ........................... 165

**COUNT 54**    **(Common Law Breach of Fiduciary Duty; Against the D&O Defendants, Rangarajan, Galen, and Bartlett)** ........................................... 167

**COUNT 55**    **(Violation of The Trust Fund Doctrine; Against the D&O Defendants, Rangarajan, Galen, Bartlett, the Shareholder Defendants, the BlueWave Defendants, the BlueWave Transferee Defendants, the Major Sales Contractor Defendants, Ryan, and the Doe Defendants)** .................................................................................. 169

**COUNT 56**    **(Breach of Statutory Fiduciary Duty -- Va. Code § 13.1-690; Against Mallory)** ....................................................................................... 171

**COUNT 57**    **(Common Law Breach of Fiduciary Duty; Against Mallory)** .................. 172

<u>TABLE OF CONTENTS</u>

(continued)

<u>Page</u>

**COUNT 58**    **(Aiding and Abetting Breach of Fiduciary Duty; Against the BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, Ryan, and the Doe Defendants)** ............................................... 173

**COUNT 59**    **(Common Law Conspiracy; Against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, and the Doe Defendants)** ............................................ 175

**COUNT 60**    **(Statutory Business Conspiracy – Va. Code §§ 18.2-499 et seq.; Against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, and the Doe Defendants)** ............................................ 176

**COUNT 61**    **(Unlawful Distributions -- Va. Code §§ 13.1-653 and 13.1-690; Against Mallory, McConnell, Warnick, Galen, and Bartlett)** ................... 178

**COUNT 62**    **(Corporate Waste; Against the D&O Defendants, Rangarajan, Galen, and Bartlett)** ....................................................................... 179

**COUNT 63**    **(Negligence; Against the D&O Defendants, Rangarajan, Galen, and Bartlett)** ....................................................................... 180

**COUNT 64**    **(Gross Negligence; Against the D&O Defendants, Rangarajan, Galen, and Bartlett)** ....................................................................... 182

**COUNT 65**    **(Assumpsit; Against All Defendants)** ............................................ 183

**COUNT 66**    **(Unjust Enrichment; Against All Defendants)** ............................ 184

**COUNT 67**    **(Fraud Committed Upon Assigning Creditors; Against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants)** .................................................... 185

**COUNT 68**    **(Constructive Fraud Committed Against Assigning Creditors; Against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants)** ..................... 186

**COUNT 69**    **(Tortious Interference With Contracts of Assigning Creditors; Against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants)** ..................... 187

**COUNT 70**    **(Tortious Interference With Existing Contract, Contract Expectancy, Prospective Business Relationship and Economic Advantage of Assigning Creditors; Against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants)** .................................................... 189

<u>TABLE OF CONTENTS</u>
(continued)

<u>Page</u>

**COUNT 71**   **(Fraud, Tortious Interference with Business and Contractual Relations, Civil Conspiracy and Unjust Enrichment Claims Asserted by Assigning Creditor Aetna; Against The D&O Defendants, Rangarajan, and the BlueWave Defendants)**................................................190

**COUNT 72**   **(Common Law Conspiracy Asserted by the Assigning Creditors; Against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants)** .....................191

**COUNT 73**   **(Statutory Business Conspiracy Asserted by the Assigning Creditors – Va. Code §§ 18.2-499 et seq.; Against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants)**............................................................192

**COUNT 74**   **(Declaratory Relief Under 28 U.S.C. §§ 2201-2202 and Fed.R.Bankr.P. 7001 Declaring BlueWave Agreement to be Illegal and Unenforceable Pursuant to Ga. Code Ann. § 13-8-1 and Other Applicable Law; Against BlueWave)**................................194

**COUNT 75**   **(Objections to Proofs of Claims and Requests for Allowance of Administrative Expenses Under 11 U.S.C. §§ 502(b)(7), 502(d), 502(e), 503, and 507; Against the Mallory Defendants, the McConnell Defendants, Warnick, Rangarajan, the Galen Defendants, Ryan, BlueWave, Helena Laboratories, the Golias Family Shareholders, Petersen, Mayes, Tessler, Oates, and the Doe Defendants)** .......................195

**COUNT 76**   **(Equitable Subordination Under 11 U.S.C. § 510(c); Against the Mallory Defendants, the McConnell Defendants, Warnick, Rangarajan, the Galen Defendants, Ryan, BlueWave, Helena Laboratories, the Golias Family Shareholders, Petersen, Mayes, Tessler, Oates, and the Doe Defendants)**....................................196

**PRAYER FOR RELIEF**.......................................................................197

xi

Plaintiff Richard Arrowsmith, as Liquidating Trustee ("***Plaintiff***" or "***Liquidating***

***Trustee***") of the HDL Liquidating Trust (the "***Trust***"), by undersigned counsel, alleges, upon

knowledge and/or information and belief, as follows:

## I.    NATURE OF THE ACTION

1.    This is an action brought by Plaintiff to recover the catastrophic losses caused to

Health Diagnostic Laboratory Inc. (together with Central Medical Laboratory, LLC and

Integrated Health Leaders, LLC, "***HDL***" or the "***Debtors***") and its creditors. HDL's former

officers and directors designed and carried out improper, illegal and fraudulent business practices

in breach of their fiduciary duties. Other defendants aided and abetted these breaches and

conspired with them, and collectively the defendants received hundreds of millions of dollars in

fraudulent transfers. These actions ultimately led to HDL's bankruptcy, which was commenced

in this Court, on June 7, 2015 (the "***Petition Date***").

### A.    From The Start, HDL's Founders Conspired With BlueWave To Sell HDL's Tests Through Improper And Illegal Business Practices

2.    HDL was formed in late 2008 as an independent laboratory business offering

blood tests for early detection of cardiovascular disease, diabetes and related diseases. Two of

HDL's co-founders, LaTonya S. Mallory ("***Mallory***") and George Russell Warnick ("***Warnick***"),

had previously worked together at Berkeley HeartLab, Inc. ("***Berkeley***") with Floyd Calhoun

Dent, III ("***Dent***") and Robert Bradford Johnson ("***Johnson***"), the two co-founders of BlueWave

Healthcare Consultants, Inc. ("***BlueWave***"), which formed the outside sales and marketing force

used to sell HDL's tests to doctors. Together with HDL's third co-founder, Joseph P. McConnell

("***McConnell***"), they collectively hatched a scheme to build and grow HDL through illegal and

fraudulent business practices and to share the spoils with BlueWave, all for their personal gain.

1

G.     **To Recover The Losses Suffered By Creditors, Plaintiff Brings Dozens Of Causes Of Action Against A Wide Range Of Defendants**

37.     Plaintiff brings causes of action against a wide range of individuals and entities that improperly benefitted from these wrongful activities. The defendants include Mallory, McConnell, Warnick, and other HDL directors and officers; BlueWave, Dent, and Johnson; HDL stockholders who received illegal distributions; and numerous subsequent transferees from BlueWave.

38.     Plaintiff alleges 76 causes of action against these defendants, including:

- Actual and constructive fraudulent transfers and obligations under federal and state law;

- Preferential transfers;

- Breaches of fiduciary duty and related torts;

- Conspiracy;

- Recharacterization as equity of certain advances made and recovery of the associated payments as fraudulent transfers;

- Unlawful distributions, corporate waste, negligence, violation of trust fund doctrine, and unjust enrichment;

- Fraud and intentional interference with contracts and business relationships against creditors; and

- Objection to and equitable subordination of unsecured, administrative, and other claims of the defendants.

39.     HDL's officers and directors breached their duties of due care and loyalty to HDL, engaged in repeated acts of self-dealing, and willfully and continuously violated the law through interrelated policies. They squandered tens of millions of dollars through a series of self-dealing and improper transactions. They were aided and abetted in these breaches of fiduciary duty by BlueWave, its principals, and many others, who provided support for HDL's improper business practices. These individuals and entities also conspired together to damage HDL, its

11

business, and its creditors, taking hundreds of millions of dollars out of HDL for their own personal gain and making numerous fraudulent transfers. They caused catastrophic damage to HDL, leaving creditors holding the bag.

## II.   JURISDICTION AND VENUE

40.    This Court, before which the above-captioned chapter 11 cases are pending, has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157(a) and 1334, and supplemental jurisdiction over Plaintiff's state law causes of action under 28 U.S.C. § 1367.

41.    This Court also has jurisdiction over this adversary proceeding pursuant to Section 11.1 of the Modified Second Amended Plan of Liquidation Proposed by the Debtors (the "**Plan**") [Docket No. 1012], and Paragraph 65 of this Court's May 12, 2016 order confirming the Plan (the "**Confirmation Order**") [Docket No. 1095].

42.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

43.    This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) seeking, *inter alia*, recovery of property of the Debtors' estates.

44.    Pursuant to 28 U.S.C. § 157(e), Plaintiff consents to the conduct of a jury trial by this Court.

## III.   PARTIES

### A.    Plaintiff

45.    Plaintiff Richard Arrowsmith is the Liquidating Trustee of the Trust.

### B.    Defendants

#### 1.    Directors, Officers, and Shareholders

46.    Defendant Mallory was a co-founder of HDL and owned 8.9048% of HDL's stock as of the Petition Date.   Mallory served as Chief Executive Officer of HDL from its

formation in 2008 through September 2014 and chairman of the HDL Board of Directors from HDL's formation in 2008 through the end of 2014.

47.    Defendant Scott Mallory, the husband of Mallory, owned 6.0021% of HDL's stock as of the Petition Date.

48.    Defendant Janet Mallory Curtin, in her capacity as Trustee of The LaTonya Mallory 2012 Irrevocable Trust (the "*Mallory Trust*"), is an immediate or mediate transferee of Mallory, in amounts to be proved at trial. Mallory controlled and/or dominated and influenced the activities of the Mallory Trust and, therefore, the Mallory Trust is a mere alter ego of Mallory and is imputed with Mallory's knowledge of the wrongdoing described herein.

49.    Accordingly, Mallory and her husband Scott Mallory (the "*Mallory Defendants*") collectively owned approximately 14.91% of HDL's stock as of the Petition Date.

50.    Defendant McConnell was a co-founder of HDL and owned 12.8336% of HDL's stock as of the Petition Date.  McConnell served as Chief Medical Officer of HDL and took over from Mallory as Chief Executive Officer in September 2014, and served as a director of HDL beginning in June 2009 and continuing through the bankruptcy case.

51.    Defendant Paula Sue Bowman, in her capacity as Trustee of The Joseph P. McConnell 2012 Irrevocable Trust, owned 2.0734% of HDL's stock as of or shortly after the Petition Date. Accordingly, McConnell and the irrevocable trust he created owned approximately 14.91% of HDL's stock as of the Petition Date. McConnell and Paula Sue Bowman, in her capacity as Trustee of The Joseph P. McConnell 2012 Irrevocable Trust, are hereinafter referred to as the McConnell Defendants (the "*McConnell Defendants*"). McConnell controlled and/or dominated and influenced the activities of The Joseph P. McConnell 2012 Irrevocable Trust and,

therefore, The Joseph P. McConnell 2012 Irrevocable Trust is a mere alter ego of McConnell and is imputed with McConnell's knowledge of the wrongdoing described herein.

52.     Defendant Warnick was a co-founder of HDL and owned 7.6236% of HDL's stock as of the Petition Date.  He served as Chief Scientific Officer of HDL since November 2009 and as a director of HDL beginning in 2011 and continuing through the bankruptcy case.

53.     Defendants Karl F. Warnick, Kristan Warnick, and Warnick, in their capacity as Trustees of The Warnick Family 2012 Irrevocable Trust, owned 7.2834% of HDL's stock. Accordingly, Warnick and The Warnick Family 2012 Irrevocable Trust owned approximately 14.91% of HDL's stock as of the Petition Date. Warnick, and Karl F. Warnick, Kristan Warnick, and Warnick in their capacity as Trustees of The Warnick Family 2012 Irrevocable Trust, are hereinafter known as the Warnick Defendants (the "***Warnick Defendants***").

54.     Defendant The Warnick Family, LLC ("***Warnick Family LLC***") is a Virginia limited liability company that was an immediate or mediate transferee of payments made by HDL to one or more of the Warnick Defendants, in amounts to be proved at trial.

55.     Defendant Warnick Management, LLC ("***Warnick Management***") is a Virginia limited liability company that was an immediate or mediate transferee of payments made by HDL to one or more of the Warnick Defendants, in amounts to be proved at trial.

56.     Warnick Family LLC, and Warnick Management are hereinafter known as the Warnick Entity Defendants (the "***Warnick Entity Defendants***"). Warnick owned, controlled, and/or dominated and influenced the activities of The Warnick Family 2012 Irrevocable Trust and the Warnick Entity Defendants and, therefore, The Warnick Family 2012 Irrevocable Trust and the Warnick Entity Defendants are mere alter egos of Warnick and are imputed with Warnick's knowledge of the wrongdoing described herein.

14

57.     Defendant Tipton Golias was the largest owner of HDL's stock and owned 38.4795% of HDL's stock as of the Petition Date.

58.     Defendant Joseph Golias, a son of Tipton Golias, owned 5.21% of HDL's stock as of the Petition Date.

59.     Defendant Donald Golias, a son of Tipton Golias, owned 2.605% of HDL's stock as of the Petition Date.

60.     Defendant Tipton Golias, in his capacity as Trustee of The Wyndell L. Golias Voting Trust, owned 1.1164% of HDL's stock as of the Petition Date.

61.     Defendant Karla Falgout, a daughter of Tipton Golias, owned 2.605% of HDL's stock as of the Petition Date.

62.     Tipton Golias, Joseph Golias, Donald Golias, Karla Falgout, and Tipton Golias, in his capacity as Trustee of The Wyndell L. Golias Voting Trust (collectively, the "***Golias Family Shareholders***"), collectively owned 50.02% of HDL's stock as of the Petition Date.

63.     Defendant Helena Laboratories Corporation ("***Helena Laboratories***") is a Texas corporation.  Helena Laboratories is owned by Tipton Golias, who was its founder and also serves as its Chairman, Chief Executive Officer, and a director. Defendant Noel D. Bartlett, Jr. ("***Bartlett***") is the Chief Financial Officer of Helena Laboratories and Helena Laboratories was at all relevant times an affiliate of HDL.

64.     Defendant BlueWave, HDL's sales agent and marketing consultant, is an Alabama corporation.

65.     Defendant Dent is a principal and insider of BlueWave and owned 1.5630% of HDL's stock as of the Petition Date.

66.     Defendant Johnson is a principal and insider of BlueWave and owned 1.5630% of HDL's stock as of the Petition Date.

67.     Defendants BlueWave, Dent, and Johnson are collectively referred to hereinafter as the BlueWave Defendants (the "***BlueWave Defendants***"). Dent and Johnson were principals and insiders of BlueWave and BlueWave is imputed with their knowledge of the wrongdoing described herein.

68.     Defendant Robert S. Galen ("***Galen***") owned 1.0420% of HDL's stock as of the Petition Date and served as a director on the HDL Board of Directors beginning in early October 2014 and continuing through the bankruptcy case.   Galen served as a consulting Medical Director of Helena Laboratories. Galen Associates, Inc. ("***Galen Associates***") is a Delaware corporation owned by Galen. Galen and Galen Associates are collectively referred to hereinafter as the Galen Defendants (the "***Galen Defendants***").

69.     Defendant Bartlett owned 0.2605% of HDL's stock as of the Petition Date and served as a member of the HDL Board of Directors beginning in early October 2014 and continuing through the bankruptcy case.

70.     Defendant Eric Petersen ("***Petersen***"), an employee of Helena Laboratories, owned 0.2605% of HDL's stock as of the Petition Date.

71.     Defendant David Mayes ("***Mayes***"), the brother-in-law of Tipton Golias and an employee of Helena Laboratories, owned 0.2605% of HDL's stock as of the Petition Date.

72.     Defendant John Tessler ("***Tessler***"), an employee of Helena Laboratories, owned 0.2605% of HDL's stock as of the Petition Date.

73.     Defendant Pamela Oates ("***Oates***"), an employee of Helena Laboratories, owned 0.0532% of HDL's stock as of the Petition Date.

74.     Defendant Satyanarain Rangarajan ("**Rangarajan**"), a co-founder and Chief Operating Officer of HDL, initially owned 5.1% of HDL's stock, but his stock was repurchased by HDL in 2013.

75.     Defendant Dennis M. Ryan ("**Ryan**"), a former partner at LeClairRyan, a Professional Corporation ("**LeClairRyan**"), became HDL's executive vice president on or about March 31, 2012.

76.     Collectively, the Mallory Defendants, the McConnell Defendants, the Warnick Defendants, the Golias Family Shareholders, Dent, Johnson, Galen, Bartlett, Petersen, Mayes, Tessler, Oates, and Rangarajan are hereinafter referred to as the Shareholder Defendants (the "**Shareholder Defendants**").

77.     The following table shows the respective percentages of HDL's stock held by each of the Shareholder Defendants as of the Petition Date:

| Shareholder Defendant | Percentage of HDL Stock Held on Petition Date |
|---|---|
| Tipton Golias | 38.4795% |
| Joseph P. McConnell | 12.8336% |
| LaTonya Mallory | 8.9048% |
| George Russell Warnick | 7.6236% |
| The Warnick Family 2012 Irrevocable Trust | 7.2834% |
| Scott Mallory | 6.0021% |
| Joseph Golias | 5.2100% |
| Donald Golias | 2.6050% |
| Karla Falgout | 2.6050% |
| The Joseph P. McConnell 2012 Irrevocable Trust | 2.0734% |
| Robert Bradford Johnson | 1.5630% |
| Floyd Calhoun Dent III | 1.5630% |
| The Wyndell L. Golias Voting Trust | 1.1164% |
| Robert S. Galen | 1.0420% |
| Eric Petersen | 0.2605% |
| David Mayes | 0.2605% |

| John Tessler | 0.2605% |
| Noel D. Bartlett Jr. | 0.2605% |
| Pamela Oates | 0.0532% |

78.     Collectively, Mallory, McConnell, and Warnick are hereinafter referred to as the D&O Defendants (the "**D&O Defendants**"). The D&O Defendants each knew or should have known of the improper and illegal actions taken by the other D&O Defendants set forth herein, they directly or indirectly authorized and approved of such actions taken by the other D&O Defendants, and they failed to stop such actions despite a fiduciary duty to do so.

### 2.     BlueWave Independent Sales Contractors And Transferees

79.     Defendant HisWay Of South Carolina, Inc. is a South Carolina corporation ("**HisWay**") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial. Dent is the owner of HisWay which, at all relevant times, was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests. HisWay is imputed with Dent's knowledge of the wrongdoing described herein.

80.     Defendant Royal Blue Medical Inc. is an Alabama corporation ("**Royal Blue**") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  Johnson is the owner of Royal Blue which, at all relevant times, was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests. Royal Blue is imputed with Johnson's knowledge of the wrongdoing described herein.

81.     Defendant Remember Pember Inc. is an Alabama corporation ("**Remember Pember**") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times Remember Pember was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

82.    Defendant RBLIV Consulting, Inc. is an Alabama corporation ("***RBLIV***") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times RBLIV was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

83.    Defendant MRT Health Consultants Inc. is an Alabama corporation ("***MRT***") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times MRT was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

84.    Defendant Southhill Consulting Group, Inc., formerly known as The Med Group of Georgia, Inc., is a Georgia corporation ("***Southhill***") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times Southhill was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

85.    Defendant Southeast Healthcare Consultants LLC is a South Carolina limited liability company ("***Southeast***") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times Southeast was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

86.    Defendant Disease Testing & Management LLC is a Florida limited liability company ("***DDT&M***") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times DDT&M was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

87.    Defendant Coffman Enterprises Inc. is a Texas corporation ("***Coffman Enterprises***") that was an immediate or mediate transferee of payments made by HDL to

BlueWave, in amounts to be proved at trial.  At all relevant times Coffman Enterprises was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

88.    Defendant Christo Consulting Corp. is a Texas corporation ("***Christo Consulting***") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times Christo Consulting was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

89.    Defendant JP Cornwell Inc. is a Texas corporation ("***JP Cornwell***") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times JP Cornwell was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

90.    Defendant Lockhardt Consulting Inc. is a Texas corporation ("***Lockhardt Consulting***") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times Lockhardt Consulting was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

91.    Defendant Medcentric LLC is a Nevada limited liability company ("***Medcentric***") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times Medcentric was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

92.    Defendant Med-Con-EC LLC is a North Carolina limited liability company ("***Med-Con-EC***") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times Med-Con-EC was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

20

93.     Defendant Meade Medical Group, LLC is a Kentucky limited liability company
(“**Meade Medical**”) that was an immediate or mediate transferee of payments made by HDL to
BlueWave, in amounts to be proved at trial.  At all relevant times Meade Medical was an
independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

94.     Defendant Labyrinth LLC is a Maryland limited liability company (“**Labyrinth**”)
that was an immediate or mediate transferee of payments made by HDL to BlueWave, in
amounts to be proved at trial.  At all relevant times Labyrinth was an independent sales
contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

95.     Defendant JBH Marketing, Inc. is a Washington corporation (“**JBH Marketing**”)
that was an immediate or mediate transferee of payments made by HDL to BlueWave, in
amounts to be proved at trial.  At all relevant times JBH Marketing was an independent sales
contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

96.     Defendant Advanced Medical Consulting LLC is a Missouri limited liability
company (“**Advanced Medical Consulting**”) that was an immediate or mediate transferee of
payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times
Advanced Medical Consulting was an independent sales contractor of BlueWave that, *inter alia*,
marketed and sold HDL tests.

97.     Defendant Paramount Medical Consultants Inc. is an Idaho corporation
(“**Paramount Medical**”) that was an immediate or mediate transferee of payments made by HDL
to BlueWave, in amounts to be proved at trial.  At all relevant times Paramount Medical was an
independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

98.     Defendant Advanced Medical Sales, L.L.C. is a Michigan limited liability
company (“**Advanced Medical Sales**”) that was an immediate or mediate transferee of payments

made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times Advanced Medical Sales was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

99.    Defendant Quasi Maturi LLC is a New Jersey limited liability company ("***Quasi Maturi***") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times Quasi Maturi was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

100.    Defendant Ocean Diagnostics & Consulting, LLC is a Florida limited liability company ("***Ocean Diagnostics***") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times Ocean Diagnostics was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

101.    Defendant M. Looney Consulting Inc. is a Texas corporation ("***M. Looney***") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times M. Looney was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

102.    Defendant Southern Coast Consultants, LLC is a North Carolina limited liability company ("***Southern Coast Consultants***") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times Southern Coast Consultants was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

103.    Defendant El Medical Consulting Inc. is an Illinois corporation ("***El Medical Consulting***") that was an immediate or mediate transferee of payments made by HDL to

22

BlueWave, in amounts to be proved at trial.  At all relevant times El Medical Consulting was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

104.    Defendant DX Sales, LLC is an Indiana limited liability company ("**DX Sales**") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times DX Sales was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

105.    Defendant Metta Consulting Inc. is a California corporation ("**Metta Consulting**") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times Metta Consulting was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

106.    Defendant WCBLUE Lab LLC is a California limited liability company ("**WCBLUE**") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times WCBLUE was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

107.    Defendant Beyond Medicine LLC is a Missouri limited liability company ("**Beyond Medicine**") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times Beyond Medicine was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

108.    Defendant MML Equipment Inc. is an Oklahoma corporation ("**MML Equipment**") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times MML Equipment was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

109.    Defendant Bio-Matrix Healthcare Consultants, LLC is a South Carolina limited liability company ("***Bio-Matrix Healthcare***") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times Bio-Matrix Healthcare was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

110.    Defendant Nibar Health Consultants, Inc. is an Arizona corporation ("***Nibar***") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times Nibar was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

111.    Defendant Infinity Medical Consulting LLC is a Nevada limited liability company ("***Infinity***") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times Infinity was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

112.    Defendant EELLS Consulting Inc. is a Colorado corporation ("***EELLS***") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  At all relevant times EELLS was an independent sales contractor of BlueWave that, *inter alia*, marketed and sold HDL tests.

113.    Defendant Cobalt Healthcare Consultants Inc. is an Alabama corporation ("***Cobalt***") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  Dent and Johnson are directors, officers, and/or owners of Cobalt, and Cobalt is imputed with their knowledge of the wrongdoing described herein.

24

114.    Defendant AROC Enterprises LLC is a South Carolina limited liability company ("**AROC**") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  Dent is a member of AROC and AROC is imputed with Dent's knowledge of the wrongdoing described herein.

115.    Defendant Riverland Pines LLC is a South Carolina limited liability company ("**Riverland Pines**") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  Dent's wife Christina Dent is a member of Riverland Pines and Riverland Pines is imputed with Dent's knowledge of the wrongdoing described herein.

116.    Defendant Crosspoint Properties LLC is a South Carolina limited liability company ("**Crosspoint**") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  Dent is a member of Crosspoint and Crosspoint is imputed with Dent's knowledge of the wrongdoing described herein.

117.    Defendant Helm-Station Investments LLLP is a Nevada limited liability limited partnership ("**Helm-Station**") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  Dent is a limited partner of Helm-Station and Helm-Station is imputed with Dent's knowledge of the wrongdoing described herein.

118.    Defendant Lakelin Pines LLC is a South Carolina limited liability company ("**Lakelin Pines**") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  Dent's wife Christina Dent is a member of Lakelin Pines and Lakelin Pines is imputed with Dent's knowledge of the wrongdoing described herein.

119.    Defendant Trini "D" Island LLC is a South Carolina limited liability company ("**Trini D**") that was an immediate or mediate transferee of payments made by HDL to

BlueWave, in amounts to be proved at trial. Dent's wife Christina Dent is a member of Trini D

and Trini D is imputed with Dent's knowledge of the wrongdoing described herein.

120.    Defendant CAE Properties LLC is a South Carolina limited liability company

("*CAE*") that was an immediate or mediate transferee of payments made by HDL to BlueWave,

in amounts to be proved at trial. Dent's father, Floyd C. Dent, Jr., is a member of CAE and CAE

is imputed with Dent's knowledge of the wrongdoing described herein.

121.    Defendant Blue Eagle Farm, LLC is an Alabama limited liability company ("***Blue***

***Eagle Farm***") that was an immediate or mediate transferee of payments made by HDL to

BlueWave, in amounts to be proved at trial. Johnson is a member of Blue Eagle Farm and Blue

Eagle Farm is imputed with Johnson's knowledge of the wrongdoing described herein.

122.    Defendant Blue Eagle Farming LLC is an Alabama limited liability company

("***Blue Eagle Farming***") that was an immediate or mediate transferee of payments made by

HDL to BlueWave, in amounts to be proved at trial. Johnson is a member of Blue Eagle

Farming and Blue Eagle Farming is imputed with Johnson's knowledge of the wrongdoing

described herein.

123.    Defendant Forse Medical Inc. is an Alabama corporation ("***Forse Medical***") that

was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to

be proved at trial. Johnson is an officer and/or director of Forse Medical and Forse Medical is

imputed with Johnson's knowledge of the wrongdoing described herein.

124.    Defendant Forse Investments, LLC is an Alabama limited liability company

("***Forse Investments***") that was an immediate or mediate transferee of payments made by HDL

to BlueWave, in amounts to be proved at trial. Johnson is a member of Forse Investments and

Forse Investments is imputed with Johnson's knowledge of the wrongdoing described herein.

125.    Defendant Eagle Ray Investments LLC is an Alabama limited liability company ("*Eagle Ray*") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  Johnson is a member of Eagle Ray and Eagle Ray is imputed with Johnson's knowledge of the wrongdoing described herein.

126.    Defendant War-Horse Properties, LLLP, is a Nevada limited liability limited partnership ("*War-Horse*") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  Johnson is a member of War-Horse and War-Horse is imputed with Johnson's knowledge of the wrongdoing described herein.

127.    Defendant H J Farming, LLC is an Alabama limited liability company ("*H J Farming*") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  Johnson is a member of H J Farming and H J Farming is imputed with Johnson's knowledge of the wrongdoing described herein.

128.    Defendant Blue Smash Investments, LLC is an Alabama limited liability company ("*Blue Smash*") that was an immediate or mediate transferee of payments made by HDL to BlueWave, in amounts to be proved at trial.  Johnson is a member of Blue Smash and Blue Smash is imputed with Johnson's knowledge of the wrongdoing described herein.

129.    Defendant Leah Bouton ("*Bouton*") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

130.    Defendant Thomas Carnaggio ("*Carnaggio*") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

131.    Defendant Kevin Carrier ("*Carrier*") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

132.    Defendant Jerry Carroll ("*Carroll*") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

133.    Defendant John Coffman ("*Coffman*") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

134.    Defendant Patrick Colberg ("*Colberg*") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

135.    Defendant Jeffrey "Boomer" Cornwell ("*Cornwell*") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

136.    Defendant Kristin Dukes ("*Dukes*") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

137.    Defendant Jason Dupin ("*Dupin*") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

138.    Defendant Seneca Garrett ("*Garrett*") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

139.    Defendant Leigha Greenwood ("*Greenwood*") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

140.    Defendant Erika Guest ("*Guest*") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

141.    Defendant Julie Harding ("*Harding*") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

142.    Defendant Robert B. "Burt" Lively ("*Lively*") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

143.    Defendant Heather Lockhardt ("**Lockhardt**") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

144.    Defendant Courtney Love ("**Love**") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

145.    Defendant Charles Maimone ("**Maimone**") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

146.    Defendant Kyle Martel ("**Martel**") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

147.    Defendant David Pember ("**Pember**") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

148.    Defendant Lee Roberts ("**Roberts**") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

149.    Defendant Michael H. Samadani ("**Samadani**") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

150.    Defendant Jennifer Speer ("**Speer**") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

151.    Defendant Nicole Tice ("**Tice**") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

152.    Defendant Robert E. Younger ("**Younger**") was an independent sales representative for BlueWave and a major seller of HDL tests to HCPs and doctors.

153.    HisWay, Royal Blue, Remember Pember, RBLIV, MRT, Southhill, Southeast, DDT&M, Coffman Enterprises, Christo Consulting, JP Cornwell, Lockhardt Consulting, Medcentric, Med-Con-EC, Meade Medical, Labyrinth, JBH Marketing, Advanced Medical

Consulting, Paramount Medical, Advanced Medical Sales, Quasi Maturi, Ocean Diagnostics, M. Looney, Southern Coast Consultants, El Medical Consulting, DX Sales, Metta Consulting, WCBLUE, Beyond Medicine, MML Equipment, Bio-Matrix Healthcare, Nibar, Infinity, EELLS, Cobalt, AROC, Riverland Pines, Crosspoint, Helm-Station, Lakelin Pines, Trini D, CAE, Blue Eagle Farm, Blue Eagle Farming, Forse Medical, Forse Investments, Eagle Ray, War-Horse, H J Farming, and Blue Smash, collectively, are hereinafter referred to as the BlueWave Transferee Defendants ("***BlueWave Transferee Defendants***").

154.    Each of the BlueWave Transferee Defendants received amounts ranging from tens of thousands of dollars to millions of dollars as immediate or mediate transferees of payments made by HDL to BlueWave, in specific amounts to be proved at trial. Each of the BlueWave Transferee Defendants was actively engaged in the heavily regulated health care industry, knew or should have known that the business practices they carried out as described herein were illegal and improper, but engaged in such business practices because they received financial benefits from them, including through transfers as a result of the BlueWave Agreement.

155.    HisWay, Royal Blue, RBLIV, Southhill, Southeast, and JP Cornwell are hereinafter referred to collectively as the Major Sales Contractor Defendants ("***Major Sales Contractor Defendants***").

156.    Each of the Major Sales Contractor Defendants was an independent sales contractor for BlueWave, a major seller of HDL tests to HCPs and doctors, and conspired and coordinated with the BlueWave Defendants to implement the illegal scheme and business practices described in detail herein and to injure HDL and its business, and HDL's creditors and their businesses. The Major Sales Contractor Defendants were actively engaged in the heavily regulated health care industry and, through their officers, directors, and managers, whose

respective knowledge is imputed to each Major Sales Contractor Defendant, knew or should have known that the business practices they carried out as described herein were illegal and improper. Certain Major Sales Contractor Defendants, including JP Cornwell, provided HCPs with gifts such as sporting event tickets, gift cards, electronics, and other items to induce HCPs to order tests from HDL, a violation of federal and state anti-kickback laws. The Major Sales Contractor Defendants, through their officers, directors, and managers, whose respective knowledge is imputed to each Major Sales Contractor Defendant, also knew that the D&O Defendants, Rangarajan, Galen, and Bartlett owed fiduciary duties to HDL and knew that these business practices constituted breaches of those fiduciary duties.

157. The Major Sales Contractor Defendants made knowing and negligent misrepresentations of fact to, among others, Assigning Creditors Cigna Health and Life Insurance Company and Connecticut General Life Insurance Company (collectively, "*Cigna*"), Aetna, Inc. ("*Aetna*"), and other private insurers about the true nature of those business practices. The Major Sales Contractor Defendants falsely represented, among other things, that the amounts charged for the tests included a co-pay, co-insurance, or deductible amount that HDL intended to collect from patients (when HDL routinely did not collect such amounts), that HDL's business and the sales of HDL tests by the Major Sales Contractor Defendants were conducted in accordance with the AKS and other healthcare law (when in fact they were not), and that the HDL tests that the Major Sales Contractor Defendants sold were medically necessary (when many times they were not).

158. The Major Sales Contractor Defendants, through their officers, directors, and managers, whose respective knowledge is imputed to each Major Sales Contractor Defendant, also knew that HDL had contracts with its creditors, including the Assigning Creditors, that

31

HCPs had contracts with private insurers, including Cigna and Aetna, and that the conduct and actions of the Major Sales Contractor Defendants interfered with such contracts and business relationships. The Major Sales Contractor Defendants' interference included regularly telling HCPs that HDL did not intend to collect from patients for co-pay, co-insurance, or deductible amounts, and selling HDL tests to HCPs by promoting the P&H fees they would receive. HCPs were thereby induced to order medically unnecessary tests for patients, leading Cigna and Aetna to pay inflated and fraudulent claims to HDL. The Major Sales Contractor Defendants engaged in such business practices, made such misrepresentations, and undertook such actions and conduct because they received financial benefits from them, including through transfers as a result of the BlueWave Agreement.

159.    Bouton, Carnaggio, Carrier, Carroll, Coffman, Colberg, Cornwell, Dukes, Dupin, Garrett, Greenwood, Guest, Harding, Lively, Lockhardt, Love, Maimone, Martel, Pember, Roberts, Samadani, Speer, Tice, and Younger are hereinafter referred to as the BlueWave Sales Representative Defendants (the "***BlueWave Sales Representative Defendants***").

160.    Each of the BlueWave Sales Representative Defendants was an independent sales representative for BlueWave, a major seller of HDL tests to HCPs and doctors, and conspired and coordinated with the BlueWave Defendants to implement the illegal scheme, business practices, and misrepresentations described in detail herein. Certain BlueWave Sales Representative Defendants, including Cornwell, provided HCPs with gifts such as sporting event tickets, gift cards, electronics, and other items to induce HCPs to order tests from HDL, a violation of federal and state anti-kickback laws. Each of the BlueWave Sales Representative Defendants was actively engaged in the heavily regulated health care industry and knew or

should have known that the business practices they carried out as described herein were illegal and improper.

161.    The BlueWave Sales Representative Defendants made knowing and negligent misrepresentations of fact to, among others, Assigning Creditors Cigna, Aetna, and other private insurers about the true nature of those business practices. The BlueWave Sales Representative Defendants falsely represented, among other things, that the amounts charged for the tests included a co-pay, co-insurance, or deductible amount that HDL intended to collect from patients (when HDL routinely did not collect such amounts), that HDL's business and the sales of HDL tests by the BlueWave Sales Representative Defendants were conducted in accordance with the AKS and other healthcare law (when in fact they were not), and that the HDL tests that the BlueWave Sales Representative Defendants sold were medically necessary (when many times they were not).

162.    The BlueWave Sales Representative Defendants also knew that HDL had contracts with its creditors, including the Assigning Creditors, that HCPs had contracts with private insurers, including Cigna and Aetna, and that the conduct and actions of the BlueWave Sales Representative Defendants interfered with such contracts and business relationships. The BlueWave Sales Representative Defendants' interference included regularly telling HCPs that HDL did not intend to collect from patients for co-pay, co-insurance, or deductible amounts, and selling HDL tests to HCPs by promoting the P&H fees they would receive. HCPs were thereby induced to order medically unnecessary tests for patients, leading Cigna and Aetna to pay inflated and fraudulent claims to HDL. The BlueWave Sales Representative Defendants engaged in such business practices, made such misrepresentations, and undertook such actions and

conduct because they received financial benefits from them, including through transfers as a result of the BlueWave Agreement.

### 3.    Doe Defendants

163.    Plaintiff is unaware of the true names and capacities of Defendants sued herein as Does 1-50 (the "***Doe Defendants***"), which include, without limitation, any and all immediate or mediate transferees of payments made by HDL to BlueWave including any and all independent contractors of BlueWave, and individuals and entities that received payments at the direction of Dent and/or Johnson, any and all affiliates of the Defendants and/or any other parties that participated in, were involved in, or benefited from, the conduct and transactions described herein and/or received any contemporaneous or subsequent transfers of property of the Debtors, and therefore sues these Defendants by such fictitious names.  Each of the fictitiously named Defendants is responsible in some manner for the actions and other conduct alleged herein.

164.    Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

## IV.    FACTUAL ALLEGATIONS

### A.    Formation of HDL

165.    HDL incorporated on November 25, 2008 as a start-up laboratory in Richmond, Virginia. It began processing its first samples in 2009, offering a panel of blood tests for early detection of cardiovascular disease, diabetes, and related illnesses.

166.    Mallory and Warnick had previously worked with Johnson and Dent at Berkeley. HDL offered similar testing services as Berkeley.

167.    After leaving Berkeley, Mallory and Warnick, together with McConnell, co-founded HDL, served as HDL officers, and ultimately constituted its Board of Directors.

168.    Johnson and Dent later also left Berkeley and, on January 4, 2010, incorporated BlueWave to provide an outside sales force dedicated to marketing and selling HDL's tests and test panels.

169.    The D&O Defendants, as well as the BlueWave Defendants, knew that HDL's revenues would come in substantial part from payments by Medicare, TRICARE, and other government programs. They likewise knew that, as a result, HDL operated in a highly regulated legal environment, subject to oversight and scrutiny by federal and state regulators. They also knew that major private insurers, such as Aetna, Cigna, and others, had existing contractual relationships with HCPs and patients that imposed myriad terms and conditions governing the medical services that HCPs could order under their contracts.

**B.    The Legal and Regulatory Environment of HDL's Laboratory Business**

170.    The federal AKS prohibits knowingly and willfully offering, paying, soliciting or receiving any remuneration to refer, purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made, in whole or part, by a federal health care program, such as Medicare or Medicaid. The remuneration can be in any form (*e.g.*, in cash or in kind), and can be provided directly or indirectly, overtly or covertly.  Additionally, the AKS is implicated if any "one purpose" of an arrangement is to induce or reward referrals. Many states also have similar kickback laws, including some that are more prohibitive than the federal AKS.

171.    The OIG has issued a number of Special Fraud Alerts related to P&H payments. For example, in 1994, the OIG issued a *Special Fraud Alert: Arrangements for the Provision of Clinical Lab Services* ("***1994 Special Fraud Alert***"), which stated that because HCPs may refer high volumes of patient specimens daily, "it is essential that the physician's decision regarding where to refer specimens is based only on the best interests of the patient. Whenever a laboratory

35

offers or gives to a source of referrals anything of value not paid for at fair market value, the

inference may be made that the thing of value is offered to induce the referral of business." The

1994 Special Fraud Alert identified a number of practices that may constitute an inducement in

violation of the AKS, including arrangements where a laboratory provides to an HCP free

services or services "that are normally the responsibility of the physician's office staff."

172.    The OIG also has issued a number of OIG Advisory Opinions applicable to P&H

payments.  For example, OIG Advisory Opinion No. 05-08, issued on June 6, 2005, related to an

arrangement in which a laboratory would provide free blood collection supplies and pay the

HCPs a fee of $3 to $6 for the collection of blood samples.   The OIG determined that this

arrangement "would clearly implicate the anti-kickback statute" because there was a "substantial

risk" that the remuneration was provided to HCPs in exchange for referrals to the laboratory.  In

addition to being "an obvious financial benefit to the referring physician," the OIG stated that the

arrangement increased the "risk of overutilization and inappropriate higher costs to the Federal

health care programs."  The OIG further noted that the arrangement would implicate the federal

FCA and the CMP Law, if the HCP also submitted a claim to Medicare for the blood collection

services. The OIG's strongly held position on P&H payments has also been reiterated in industry

settlements, including a 2010 settlement with Ameritox Inc.

173.    With regard to commission-based sales agreements, the OIG has also issued a

number of Advisory Opinions identifying as suspect various service arrangements in which

compensation is based, in whole or part, on a percentage of revenue in violation of anti-kickback

laws. For example, the OIG issued Advisory Opinion No. 98-1 on March 25, 1998, in response

to an orthopedic manufacturer that proposed to engage a third-party company through an

Independent Contractor Agreement to provide marketing, billing, distribution and consulting

services in exchange for a fee of 20-25% of "collected revenues," plus other fees for specific services, stating that the percentage compensation arrangements were "potentially abusive because they provide financial incentives that may encourage overutilization of items and services and may increase program costs." Numerous courts also have held that commission-based sales agreements between manufacturers and their contractors are void and unenforceable based on the AKS.

174.    With regard to routinely not collecting patient co-payments, co-insurance and deductibles, the 1994 Special Fraud Alert stated, among other things, that the waiver of charges to managed care patients by an out-of-network laboratory may violate the federal AKS. Additionally, the waiver of patient co-payments, co-insurance and deductibles is prohibited by the CMP Law and certain state laws, such as *Colo. Rev. Sta. Ann §18-13-119; Fla. Sta. §817.234(7); and Tex. Ins. Code. Ann. §1204.055*.

175.    Further, laboratories engaging in the practice of routinely not collecting patient co-payments, co-insurance, and deductibles may commit fraud or tortiously interfere with private insurers' contractual relationships with HCPs and patients. Regardless of whether a laboratory is an in-network or out-of-network provider for a specific health insurance plan, laboratories are, or should be, well aware of their responsibility to collect patient co-payments, co-insurance, and deductibles based on plan policies, procedures, billing guidelines, patient assignment of benefits requirements, and common industry practices. When a laboratory submits a claim to a private insurer for reimbursement of services consistent with a patient's assignment of benefits, the private insurer makes payment based on the laboratory's representation that the claim is not false or misleading in any material respect, including the laboratory's actual or implicit representation of its usual, customary and reasonable ("*UCR*") charge for the services provided. However, a

laboratory that routinely fails to collect patient co-payments, co-insurance, and deductibles falsely misrepresents its UCR charge, encourages overutilization of services, and bills for amounts in excess of those actually charged to patients.

176.    In addition, laboratories are permitted to submit claims for reimbursement to private insurers only for medically necessary tests and services to patients. A laboratory that engages in illegal and improper business practices, such as payment of P&H fees to HCPs and routinely not collecting patient co-payments, co-insurance, and deductibles, improperly induces orders for medically unnecessary blood tests. By submitting such claims to private insurers, laboratories falsely misrepresent that the claims are for the reimbursement of medically necessary services.

**C.    Process and Handling Payments**





206.   The D&O Defendants and Rangarajan breached their fiduciary duties of due care and loyalty, by knowingly, recklessly, in a grossly negligent manner, and through willful misconduct, implementing the P&H Program. As detailed below, they used the revenue the P&H Program induced to pay themselves millions of dollars in increasingly large salaries, bonuses, and shareholder distributions.

**D.     The BlueWave Agreement**

**1.     HDL Negotiated And Executed An Illegal And Improper Agreement With BlueWave, Paying BlueWave More Than $220 Million**

207.   In a December 9, 2009 email, Mallory provided a term sheet to Ryan at LeClairRyan and requested that he prepare an agreement with the soon-to-be formed BlueWave.

208.   This initial term sheet indicated that HDL would provide a commission to BlueWave of "16.8% of total revenue generated by their team." It also provided that HDL would pay BlueWave "a 'subsidy' to get started" in the amounts of $625,000 in year 1, $516,000 in year 2, $387,000 in year 3, $258,000 in year 4, and $129,000 in year 5.

209.    After a period of negotiation between Ryan and BlueWave's counsel, Ryan sent a draft agreement to BlueWave on January 7, 2010, which was further negotiated by the parties over the next several months.

210.    The BlueWave Agreement between HDL and BlueWave was fully executed on April 5, 2010, with an effective date of January 4, 2010.

211.    Section 4(a) of the final BlueWave Agreement provided for a commission fee of (a) 13.8% of revenue from "sales" for the period beginning April 1, 2010 through September 30, 2011; (b) 19.8% for the following 18 months; and (c) 16.8% for the remainder of the BlueWave Agreement. A schedule was attached to the BlueWave Agreement providing for "Sales Goals" for each quarter of 2010.

212.    The BlueWave Agreement also provided BlueWave with a monthly base fee of $53,750 in year one; $43,000 in year two; $32,250 in year three; $21,500 in year four; and $10,750 in year five.

213.    Reflecting the close ties between Mallory and HDL on the one hand, and Dent, Johnson, and BlueWave on the other hand, Section 4(d) of the BlueWave Agreement granted Dent and Johnson each 29.4 shares of HDL stock personally.

214.    HDL paid BlueWave $6,898,661 in 2010, $21,005,337 in 2011, $71,974,994 in 2012, $66,294,464 in 2013, and $53,976,744 in 2014, totaling a staggering $220,150,201 from January 2010 to November 2014 (the "***BlueWave Payments***"), including approximately $90 million in transfers in the two years before HDL's bankruptcy filing on June 7, 2015. Attached hereto marked as **Exhibit A** is a schedule showing the dates and amounts of the BlueWave Payments.

215.    Approximately $173 million of the BlueWave Payments went directly to Dent and Johnson or their wholly-owned entities, with the balance transferred to sales representatives and related entities that BlueWave used as independent sales contractors, including the BlueWave Transferee Defendants, the Major Sales Contractor Defendants, and the BlueWave Sales Representative Defendants.

> **2.      By Entering Into The BlueWave Agreement, The D&O Defendants, Aided And Abetted By The BlueWave Defendants And Others, Put HDL On A Collision Course With The Government**

216.    The BlueWave Agreement should never have been executed. Its execution and implementation constituted willful misconduct in violation of the law and immediately put HDL in danger of legal and regulatory action, and crushing liabilities, because sales arrangements involving compensation based on the volume or value of the sales generated violate the AKS.

217.    Having hatched the HDL/BlueWave scheme together, however, Mallory, Warnick, Johnson, and Dent were determined to implement precisely such a sales-based compensation for BlueWave even if it risked a government investigation and other legal action. The non-arms' length terms, excessive payments, and personal stock grants called for in the BlueWave Agreement were an essential part of the conspiracy.

218.    BlueWave, Johnson, and Dent had such a close relationship with Mallory, and through Mallory with HDL, that BlueWave, Johnson, and Dent were able to exercise undue influence and control over HDL, and induce HDL's assent to the improper BlueWave Agreement. Part of their undue influence and close relationship came from the enormous revenues BlueWave was poised to, and later did, improperly generate for HDL and the personal gain of the conspirators. HDL employees joked that BlueWave's Dent and Johnson really ran HDL because Mallory always had to discuss issues with them before making decisions.

219.    The D&O Defendants and the BlueWave Defendants knew, or should have known, that the BlueWave Agreement violated the federal AKS or posed a grave risk of being aggressively challenged by the government as such a violation because it: (i) provided significant financial incentives that increased the risk of, and ultimately resulted in, abusive marketing and billing practices, such as P&H payments to maximize revenue; (ii) provided significant opportunities to unduly influence referral sources through active marketing and direct contact with physicians who ordered HDL's products and services; (iii) failed to provide safeguards against fraud and abuse; and (iv) created a significant risk of, and ultimately resulted in, overutilization of HDL's products and services.

220.





237.    The D&O Defendants' decision to implement these practices in conspiracy with the BlueWave Defendants and others, and in willful violation of the law, constituted willful misconduct, breaches of their fiduciary duties of due care and loyalty, corporate waste, gross negligence, negligence, fraud, tortious interference, and other misconduct. Their misconduct resulted in the DOJ investigation and DOJ Settlement, multiple lawsuits from private insurers, and the subsequent bankruptcy and liquidation of HDL, and caused enormous damage to HDL and its creditors. The failure of the HDL Board of Directors to end the Patient Responsibility Collection Practice, even after Galen and Bartlett joined the HDL Board of Directors in early October 2014, further breached their fiduciary duties and constituted willful misconduct.

**F.      HDL Paid Millions Of Dollars To Berkeley HeartLab To Settle Claims Based On Warnick's And Mallory's Conduct**

238.    As discussed above, Warnick and Mallory worked together at Berkeley before leaving and co-founding HDL. While at Berkeley, they also worked with Dent and Johnson. As of January 1, 2010, all four had resigned from Berkeley.

239.    On January 14, 2010, Berkeley sued HDL, Warnick and Mallory, as well as Dent, Johnson, and several other former Berkeley employees, in the United States District Court for the Eastern District of Virginia, Richmond Division (the "*District Court*"), alleging breaches of contract and fiduciary duty, tortious interference, and other claims (the "*Berkeley Lawsuit*"). In its complaint, Berkeley alleged that Mallory and Warnick, and through them HDL, had unfairly competed with Berkeley by, among other alleged conduct, using Berkeley's confidential information to take HCP clients from Berkeley.

240.    On January 28, 2010, the District Court entered a temporary restraining order, which was replaced by a Consent Order (the "*Consent Order*") entered on February 8, 2010.

241.    Pursuant to a Settlement Agreement and Release dated April 15, 2010 (the "*Berkeley Settlement Agreement*"), HDL, Mallory, and Warnick were collectively obligated to pay an upfront payment of $2,250,000, an additional $4.8 million in six quarterly payments of $800,000, and further supplemental payments calculated on a per sample basis, which ultimately totaled $1,379,750.    The Berkeley Settlement Agreement required payments of at least $7,050,000, all of which were paid by HDL and not by Mallory or Warnick despite their collective, personal liability for those amounts.

242.    In addition, the Berkeley Settlement Agreement also imposed a host of restrictions on HDL's business, solicitation of customers and employees, and marketing of HDL's tests by BlueWave.

243.    On July 26, 2011, HDL sued Berkeley and other defendants in the District Court alleging, among other claims, breach of the Berkeley Settlement Agreement and defamation for asserting that HDL's billing and other practices were illegal.

244.    Pursuant to a Memorandum of Understanding dated December 19, 2011, and a subsequent settlement agreement executed in January 2012, HDL paid Berkeley an additional $775,000, as well as the final $800,000 quarterly installment, bringing the total amount paid to Berkeley to $9,204,750. The Consent Order was thereafter vacated and other modifications were made to the Berkeley Settlement Agreement.

245.    By their conduct triggering the Berkeley Lawsuit, and by directing HDL to pay in excess of $9.2 million to discharge their own personal liability to Berkeley (the "***Berkeley Related Misconduct***"), Mallory and Warnick, aided and abetted by Dent, Johnson, and BlueWave, (a) breached their fiduciary duties of due care and loyalty to HDL and its creditors, including the Assigning Creditors, defined below, (b) failed to act in accordance with good faith business judgment in the best interests of HDL, (c) garnered personal benefits for themselves not shared by other shareholders or creditors, and (d) injured HDL and its creditors, including the Assigning Creditors.

### G.    Tipton Golias, Already HDL's Largest Stockholder, Invested Additional Equity Amounts In HDL Mischaracterized As A Loan

246.    Tipton Golias provided a total of $6,150,000 in funding to HDL from December 2009 through April 2010 pursuant to three separate advances, each documented by promissory notes from HDL to Tipton Golias (collectively, the "***Golias Notes***"). The $6,150,000 Tipton Golias advanced provided HDL with financing it desperately needed and which it was unable to obtain from a commercial lender.

247.    On December 29, 2011, HDL repaid all three Golias Notes to Tipton Golias in the total amount of $9,981,300.  The terms of each of the Golias Notes are individually described below.

248.    The first advance Tipton Golias made to HDL was a $1,500,000 line of credit

made under a Convertible Promissory Note dated December 11, 2009 (the "***December 11, 2009***
***Note***"), issued pursuant to the HDL Shareholders Agreement dated June 23, 2009, as amended
by a First Amendment dated November 1, 2009 and subsequently amended by a Second
Amendment dated April 2, 2010 (collectively, the "***Shareholders Agreement***"). The December
11, 2009 Note bore interest at the prime rate as reported in the *Wall Street Journal* plus one-half
(1/2) percent, and was initially due and payable in 18 months. The April 2, 2010 Second
Amendment to the Shareholders Agreement extended the term of the December 11, 2009 Note to
30 months.

249.    Under the December 11, 2009 Note, Tipton Golias advanced $100,000 to HDL on
December 11, 2009, $650,000 on December 15, 2009, and $750,000 on January 20, 2010.

250.    On December 29, 2011, HDL repaid the December 11, 2009 Note to Tipton
Golias in the amount of $1,611,925, including interest.

251.    The second advance Tipton Golias made to HDL consisted of a $1,000,000 line of
credit under a Convertible Promissory Note dated February 18, 2010 (the "***February 18, 2010***
***Note***"), also issued pursuant to the Shareholders Agreement. The February 18, 2010 Note bore
interest at the prime rate as reported in the *Wall Street Journal* plus one-half (1/2) percent, and
was initially due and payable in 18 months. The April 2, 2010 Second Amendment to the
Shareholders Agreement extended the term of the February 18, 2010 Note to 30 months.

252.    Under the February 18, 2010 Note, Tipton Golias advanced $750,000 to HDL on
February 19, 2010 and $250,000 on March 5, 2010.

253.    On December 29, 2011, HDL repaid the February 18, 2010 Note to Tipton Golias
in the amount of $1,069,375, including interest.

254.     The third investment Tipton Golias made in HDL was described as a $5,250,000 line of credit made under a Convertible Promissory Note dated March 1, 2010 (the "***March 1, 2010 Note***"), also issued pursuant to the Shareholders Agreement.  The March 1, 2010 Note was secured by HDL's receivables.

255.     Under the March 1, 2010 Note, Tipton Golias advanced a total of $3,650,000 to HDL in the following installments: $600,000 on March 24, 2010, $2,250,000 on April 20, 2010, and $800,000 on April 26, 2010.

256.     Unlike the first two Golias Notes, which were for only an 18 month term, later extended to 30 months, the March 1, 2010 Note did not require repayment until December 31, 2018, more than eight and a half years after the March 1, 2010 Note was signed. Moreover, unlike the first two Golias Notes, the March 1, 2010 Note did not include an interest rate.

257.     Instead, the March 1, 2010 Note was repayable pursuant to a formula based on the repayment date. Specifically, the minimum amount HDL was permitted to repay was two times the loan principal amount, if repaid on or before December 31, 2011 ("2 times loan principal (each $1.00 of repayment is credited with $.50 of principal repayment)"), increasing all the way to *six times* the loan principal amount if repaid between January 1, 2018 and December 31, 2018 ("6 times loan principal (each $1.00 of repayment is credited with $.167 of principal repayment)").

258.     On December 29, 2011, just days before the "2 times" repayment formula would have increased to a "2.5 times" figure, HDL paid the March 1, 2010 Note to Tipton Golias in the amount of $7,300,000 (the "***Golias Double Payment***"). HDL's payment was double the amount of Tipton Golias's $3,650,000 advance and represented an effective interest rate of 50.27% per annum.

259.    HDL needed the $2,250,000 that Tipton Golias advanced on April 20, 2010 to pay

the $2,250,000 upfront payment under the Berkeley Settlement Agreement and needed the other

funds advanced for HDL's business.

260.    When the March 1, 2010 Note was paid to Tipton Golias on December 29, 2011,

HDL was required to pay double the $2,250,000 amount, or $4,500,000, for that advance. As a

result, the Berkeley Related Misconduct ultimately cost HDL not only the approximately $9.2

million paid to Berkeley directly but also this additional $2,250,000 paid to Tipton Golias, for a

total of more than $11.45 million.

261.    Notwithstanding the name given to the March 1, 2010 Note, and unlike the first

two Golias Notes which were actually interest-bearing loans, this third instrument was intended

to and did provide Golias with investment returns consistent with stock or preferred stock, up to

and including a potential six fold return on investment. In an acknowledgment of its inherent

equity features, the March 1, 2010 Note did not provide, as the first two Golias Notes had stated,

that the amounts advanced could be converted into HDL stock.

262.    HDL and Tipton Golias intended the March 1, 2010 Note to be an equity

investment rather than a true loan.

**H.    HDL Engaged In Medically Unnecessary And Improper CYP2C19 Testing**

263.    On the morning of July 8, 2010, Steve Norris, then employed by HDL in its Sales

and Marketing Support group, sent an email to Warnick, McConnell, Mallory, and Rangarajan,

inquiring about HDL's CYP2C19 test, a test for patients taking, or being considered to take, a

platelet inhibitor drug called Clopidogrel, or by its brand name of Plavix.

264.    Prior to Norris's email, Mallory had directed that the CYP2C19 test be added to

doctors' baseline testing panel at HDL.

265.    In his email, Norris asked if doctors should be adding the CYP2C19 test, noting

that it was his "understanding that this test was going to be run on approximately 10% of our

patients." Referring to reimbursement by public and private insurers, Norris then asked, "Will we

be reimbursed for this every time?"

266.    Mallory responded by email to Norris that afternoon, stating "Yes, they add to

their baseline. We will get reimbursement for it."

267.    On the night of July 8, 2010, Mallory sent an email to Rangarajan, Norris,

McConnell, and others at HDL, notifying them that a family practice doctor had sent in a

prescription to add HDL's expensive CYP2C19 test "to all of his samples that we have in

storage." Mallory commented that she had "personally spoken with most of you" but was

sending the email "to make sure everyone has the same information." Mallory said that HDL

may have up to 2,500 samples in storage for this doctor, and explained that HDL was to produce

a summary report instead of sending the doctor 2,500 individual reports.

268.    As Norris's email observed, the CYP2C19 test is appropriate for a small set of

patients. It is medically necessary for patients who are taking, or being considered to take, a

platelet inhibitor drug called Clopidogrel, or by its brand name of Plavix. The CYP2C19 test,

however, would not be appropriate for all patients of such a family practice doctor or to be added

on to every doctor's baseline testing panel.  Having the CYP2C19 test run on all samples in

storage for this doctor's patients was medically unnecessary, and inducing this doctor to place

the order was a violation of the AKS and other healthcare law.

269.    In the same email sent on the night of July 8, 2010, Mallory separately

highlighted the financial side of this "add on" testing on stored specimens. "I'd like to have all of

the backlog of back testing cleared by the end of July so that the reimbursement will hit us in

September when we will need to pay our next settlement fees to BHL [Berkeley]. Thanks to everyone for helping to get this done as soon as possible. This add on business alone could result in almost a million extra for us."

270.    Running the CYP2C19 test on the approximately 2,500 samples held in storage, and adding it to each doctor's baseline testing panel, was improper and a violation of the AKS, the FCA, and/or other healthcare laws, and interfered with the contracts of private insurers. Having the test run on the approximately 2,500 samples in storage was done not because it was medically necessary but because HDL needed to generate cash in time to make the September 2010 quarterly settlement payment to Berkeley under the Berkeley Settlement Agreement.

271.    In running the CYP2C19 test on these stored samples, and in adding it to each doctor's baseline testing panel (the "***Improper CYP2C19 Testing***"), Mallory, the other D&O Defendants, and Rangarajan exposed HDL to substantial legal liability, breached their fiduciary duties, defrauded payers, and caused damage to HDL and its creditors.

I.    **The Defendants Made Improper Payments To Doctors Through A Medical Advisory Board And Other Practices**

272.    The D&O Defendants, Rangarajan, and the BlueWave Defendants sought out other ways to pay doctors to promote HDL's lab tests, including through a Medical Advisory Board ("***MAB***"), speaking fees, and individual consulting agreements (collectively, the "***Consulting Program***").

273.    During 2010, the D&O Defendants and Rangarajan directed HDL to enter into consulting agreements with a number of doctors. Under the consulting agreements, the doctors were required to perform only minimal services, such as reviewing HDL marketing materials and participating in MAB meetings and calls.

274.    In exchange for this small time commitment, HDL paid the consulting doctors $2,500 or, in some cases, $3,000, per month. This extra $30,000 to $36,000 in annual income, on top of P&H fees paid to these doctors when they ordered HDL tests, was intended to ensure their loyalty to HDL and to encourage them to be ambassadors for HDL's tests to other doctors and HCPs. Several consulting agreements provided that HDL would pay additional amounts for writing and speaking engagements.

275.    Mallory also used the MAB and the consulting payments to ensure that the doctors would continue to order tests from HDL. Mallory directed that certain doctors receive consulting agreements, and be appointed to the MAB, after those doctors had threatened to use another lab instead of HDL.

276.    The Consulting Program was another form of illegal, or potentially illegal, inducement, the payment of which exposed HDL to yet another ground for government investigation and resulting liability. By authorizing these payments, the D&O Defendants and Rangarajan, aided and abetted by the BlueWave Defendants, breached their fiduciary duties of due care and loyalty, acted in a grossly negligent and negligent manner, and wasted corporate assets, among other misconduct, all to the damage of HDL and its creditors.

## J.    At The D&O Defendants' Direction, HDL Squandered More Than $18 Million Forming And Funding Global Genomics Group

277.    On May 25, 2012, Global Genomics Group, LLC ("*G3*"), a Delaware limited liability company, was formed to discover genetic biomarkers to detect human susceptibility to cardiovascular disease. G3 was owned equally by HDL Holdings USA, LLC ("*Holdings*"), a non-debtor wholly owned subsidiary of HDL, and G3 Founders, LLC ("*G3 Founders*"), with each holding a 50% membership interest in G3.

278.   Holdings was required to make a cash capital contribution of $17,350,000 for its 50% membership interest, funded by HDL. G3 Founders was required only to make a contribution of intellectual property, receiving an equal credit of $17,350,000 for that non-cash contribution.

279.   The manager of G3 Founders was Dr. Szillard Voros ("*Voros*").  Voros also served as the Chief Executive Officer of G3 and an officer of HDL.

280.   In January 2013, a First Amendment to the Operating Agreement was executed pursuant to which Marc Goldstone ("*Goldstone*") received a 1% membership interest in G3, with each of Holdings and G3 Founders transferring a 0.5% membership to Goldstone.

281.   The Amended and Restated Operating Agreement of G3 dated July 1, 2014 by and among G3 Founders and Holdings states that G3's managers are Voros, Mallory, Warnick, Jeffrey B. Lamkin, and Goldstone.  Mallory was President of Holdings in addition to being Chief Executive Officer of HDL.

282.   G3 Founders subsequently transferred a total of 5% of its G3 membership interest to certain members of the Golias family and/or associates, reducing G3 Founders' membership interest to 44.5%.

283.   On July 1, 2014, HDL loaned up to $6 million to G3, pursuant to a promissory note (the "*July 1, 2014 Note*") to HDL. The July 1, 2014 Note provided for repayment on the earlier to occur of (i) June 30, 2019 or (ii) an Event of Default as defined in the July 1, 2014 Note.  It also provided that if no Event of Default occurred by June 30, 2019, G3 could elect to extend the Maturity Date for a period of up to 60 additional months to the earlier of (x) June 30, 2024 or (y) an Event of Default. According to HDL's schedules, as of the Petition Date, HDL was owed $2,180,036.27 on the July 1, 2014 Note. [Docket No. 283]

284.    The July 1, 2014 Note was created retroactively, without formal approval of the HDL Board of Directors, after HDL had already made millions of dollars in payments to G3 to support G3's operations.

285.    Given the cash drain that supporting G3 imposed on HDL, on October 8, 2014, the HDL Board of Directors resolved to immediately discontinue any further investment or capital funding for G3 in light of G3's failing financial condition and the consequent loss of any further investment. However, instead of discontinuing further funding, and without seeking advice from independent outside legal counsel, the HDL Board of Directors, including Galen and Bartlett, made repeated decisions to send good money after bad to G3, in return for which HDL did not receive fair consideration. Galen and Bartlett approved this continued funding not because it was in the best interests of HDL or of its creditors but because it promoted the interests of Tipton Golias, keeping G3 in operation so that it could be acquired later by an entity in which Tipton Golias was a member, as discussed below.

286.    On December 12, 2014, the HDL Board of Directors authorized HDL to provide $200,000 per month to G3 in both December 2014 and January 2015.

287.    On January 29, 2015, the HDL Board of Directors unanimously directed McConnell to be HDL's designee for the open seat on the G3 Board of Managers, taking Mallory's seat.

288.    On January 30, 2015, the HDL Board of Directors determined that HDL would provide G3 with an additional $200,000 in funding in February 2015, in return for what the HDL Board of Directors called consideration: updated financial information, projections, payroll information, and other financial measures to be decided upon by management.

289.    On March 6, 2015, the HDL Board of Directors approved an additional $150,000 in funding to G3 in March 2015, the final such advance.

290.    During the period from July 12, 2012 to March 13, 2015, HDL provided a total of at least $18,150,582.76 in funding for G3's operations.  After the initial October 8, 2014 decision by the HDL Board of Directors not to provide G3 with further funding, HDL nevertheless wasted at least an additional $1,267,728 in direct payments to G3.

291.    HDL also continued to provide G3 with free testing through April 23, 2015, in addition to significant payroll support. This included paying a material portion of the $315,000 salary and performance bonus for Voros.

292.    Underscoring the debacle that G3 had become for HDL, on or about December 16, 2015, Sydney Investment Group, LLC (*"Sydney"*) purchased Holdings' 49.5% membership interest in G3 and its rights under the July 1, 2014 Note for only $500,000 in cash, plus the withdrawal of a proof of claim filed by G3 in HDL's bankruptcy in the sum of $17,674,607, which was based on alleged obligations by Holdings to G3 Founders to provide certain blood testing services. HDL, directly and through Holdings, had invested more than $18.1 million in G3 through equity, loans, free testing services, and payroll support and, ultimately, recovered only $500,000 in cash, a loss of more than $17.65 million.

293.    Sydney, however, was no stranger to G3 and HDL. Sydney's key investors include a number of officers, directors, or shareholders of HDL. Voros is Sydney's Chief Executive Officer and also holds a membership interest in Sydney. G3 Founders is a member of Sydney, and other members of G3 Founders hold membership interests in Sydney directly or indirectly through entities. HDL's largest shareholder, Tipton Golias, and Warnick, directly or through Warnick Management, also hold membership interests in Sydney. Galen and Bartlett,

who as HDL directors approved nearly $1.3 million in funding to G3 after the October 8, 2014

decision to cease such funding, were affiliated with or employed by Helena Laboratories, the

company owned by Sydney member Tipton Golias.

294.    The decisions to (i) form and invest in G3, (ii) provide more than $18.1 million in

funding to G3 through equity investments and loans, (iii) give HDL testing services to G3 free of

charge, (iv) spend additional amounts through significant payroll support for G3 and overlapping

staff with HDL, and (v) continue those payments despite an October 8, 2014 decision to

terminate them (collectively, the "*G3 Transactions*"), were each breaches of the fiduciary duties

of due care and loyalty by the D&O Defendants and, after joining the HDL Board of Directors in

early October 2014, by Galen and Bartlett. These actions also constituted corporate waste, and

were grossly negligent and negligent acts, among other actionable misconduct by the D&O

Defendants, Galen, and Bartlett.

**K.    Mallory Breached Her Fiduciary Duties Of Loyalty And Due Care By Usurping The Opportunity To Purchase GeneNews Limited Stock For Her Own Personal Gain And By Directing HDL To Fund Millions Of Dollars Into Innovative Diagnostic Laboratory, A Money Losing Joint Venture With GeneNews Limited**

295.    Prior to December 14, 2012, Mallory, Johnson, and Dent were in discussions with

GeneNews Limited ("*GeneNews*"), a Canadian company traded on the Toronto Stock Exchange

and over-the-counter in the United States, about the formation of a joint venture with HDL and

Cobalt, an entity owned and managed by Johnson and Dent.

296.    Based on these discussions with GeneNews about forming a joint venture with

HDL and Cobalt, Mallory, Johnson, and Dent learned of, and were offered, the opportunity to

purchase GeneNews shares through a private placement.

297.    On December 14, 2012, Mallory, Johnson, and Dent each personally invested

$1,543,261.68 CAD in a private placement, purchasing in the aggregate 17,147,352 common

shares of GeneNews at $0.09 CAD per share (the "**Personal GeneNews Stock Purchases**").  The

HDL Board of Directors minutes make no mention of Mallory's opportunity to purchase

GeneNews shares or of any approval by the HDL Board of Directors of her purchase, either prior

to or after she bought such shares.

298.    Mallory never made any disclosure of her personal opportunity to purchase

GeneNews shares to the HDL Board of Directors and never received approval to do so from the

HDL Board of Directors. Instead, Mallory simply usurped this corporate opportunity from HDL

in breach of Mallory's fiduciary duty of loyalty owed to HDL. Even if this obvious conflict of

interest had been disclosed, the HDL Board of Directors should never have approved the Mallory

share purchase given the contemplated joint venture.

299.    Mallory, having personally invested in GeneNews along with Johnson and Dent,

had a personal incentive to ensure that HDL brought to fruition the contemplated joint venture

with GeneNews, which had the potential to boost the business and stock price of GeneNews to

the personal benefit of Mallory.

300.    At a January 14, 2013 HDL Board meeting, Mallory provided an "IDL Update"

that included an overview of the proposed joint venture entity.  The reference to IDL was an

abbreviation of the expected name of the joint venture of Innovative Diagnostic Laboratory, LLP

("**IDL**").

301.    On January 22, 2013, IDL was formed as a Delaware limited liability partnership.

302.    Pursuant to a Limited Liability Partnership Agreement dated as of May 15, 2013,

IDL was owned equally by (i) Holdings, (ii) GeneNews, and (iii) Cobalt. Mallory signed for

Holdings.

303.    On June 24, 2013, IDL entered into a Sales Agreement with Cobalt under which Cobalt was to act as a sales consultant for IDL under an arrangement similar to the BlueWave Agreement with HDL. IDL agreed to pay Cobalt a sales commission equal to 24% of gross sales under an improper and illegal commission-based sales agreement similar to the BlueWave Agreement.

304.    During the period from October 25, 2013 to February 9, 2015, HDL advanced $6,779,783 in funding for IDL's operations, a portion of which funded improper sales commissions to Cobalt, which was owned by Johnson and Dent.

305.    Within two years of the December 2012 stock purchase by Mallory, Johnson, and Dent, the price of GeneNews stock had more than tripled from the $0.09 CAD per share they paid, even after accounting for a 6:1 share consolidation. If Mallory sold her stock once its price had tripled, she could have earned a profit of approximately $3.6 million.

306.    Mallory's self-interested decision to push HDL, through Holdings, into the IDL joint venture, a decision that was approved by Mallory and the other D&O Defendants in breach of their fiduciary duties, proved very damaging for HDL, which failed to receive fair consideration for its funding of IDL. After investing more than $6.7 million in IDL, HDL sold its interest in IDL at a large loss.

307.    On May 15, 2015, Holdings, GeneNews and Cobalt entered into a purchase agreement (the "***May 15, 2015 Agreement***") whereby Holdings sold its ownership interest in IDL to GeneNews and Cobalt in exchange for $2 million paid on the closing date, and $2 million to be paid through two separate promissory notes of $1 million from Cobalt and GeneNews, each of which were to mature on May 15, 2016.

308.    The sale price under the May 15, 2015 Agreement was inadequate, and the decision to authorize Holdings to enter into that agreement, and to sell its ownership interest in IDL to GeneNews and Cobalt, damaged HDL and its creditors.  Even if HDL were to collect the entire purchase price, HDL would lose approximately $2.5 million on its investment in IDL.

309.    On March 4, 2016, GeneNews entered into an agreement (the "***March 4, 2016 Agreement***") with Cobalt pursuant to which GeneNews's wholly-owned subsidiary, GeneNews (USA), Inc. acquired Cobalt's fifty percent (50%) ownership of IDL, giving GeneNews full ownership of IDL.  Under the March 4, 2016 Agreement, GeneNews assumed Cobalt's liability under Cobalt's $1 million note payable to Holdings.

310.    Instead of paying the notes to HDL when due, GeneNews asserted an inability to pay and requested and received an extension from HDL, until May 2017, on the $2 million in notes owed to Holdings. GeneNews subsequently defaulted on its obligations to make required monthly payments, forcing the Liquidating Trustee to bring a collection action against GeneNews in an attempt to collect on the two notes totaling $2 million.

311.    The formation and funding of IDL, a portion of which went to Cobalt in the form of sales commissions, and HDL's related transactions with IDL, GeneNews, and Cobalt (collectively, the "***IDL Transactions***"), resulted in substantial losses for HDL and its creditors. Mallory, and the HDL Board of Directors, breached their fiduciary duties of loyalty and due care, committed corporate waste, and acted in a grossly negligent and negligent manner, among other misconduct, in authorizing the expenditure of HDL funds to support IDL, an unsuccessful company in which Mallory, Johnson, and Dent had together personally invested over $4.6 million CAD.

L.    **At The D&O Defendants' Direction, HDL Wasted Millions Of Dollars On Its Investment In C3Nexus, LLC**

312.    C3Nexus, LLC ("*C3Nexus*") is a Virginia limited liability company organized in 2012. C3Nexus provides home care for cardiovascular and chronic care patients who were recently discharged from the hospital utilizing remote heart monitoring and nurse concierges.

313.    C3Nexus' members include Dr. Shaival Kapadia ("*Kapadia*"), Nuno Valentine ("*Valentine*"), and Mark Babb, who served as its President in December 2014.  As of March 28, 2016, Valentine was a Manager of C3Nexus.

314.    Starting in 2012, HDL provided free office space to C3Nexus in the HDL offices, and HDL provided funding for the operations of C3Nexus by paying salaries, IT costs, and telephone service for C3Nexus.

315.    Mallory personally loaned $500,000 to C3Nexus on or around February 1, 2013 (the "*Mallory Loan to C3Nexus*") pursuant to a note given by C3Nexus to Mallory.

316.    HDL's initial support for the operations of C3Nexus was not formally documented until December 1, 2013, even though a potential investment in C3Nexus by HDL was discussed at the June 3, 2013 HDL Board of Directors meeting.

317.    On or about December 1, 2013, C3Nexus and HDL executed a Loan and Security Agreement (the "*Loan and Security Agreement*"), whereby HDL formally memorialized the existence of a secured line of credit for the benefit of C3Nexus in the aggregate maximum principal amount of $5,569,121.02 (the "*Line of Credit*").

318.    Pursuant to the terms of the Loan and Security Agreement, C3Nexus agreed that the initial advance under the Line of Credit was to reflect existing debt owed by C3Nexus to HDL in the amount of $569,121.02.  Such amount represented the fair market value of certain

services and space previously provided by HDL to C3Nexus together with interest accrued as of the date of the Loan and Security Agreement.

319.    On December 1, 2013, C3Nexus and HDL entered into that certain Employee Lease Arrangement and Support Agreement (the "***Employee Lease Arrangement and Support Agreement***").    Pursuant to such agreement, HDL agreed to lease eight employees for an initial term of twelve months but ultimately provided compensation and benefits to thirteen C3Nexus employees, including Kapadia and Valentine, through December 31, 2014 or January 2015.

320.    On December 1, 2013, C3Nexus and HDL also entered into a Space Use Agreement (the "***Space Use Agreement***"), and a Support Services Agreement dated December 1, 2013 (the "***Support Services Agreement***").

321.    On December 1, 2013, C3Nexus gave Mallory a Subordinated Promissory Note which, *inter alia*, subordinated the payment of the prior Mallory Loan to C3Nexus to the C3Nexus Senior Obligations defined below.

322.    On or about November 30, 2014, C3Nexus and HDL entered into a Termination Agreement (the "***Termination Agreement***").    The Termination Agreement terminated the Loan and Security Agreement and stated, *inter alia*, that the outstanding principal balance as of November 30, 2014 under a then-existing note given by C3Nexus to HDL (the "***C3Nexus Note***") was $2,915,990, including principal and accrued interest (the "***C3Nexus Senior Obligations***").

323.    The Termination Agreement also terminated the Employee Lease Arrangement and Support Agreement, the Space Use Agreement, and the Support Service Agreement.

324.    The Termination Agreement also provided that simultaneously with its execution or immediately prior thereto, HDL was to make a final advance to C3Nexus in the amount of

$148,286, plus an additional advance for C3Nexus attorney's fees of $35,000, both of which were included in the outstanding balance under the C3Nexus Note.

325.    The Termination Agreement further provided that simultaneously with the discussions of HDL and C3Nexus regarding the loan evidenced by the Line of Credit, the parties entered into negotiations regarding a potential investment by HDL in C3Nexus, as a result of which HDL would acquire an equity interest in C3Nexus (the "***Potential C3Nexus Investment***"). However, the Termination Agreement stated that key terms regarding the Potential C3Nexus Investment were never agreed upon and a proposed investment agreement was never finalized or executed. Accordingly, the Termination Agreement provided that HDL has no ownership interest in C3Nexus or any right to share in the income or profits of C3Nexus.

326.    The Termination Agreement also stated that C3Nexus had been investigating a new project regarding the recruitment of phlebotomists and the delivery of phlebotomy services. This project, including the intellectual property developed during the investigation is generally known as "IGGBO".

327.    In the Termination Agreement, HDL acknowledged that all rights regarding IGGBO are and shall remain the property of VALKAP, LLC, a Virginia liability company and an affiliate of C3Nexus, and HDL released any right, title, claim or interest with respect to IGGBO.

328.    On or about November 30, 2014, substantially contemporaneously with the execution of the Termination Agreement, C3Nexus, as borrower, and HDL, as lender, entered into the Amended and Restated Promissory Note (the "***Amended and Restated C3Nexus Note***").

329.    Under the Amended and Restated C3Nexus Note, C3Nexus agreed to repay to HDL the principal sum of $2,915,990 at an interest rate per annum equal to 1-month LIBOR plus

71

three percent (3%) (the "*C3Nexus Loan*"). C3Nexus further agreed to repay to HDL in substantially equal fully amortizing payments of principal and interest commencing on December 1, 2015 and continuing on the first day of each subsequent month, with a final payment due on November 30, 2020 in the remaining balance of principal and unpaid interest.

330.    In the event that C3Nexus failed to cure any payment default within 15 days of written notice by HDL, the entire unpaid principal amount of the C3Nexus Loan, together with all accrued interest and all unpaid late charges and fees, would be immediately due and payable without further notice or demand.

331.    On December 17, 2015, HDL sent a notice of default to C3Nexus demanding payment of $56,708.35, which included principal, interest, and a five percent (5%) late payment charge provided under the Amended and Restated C3Nexus Note.

332.    C3Nexus has not paid HDL any of the amounts outstanding under the Amended and Restated C3Nexus Note.

333.    The C3Nexus balance sheet as of February 2, 2016 shows a "Note Payable – Tonya Mallory" in the sum of $210,355.19 as a long-term liability.

334.    All transactions involving C3Nexus and IGGBO are referred to hereinafter collectively as the C3Nexus Transactions (the "*C3Nexus Transactions*").

335.    The D&O Defendants, and Galen and Bartlett after early October 2014, breached their fiduciary duties of loyalty and due care, committed corporate waste, and acted in a grossly negligent and negligent manner, among other misconduct, in connection with the C3Nexus Transactions, including authorizing the expenditure of HDL funds to support C3Nexus without fair consideration to HDL, which benefitted Mallory personally as a lender to C3Nexus. HDL has suffered approximately $3 million in losses on account of the C3Nexus Transactions, and

may have suffered additional, unaccounted for losses based on services HDL provided C3Nexus without compensation. In addition, although HDL directly funded the compensation of the C3Nexus employees while they were developing the IGGBO project, and no payments have been made on the Amended and Restated C3Nexus Note, the D&O Defendants agreed to exclude HDL from any share in IGGBO's potential success.

> **M.**     **At The D&O Defendants' Direction, HDL Squandered Millions Of Dollars Through Inappropriate Corporate Sponsorships And Large Charitable Gifts**

336.    At Mallory's direction, and with the approval of McConnell and Warnick, in December 2011, HDL agreed to and thereafter made $2,353,000 in charitable donations to the Science Museum of Virginia.

337.    In December 2012, HDL signed a gift agreement with Virginia Commonwealth University ("**VCU**"), promising to pay $400,000 a year through 2022, for a total of $4 million, to VCU to sponsor its athletic programs. HDL made a total of at least $800,000 in payments to VCU before filing bankruptcy.

338.    In August 2013, HDL also agreed to be the "health and wellness" sponsor of the Washington Redskins football team and incurred a $250,000 obligation for this inappropriate and wasteful sponsorship.

339.    These and other wasteful donations and sponsorships (collectively, the "**Sponsorships**"), intended to raise Mallory's personal profile in the Richmond area community at HDL's expense, cost HDL and its creditors more than $3.1 million.

340.    The D&O Defendants breached their fiduciary duties of loyalty and due care, committed corporate waste, and acted in a grossly negligent and negligent manner, among other misconduct, in authorizing the expenditure of HDL funds for these Sponsorships.

**N.    At All Relevant Times, HDL Was Insolvent, Had Unreasonably Small Capital For Its Business, And Incurred Or Should Have Known It Was Incurring Debts That It Lacked The Ability To Pay**

341.    From the moment in October 2009 when HDL embarked on the illegal scheme to pay P&H fees to HCPs, when it agreed to and paid BlueWave percentage-based compensation under the BlueWave Agreement, and when it implemented the Patient Responsibility Collection Practice called for in the BlueWave Agreement, HDL was incurring millions of dollars in unrecognized liabilities to the government, private payers, and unsecured creditors, far beyond the value of its assets. HDL's failure to acknowledge these liabilities on its books is irrelevant: with each payment to HCPs and to BlueWave, with each waiver of co-pays, co-insurance, and deductibles under the fraudulent Patient Responsibility Collection Practice, those liabilities increased and HDL sunk deeper into insolvency.

342.    Although HDL appeared to be generating huge revenues and profits, which it freely distributed to the Shareholder Defendants, HDL failed to account for the catastrophic liabilities its improper practices were creating. Once HDL was forced to stop these improper practices, it experienced a predictable and precipitous financial collapse.

343.    Four creditors alone, the U.S. Government and three private payers, collectively account for more than $325 million in liabilities, all arising from HDL's improper business practices of the P&H Program, the BlueWave Agreement, and the Patient Responsibility Collection Practice. These creditors are (1) the DOJ, with a claim of $94 million under the settlement agreement with HDL described herein; (2) United Healthcare Insurance Company, with a claim of $96 million; (3) Aetna, with claims totaling $77 million; and (4) Cigna, with claims of $59 million (collectively, the "***Payer Creditors***").

344.    From the outset, HDL failed to account for these large and growing liabilities, together with millions of dollars owed to other unsecured creditors, or to reflect them on its

financial statements at the time of the Shareholder Distributions (defined below). Had HDL reflected these liabilities on its financial statements, those financial statements would have shown that HDL was insolvent at all relevant times.  HDL's audited financial statements, therefore, failed to reflect the true state of HDL's business.

345.   The audited balance sheet, as of December 31, 2011, similarly showed assets of approximately $63 million, and liabilities of only approximately $23 million, with a total equity of approximately $40 million.

346.   If the December 31, 2011 balance sheet had properly and fully reflected the liabilities that HDL's improper business practices had caused, the $23 million in liabilities would have been many times larger, and total equity would have been stated in a negative amount, even without considering the overstatement of the actual value of HDL's assets given its improper business practices.

347.   The audited balance sheet as of December 31, 2012 showed assets of approximately $130 million, later restated to approximately $125 million, and liabilities of approximately $46 million, later restated to approximately $48 million, with a total equity of approximately $84 million, later restated to approximately $77 million.

348.   If the December 31, 2012 balance sheet had properly and fully reflected the liabilities that HDL's improper business practices had caused, the $48 million in liabilities would have been many times larger, and total equity would have been stated in a negative amount, even without considering the overstatement of the actual value of HDL's assets given its improper business practices.

349.    The audited balance sheet as of December 31, 2013 similarly showed assets of approximately $156 million, and liabilities of only approximately $73 million, with a total equity of approximately $82 million.

350.    If the December 31, 2013 balance sheet had properly and fully reflected the liabilities that HDL's improper business practices had caused, the $73 million in liabilities would have been many times larger, and total equity would have been stated in a negative amount. Had the full amount of the Payer Creditors' claims been reflected, liabilities would have been stated at in excess of $399 million, and total equity would have been stated at more than negative $243 million, even without considering the overstatement of the actual value of HDL's assets given its improper business practices.

351.    In fact, the rosy financial picture presented by the audited balance sheet as of December 31, 2013, was belied by the reality of cash flow difficulties that occurred in January 2014, even before the audit was actually issued on April 7, 2014.

352.    In January 2014, HDL was experiencing cash flow problems and was in danger of violating a bank covenant.    Accordingly, HDL's Chief Financial Officer Steve Carroll approached Mallory, McConnell and Warnick to request that they provide short term funding to HDL.

353.    On February 4, 2014, Mallory made a short-term loan to HDL through the Mallory Trust in the amount of $3.5 million, which was evidenced by a promissory note (the "*February 4, 2014 Note*") issued by HDL to Mallory. The HDL Board of Directors, by McConnell and Warnick, approved the February 4, 2014 Note as a "short term bridge advance," with Mallory abstaining.

354.    The February 4, 2014 Note was unsecured, bore interest at 3% per annum, and was payable in 60 days. HDL had the right to prepay the February 4, 2014 Note and Mallory had the right to payment on demand.  The February 4, 2014 Note was executed by McConnell on behalf of HDL.

355.    HDL repaid the February 4, 2014 Note to Mallory on February 25, 2014 in the amount of $3,506,041, including interest (the "**Mallory Payment**"), but HDL's liquidity problems, financial distress, and insolvency would soon get even worse.

356.    At all relevant times, HDL was insolvent and the fair amount of its liabilities exceeded the fair value of its assets. In addition, given the large and growing liability exposure that HDL did not acknowledge, at all relevant times, HDL had unreasonably small capital with which to conduct its business, and incurred or should have known it was incurring debts that it lacked the ability to pay as they came due.

357.    At the time of its June 7, 2015 bankruptcy filing, HDL listed approximately $108 million in scheduled claims. Although grossly understated, that figure was well in excess of the value of HDL's assets. Total filed claims in the HDL bankruptcy proceeding vastly exceed the scheduled amount and are approximately *$3 billion*, dwarfing the value of HDL's assets and underscoring the depth of HDL's insolvency.

**O.    At All Relevant Times, HDL Was Under the Domination and Control Of The D&O Defendants, In Conspiracy With The BlueWave Defendants**

358.    At all relevant times from HDL's formation in 2009 through the Petition Date, the D&O Defendants exercised domination and control over HDL and its affairs, and acted in furtherance of their own financial interests, in willful violation of the law, and in disregard of their fiduciary and other duties to HDL and its creditors. The D&O Defendants also concealed their wrongful acts from the other shareholders, including Tipton Golias and the remaining

Golias Family Shareholders who, collectively, held a majority of HDL's stock and could have acted to prevent or remedy such acts had they known of the misconduct. This domination, control, and concealment prevented HDL from bringing any of the claims set forth herein until after the Trust was formed. To the extent that any applicable statutes of limitation would otherwise have been deemed to have expired, Plaintiff requests that all such statutes of limitation be tolled and extended based on the facts set forth herein.

359.    In addition, BlueWave, Johnson, and Dent had such a close relationship with Mallory, and through Mallory HDL, that BlueWave, Johnson, and Dent were able to exercise undue influence and control over HDL. The undue influence and close relationship came, in part, from the enormous revenues BlueWave improperly generated for HDL and the personal gain of these conspirators.

360.    BlueWave, Dent, and Johnson used their influence to exercise domination and control over HDL and its agreements, affairs, business practices, and policies, all in furtherance of their own financial interests and in disregard of the interests of HDL and its creditors.

**P.      The D&O Defendants Made Or Directed Intentional Misrepresentations To HCPs, Payers, And Other Creditors About The Nature And Propriety Of HDL's Business Practices**

361.    The D&O Defendants, including Mallory, made or directed others at HDL to make intentional misrepresentations to HCPs, payers, and other creditors about the legality of the P&H Program and the nature of HDL's Patient Responsibility Collection Practice, knowing that the statements made were untrue or misleading, and intending for HCPs, payers, and other creditors to rely on those misrepresentations. The D&O Defendants continued with these misrepresentations until at least June 30, 2014, when HDL announced that it was ceasing its practice of paying P&H fees following issuance of the Special Fraud Alert.

362.    Prior to that time, based on the D&O Defendants' misrepresentations, HCPs, payers, and other creditors, including without limitation, the Assigning Creditors (defined below), were ignorant of the truth of the impropriety of these practices and were induced to continue to do business with HDL, to make payments for HDL tests performed on patients, and to extend credit to HDL for goods and services, and were damaged and harmed by these misrepresentations.

363.    As a further example of the D&O Defendants' misrepresentations, as discussed below, in response to a letter from Cigna questioning HDL's billing practices on April 12, 2011, Mallory, according to Cigna, "assure[d] Cigna that HDL will not engage in a general practice of accepting as payment in full the payments made by Cigna where deductible or co-payments apply." That statement was a blatant misrepresentation as HDL in fact continued until 2015 its practice of accepting amounts from Cigna as payment in full, even where co-payments, co-insurance, or deductibles applied.

**Q.    HDL Made Massive Distributions To Shareholders**

364.    From April 2011 through May 2015, HDL made millions of dollars in distributions to the Shareholder Defendants on account of their stock ownership. All distributions to HDL shareholders were approved by HDL's Board of Directors, which consisted of Mallory, McConnell and Warnick during that time period.

365.    HDL made a total of approximately $123.2 million in distributions to or for the benefit of the Shareholder Defendants from April 2011 to May 2015 (the "***Shareholder Distributions***"). Attached hereto marked as **Exhibit B** is a schedule showing the dates, amounts, and recipients of the Shareholder Distributions, with a summary on the first page of Exhibit B. Of that amount, HDL paid approximately $18.1 million to or for the benefit of Mallory, $17.9 million to or for the benefit of McConnell, $17.4 million to or for the benefit of Warnick, and

more than $5.4 million to or for the benefit of Rangarajan. HDL paid approximately $46.7 million to or for the benefit of HDL's largest shareholder, Tipton Golias, and millions more to or for the benefit of the other shareholders.

366.     The Shareholder Distributions were comprised of (i) direct payments by HDL to the Shareholder Defendants and the Doe Defendants and (ii) payments made by HDL to taxing authorities for the benefit of the Shareholder Defendants and the Doe Defendants pursuant to the Shareholders Agreement.

367.     In December 2012, the HDL Board of Directors considered making, in addition to distributions for taxes owed by the Shareholder Defendants, an enormous discretionary distribution designed to get cash into the hands of Mallory, McConnell, and Warnick, the three Shareholder Defendants who were also on the HDL Board of Directors.

368.     The December 3, 2012 HDL Board of Directors meeting agenda states as follows: "BOD reviewed revised memo from CFO with outside counsel and decided to proceed with 57 distributions on Friday December 7th.  Further consideration will be given before proceeding."

369.     The HDL Board of Directors soon thereafter approved the discretionary distribution to the Shareholder Defendants and, on December 7, 2012, HDL distributed a total of $43,499,999 to the Shareholder Defendants.

370.     Of that 2012 discretionary distribution amount, approximately $6.1 million was paid to Mallory, $6.1 million to McConnell, $4.0 million to Warnick, and $2.2 million to Rangarajan. Tipton Golias, HDL's largest shareholder, received $17.7 million from that distribution alone.

**R.    HDL Entered Into Employment Agreements With Mallory, McConnell, Warnick, And Ryan And Paid Excessive, And Increasing, Salaries, Bonuses, And Other Compensation**

371.    Early in HDL's existence, Mallory, McConnell, and Warnick made sure to provide themselves with generous employment agreements. Although initial compensation levels were moderate, Mallory, McConnell, and Warnick soon entered into amended agreements that more than doubled their base salaries. They subsequently raised their salaries on multiple occasions and paid themselves huge bonuses, which they approved as members of the HDL Board of Directors. In addition, they each received millions of dollars in distributions as shareholders.

372.    On February 1, 2009, Mallory entered into an Employment Agreement with HDL as HDL's president and chief executive officer. The 2009 agreement provided for Mallory to be paid an annual base salary of $150,000.

373.    McConnell entered into an Employment Agreement with HDL dated as of November 1, 2009, to be HDL's Chief Medical Officer at an annual base salary of $150,000.

374.    On January 1, 2010, Warnick entered into an Employment Agreement with HDL to be employed as HDL's Chief Scientific Officer. Warnick was credited with an effective date of employment beginning November 1, 2009, and was provided an annual base salary of $220,000.

375.    On April 1, 2010, Rangarajan entered into an Employment Agreement with HDL to be employed as HDL's Chief Operating Officer. Rangarajan was provided an annual base salary of $220,000.

376.    Then, on March 1, 2011, Mallory and HDL entered into the Amended and Restated Employment Agreement. She was still employed as HDL's president and chief executive officer but her salary was increased dramatically, to an annual base salary of $409,000.

81

377.    Similar to Mallory, on March 1, 2011, McConnell entered into the Amended and Restated Employment Agreement with HDL. This agreement boosted his annual base salary dramatically as well, also to $409,000.

378.    Likewise, on March 1, 2011, Warnick entered into an Amended and Restated Employment Agreement with HDL, replacing his previous Employment Agreement. Warnick retained his position and was credited with an effective date of employment beginning July 10, 2009. His annual base salary was increased dramatically, to the same $409,000 amount that Mallory and McConnell received.

379.    On January 1, 2012, Ryan entered into an Employment Agreement with HDL to be employed as HDL's Executive Vice President, with an effective date of employment beginning March 31, 2012. Ryan's Employment Agreement provided for Ryan to be paid an annual base salary of $350,000. A First Amendment to Ryan's Employment Agreement dated February 2013 clarified his position as Executive Vice President, Corporate Initiatives.

380.    Despite working only nine months in 2012, Ryan received base salary of $266,000 and a bonus of almost $850,000, for total 2012 compensation of $1.1 million. Ryan received another almost $200,000 in base salary in 2013, despite leaving HDL as of June 14, 2013.

381.    The base salaries of Mallory, McConnell, and Warnick continued to increase until 2015, the year of HDL's bankruptcy filing. In 2012, their base salaries had each increased to approximately $600,000, and each received, in addition, an enormous bonus of $1.4 million. Rangarajan's base salary had also increased to approximately $600,000 in 2012. In 2013, the base salaries for Mallory, McConnell, and Warnick increased yet again, to approximately $1 million each, and in addition each received a bonus in the staggering amount of $2 million.

382.    From the start of their employment through 2015, Mallory, McConnell, and Warnick were each paid more than $7 million, Rangarajan more than $2.2 million, and Ryan approximately $1.3 million, totaling approximately $25 million in base salary and bonuses alone (collectively, the "***D&O Compensation***"), including without limitation, those payments set forth on **Exhibit C** attached hereto, which lists the dates, amounts, and recipients of those payments together with a summary of the D&O Compensation on the first page of Exhibit C.

383.    The D&O Compensation paid to Mallory, McConnell, Warnick, and Rangarajan was repeatedly increased through blatant acts of self-dealing in breach of their fiduciary duties of loyalty. The D&O Compensation was excessive compared to that paid to others in the laboratory testing industry, and HDL failed to receive reasonably equivalent value in exchange for the D&O Compensation. The payment of this D&O Compensation was also the result of decisions by Mallory, McConnell, and Warnick, together with BlueWave, Johnson, and Dent, to build HDL's business on improper and illegal practices that were injurious to HDL and its creditors.

384.    On December 20, 2011, the HDL Board of Directors, consisting of only Mallory, McConnell, and Warnick, executed a written consent retroactively approving line of credit loans from HDL to each of them, and one to Rangarajan, that had been made months earlier. Each line of credit was documented with a Demand Note dated April 14, 2011, bearing only a one percent interest rate. Warnick's Demand Note line of credit was in the amount of $850,000, the Demand Notes for Mallory and McConnell were in the amount of $300,000, and the Demand Note for Rangarajan was in the amount of $200,000.

**S.    HDL Entered Into A Buyout Agreement With Rangarajan, Paying Him Millions To Repurchase His HDL Stock On Top Of An Excessive Bonus**

385.    At Mallory's direction, HDL terminated Rangarajan's employment as Chief Operating Officer as of October 31, 2012. Pursuant to a Settlement Agreement and Release

executed in February 2013 (the "***Rangarajan Settlement Agreement***"), HDL agreed to repurchase Rangarajan's stock for $18,800,000 and pay him a bonus in the amount of $1,200,000.

386.    Although the Demand Note dated April 14, 2011 was in the amount of $200,000, HDL advanced approximately $550,000 to Rangarajan in January 2011 and forgave that amount under the Rangarajan Settlement Agreement.

387.    Under the Rangarajan Settlement Agreement, HDL paid Rangarajan the $1.2 million bonus payment on March 8, 2013, $7,100,000 on June 3, 2013, and $5,850,000 on June 2, 2014. Additionally, HDL forgave Rangarajan's obligation to repay $550,000 under the Demand Note (the $14,150,000 in payments and the $550,000 debt forgiveness are collectively hereinafter referred to as the "***Rangarajan Buyout Payments***"). A final payment in the amount of $5,850,000, due on June 1, 2015, on the eve of HDL's bankruptcy, was not made.

**T.    HDL Entered Into A Separation Agreement With Mallory, Agreeing to Pay Her More Than $2 Million In Unnecessary Severance**

388.    HDL entered into a Separation Agreement with Mallory dated January 1, 2015 (the "***Mallory Separation Agreement***"). According to the Mallory Separation Agreement, Mallory voluntarily resigned her seat on the HDL Board of Directors on November 6, 2014. The Mallory Separation Agreement stated that Mallory's employment with HDL was terminated as of January 1, 2015.

389.    Mallory should have been terminated for "Cause" under her Amended and Restated Employment Agreement, including for her misconduct injurious to HDL and breaches of fiduciary duty. If she had been terminated for "Cause" that would have precluded her from having any claim to severance. The HDL Board of Directors, however, agreed to pay Mallory severance totaling $2,737,635, representing 36 months of her salary, without HDL receiving

reasonably equivalent value.   Pursuant to the Mallory Separation Agreement, Mallory irrevocably and unconditionally released HDL and related parties from any and all claims.

390.   HDL made a series of installment payments to Mallory as provided in the Mallory Separation Agreement. HDL scheduled Mallory as an unsecured creditor in the amount of $2,421,754, presumably for the remaining unpaid amounts under the Mallory Separation Agreement (the "***Mallory Separation Amount***").

### U.   The DOJ Investigation, Settlement, and Complaint-in-Intervention

391.   HDL's apparent success was based on a business model that used kickbacks and improper referrals to encourage and induce HCPs to order unnecessary tests. That created a ticking time-bomb that was destined to explode.

392.   On January 7, 2013, the time-bomb went off when HDL received a subpoena from the DOJ broadly requiring the production of information regarding these business practices and activities.

393.   The DOJ investigation arose out of three civil actions (the "***DOJ Actions***") filed under seal against HDL and other entities in the laboratory testing industry pursuant to the *qui tam* whistleblower provisions of the FCA.

394.   On April 9, 2015, HDL entered into a settlement with the DOJ, discussed in detail above. The DOJ Settlement states that the whistleblowers, known as "relators," alleged, among other things, that HDL submitted claims for payment to government health care programs that were not reimbursable because they were tainted by kickbacks and/or were for medically unnecessary services.

395.   Based on the Covered Conduct, described above, the United States asserted in the DOJ Settlement that HDL was liable for knowingly submitting, and conspiring to submit, false claims to government health care programs in violation of the FCA.

396.    The amount of $94,144,852.52, plus interest, remains outstanding under the DOJ Settlement. The settlement amount was based solely upon HDL's ability to pay the DOJ Settlement, rather than the recovery of actual damages to the government plus available penalties and other sanctions under relevant statutes. The FCA provides for, among other things, treble damages and a civil penalty for each false claim, and the DOJ could have asserted a claim against HDL for over $1 billion in damages, treble damages, and civil penalties.

397.    In addition to the DOJ Settlement, HDL also entered into a five-year Corporate Integrity Agreement ("*CIA*") with the OIG in exchange for the OIG waiving its permissive exclusion authority. The CIA resulted in HDL incurring substantial, ongoing legal fees related to the implementation of, and compliance with, the burdensome CIA.

398.    On August 7, 2015, the DOJ filed a Complaint-in-Intervention in the consolidated DOJ Actions now titled, *United States et al. ex. rel. Lutz et al. v. Berkeley Heartlab Inc., et al.*, Case No. 9:14-CV-00230-RMG (D.S.C.) (the "*Complaint-in-Intervention*"), asserting claims against the remaining defendants Berkeley, Mallory, BlueWave, Dent, and Johnson.

**V.    Claims By Insurance Companies**

399.    Given the domination and control over HDL by the D&O Defendants, in conspiracy with the BlueWave Defendants, the full extent of the misconduct, including breaches of fiduciary duty, was not discovered by private insurers until after the DOJ investigation and the publicity that followed it.

400.    Upon learning of the DOJ investigation, two insurance companies filed actions against HDL based upon its business practices, specifically including the Patient Responsibility Collection Practice.

401.    First, on October 15, 2014, Cigna brought suit in the United States District Court

for the District of Connecticut (Case No. 3:14-cv-01519-VAB) for recovery of the entire $84

million in claims it paid to HDL.

402.    The gist of this action was summarized in Paragraph 44 of Cigna's Complaint (the

"***Cigna Complaint***"), which described HDL's conduct as follows:

> HDL has developed a business model designed to game the healthcare
> system by submitting grossly inflated, phantom "charges" to Cigna that do
> not reflect the actual amount HDL bills patients.  The outline of HDL's
> scheme is simple.  HDL misrepresents to members of Cigna-administered
> plans that they may receive services from HDL without incurring any
> financial obligation, and that Cigna will be responsible for the cost of
> services delivered under these conditions.  After luring plan members in
> this way, HDL submits charges to Cigna at astronomical rates, which are
> much higher than the "normal charge" HDL actually intends to accept as
> payment in full.  Cigna then relies on the representations in HDL's bills,
> by paying more for HDL's services than it is obligated to pay under the
> relevant plans.

403.    Similarly, on April 10, 2015, Aetna filed suit against both HDL and BlueWave in

the United States District Court for the Eastern District of Pennsylvania (Case No. 2:15-cv-

01868-RK) (the "***Aetna Litigation***").

404.    On August 31, 2015, Aetna filed a First Amended Complaint (the "***Amended

Aetna Complaint***") which added Dent, Johnson and Mallory as defendants with HDL and

BlueWave in the Aetna Litigation (Aetna Litigation Docket No. 16).

405.    On December 28, 2015, U.S. District Judge Robert F. Kelly issued a

Memorandum decision (Aetna Litigation Docket No. 29) and order (Aetna Litigation Docket No.

30) denying the motion filed by BlueWave, Dent and Johnson to dismiss the Amended Aetna

Complaint.

406.    The Amended Aetna Complaint asserts, *inter alia*, that HDL and Mallory, in

conjunction with BlueWave, Dent, and Johnson, had worked unlawfully to induce physicians

and patients to utilize HDL's out-of-network services. It describes a scheme in which both HDL and BlueWave offered to pay HCPs kickbacks in excess of amounts HDL could legally pay to compensate those HCPs for the cost of preparing blood samples for HDL.

407.    As both the Cigna Complaint and the Amended Aetna Complaint allege, a key part of HDL's operations was the Patient Responsibility Collection Policy and the fact that the actual charge for the services had already been discounted to levels well below the charge that HDL submitted to the insurance companies for reimbursement, resulting in the payment to HDL by Cigna, Aetna, and other private insurers of inflated and fraudulent claims.

408.    Further, Cigna alleges that in response to a letter from Cigna questioning HDL's billing practices on April 12, 2011, Mallory "assure[d] Cigna that HDL will not engage in a general practice of accepting as payment in full the payments made by Cigna where deductible or co-payments apply."

409.    By engaging in the conduct alleged in the Cigna Complaint and the Amended Aetna Complaint, the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants damaged HDL and its creditors by triggering enormous unaccounted for liabilities, and damaged public and private insurers, including Cigna and Aetna, by inducing them to pay HDL for inflated and fraudulent claims.

## W.    McConnell, Warnick, Galen and Bartlett Failed To Obtain A Tolling Agreement From Individual LeClairRyan Attorneys

410.    As of October 2014, the HDL Board of Directors consisted of McConnell, Warnick, Galen, and Bartlett. These Defendants had months to put in place a tolling agreement not only with LeClairRyan but also with certain of LeClairRyan's current or former partners and attorneys, including without limitation, Ryan, Michael F. Ruggio, Patrick Hurd, and Charles M.

88

Sims (all such current or former LeClairRyan partners and attorneys, the "*LR Individuals*"). Instead of securing such a tolling agreement, as the months passed, McConnell, Warnick, Galen, and Bartlett allowed time to pass without obtaining a tolling agreement covering the LR Individuals.

411.   In April 2015, McConnell, Warnick, Galen, and Bartlett not only failed to obtain a tolling agreement with the LR Individuals but also expressly agreed to forego asking for a tolling agreement from Ruggio, who had subsequently left LeClairRyan.

412.   The decision by McConnell, Warnick, Galen, and Bartlett not to ask for a tolling agreement from Ruggio, and the failure to obtain such a tolling agreement from the LR Individuals or otherwise to commence timely claims against them to preserve HDL's claims, removed potential defendants with direct liability, any applicable insurance policies protecting those individuals, and assets of those individuals as a source of collection upon an award or settlement. This reduced the value of the claims held by the estate and subsequently by the Trust, including those sought to be settled by the estate and the Trust against LeClairRyan directly.

413.   The failure of McConnell, Warnick, Galen, and Bartlett to obtain a tolling agreement from the LR Individuals or otherwise to act to preserve those claims and causes of action has damaged HDL and its creditors and constituted breaches of fiduciary duties, corporate waste, gross negligence, negligence, and other misconduct.

**X.   HDL's Bankruptcy Proceeding, Confirmation Of Plan Of Liquidation, And Creation Of Liquidating Trust**

414.   On June 7, 2015, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court.

415.   On June 16, 2015, the United States Trustee appointed the Official Unsecured Creditors' Committee (the "*Creditors' Committee*") of Health Diagnostic Laboratory, Inc., *et al.,*

89

consisting of Oncimmune (USA) LLC ("**Oncimmune**"); Pietragallo Gordon Alfano Bosick & Raspanti, LLP; Numares GROUP Corporation; Diadexus, Inc.; Mercodia, Inc.; Kansas Bioscience Authority; and Aetna. Oncimmune subsequently resigned from the Creditors' Committee and Cleveland HeartLab, Inc. was added as a member.

416.    Following an auction and subsequent hearing, on September 17, 2015, this Court entered an order authorizing the sale of substantially all of the Debtors' assets to the sole bidder, True Health Diagnostics, LLC ("**True Health**") [Docket No. 512].

417.    The transaction closed on September 29, 2015 with a cash purchase price of $27.1 million plus a $10 million seller note to be repaid over time.

418.    Of the True Health sale proceeds, $21.3 million were paid to secured and administrative creditors, with the HDL estate receiving only $5.8 million in net proceeds.

419.    On March 25, 2016, the Debtors filed the Plan.

420.    Pursuant to the Plan, and a Liquidating Trust Agreement executed in implementation of the Plan, Arrowsmith has been named as the Liquidating Trustee by the Trust formed for the benefit of HDL's creditors. Pursuant to Section 6.5(a)(12) of the Plan, the Liquidating Trustee has the power and duty to, *inter alia*, prosecute Litigation Claims (defined in the Plan) not expressly released or waived under the Plan. Under Section 1.76 of the Plan, Litigation Claims are collectively, (i) claims, rights or other Causes of Action which may be asserted by or on behalf of the Debtors, the Estates or the Creditors' Committee; and (ii) the Creditor Causes of Action (defined in the Plan) assigned to or otherwise transferred to the Trust pursuant to Section 6.16 of the Plan.

421.    On May 12, 2016, the Court entered a memorandum opinion [Docket No. 1094] and the Confirmation Order.

### Y.    Assignments Of Creditor Causes Of Action

422.    Pursuant to Section 6.16(a) of the Plan, and associated Assignment Agreements, 30 creditors, in addition to Aetna and Cigna as described below (collectively, the "***Assigning Creditors***"), assigned to the Liquidating Trustee and the Trust their Creditor Causes of Action, as defined in Section 1.33 of the Plan. The Assigning Creditors, other than Aetna and Cigna, have claims totaling $4,049,114.47.

423.    Pursuant to a Settlement Agreement between Aetna and the Creditors' Committee dated March 29, 2016, Aetna assigned to the Liquidating Trustee and the Trust any and all claims against (i) former and current directors and officers of the Debtors (including Mallory) and (ii) BlueWave, Dent, and Johnson, including but not limited to all claims and causes of action asserted in the Aetna Litigation.

424.    Aetna has an allowed Class 3 claim (defined in the Plan) against HDL in the amount of $49.5 million and an allowed Class 4 claim (defined in the Plan) in the amount of $27.6 million, for total claims of approximately $77 million.

425.    Pursuant to a Settlement Agreement dated July 14, 2016 between Cigna and the Liquidating Trustee, on behalf of the Trust, Cigna agreed to, and subsequently did, assign to the Liquidating Trustee and the Trust any and all claims against all persons and entities, including without limitation the former and current directors and officers of the Debtors, BlueWave, Dent, and Johnson, related to the provision of laboratory services by HDL to patients covered by healthcare benefit plans or policies for which Cigna administered claims or their physicians.

426.    Cigna has an allowed Class 4 claim (defined in the Plan) in the amount of $59 million.

427.    Collectively, Assigning Creditors filed or otherwise have allowed Class 3 and Class 4 claims against HDL totaling approximately $140 million.

91

## COUNT 1

**(Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11 U.S.C. §§548 and 550; Against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants – Actual Fraud)**

428.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

429.    The transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional Shareholder Distributions that Plaintiff later discovers.

430.    The transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants were made with actual intent to hinder, delay or defraud creditors of HDL. The requisite intent can be imputed to HDL from the dominion and control of HDL by Mallory, McConnell, Warnick, and the other members of the HDL Board of Directors, conspiring with BlueWave, Dent, and Johnson.

431.    The primary purpose of the Shareholder Distributions was to take this cash from HDL for the benefit of the Shareholder Defendants and the Doe Defendants without those assets being made available to HDL's creditors.

432.    At least four "badges of fraud" apply to the transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants: (i) the transfers were to "insiders," including officers, directors, and affiliates of HDL, who exercised dominion and control over HDL; (ii) the transfers of the Shareholder Distributions were made at the same time substantial new liabilities and debts were being incurred through continuation of the improper P&H Program, the BlueWave Agreement, and the Patient Responsibility Collection Practice; (iii) HDL received no value or consideration in exchange for the transfers of the Shareholder

Distributions; and (iv) HDL was or became insolvent at the time of the Shareholder Distributions.

433.    The Shareholder Distributions were made to or for the benefit of the Shareholder Defendants and the Doe Defendants.

434.    HDL's transfers of the Shareholder Distributions should be avoided pursuant to Bankruptcy Code section 548.

435.    Under Bankruptcy Code section 550, Plaintiff may recover the Shareholder Distributions from the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 2

**(Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11 U.S.C. §§548 and 550; Against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants – Constructive Fraud)**

436.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

437.    The transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional Shareholder Distributions that Plaintiff later discovers.

438.    HDL received less than a reasonably equivalent value in exchange for transferring the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants.

439.    At the time of HDL's transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants, HDL was insolvent or became insolvent as a result of such transfers.

440.    At the time of HDL's transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants, HDL was engaged or about to engage in business for which its remaining assets and/or capital were unreasonably small in relation to its business.

441.    At the time of HDL's transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants, HDL intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

442.    At all relevant times, HDL had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code section 502, including vendors, landlords, suppliers, lenders and other creditors.

443.    The Shareholder Distributions were made to or for the benefit of the Shareholder Defendants and the Doe Defendants.

444.    HDL's transfers of the Shareholder Distributions should be avoided pursuant to Bankruptcy Code section 548.

445.    Under Bankruptcy Code section 550, Plaintiff may recover the Shareholder Distributions from the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 3

**(Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, 28 U.S.C. § 3304; Against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants – Actual Fraud)**

446.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

447.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

448.    The DOJ filed Proof of Claim No. 1335 in the amount of $94,144,852.52, plus interest, in the HDL bankruptcy case, based on HDL's conduct dating back to November 2008.

449.    The transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional Shareholder Distributions that Plaintiff later discovers.

450.    The transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants were made with actual intent to hinder, delay or defraud creditors of HDL. The requisite intent can be imputed to HDL from the dominion and control of HDL by Mallory, McConnell, Warnick, and the other members of the HDL Board of Directors, conspiring with BlueWave, Dent, and Johnson.

451.    The primary purpose of the Shareholder Distributions was to take this cash from HDL for the benefit of the Shareholder Defendants and the Doe Defendants without those assets being made available to HDL's creditors.

452.    At least four "badges of fraud" apply to the transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants: (i) the transfers were to "insiders," including officers, directors, and affiliates of HDL, who exercised dominion and control over HDL; (ii) the transfers of the Shareholder Distributions were made at the same time substantial new liabilities and debts were being incurred through continuation of the improper P&H Program, the BlueWave Agreement, and the Patient Responsibility Collection Practice; (iii) HDL received no value or consideration in exchange for the transfers of the Shareholder Distributions; and (iv) HDL was or became insolvent at the time of the Shareholder Distributions.

453.    The Shareholder Distributions were made to or for the benefit of the Shareholder

Defendants and the Doe Defendants.

454.    HDL's transfers of the Shareholder Distributions made within the six (6) years

before the Petition Date should be avoided pursuant to applicable provisions of the Federal Debt

Collection Procedures Act, 28 U.S.C. § 3301 et. seq., and Bankruptcy Code sections 544(b) and

550.

455.    Under Bankruptcy Code section 550, Plaintiff may recover the Shareholder

Distributions from the Shareholder Defendants, the Mallory Trust, the Warnick Entity

Defendants, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 4

**(Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11
U.S.C. §§544(b) and 550 and, as applicable, 28 U.S.C. § 3304; Against the Shareholder
Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants –
Constructive Fraud)**

456.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

457.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of

an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

458.    The DOJ filed Proof of Claim No. 1335 in the amount of $94,144,852.52, plus

interest, in the HDL bankruptcy case, based on HDL's conduct dating back to November 2008.

459.    The transfers of the Shareholder Distributions to the Shareholder Defendants and

the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the

right to seek the avoidance and recovery of any and all additional Shareholder Distributions that

Plaintiff later discovers.

460.    HDL did not receive reasonably equivalent value in exchange for transferring the

Shareholder Distributions to the Shareholder Defendants and the Doe Defendants.

461.     At the time of HDL's transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants, HDL was insolvent or became insolvent as a result of such transfers.

462.     At the time of HDL's transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants, HDL was engaged or about to engage in business for which its remaining assets and/or capital were unreasonably small in relation to its business.

463.     At the time of HDL's transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants, HDL intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

464.     The Shareholder Distributions were made to or for the benefit of the Shareholder Defendants and the Doe Defendants.

465.     HDL's transfers of the Shareholder Distributions made within the six (6) years before the Petition Date should be avoided pursuant to applicable provisions of the Federal Debt Collection Procedures Act, 28 U.S.C. § 3301 et. seq., and Bankruptcy Code sections 544(b) and 550.

466.     Under Bankruptcy Code section 550, Plaintiff may recover the Shareholder Distributions from the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 5

**(Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Va. Code § 55–80; Against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants – Actual Fraud)**

467.     Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

468.     The transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional Shareholder Distributions that Plaintiff later discovers.

469.     The transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants were made with actual intent to hinder, delay or defraud creditors of HDL, including without limitation, the Assigning Creditors.

470.     The requisite intent can be imputed to HDL from the dominion and control of HDL by Mallory, McConnell, Warnick, and the other members of the HDL Board of Directors, conspiring with BlueWave, Dent, and Johnson.

471.     The primary purpose of the Shareholder Distributions was to take this cash from HDL for the benefit of the Shareholder Defendants and the Doe Defendants without those assets being made available to HDL's creditors.

472.     At least four "badges of fraud" apply to the transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants: (i) the transfers were to "insiders," including officers, directors, and affiliates of HDL; (ii) the transfers of the Shareholder Distributions were made at the same time substantial new liabilities and debts were being incurred through continuation of the P&H Program, the BlueWave Agreement, and the Patient Responsibility Collection Practice; (iii) HDL received no value or consideration in exchange for the transfers of the Shareholder Distributions; and (iv) HDL was or became insolvent at the time of the Shareholder Distributions.

473.    The Shareholder Defendants had knowledge of facts and circumstances that would cause persons of ordinary care and prudence to be suspicious and to inquire before accepting the transfer of the Shareholder Distributions.

474.    The Shareholder Distributions were made to or for the benefit of the Shareholder Defendants and the Doe Defendants.

475.    HDL's transfers of the Shareholder Distributions should be avoided pursuant to applicable provisions of the Virginia Fraudulent Transfer Act, and Bankruptcy Code sections 544(b) and 550.

476.    Under Bankruptcy Code section 550, Plaintiff may recover the Shareholder Distributions from the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 6

**(Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Va. Code § 55–81; Against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants – Insolvency)**

477.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

478.    The transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional Shareholder Distributions that Plaintiff later discovers.

479.    HDL did not receive consideration deemed valuable in law in exchange for the Shareholder Distributions, as the Shareholder Distributions took cash from HDL for the benefit of the Shareholder Defendants and the Doe Defendants without receiving any consideration in return.

99

480.    At the time the Shareholder Distributions were made, the Debtors were insolvent as set forth in detail above.

481.    The Shareholder Distributions were made to or for the benefit of the Shareholder Defendants and the Doe Defendants.

482.    HDL's transfers of the Shareholder Distributions should be avoided pursuant to applicable provisions of the Virginia Fraudulent Transfer Act, including Va. Code § 55-81, and Bankruptcy Code sections 544(b) and 550.

483.    Under Bankruptcy Code section 550, Plaintiff may recover the Shareholder Distributions from the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 7

**(Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Texas Bus. & Com. Code §§ 24.001 et seq., Georgia Code §§ 18-2-70 et seq., Alabama Code §§ 8-9A-1 et seq., West Virginia Code §§ 40-1A-1 et seq., Revised Code of Washington § 19.40.011 et seq., and Minnesota Statutes §§ 513.41 et seq.; Against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants – Actual Fraud)**

484.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

485.    The transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional Shareholder Distributions that Plaintiff later discovers.

486.    The transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants were made with actual intent to hinder, delay or defraud creditors of HDL, including without limitation, the Assigning Creditors.

487.    The requisite intent can be imputed to HDL from the dominion and control of
HDL by Mallory, McConnell, Warnick, and the other members of the HDL Board of Directors,
conspiring with BlueWave, Dent, and Johnson.

488.    The primary purpose of the Shareholder Distributions was to take this cash from
HDL for the benefit of the Shareholder Defendants and the Doe Defendants without those assets
being made available to HDL's creditors.

489.    At least four "badges of fraud" apply to the transfers of the Shareholder
Distributions to the Shareholder Defendants and the Doe Defendants: (i) the transfers were to
"insiders," including officers, directors, and affiliates of HDL; (ii) the transfers of the
Shareholder Distributions were made at the same time substantial new liabilities and debts were
being incurred through continuation of the P&H Program, the BlueWave Agreement, and the
Patient Responsibility Collection Practice; (iii) HDL received no value or consideration in
exchange for the transfers of the Shareholder Distributions; and (iv) HDL was or became
insolvent at the time of the Shareholder Distributions.

490.    The Shareholder Distributions were made to or for the benefit of the Shareholder
Defendants and the Doe Defendants.

491.    Certain of the Shareholder Distributions were transferred to bank accounts in
Texas, Georgia, Alabama, West Virginia, Washington and/or Minnesota.

492.    HDL's transfers of the Shareholder Distributions to bank accounts in Texas,
Georgia, Alabama, West Virginia, Washington and/or Minnesota should be avoided pursuant to
applicable provisions of Texas Bus. & Com. Code §§ 24.001 et seq., Georgia Code §§ 18-2-70 et
seq., Alabama Code §§ 8-9A-1 et seq., West Virginia Code §§ 40-1A-1 et seq., Revised Code of

Washington § 19.40.011 et seq., or Minnesota Statutes §§ 513.41 et seq. and Bankruptcy Code

sections 544(b) and 550.

493.     Under Bankruptcy Code section 550, Plaintiff may recover the Shareholder

Distributions from the Shareholder Defendants, the Mallory Trust, the Warnick Entity

Defendants, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 8

**(Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11
U.S.C. §§544(b) and 550 and, as applicable, Texas Bus. & Com. Code §§ 24.001 et. seq.,
Georgia Code §§ 18-2-70 et seq., Alabama Code §§ 8-9A-1 et seq., West Virginia Code §§
40-1A-1 set seq., Revised Code of Washington § 19.40.011 et seq. and Minnesota Statutes §§
513.41 et seq.; Against the Shareholder Defendants, the Mallory Trust, the Warnick Entity
Defendants, and the Doe Defendants – Constructive Fraud)**

494.     Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

495.     The transfers of the Shareholder Distributions to the Shareholder Defendants and

the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the

right to seek the avoidance and recovery of any and all additional Shareholder Distributions that

Plaintiff later discovers.

496.     HDL did not receive reasonably equivalent value in exchange for transferring the

Shareholder Distributions to the Shareholder Defendants and the Doe Defendants.

497.     At the time of HDL's transfers of the Shareholder Distributions to the Shareholder

Defendants and the Doe Defendants, HDL was insolvent or was rendered insolvent by the

Shareholder Distributions.

498.     At the time of HDL's transfers of the Shareholder Distributions to the Shareholder

Defendants and the Doe Defendants, HDL was engaged or about to engage in business for which

its remaining assets and/or capital were unreasonably small in relation to its business.

499. At the time of HDL's transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants, HDL intended to incur, or believed or reasonably should have believed that the Debtors would incur, debts beyond the Debtors' abilities to pay as they became due.

500. At all relevant times, HDL had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code section 502, including vendors, landlords, suppliers, lenders and other creditors.

501. The Shareholder Distributions were made to or for the benefit of the Shareholder Defendants and the Doe Defendants.

502. Certain of the Shareholder Distributions were transferred to bank accounts in Texas, Georgia, Alabama, West Virginia, Washington and/or Minnesota.

503. HDL's transfers of the Shareholder Distributions to bank accounts in Texas, Georgia, Alabama, West Virginia, Washington and/or Minnesota should be avoided pursuant to applicable provisions of Texas Bus. & Com. Code §§ 24.001 et seq., Georgia Code §§ 18-2-70 et seq., Alabama Code §§ 8-9A-1 et seq., West Virginia Code §§ 40-1A-1 et seq., Revised Code of Washington § 19.40.011 et seq., or Minnesota Statutes §§ 513.41 et seq. and Bankruptcy Code sections 544(b) and 550.

504. Under Bankruptcy Code section 550, Plaintiff may recover the Shareholder Distributions from the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 9

**(Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11
U.S.C. §§544(b) and 550 and, as applicable, S.C. Code § 27-23-10; Against the Shareholder
Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants –
Actual Fraud)**

505.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

506.    The transfers of the Shareholder Distributions to the Shareholder Defendants and
the Doe Defendants represented voluntary transfers of an interest of HDL in property. Plaintiff
reserves the right to seek the avoidance and recovery of any and all additional Shareholder
Distributions that Plaintiff later discovers.

507.    The transfers of the Shareholder Distributions to the Shareholder Defendants and
the Doe Defendants were made with actual intent to hinder, delay or defraud creditors of HDL,
including without limitation, the Assigning Creditors.

508.    The requisite intent can be imputed to HDL from the dominion and control of
HDL by Mallory, McConnell, Warnick, and the other members of the HDL Board of Directors,
conspiring with BlueWave, Dent, and Johnson.

509.    The primary purpose of the Shareholder Distributions was to take this cash from
HDL for the benefit of the Shareholder Defendants and the Doe Defendants without those assets
being made available to HDL's creditors.

510.    At least four "badges of fraud" apply to the transfers of the Shareholder
Distributions to the Shareholder Defendants and the Doe Defendants: (i) the transfers were to
"insiders," including officers, directors, and affiliates of HDL; (ii) the transfers of the
Shareholder Distributions were made at the same time substantial new liabilities and debts were
being incurred through continuation of the P&H Program, the BlueWave Agreement, and the
Patient Responsibility Collection Practice; (iii) HDL received no value or consideration in

exchange for the transfers of the Shareholder Distributions; and (iv) HDL was or became insolvent at the time of the Shareholder Distributions.

511.    The Shareholder Distributions were made to or for the benefit of the Shareholder Defendants and the Doe Defendants.

512.    Certain of the Shareholder Distributions were transferred to bank accounts in South Carolina.

513.    HDL's transfers of the Shareholder Distributions to bank accounts in South Carolina should be avoided pursuant to applicable provisions of S.C. Code § 27-23-10, and Bankruptcy Code sections 544(b) and 550.

514.    Under Bankruptcy Code section 550, Plaintiff may recover the Shareholder Distributions from the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 10

**(Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, S.C. Code § 27-23-10; Against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants – Constructive Fraud)**

515.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

516.    The transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants represented voluntary transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional Shareholder Distributions that Plaintiff later discovers.

517.    HDL did not receive valuable consideration in exchange for transferring the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants.

518.    At the time of HDL's transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants, HDL was insolvent or was rendered insolvent by the Shareholder Distributions, and HDL failed to retain sufficient property or assets to pay its indebtedness in full.

519.    At the time of HDL's transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants, HDL was engaged or about to engage in business for which its remaining assets and/or capital were unreasonably small in relation to its business.

520.    At the time of HDL's transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants, HDL intended to incur, or believed or reasonably should have believed that the Debtors would incur, debts beyond the Debtors' abilities to pay as they became due.

521.    At all relevant times, HDL had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code section 502, including vendors, landlords, suppliers, lenders and other creditors.

522.    The Shareholder Distributions were made to or for the benefit of the Shareholder Defendants and the Doe Defendants.

523.    Certain of the Shareholder Distributions were transferred to bank accounts in South Carolina.

524.    HDL's transfers of the Shareholder Distributions to bank accounts in South Carolina should be avoided pursuant to applicable provisions of S.C. Code § 27-23-10, and Bankruptcy Code sections 544(b) and 550.

525.    Under Bankruptcy Code section 550, Plaintiff may recover the Shareholder Distributions from the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 11

**(Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, New York Debtor and Creditor Law § 276; Against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants – Actual Fraud – Conveyances Made with Intent to Defraud)**

526.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

527.    The transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional Shareholder Distributions that Plaintiff later discovers.

528.    The transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants were made with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud creditors of HDL, including without limitation, the Assigning Creditors.

529.    The requisite intent can be imputed to HDL from the dominion and control of HDL by Mallory, McConnell, Warnick, and the other members of the HDL Board of Directors, conspiring with BlueWave, Dent, and Johnson.

530.    The primary purpose of the Shareholder Distributions was to take this cash from HDL for the benefit of the Shareholder Defendants and the Doe Defendants without those assets being made available to HDL's creditors.

531.    HDL's intent can be further inferred by at least four "badges of fraud" which apply to the transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe

Defendants: (i) the transfers were to "insiders," including officers, directors, and affiliates of HDL; (ii) the transfers of the Shareholder Distributions were made at the same time substantial new liabilities and debts were being incurred through continuation of the P&H Program, the BlueWave Agreement, and the Patient Responsibility Collection Practice; (iii) HDL received no value or consideration in exchange for the transfers of the Shareholder Distributions; and (iv) HDL was or became insolvent at the time of the Shareholder Distributions.

532.    The Shareholder Defendants had knowledge of facts and circumstances that would cause persons of ordinary care and prudence to be suspicious and to inquire before accepting the transfer of the Shareholder Distributions.

533.    The Shareholder Distributions were made to or for the benefit of the Shareholder Defendants and the Doe Defendants.

534.    Certain of the Shareholder Distributions were transferred to bank accounts in New York.

535.    HDL's transfers of the Shareholder Distributions should be avoided pursuant to applicable provisions of the New York Debtor and Creditor Law, including New York Debtor and Creditor Law § 276 and Bankruptcy Code sections 544(b) and 550.

536.    Under Bankruptcy Code section 550, Plaintiff may recover the Shareholder Distributions from the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 12

**(Avoidance of Transfer of Distributions to Shareholders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, New York Debtor and Creditor Law §§ 273 and 274; Against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants – Constructive Fraud)**

537.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

538.    The transfers of the Shareholder Distributions to the Shareholder Defendants and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional Shareholder Distributions that Plaintiff later discovers.

539.    The Shareholder Distributions were made without a fair consideration to HDL, as the Shareholder Distributions took cash from HDL for the benefit of the Shareholder Defendants and the Doe Defendants without HDL receiving any consideration in return.

540.    At the time the Shareholder Distributions were made, the Debtors were insolvent or were rendered insolvent as set forth in detail above.

541.    At the time the Shareholder Distributions were made, the Debtors were engaged or about to engage in a business or transaction for which the property remaining in their hands after the Shareholder Distributions were made was an unreasonably small capital as set forth in detail above.

542.    As a result, the Shareholder Distributions were fraudulent as to creditors and other persons who became creditors during the continuance of the Debtors' businesses, including without limitation, the Assigning Creditors, without regard to the Debtors' actual intent.

543.    At the time the Shareholder Distributions were made, the Debtors intended to or believed that they would incur debts beyond their ability to pay as they matured.

544.    Accordingly, the Shareholder Distributions were fraudulent as to the Debtors' present and future creditors at the time of the Shareholder Distributions, including without limitation, the Assigning Creditors.

545.    The Shareholder Distributions were made to or for the benefit of the Shareholder Defendants and the Doe Defendants.

546.    Certain of the Shareholder Distributions were transferred to bank accounts in New York.

547.    HDL's transfers of the Shareholder Distributions should be avoided pursuant to applicable provisions of the New York Debtor and Creditor Law, including New York Debtor and Creditor Law §§273 and 274, and Bankruptcy Code sections 544(b) and 550.

548.    Under Bankruptcy Code section 550, Plaintiff may recover the Shareholder Distributions from the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 13

**(Avoidance of Transfers of Compensation to Insiders and Recovery of Value Under 11
U.S.C. §§548 and 550; Against Mallory, the Mallory Trust, McConnell, Warnick, the
Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants – Actual Fraud)**

549.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

550.    The transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional D&O Compensation that Plaintiff later discovers.

551.    The transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants were made with actual intent to hinder, delay or defraud creditors of HDL. The requisite intent can be imputed to HDL from the dominion and control of HDL by Mallory, McConnell, Warnick, and the other members of the HDL Board of Directors, conspiring with BlueWave, Dent, and Johnson.

552.    The primary purpose of the D&O Compensation was to take this cash from HDL for the benefit of Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants without those assets being made available to HDL's creditors.

553.    At least four "badges of fraud" apply to the transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants: (i) the transfers were to "insiders," including officers, directors, and affiliates of HDL, who exercised dominion and control over HDL; (ii) the transfers of the D&O Compensation were made at the same time substantial new liabilities and debts were being incurred through continuation of the improper P&H Program, the BlueWave Agreement, and the Patient Responsibility Collection Practice; (iii) given the enormous liabilities created for HDL through the conduct of the officers paid the D&O Compensation, HDL received no value or consideration in exchange for the transfers of the D&O Compensation; and (iv) HDL was or became insolvent at the time of each of the transfers of the D&O Compensation.

554.    The D&O Compensation was transferred to or for the benefit of Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants.

555.    HDL's transfers of the D&O Compensation should be avoided pursuant to Bankruptcy Code section 548.

556.    Under Bankruptcy Code section 550, Plaintiff may recover the D&O Compensation from Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 14

**(Avoidance of Transfers of Compensation to Insiders and Recovery of Value Under 11 U.S.C. §§548 and 550; Against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants – Constructive Fraud)**

557.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

558.    The transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional D&O Compensation that Plaintiff later discovers.

559.    HDL received less than a reasonably equivalent value in exchange for transferring the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants.

560.    At the time of HDL's transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants, HDL was insolvent or became insolvent as a result of such transfers.

561.    At the time of HDL's transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants, HDL was engaged or about to engage in business for which its remaining assets and/or capital were unreasonably small in relation to its business.

562.    At the time of HDL's transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants, HDL intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

563.    At all relevant times, HDL had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code section 502, including vendors, landlords, suppliers, lenders and other creditors.

564.    The transfers of the D&O Compensation were made to or for the benefit of Mallory, McConnell, Warnick, Rangarajan, and the Doe Defendants.

565.    HDL's transfers of the D&O Compensation should be avoided pursuant to Bankruptcy Code section 548.

566.    Under Bankruptcy Code section 550, Plaintiff may recover the D&O Compensation from Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 15

**(Avoidance of Transfers of Compensation to Insiders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, 28 U.S.C. § 3304; Against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants – Actual Fraud)**

567.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

568.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

569.    The DOJ filed Proof of Claim No. 1335 in the amount of $94,144,852.52, plus interest, in the HDL bankruptcy case, based on HDL's conduct dating back to November 2008.

570.    The transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional D&O Compensation that Plaintiff later discovers.

571.    The transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants were made with actual intent to hinder, delay or defraud creditors of HDL. The requisite intent can be imputed to HDL from the dominion and control of HDL by Mallory, McConnell, Warnick, and the other members of the HDL Board of Directors, conspiring with BlueWave, Dent, and Johnson.

572.    The primary purpose of the D&O Compensation was to take this cash from HDL for the benefit of Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants without those assets being made available to HDL's creditors.

573.    At least four "badges of fraud" apply to the transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants: (i) the transfers were to "insiders," including officers, directors, and affiliates of HDL, who exercised dominion and control over HDL; (ii) the transfers of the D&O Compensation were made at the same time substantial new liabilities and debts were being incurred through continuation of the improper P&H Program, the BlueWave Agreement, and the Patient Responsibility Collection Practice; (iii) given the enormous liabilities created for HDL through the conduct of the officers paid the D&O Compensation, HDL received no value or consideration in exchange for the transfers of the D&O Compensation; and (iv) HDL was or became insolvent at the time of each of the transfers of the D&O Compensation.

574.    The transfers of the D&O Compensation were made to or for the benefit of Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants.

575.    HDL's transfers of the D&O Compensation made within the six (6) years before the Petition Date should be avoided pursuant to applicable provisions of the Federal Debt Collection Procedures Act, 28 U.S.C. § 3301 et. seq., and Bankruptcy Code sections 544(b) and 550.

576.    Under Bankruptcy Code section 550, Plaintiff may recover the D&O Compensation from Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 16

**(Avoidance of Transfers of Compensation to Insiders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, 28 U.S.C. § 3304; Against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants – Constructive Fraud)**

577.   Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

578.   Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

579.   The DOJ filed Proof of Claim No. 1335 in the amount of $94,144,852.52, plus interest, in the HDL bankruptcy case, based on HDL's conduct dating back to November 2008.

580.   The transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional D&O Compensation that Plaintiff later discovers.

581.   HDL did not receive reasonably equivalent value in exchange for transferring the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants.

582.   At the time of HDL's transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants, HDL was insolvent or became insolvent as a result of such transfers.

583.   At the time of HDL's transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants, HDL was engaged or about to engage in business for which its remaining assets and/or capital were unreasonably small in relation to its business.

115

584.    At the time of HDL's transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants, HDL intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

585.    The transfers of the D&O Compensation were made to or for the benefit of Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants.

586.    HDL's transfers of the D&O Compensation made within the six (6) years before the Petition Date should be avoided pursuant to applicable provisions of the Federal Debt Collection Procedures Act, 28 U.S.C. § 3301 et. seq., and Bankruptcy Code sections 544(b) and 550.

587.    Under Bankruptcy Code section 550, Plaintiff may recover the D&O Compensation from Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 17

**(Avoidance of Transfers of Compensation to Insiders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Va. Code §§ 55–80; Against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants – Actual Fraud)**

588.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

589.    The transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional D&O Compensation that Plaintiff later discovers.

590.    The transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants were made with actual intent to hinder, delay or defraud creditors of HDL, including without limitation, the Assigning Creditors.

591.    The requisite intent can be imputed to HDL from the dominion and control of HDL by Mallory, McConnell, Warnick, and the other members of the HDL Board of Directors, conspiring with BlueWave, Dent, and Johnson.

592.    The primary purpose of the D&O Compensation was to take this cash from HDL for the benefit of Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants without those assets being made available to HDL's creditors.

593.    At least four "badges of fraud" apply to the transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants: (i) the transfers were to "insiders," including officers, directors, and affiliates of HDL; (ii) the transfers of the D&O Compensation were made at the same time substantial new liabilities and debts were being incurred through continuation of the P&H Program, the BlueWave Agreement, and the Patient Responsibility Collection Practice; (iii) given the enormous liabilities created for HDL through the conduct of the officers paid the D&O Compensation, HDL received no value or consideration in exchange for the transfers of the D&O Compensation; and (iv) HDL was or became insolvent at the time of each of the transfers of the D&O Compensation.

594.    Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants had knowledge of facts and circumstances that would cause persons of ordinary care and prudence to be suspicious and to inquire before accepting the transfers of the D&O Compensation.

595.    The transfers of the D&O Compensation were made to or for the benefit of Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants.

596.    HDL's transfers of the D&O Compensation should be avoided pursuant to applicable provisions of the Virginia Fraudulent Transfer Act, and Bankruptcy Code sections 544(b) and 550.

597.    Under Bankruptcy Code section 550, Plaintiff may recover the D&O Compensation from Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 18

**(Avoidance of Transfers of Compensation to Insiders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Va. Code §§ 55–81; Against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants – Insolvency)**

598.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

599.    The transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional D&O Compensation that Plaintiff later discovers.

600.    Given the enormous liabilities created for HDL through the conduct of the officers paid the D&O Compensation, HDL did not receive consideration deemed valuable in law in exchange for the D&O Compensation. The D&O Compensation took cash from HDL for the benefit of Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants without HDL receiving any consideration in return.

601.    At the time of each of the transfers of the D&O Compensation, the Debtors were insolvent as set forth in detail above.

602.    The transfers of the D&O Compensation were made to or for the benefit of Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants.

603.    HDL's transfers of the D&O Compensation should be avoided pursuant to applicable provisions of the Virginia Fraudulent Transfer Act, including Va. Code § 55-81, and Bankruptcy Code sections 544(b) and 550.

604.    Under Bankruptcy Code section 550, Plaintiff may recover the D&O Compensation from Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 19

**(Avoidance of Transfers of Compensation to Insiders and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Revised Code of Washington § 19.40.011 et seq. and Minnesota Statutes §§ 513.41 et seq.; Against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants – Actual Fraud)**

605.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

606.    The transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional D&O Compensation that Plaintiff later discovers.

607.    The transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants were made with actual intent to hinder, delay or defraud creditors of HDL, including without limitation, the Assigning Creditors.

608.    The requisite intent can be imputed to HDL from the dominion and control of HDL by Mallory, McConnell, Warnick, and the other members of the HDL Board of Directors, conspiring with BlueWave, Dent, and Johnson.

609.    The primary purpose of the D&O Compensation was to take this cash from HDL for the benefit of Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants without those assets being made available to HDL's creditors.

610.    At least four "badges of fraud" apply to the transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants: (i) the transfers were to "insiders," including officers, directors, and affiliates of HDL; (ii) the transfers of the D&O Compensation were made at the same time substantial new liabilities and debts were being incurred through continuation of the P&H Program, the BlueWave Agreement, and the Patient Responsibility Collection Practice; (iii) given the enormous liabilities created for HDL through the conduct of the officers paid the D&O Compensation, HDL received no value or consideration in exchange for the transfers of the D&O Compensation; and (iv) HDL was or became insolvent at the time of each of the transfers of the D&O Compensation.

611.    Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants had knowledge of facts and circumstances that would cause persons of ordinary care and prudence to be suspicious and to inquire before accepting the transfers of the D&O Compensation.

612.    The transfers of the D&O Compensation were made to or for the benefit of Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants.

613.    Certain of the transfers of the D&O Compensation were transferred to bank accounts in Washington and/or Minnesota.

614.    HDL's transfers of the D&O Compensation to bank accounts in Washington and/or Minnesota should be avoided pursuant to applicable provisions of Revised Code of Washington § 19.40.011 et seq. or Minnesota Statutes §§ 513.41 et seq. and Bankruptcy Code sections 544(b) and 550.

615.    Under Bankruptcy Code section 550, Plaintiff may recover the D&O

Compensation from Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity

Defendants, Rangarajan, Ryan, and the Doe Defendants as initial, immediate and/or mediate

transferees.

## COUNT 20

**(Avoidance of Transfers of Compensation to Insiders and Recovery of Value Under 11
U.S.C. §§544(b) and 550 and, as applicable, Revised Code of Washington § 19.40.011 et seq.
and Minnesota Statutes §§ 513.41 et seq.; Against Mallory, the Mallory Trust, McConnell,
Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants –
Constructive Fraud)**

616.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

617.    The transfers of the D&O Compensation to Mallory, McConnell, Warnick,

Rangarajan, Ryan, and the Doe Defendants represented transfers of an interest of HDL in

property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional

D&O Compensation that Plaintiff later discovers.

618.    HDL did not receive reasonably equivalent value in exchange for transferring the

D&O Compensation to Mallory, Warnick, Rangarajan, Ryan, and the Doe Defendants.

619.    At the time of HDL's transfers of the D&O Compensation to Mallory,

McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants, HDL was insolvent or was

rendered insolvent by the transfers of the D&O Compensation.

620.    At the time of HDL's transfers of the D&O Compensation to Mallory,

McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants, HDL was engaged or about to

engage in business for which its remaining assets and/or capital were unreasonably small in

relation to its business.

621.    At the time of HDL's transfers of the D&O Compensation to Mallory,

McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants, HDL intended to incur, or

believed or reasonably should have believed that the Debtors would incur, debts beyond the Debtors' abilities to pay as they became due.

622.    At all relevant times, HDL had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code section 502, including vendors, landlords, suppliers, lenders and other creditors.

623.    The transfers of the D&O Compensation were made to or for the benefit of Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants.

624.    Certain of the transfers of the D&O Compensation were transferred to bank accounts in Washington and/or Minnesota.

625.    HDL's transfers of the D&O Compensation to bank accounts in Washington and/or Minnesota should be avoided pursuant to applicable provisions of Revised Code of Washington §§ 19.40.011 et seq. or Minnesota Statutes §§ 513.41 et seq. and Bankruptcy Code sections 544(b) and 550.

626.    Under Bankruptcy Code section 550, Plaintiff may recover the D&O Compensation from Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 21

**(Avoidance of Transfers to Insiders Under Employment Contracts Outside of the Ordinary Course of Business and Recovery of Value Under 11 U.S.C. §§548(a)(1)(B)(i) and (ii)(IV) and 550; Against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants — Insider Employment Contract Payments)**

627.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

628.    The transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants represented transfers of an interest of HDL in

property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional D&O Compensation that Plaintiff later discovers.

629.   HDL received less than a reasonably equivalent value in exchange for transferring the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants.

630.   Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants, were insiders of HDL at the time of each of the transfers of the D&O Compensation.

631.   The transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants, were made to or for the benefit of Mallory, McConnell, Warnick, Rangarajan, Ryan, and the Doe Defendants.

632.   The transfers of the D&O Compensation to Mallory, McConnell, Warnick, Rangarajan, and the Doe Defendants, were made under employment contracts and were not in the ordinary course of business.

633.   HDL's transfers of the D&O Compensation should be avoided pursuant to Bankruptcy Code sections 548(a)(1)(B)(i) and (ii)(IV).

634.   Under Bankruptcy Code section 550, Plaintiff may recover the D&O Compensation from Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants as initial, immediate and/or mediate transferees.

## <u>COUNT 22</u>

**(Avoidance of the Mallory Separation Amount Obligation Under 11 U.S.C. §§548(a)(1)(B)(i) and (a)(1)(B)(ii)(I), (ii)(II), (ii)(III) and (ii)(IV) and Recovery of Value Under 11 U.S.C. § 550; Against Mallory and the Mallory Trust – Insider Employment Contract Obligation Outside of the Ordinary Course of Business and Constructive Fraud)**

635.   Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

636.    HDL received less than a reasonably equivalent value in exchange for incurring the obligation for the Mallory Separation Amount and for making transfers to Mallory for payments under the Mallory Separation Agreement.

637.    At the time HDL entered into the Mallory Separation Agreement and incurred the obligation for the Mallory Separation Amount, and at the time HDL made transfers to Mallory under the Mallory Separation Agreement, HDL was insolvent or became insolvent as a result of incurring such obligation or making such transfers.

638.    At the time HDL entered into the Mallory Separation Agreement and incurred the obligation for the Mallory Separation Amount, and at the time HDL made transfers to Mallory under the Mallory Separation Agreement, HDL was engaged or about to engage in business for which its remaining assets and/or capital were unreasonably small in relation to its business.

639.    At the time HDL entered into the Mallory Separation Agreement and incurred the obligation for the Mallory Separation Amount, and at the time HDL made transfers to Mallory under the Mallory Separation Agreement, HDL intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

640.    At all relevant times, HDL had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code section 502, including vendors, landlords, suppliers, lenders and other creditors.

641.    Mallory was an insider of HDL at the time HDL entered into the Mallory Separation Agreement and incurred the obligation for the Mallory Separation Amount, and at the time HDL made transfers to Mallory under the Mallory Separation Agreement.

642.    The Mallory Separation Amount was incurred, and the transfers under the Mallory Separation Agreement were made, to or for the benefit of Mallory.

643.    The obligation for the Mallory Separation Amount was incurred, and the transfers under the Mallory Separation Agreement were made, under an employment contract and not in the ordinary course of business.

644.    HDL's obligation for the Mallory Separation Amount, and the transfers made under the Mallory Separation Agreement, should be avoided pursuant to Bankruptcy Code sections 548(a)(1)(B)(i) and 548(a)(1)(B)(ii)(I), (ii)(II), (ii)(III) or (ii)(IV), and Mallory's scheduled claim based on the Mallory Separation Amount should be disallowed in its entirety.

645.    Under Bankruptcy Code section 550, Plaintiff may recover the transfers made under the Mallory Separation Agreement from Mallory and/or the Mallory Trust as initial, immediate and/or mediate transferees.

## COUNT 23

**(Avoidance of Transfer of the Rangarajan Buyout Payments and Recovery of Value Under 11 U.S.C. §§548 and 550; Against Rangarajan – Actual Fraud)**

646.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

647.    The transfers of the Rangarajan Buyout Payments to Rangarajan represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional Rangarajan Buyout Payments that Plaintiff later discovers.

648.    The transfers of the Rangarajan Buyout Payments to Rangarajan were made with actual intent to hinder, delay or defraud creditors of HDL. The requisite intent can be imputed to HDL from the dominion and control of HDL by the D&O Defendants, conspiring with BlueWave, Dent, and Johnson.

649.    The primary purpose of the Rangarajan Buyout Payments to Rangarajan was to take this cash from HDL for the benefit of Rangarajan without those assets being made available to HDL's creditors.

650.     At least four "badges of fraud" apply to the transfers of the Rangarajan Buyout Payments to Rangarajan: (i) the transfers were to an "insider," as Rangarajan was an officer of HDL and was approved by the D&O Defendants, whose dominion and control over HDL was further enhanced by making the Rangarajan Buyout Payments; (ii) the transfers of the Rangarajan Buyout Payments were made at the same time substantial new liabilities and debts were being incurred through continuation of the improper P&H Program, the BlueWave Agreement, and the Patient Responsibility Collection Practice; (iii) HDL received no value or consideration in exchange for the transfers of the Rangarajan Buyout Payments; and (iv) HDL was or became insolvent at the time of the Rangarajan Buyout Payments.

651.     The Rangarajan Buyout Payments were made to or for the benefit of Rangarajan.

652.     HDL's transfers of the Rangarajan Buyout Payments should be avoided pursuant to Bankruptcy Code section 548.

653.     Under Bankruptcy Code section 550, Plaintiff may recover the Rangarajan Buyout Payments from Rangarajan as an initial, immediate and/or mediate transferee.

## COUNT 24

**(Avoidance of Transfer of the Rangarajan Buyout Payments to Rangarajan and Recovery of Value Under 11 U.S.C. §§548 and 550; Against Rangarajan – Constructive Fraud)**

654.     Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

655.     The transfers of the Rangarajan Buyout Payments to Rangarajan represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional Rangarajan Buyout Payments that Plaintiff later discovers.

656.     HDL received less than a reasonably equivalent value in exchange for transferring the Rangarajan Buyout Payments to Rangarajan.

657.    At the time of HDL's transfers of the Rangarajan Buyout Payments to Rangarajan, HDL was insolvent or became insolvent as a result of such transfers.

658.    At the time of HDL's transfers of the Rangarajan Buyout Payments to Rangarajan, HDL was engaged or about to engage in business for which its remaining assets and/or capital were unreasonably small in relation to its business.

659.    At the time of HDL's transfers of the Rangarajan Buyout Payments to Rangarajan, HDL intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

660.    At all relevant times, HDL had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code section 502, including vendors, landlords, suppliers, lenders and other creditors.

661.    The Rangarajan Buyout Payments were made to or for the benefit of Rangarajan.

662.    HDL's transfers of the Rangarajan Buyout Payments should be avoided pursuant to Bankruptcy Code section 548.

663.    Under Bankruptcy Code section 550, Plaintiff may recover the Rangarajan Buyout Payments from Rangarajan as an initial, immediate and/or mediate transferee.

## COUNT 25

**(Avoidance of Transfer of the Rangarajan Buyout Payments to Rangarajan and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, 28 U.S.C. § 3304; Against Rangarajan – Actual Fraud)**

664.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

665.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

666.    The DOJ filed Proof of Claim No. 1335 in the amount of $94,144,852.52, plus interest, in the HDL bankruptcy case, based on HDL's conduct dating back to November 2008.

667.    The transfers of the Rangarajan Buyout Payments to Rangarajan represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional Rangarajan Buyout Payments that Plaintiff later discovers.

668.    The transfers of the Rangarajan Buyout Payments to Rangarajan were made with actual intent to hinder, delay or defraud creditors of HDL. The requisite intent can be imputed to HDL from the dominion and control of HDL by the D&O Defendants, conspiring with BlueWave, Dent, and Johnson.

669.    The primary purpose of the Rangarajan Buyout Payments was to take this cash from HDL for the benefit of Rangarajan without those assets being made available to HDL's creditors.

670.    At least four "badges of fraud" apply to the transfers of the Rangarajan Buyout Payments to Rangarajan: (i) the transfers were to an "insider," as Rangarajan was an officer of HDL and was approved by the D&O Defendants, whose dominion and control over HDL was further enhanced by making the Rangarajan Buyout Payments; (ii) the transfers of the Rangarajan Buyout Payments were made at the same time substantial new liabilities and debts were being incurred through continuation of the improper P&H Program, the BlueWave Agreement, and the Patient Responsibility Collection Practice; (iii) HDL received no value or consideration in exchange for the transfers of the Rangarajan Buyout Payments; and (iv) HDL was or became insolvent at the time of the Rangarajan Buyout Payments.

671.    The Rangarajan Buyout Payments were made to or for the benefit of Rangarajan.

672.    HDL's transfers of the Rangarajan Buyout Payments made within the six (6) years before the Petition Date should be avoided pursuant to applicable provisions of the Federal

Debt Collection Procedures Act, 28 U.S.C. § 3301 et. seq., and Bankruptcy Code sections 544(b) and 550.

673.    Under Bankruptcy Code section 550, Plaintiff may recover the Rangarajan Buyout Payments from Rangarajan as an initial, immediate and/or mediate transferee.

## COUNT 26

**(Avoidance of Transfer of the Rangarajan Buyout Payments to Rangarajan and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, 28 U.S.C. § 3304; Against Rangarajan – Constructive Fraud)**

674.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

675.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

676.    The DOJ filed Proof of Claim No. 1335 in the amount of $94,144,852.52, plus interest, in the HDL bankruptcy case, based on HDL's conduct dating back to November 2008.

677.    The transfers of the Rangarajan Buyout Payments to Rangarajan represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional Rangarajan Buyout Payments that Plaintiff later discovers.

678.    HDL did not receive reasonably equivalent value in exchange for transferring the Rangarajan Buyout Payments to Rangarajan.

679.    At the time of HDL's transfers of the Rangarajan Buyout Payments to Rangarajan, HDL was insolvent or became insolvent as a result of such transfers.

680.    At the time of HDL's transfers of the Rangarajan Buyout Payments to Rangarajan, HDL was engaged or about to engage in business for which its remaining assets and/or capital were unreasonably small in relation to its business.

681.    At the time of HDL's transfers of the Rangarajan Buyout Payments to Rangarajan, HDL intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

682.    The Rangarajan Buyout Payments were made to or for the benefit of Rangarajan.

683.    HDL's transfers of the Rangarajan Buyout Payments made within the six (6) years before the Petition Date should be avoided pursuant to applicable provisions of the Federal Debt Collection Procedures Act, 28 U.S.C. § 3301 et. seq., and Bankruptcy Code sections 544(b) and 550.

684.    Under Bankruptcy Code section 550, Plaintiff may recover the Rangarajan Buyout Payments from Rangarajan as an initial, immediate and/or mediate transferee.

## COUNT 27

**(Avoidance of Transfer of the Rangarajan Buyout Payments to Rangarajan and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Va. Code § 55–80; Against Rangarajan – Actual Fraud)**

685.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

686.    The transfers of the Rangarajan Buyout Payments to Rangarajan represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional Rangarajan Buyout Payments that Plaintiff later discovers.

687.    The transfers of the Rangarajan Buyout Payments to Rangarajan were made with actual intent to hinder, delay or defraud creditors of HDL, including without limitation, the Assigning Creditors.

688.    The requisite intent can be imputed to HDL from the dominion and control of HDL by the D&O Defendants, conspiring with BlueWave, Dent, and Johnson.

689.    The primary purpose of the Rangarajan Buyout Payments was to take this cash from HDL for the benefit of Rangarajan without those assets being made available to HDL's creditors.

690.    At least four "badges of fraud" apply to the transfers of the Rangarajan Buyout Payments to Rangarajan: (i) the transfers were to an "insider," as Rangarajan was an officer of HDL and was approved by the D&O Defendants, whose dominion and control over HDL was further enhanced by making the Rangarajan Buyout Payments; (ii) the transfers of the Rangarajan Buyout Payments were made at the same time substantial new liabilities and debts were being incurred through continuation of the P&H Program, the BlueWave Agreement, and the Patient Responsibility Collection Practice; (iii) HDL received no value or consideration in exchange for the transfers of the Rangarajan Buyout Payments; and (iv) HDL was or became insolvent at the time of the Rangarajan Buyout Payments.

691.    Rangarajan had knowledge of facts and circumstances that would cause persons of ordinary care and prudence to be suspicious and to inquire before accepting the transfer of the Rangarajan Buyout Payments.

692.    The Rangarajan Buyout Payments were made to or for the benefit of Rangarajan.

693.    HDL's transfers of the Rangarajan Buyout Payments should be avoided pursuant to applicable provisions of the Virginia Fraudulent Transfer Act, and Bankruptcy Code sections 544(b) and 550.

694.    Under Bankruptcy Code section 550, Plaintiff may recover the Rangarajan Buyout Payments from Rangarajan as an initial, immediate and/or mediate transferee.

## COUNT 28

**(Avoidance of Transfer of the Rangarajan Buyout Payments to Rangarajan and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Va. Code § 55–81; Against Rangarajan – Insolvency)**

695.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

696.    The transfers of the Rangarajan Buyout Payments to Rangarajan represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional Rangarajan Buyout Payments that Plaintiff later discovers.

697.    HDL did not receive consideration deemed valuable in law in exchange for the Rangarajan Buyout Payments, as the Rangarajan Buyout Payments took cash from HDL for the benefit of Rangarajan without HDL receiving any consideration in return.

698.    At the time the Rangarajan Buyout Payments were made, the Debtors were insolvent as set forth in detail above.

699.    The Rangarajan Buyout Payments were made to or for the benefit of Rangarajan.

700.    HDL's transfers of the Rangarajan Buyout Payments should be avoided pursuant to applicable provisions of the Virginia Fraudulent Transfer Act, including Va. Code § 55-81, and Bankruptcy Code sections 544(b) and 550.

701.    Under Bankruptcy Code section 550, Plaintiff may recover the Rangarajan Buyout Payments from Rangarajan as an initial, immediate and/or mediate transferee.

## COUNT 29

**(Recharacterization Of March 1, 2010 Note And the Golias Double Payment As Equity; Against Tipton Golias)**

702.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

703.    Although documented as a line of credit, the funds advanced under the March 1, 2010 Note were in fact capital contributions by Tipton Golias to the Debtors.

704.    The Debtors were forced to turn to Tipton Golias, the largest shareholder and an insider of the Debtors, for additional capital because the Debtors were unable to obtain financing from any third party lender and were undercapitalized. The March 1, 2010 Note lacked a fixed rate of interest, did not require interest payments, and did not have a fixed maturity date. In addition, the source of repayment was based on the success of the Debtors' business and no sinking fund was established for its repayment.

705.    The creditors of the Debtors were harmed by Tipton Golias placing purportedly secured debt on the Debtors through the March 1, 2010 Note when such funds should have been designated as capital contributions. The economic reality of the circumstances surrounding the advancement of funds as "loans" weighs in favor of recharacterizing such amounts as equity.

706.    All indicia of intent except for the mere form of the instrument and the vocabulary chosen indicate that Tipton Golias and the Debtors intended from the inception that the funds provided as documented in the March 1, 2010 Note be treated as equity.

707.    Considering the totality of the circumstances, the infusions made under the March 1, 2010 Note should be characterized as equity and the payment to Tipton Golias through the Golias Double Payment should be characterized as an equity distribution.

708.    Accordingly, the March 1, 2010 Note, and all transfers made by Tipton Golias to the Debtors pursuant to the March 1, 2010 Note, should be recharacterized as equity in the Debtors, and the Golias Double Payment made to Tipton Golias should be recharacterized as an equity distribution.

## <u>COUNT 30</u>

**(Avoidance of Transfer of the Golias Double Payment and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, 28 U.S.C. § 3304; Against Tipton Golias – Constructive Fraud)**

709.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

710.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

711.    The DOJ filed Proof of Claim No. 1335 in the amount of $94,144,852.52, plus interest, in the HDL bankruptcy case, based on HDL's conduct dating back to November 2008.

712.    The transfer of the Golias Double Payment to Tipton Golias represented a transfer of an interest of HDL in property.

713.    HDL did not receive reasonably equivalent value in exchange for transferring the Golias Double Payment to Tipton Golias.

714.    At the time of HDL's transfer of the Golias Double Payment to Tipton Golias, HDL was insolvent or became insolvent as a result of such transfer.

715.    At the time of HDL's transfer of the Golias Double Payment to Tipton Golias, HDL was engaged or about to engage in business for which its remaining assets and/or capital were unreasonably small in relation to its business.

716.    At the time of HDL's transfer of the Golias Double Payment to Tipton Golias, HDL intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

717.    The Golias Double Payment was made to or for the benefit of Tipton Golias.

718.    HDL's transfer of the Golias Double Payment made within the six (6) years before the Petition Date should be avoided pursuant to applicable provisions of the Federal Debt Collection Procedures Act, 28 U.S.C. § 3301 et. seq., and Bankruptcy Code sections 544(b) and 550.

719.    Under Bankruptcy Code section 550, Plaintiff may recover the Golias Double Payment from Tipton Golias as an initial, immediate and/or mediate transferee.

134

## COUNT 31

**(Avoidance of Transfer of the Golias Double Payment and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Va. Code § 55–81; Against Tipton Golias – Constructive Fraud)**

720.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

721.    The transfer of the Golias Double Payment represented a transfer of an interest of HDL in property.

722.    HDL did not receive consideration deemed valuable in law in exchange for the Golias Double Payment, as the Golias Double Payment took cash from HDL for the benefit of Tipton Golias without HDL receiving any consideration in return.

723.    At the time the Golias Double Payment was made, the Debtors were insolvent as set forth in detail above.

724.    The Golias Double Payment was made to or for the benefit of Tipton Golias.

725.    HDL's transfer of the Golias Double Payment should be avoided pursuant to applicable provisions of the Virginia Fraudulent Transfer Act, including Va. Code § 55-81, and Bankruptcy Code sections 544(b) and 550.

726.    Under Bankruptcy Code section 550, Plaintiff may recover the Golias Double Payment from Tipton Golias as an initial, immediate and/or mediate transferee.

## COUNT 32

**(Avoidance of Transfer of the Golias Double Payment to Tipton Golias and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Texas Bus. & Com. Code §§ 24.001 et. seq., Against Tipton Golias – Constructive Fraud)**

727.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

728.    The transfer of the Golias Double Payment to Tipton Golias represented a transfer of an interest of HDL in property.

135

729.    HDL did not receive reasonably equivalent value in exchange for transferring the Golias Double Payment to Tipton Golias.

730.    At the time of HDL's transfer of the Golias Double Payment to Tipton Golias, HDL was insolvent or was rendered insolvent by the Golias Double Payment.

731.    At the time of HDL's transfer of the Golias Double Payment to Tipton Golias, HDL was engaged or about to engage in business for which its remaining assets and/or capital were unreasonably small in relation to its business.

732.    At the time of HDL's transfer of the Golias Double Payment to Tipton Golias, HDL intended to incur, or believed or reasonably should have believed that the Debtors would incur, debts beyond the Debtors' abilities to pay as they became due.

733.    At all relevant times, HDL had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code section 502, including vendors, landlords, suppliers, lenders and other creditors.

734.    The Golias Double Payment was made to or for the benefit of Tipton Golias.

735.    All or a portion of the Golias Double Payment was transferred to one or more bank accounts in Texas.

736.    HDL's transfer of the Golias Double Payment to one or more bank accounts in Texas should be avoided pursuant to applicable provisions of Texas Bus. & Com. Code §§ 24.001 et seq. and Bankruptcy Code sections 544(b) and 550.

737.    Under Bankruptcy Code section 550, Plaintiff may recover the Golias Double Payment from Tipton Golias as an initial, immediate and/or mediate transferee.

## COUNT 33

**(Avoidance of Transfer of the Golias Double Payment and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, New York Debtor and Creditor Law §§ 273 and 274; Against Tipton Golias – Constructive Fraud)**

738.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

739.    The transfer of the Golias Double Payment to Tipton Golias represented a transfer of an interest of HDL in property.

740.    The Golias Double Payment was made without a fair consideration to HDL, as the Golias Double Payment took cash from HDL for the benefit of Tipton Golias without HDL receiving any consideration in return.

741.    At the time the Golias Double Payment was made, the Debtors were insolvent or were rendered insolvent as set forth in detail above.

742.    At the time the Golias Double Payment was made, the Debtors were engaged or about to engage in a business or transaction for which the property remaining in their hands after the Golias Double Payment was made was an unreasonably small capital as set forth in detail above.

743.    As a result, the Golias Double Payment was fraudulent as to creditors and other persons who became creditors during the continuance of the Debtors' businesses, including without limitation, the Assigning Creditors, without regard to the Debtors' actual intent.

744.    At the time the Golias Double Payment was made, the Debtors intended to or believed that they would incur debts beyond their ability to pay as they matured.

745.    Accordingly, the Golias Double Payment was fraudulent as to the Debtors' present and future creditors at the time of the Golias Double Payment, including without limitation, the Assigning Creditors.

746.    The Golias Double Payment was made to or for the benefit of Tipton Golias.

137

747.    The Golias Double Payment was transferred to one or more bank accounts in New

York.

748.    HDL's transfer of the Golias Double Payment should be avoided pursuant to

applicable provisions of the New York Debtor and Creditor Law, including New York Debtor

and Creditor Law §§273 and 274, and Bankruptcy Code sections 544(b) and 550.

749.    Under Bankruptcy Code section 550, Plaintiff may recover the Golias Double

Payment from Tipton Golias as an initial, immediate and/or mediate transferee.

## COUNT 34

### (Recharacterization Of February 4, 2014 Note And Mallory Payment As Equity; Against Mallory and the Mallory Trust)

750.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

751.    Although documented as a note, the funds advanced under the February 4, 2014

Note were in fact a capital contribution by Mallory and/or the Mallory Trust to the Debtors.

752.    The Debtors were forced to turn to Mallory, a major shareholder, CEO, and

insider, for additional capital because the Debtors were unable to obtain financing from any third

party lender and were undercapitalized. The source of repayment of the February 4, 2014 Note

was dependent on the Debtors' business generating funds, the February 4, 2014 Note was

subordinated to repayment of HDL's senior bank lender, and no sinking fund was established for

its repayment.

753.    The creditors of the Debtors were harmed by Mallory and the Mallory Trust

placing purported debt on the Debtors through the February 4, 2014 Note when such funds

should have been designated as capital contributions. The economic reality of the circumstances

surrounding the advancement of funds as a "loan" weighs in favor of recharacterizing such

amounts as equity.

754.    All indicia of intent except for the mere form of the instrument and the vocabulary chosen indicate that Mallory, the Mallory Trust, and the Debtors intended from the inception that the funds provided as documented in the February 4, 2014 Note be treated as equity.

755.    Considering the totality of the circumstances, the infusion made under the February 4, 2014 Note should be characterized as equity and the payment to Mallory through the Mallory Payment should be characterized as an equity distribution.

756.    Accordingly, the February 4, 2014 Note, and all transfers made by Mallory and/or the Mallory Trust to the Debtors pursuant to the February 4, 2014 Note, should be recharacterized as equity in the Debtors and the Mallory Payment made to Mallory and/or the Mallory Trust through the Mallory Payment should be recharacterized as an equity distribution.

## COUNT 35

**(Avoidance of Transfer of the Mallory Payment and Recovery of Value Under 11 U.S.C. §§548 and 550; Against Mallory and the Mallory Trust – Constructive Fraud)**

757.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

758.    The transfer of the Mallory Payment represented a transfer of an interest of HDL in property.

759.    HDL received less than a reasonably equivalent value in exchange for transferring the Mallory Payment to Mallory and/or the Mallory Trust.

760.    At the time of HDL's transfer of the Mallory Payment to Mallory and/or the Mallory Trust, HDL was insolvent or became insolvent as a result of such transfer.

761.    At the time of HDL's transfer of the Mallory Payment to Mallory and/or the Mallory Trust, HDL was engaged or about to engage in business for which its remaining assets and/or capital were unreasonably small in relation to its business.

762.   At the time of HDL's transfer of the Mallory Payment to Mallory and/or the Mallory Trust, HDL intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

763.   At all relevant times, HDL had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code section 502, including vendors, landlords, suppliers, lenders and other creditors.

764.   The Mallory Payment was made to or for the benefit of Mallory and/or the Mallory Trust.

765.   HDL's transfer of the Mallory Payment should be avoided pursuant to Bankruptcy Code section 548.

766.   Under Bankruptcy Code section 550, Plaintiff may recover the Mallory Payment from Mallory and/or the Mallory Trust as initial, immediate and/or mediate transferees.

## COUNT 36

**(Avoidance of Transfer of Mallory Payment and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Va. Code § 55–81; Against Mallory and/or the Mallory Trust – Insolvency)**

767.   Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

768.   The transfer of the Mallory Payment represented a transfer of an interest of HDL in property.

769.   HDL did not receive consideration deemed valuable in law in exchange for the Mallory Payment, as the Mallory Payment took cash from HDL for the benefit of Mallory and/or the Mallory Trust without HDL receiving any consideration in return.

770.   At the time the Mallory Payment was made, the Debtors were insolvent as set forth in detail above.

771.    The Mallory Payment was made to or for the benefit of Mallory and/or the Mallory Trust.

772.    HDL's transfer of the Mallory Payment should be avoided pursuant to applicable provisions of the Virginia Fraudulent Transfer Act, including Va. Code § 55-81, and Bankruptcy Code sections 544(b) and 550.

773.    Under Bankruptcy Code section 550, Plaintiff may recover the Mallory Payment from Mallory and/or the Mallory Trust as initial, immediate and/or mediate transferees.

## COUNT 37

**(Avoidance of Transfer of BlueWave Payments and Recovery of Value Under 11 U.S.C. §§548 and 550; Against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants – Actual Fraud)**

774.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

775.    The transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional BlueWave Payments that Plaintiff later discovers.

776.    The transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants were made with actual intent to hinder, delay or defraud creditors of HDL. The requisite intent can be imputed to HDL from the dominion and control of HDL by Mallory, McConnell, Warnick, and the other members of the HDL Board of Directors, conspiring with BlueWave, Dent, and Johnson.

777.    The primary purpose of the BlueWave Payments was to take this cash from HDL for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants without those assets being made available to HDL's creditors, and to further the improper scheme pursuant to the BlueWave Agreement.

141

778.    At least four "badges of fraud" apply to the transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants: (i) the transfers were made initially to BlueWave, Dent, and Johnson, who conspired with the insiders, directors, and officers of HDL to exercise dominion and control over HDL; (ii) the transfers of the BlueWave Payments were made at the same time substantial new liabilities and debts were being incurred through continuation of the improper P&H Program, the BlueWave Agreement itself, and the Patient Responsibility Collection Practice; (iii) given the enormous liabilities that the use of BlueWave as a percentage-based commission sales agent created for HDL, HDL received no value or consideration in exchange for the transfers of the BlueWave Payments; and (iv) HDL was or became insolvent at the time of the BlueWave Payments.

779.    The BlueWave Payments were made to or for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants.

780.    HDL's transfers of the BlueWave Payments should be avoided pursuant to Bankruptcy Code section 548.

781.    Under Bankruptcy Code section 550, Plaintiff may recover the BlueWave Payments from the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 38

**(Avoidance of Transfer of BlueWave Payments and Recovery of Value Under 11 U.S.C. §§548 and 550; Against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants – Constructive Fraud)**

782.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

783.    The transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants represented transfers of an interest of

HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional BlueWave Payments that Plaintiff later discovers.

784.    HDL received less than a reasonably equivalent value in exchange for transferring the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants.

785.    At the time of HDL's transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, HDL was insolvent or became insolvent as a result of such transfers.

786.    At the time of HDL's transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, HDL was engaged or about to engage in business for which its remaining assets and/or capital were unreasonably small in relation to its business.

787.    At the time of HDL's transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, HDL intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

788.    At all relevant times, HDL had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code section 502, including vendors, landlords, suppliers, lenders and other creditors.

789.    The BlueWave Payments were made to or for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants.

790.    HDL's transfers of the BlueWave Payments should be avoided pursuant to Bankruptcy Code section 548.

791.    Under Bankruptcy Code section 550, Plaintiff may recover the BlueWave Payments from the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 39

**(Avoidance of Transfer of BlueWave Payments and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, 28 U.S.C. § 3304; Against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants – Actual Fraud)**

792.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

793.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

794.    The DOJ filed Proof of Claim No. 1335 in the amount of $94,144,852.52, plus interest, in the HDL bankruptcy case, based on HDL's conduct dating back to November 2008.

795.    The transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional BlueWave Payments that Plaintiff later discovers.

796.    The transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants were made with actual intent to hinder, delay or defraud creditors of HDL. The requisite intent can be imputed to HDL from the dominion and control of HDL by Mallory, McConnell, Warnick, and the other members of the HDL Board of Directors, conspiring with BlueWave, Dent, and Johnson.

797.    The primary purpose of the BlueWave Payments was to take this cash from HDL for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants without those assets being made available to HDL's creditors, and to further the improper scheme pursuant to the BlueWave Agreement.

144

798.    At least four "badges of fraud" apply to the transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants: (i) the transfers were made initially to BlueWave, Dent, and Johnson, who conspired with the insiders, directors, and officers of HDL to exercise dominion and control over HDL; (ii) the transfers of the BlueWave Payments were made at the same time substantial new liabilities and debts were being incurred through continuation of the improper P&H Program, the BlueWave Agreement itself, and the Patient Responsibility Collection Practice; (iii) given the enormous liabilities that the use of BlueWave as a percentage-based commission sales agent created for HDL, HDL received no value or consideration in exchange for the transfers of the BlueWave Payments; and (iv) HDL was or became insolvent at the time of the BlueWave Payments.

799.    The BlueWave Payments were made to or for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants.

800.    HDL's transfers of the BlueWave Payments made within six (6) years before the Petition Date should be avoided pursuant to applicable provisions of the Federal Debt Collection Procedures Act, 28 U.S.C. § 3301 et. seq., and Bankruptcy Code sections 544(b) and 550.

801.    Under Bankruptcy Code section 550, Plaintiff may recover the BlueWave Payments from the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 40

**(Avoidance of Transfer of BlueWave Payments and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, 28 U.S.C. § 3304; Against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants – Constructive Fraud)**

802.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

803.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

145

804.    The DOJ filed Proof of Claim No. 1335 in the amount of $94,144,852.52, plus interest, in the HDL bankruptcy case, based on HDL's conduct dating back to November 2008.

805.    The transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional BlueWave Payments that Plaintiff later discovers.

806.    HDL did not receive reasonably equivalent value in exchange for transferring the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants.

807.    At the time of HDL's transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, HDL was insolvent or became insolvent as a result of such transfers.

808.    At the time of HDL's transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, HDL was engaged or about to engage in business for which its remaining assets and/or capital were unreasonably small in relation to its business.

809.    At the time of HDL's transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, HDL intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

810.    The BlueWave Payments were made to or for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants.

811.    HDL's transfers of the BlueWave Payments made within six (6) years before the

Petition Date should be avoided pursuant to applicable provisions of the Federal Debt Collection

Procedures Act, 28 U.S.C. § 3301 et. seq., and Bankruptcy Code sections 544(b) and 550.

812.    Under Bankruptcy Code section 550, Plaintiff may recover the BlueWave

Payments from the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe

Defendants as initial, immediate and/or mediate transferees.

## COUNT 41

**(Avoidance of Transfer of the BlueWave Payments and Recovery of Value Under 11 U.S.C.
§§544(b) and 550 and, as applicable, the Virginia Code Annotated § 55–80; Against the
BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants –
Actual Fraud)**

813.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

814.    The transfers of the BlueWave Payments to the BlueWave Defendants, the

BlueWave Transferee Defendants, and the Doe Defendants represented transfers of an interest of

HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all

additional BlueWave Payments that Plaintiff later discovers.

815.    The transfers of the BlueWave Payments to the BlueWave Defendants, the

BlueWave Transferee Defendants, and the Doe Defendants were made with actual intent to

hinder, delay or defraud creditors of HDL, including without limitation, the Assigning Creditors.

The requisite intent can be imputed to HDL from the dominion and control of HDL by Mallory,

McConnell, Warnick, and the other members of the HDL Board of Directors, conspiring with

BlueWave, Dent, and Johnson.

816.    The primary purpose of the BlueWave Payments was to take this cash from HDL

for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe

Defendants without those assets being made available to HDL's creditors, and to further the improper scheme pursuant to the BlueWave Agreement.

817.    At least four "badges of fraud" apply to the transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants: (i) the transfers were made initially to BlueWave, Dent, and Johnson, who conspired with the insiders, directors, and officers of HDL to exercise dominion and control over HDL; (ii) the transfers of the BlueWave Payments were made at the same time substantial new liabilities and debts were being incurred through continuation of the improper P&H Program, the BlueWave Agreement itself, and the Patient Responsibility Collection Practice; (iii) given the enormous liabilities that the use of BlueWave as a percentage-based commission sales agent created for HDL, HDL received no value or consideration in exchange for the transfers of the BlueWave Payments; and (iv) HDL was or became insolvent at the time of the BlueWave Payments.

818.    The BlueWave Payments were made to or for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants.

819.    The BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants had knowledge of facts and circumstances that would cause persons of ordinary care and prudence to be suspicious and to inquire before accepting the transfer of the BlueWave Payments.

820.    The BlueWave Payments were made to or for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants.

821.    HDL's transfers of the BlueWave Payments should be avoided pursuant to applicable provisions of the Virginia Fraudulent Transfer Act, and Bankruptcy Code sections 544(b) and 550.

822.    Under Bankruptcy Code section 550, Plaintiff may recover the BlueWave Payments from the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 42

**(Avoidance of Transfer of the BlueWave Payments and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, the Virginia Code Annotated § 55–81; Against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants – Insolvency)**

823.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

824.    The transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional BlueWave Payments that Plaintiff later discovers.

825.    HDL did not receive consideration deemed valuable in law in exchange for the BlueWave Payments, as the BlueWave Payments took cash from HDL for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants pursuant to an improper and illegal BlueWave Agreement, thereby burdening HDL with enormous liabilities to the U.S. Government and private payers.

826.    At the time the BlueWave Payments were made, the Debtors were insolvent as set forth in detail above.

827.    The BlueWave Payments were made to or for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants.

828.    HDL's transfers of the BlueWave Payments should be avoided pursuant to applicable provisions of the Virginia Fraudulent Transfer Act, including Va. Code § 55-81, and Bankruptcy Code sections 544(b) and 550.

829.    Under Bankruptcy Code section 550, Plaintiff may recover the BlueWave
Payments from the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe
Defendants as initial, immediate and/or mediate transferees.

**COUNT 43**

**(Avoidance of Transfer of BlueWave Payments and Recovery of Value Under 11 U.S.C.
§§544(b) and 550 and, as applicable, Texas Bus. & Com. Code §§ 24.001 et seq., Georgia
Code §§ 18-2-70 et seq., Alabama Code §§ 8-9A-1 et seq., West Virginia Code §§ 40-1A-1 et
seq.; Against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe
Defendants – Actual Fraud)**

830.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

831.    The transfers of the BlueWave Payments to the BlueWave Defendants, the
BlueWave Transferee Defendants, and the Doe Defendants represented transfers of an interest of
HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all
additional BlueWave Payments that Plaintiff later discovers.

832.    The transfers of the BlueWave Payments to the BlueWave Defendants, the
BlueWave Transferee Defendants, and the Doe Defendants were made with actual intent to
hinder, delay or defraud creditors of HDL, including without limitation, the Assigning Creditors.
The requisite intent can be imputed to HDL from the dominion and control of HDL by Mallory,
McConnell, Warnick, and the other members of the HDL Board of Directors, conspiring with
BlueWave, Dent, and Johnson.

833.    The primary purpose of the BlueWave Payments was to take this cash from HDL
for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe
Defendants without those assets being made available to HDL's creditors, and to further the
improper scheme pursuant to the BlueWave Agreement.

834.    At least four "badges of fraud" apply to the transfers of the BlueWave Payments
to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants: (i)

the transfers were made initially to BlueWave, Dent, and Johnson, who conspired with the insiders, directors, and officers of HDL to exercise dominion and control over HDL; (ii) the transfers of the BlueWave Payments were made at the same time substantial new liabilities and debts were being incurred through continuation of the improper P&H Program, the BlueWave Agreement itself, and the Patient Responsibility Collection Practice; (iii) given the enormous liabilities that the use of BlueWave as a percentage-based commission sales agent created for HDL, HDL received no value or consideration in exchange for the transfers of the BlueWave Payments; and (iv) HDL was or became insolvent at the time of the BlueWave Payments.

835.    The BlueWave Payments were made to or for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants.

836.    Certain of the BlueWave Payments were transferred to bank accounts in Texas, Georgia, Alabama, and/or West Virginia.

837.    HDL's transfers of the BlueWave Payments to bank accounts in Texas, Georgia, Alabama, and/or West Virginia should be avoided pursuant to applicable provisions of Texas Bus. & Com. Code §§ 24.001 et seq., Georgia Code §§ 18-2-70 et seq., Alabama Code §§ 8-9A-1 et seq., or West Virginia Code §§ 40-1A-1 et seq., and Bankruptcy Code sections 544(b) and 550.

838.    Under Bankruptcy Code section 550, Plaintiff may recover the BlueWave Payments from the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 44

**(Avoidance of Transfer of the BlueWave Payments and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Texas Bus. & Com. Code §§ 24.001 et. seq., Georgia Code §§ 18-2-70 et seq., Alabama Code §§ 8-9A-1 et seq., West Virginia Code §§ 40-1A-1 set seq.; Against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants – Constructive Fraud)**

839.     Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

840.     The transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants represented transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional BlueWave Payments that Plaintiff later discovers.

841.     HDL did not receive reasonably equivalent value in exchange for transferring the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, as the BlueWave Payments took cash from HDL for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants pursuant to an improper and illegal BlueWave Agreement, thereby burdening HDL with enormous liabilities to the U.S. Government and private payers.

842.     At the time of HDL's transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, HDL was insolvent or was rendered insolvent by the BlueWave Payments.

843.     At the time of HDL's transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, HDL was engaged or about to engage in business for which its remaining assets and/or capital were unreasonably small in relation to its business.

844.     At the time of HDL's transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, HDL intended to

incur, or believed or reasonably should have believed that the Debtors would incur, debts beyond

the Debtors' abilities to pay as they became due.

845.    At all relevant times, HDL had actual creditors holding unsecured claims

allowable within the meaning of Bankruptcy Code section 502, including vendors, landlords,

suppliers, lenders and other creditors.

846.    The BlueWave Payments were made to or for the benefit of the BlueWave

Defendants, the BlueWave Transferee Defendants, and the Doe Defendants.

847.    Certain of the BlueWave Payments were transferred to bank accounts in Texas,

Georgia, Alabama, and/or West Virginia.

848.    HDL's transfers of the BlueWave Payments to bank accounts in Texas, Georgia,

Alabama, and/or West Virginia should be avoided pursuant to applicable provisions of Texas

Bus. & Com. Code §§ 24.001 et seq., Georgia Code §§ 18-2-70 et seq., Alabama Code §§ 8-9A-

1 et seq., or West Virginia Code §§ 40-1A-1 et seq., and Bankruptcy Code sections 544(b) and

550.

849.    Under Bankruptcy Code section 550, Plaintiff may recover the BlueWave

Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe

Defendants as initial, immediate and/or mediate transferees.

## COUNT 45

**(Avoidance of Transfer of the BlueWave Payments and Recovery of Value Under 11 U.S.C.
§§544(b) and 550 and, as applicable, S.C. Code § 27-23-10; Against the BlueWave
Defendants, the BlueWave Transferee Defendants, and the Doe Defendants – Actual
Fraud)**

850.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

851.    The transfers of the BlueWave Payments to the BlueWave Defendants, the

BlueWave Transferee Defendants, and the Doe Defendants represented voluntary transfers of an

interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional BlueWave Payments that Plaintiff later discovers.

852.    The transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants were made with actual intent to hinder, delay or defraud creditors of HDL, including without limitation, the Assigning Creditors. The requisite intent can be imputed to HDL from the dominion and control of HDL by Mallory, McConnell, Warnick, and the other members of the HDL Board of Directors, conspiring with BlueWave, Dent, and Johnson.

853.    The primary purpose of the BlueWave Payments was to take this cash from HDL for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants without those assets being made available to HDL's creditors, and to further the improper scheme pursuant to the BlueWave Agreement.

854.    At least four "badges of fraud" apply to the transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants: (i) the transfers were made initially to BlueWave, Dent, and Johnson, who conspired with the insiders, directors, and officers of HDL to exercise dominion and control over HDL; (ii) the transfers of the BlueWave Payments were made at the same time substantial new liabilities and debts were being incurred through continuation of the improper P&H Program, the BlueWave Agreement itself, and the Patient Responsibility Collection Practice; (iii) given the enormous liabilities that the use of BlueWave as a percentage-based commission sales agent created for HDL, HDL received no value or consideration in exchange for the transfers of the BlueWave Payments; and (iv) HDL was or became insolvent at the time of the BlueWave Payments.

855.    The BlueWave Payments were made to or for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants.

856.    Certain of the BlueWave Payments were transferred to bank accounts in South Carolina.

857.    HDL's transfers of the BlueWave Payments to bank accounts in South Carolina should be avoided pursuant to applicable provisions of S.C. Code § 27-23-10, and Bankruptcy Code sections 544(b) and 550.

858.    Under Bankruptcy Code section 550, Plaintiff may recover the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT 46

**(Avoidance of Transfer of BlueWave Payments and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, S.C. Code § 27-23-10; Against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants – Constructive Fraud)**

859.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

860.    The transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants represented voluntary transfers of an interest of HDL in property. Plaintiff reserves the right to seek the avoidance and recovery of any and all additional BlueWave Payments that Plaintiff later discovers.

861.    HDL did not receive valuable consideration in exchange for transferring the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, as the BlueWave Payments took cash from HDL for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants pursuant

to an improper and illegal BlueWave Agreement, thereby burdening HDL with enormous liabilities to the U.S. Government and private payers.

862.   At the time of HDL's transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, HDL was insolvent or was rendered insolvent by the BlueWave Payments, and HDL failed to retain sufficient property or assets to pay its indebtedness in full.

863.   At the time of HDL's transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, HDL was engaged or about to engage in business for which its remaining assets and/or capital were unreasonably small in relation to its business.

864.   At the time of HDL's transfers of the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, HDL intended to incur, or believed or reasonably should have believed that the Debtors would incur, debts beyond the Debtors' abilities to pay as they became due.

865.   At all relevant times, HDL had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code section 502, including vendors, landlords, suppliers, lenders and other creditors.

866.   The BlueWave Payments were made to or for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants.

867.   Certain of the BlueWave Payments were transferred to bank accounts in South Carolina.

868.    HDL's transfers of the BlueWave Payments to bank accounts in South Carolina should be avoided pursuant to applicable provisions of S.C. Code § 27-23-10, and Bankruptcy Code sections 544(b) and 550.

869.    Under Bankruptcy Code section 550, Plaintiff may recover the BlueWave Payments to the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants as initial, immediate and/or mediate transferees.

### COUNT 47

**(Avoidance of Obligations Under BlueWave Agreement Under 11 U.S.C. §544(b) and, as applicable, 28 U.S.C. § 3304; Against BlueWave – Actual Fraud)**

870.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

871.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

872.    The DOJ filed Proof of Claim No. 1335 in the amount of $94,144,852.52, plus interest, in the HDL bankruptcy case, based on HDL's conduct dating back to November 2008.

873.    HDL incurred the obligations under the BlueWave Agreement with actual intent to hinder, delay or defraud creditors of HDL. The requisite intent can be imputed to HDL from the dominion and control of HDL by Mallory, McConnell, Warnick, and the other members of the HDL Board of Directors, conspiring with BlueWave, Dent, and Johnson.

874.    The primary purpose of the BlueWave Agreement was to take cash from HDL for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants without those assets being made available to HDL's creditors, and to further the improper scheme pursuant to the BlueWave Agreement.

875.    At least four "badges of fraud" apply to HDL's incurring the obligations under the BlueWave Agreement: (i) HDL incurred the obligations under the BlueWave Agreement to

BlueWave, which together with Johnson and Dent conspired with the insiders, directors, and officers of HDL to exercise dominion and control over HDL; (ii) HDL incurred the obligations under the BlueWave Agreement at the same time substantial new liabilities and debts were being incurred through continuation of the improper P&H Program, the BlueWave Agreement itself, and the Patient Responsibility Collection Practice; (iii) given the enormous liabilities that the use of BlueWave as a percentage-based commission sales agent created for HDL, HDL received no value or consideration in exchange for incurring the obligations under the BlueWave Agreement; and (iv) HDL was or became insolvent at the time it incurred the obligations under the BlueWave Agreement.

876.    HDL incurred the obligations under the BlueWave Agreement to or for the benefit of BlueWave.

877.    HDL incurred the obligations under the BlueWave Agreement within six (6) years before the Petition Date.

878.    The obligations under the BlueWave Agreement should be avoided pursuant to applicable provisions of the Federal Debt Collection Procedures Act, 28 U.S.C. § 3301 et. seq., and Bankruptcy Code section 544(b), and BlueWave's proof of claim based thereon, Claim No. 1056, should be disallowed in its entirety.

## COUNT 48

**(Avoidance of Obligations Under BlueWave Agreement Under 11 U.S.C. §544(b) and, as applicable, 28 U.S.C. § 3304; Against BlueWave – Constructive Fraud)**

879.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

880.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

881.    The DOJ filed Proof of Claim No. 1335 in the amount of $94,144,852.52, plus

interest, in the HDL bankruptcy case, based on HDL's conduct dating back to November 2008.

882.    HDL did not receive reasonably equivalent value in exchange for incurring the

obligations under the BlueWave Agreement to BlueWave.

883.    At the time HDL incurred the obligations under the BlueWave Agreement to

BlueWave, HDL was insolvent or became insolvent as a result of incurring such obligations.

884.    At the time HDL incurred the obligations under the BlueWave Agreement to

BlueWave, HDL was engaged or about to engage in business for which its remaining assets

and/or capital were unreasonably small in relation to its business.

885.    At the time HDL incurred the obligations under the BlueWave Agreement to

BlueWave, HDL intended to incur, or reasonably should have believed that it would incur, debts

beyond its ability to pay as they became due.

886.    The obligations under the BlueWave Agreement were incurred to or for the

benefit of BlueWave.

887.    HDL incurred the obligations under the BlueWave Agreement within six (6) years

before the Petition Date.

888.    The obligations under the BlueWave Agreement should be avoided pursuant to

applicable provisions of the Federal Debt Collection Procedures Act, 28 U.S.C. § 3301 et. seq.,

and Bankruptcy Code section 544(b), and BlueWave's proof of claim based thereon, Claim No.

1056, should be disallowed in its entirety.

## COUNT 49

**(Avoidance of Obligations Under BlueWave Agreement Under 11 U.S.C. §544(b) and, as
applicable, the Virginia Code Annotated § 55–80; Against BlueWave – Actual Fraud)**

889.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

159

890.    HDL incurred the obligations under the BlueWave Agreement with actual intent to hinder, delay or defraud creditors of HDL. The requisite intent can be imputed to HDL from the dominion and control of HDL by Mallory, McConnell, Warnick, and the other members of the HDL Board of Directors, conspiring with BlueWave, Dent, and Johnson.

891.    The primary purpose of the BlueWave Agreement was to take cash from HDL for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants without those assets being made available to HDL's creditors, and to further the improper scheme pursuant to the BlueWave Agreement.

892.    At least four "badges of fraud" apply to HDL's incurring the obligations under the BlueWave Agreement: (i) HDL incurred the obligations under the BlueWave Agreement to BlueWave, which together with Johnson and Dent conspired with the insiders, directors, and officers of HDL to exercise dominion and control over HDL; (ii) HDL incurred the obligations under the BlueWave Agreement at the same time substantial new liabilities and debts were being incurred through continuation of the improper P&H Program, the BlueWave Agreement itself, and the Patient Responsibility Collection Practice; (iii) given the enormous liabilities that the use of BlueWave as a percentage-based commission sales agent created for HDL, HDL received no value or consideration in exchange for incurring the obligations under the BlueWave Agreement; and (iv) HDL was or became insolvent at the time it incurred the obligations under the BlueWave Agreement.

893.    BlueWave had knowledge of facts and circumstances that would cause persons of ordinary care and prudence to be suspicious and to inquire before accepting and entering into the BlueWave Agreement.

894.    HDL incurred the obligations under the BlueWave Agreement to or for the benefit of BlueWave.

895.    HDL's obligations under the BlueWave Agreement should be avoided pursuant to applicable provisions of the Virginia Fraudulent Transfer Act, and Bankruptcy Code section 544(b), and BlueWave's proof of claim based thereon, Claim No. 1056, should be disallowed in its entirety.

## COUNT 50

**(Avoidance of Obligations Under BlueWave Agreement Under 11 U.S.C. §544(b) and, as applicable, the Virginia Code Annotated § 55–81; Against BlueWave – Constructive Fraud)**

896.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

897.    HDL did not receive consideration deemed valuable in law in exchange for entering into and incurring the obligations under the BlueWave Agreement. The BlueWave Agreement was an improper and illegal agreement and the BlueWave Payments made thereunder took cash from HDL for the benefit of the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, burdening HDL with enormous liabilities to the U.S. Government and private payers.

898.    At the time HDL incurred the obligations under the BlueWave Agreement, the Debtors were insolvent as set forth in detail above.

899.    HDL incurred the obligations under the BlueWave Agreement to or for the benefit of BlueWave.

900.    HDL's obligations under the BlueWave Agreement should be avoided pursuant to applicable provisions of the Virginia Fraudulent Transfer Act, and Bankruptcy Code section 544(b), and BlueWave's proof of claim based thereon, Claim No. 1056, should be disallowed in its entirety.

## COUNT 51

**(Avoidance and Recovery of Preferential Transfers Under 11 U.S.C. §§547 and 550;
Against the D&O Defendants, the Galen Defendants, Bartlett, the Mallory Trust, the
Warnick Entity Defendants, the Shareholder Defendants, Helena Laboratories, and the
Doe Defendants)**

901.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

902.    On or within 90 days before the Petition Date, the Debtors made transfers (the "***90
Day Preferential Transfers***") to or for the benefit of the D&O Defendants, the Galen
Defendants, Bartlett, the Shareholder Defendants, Helena Laboratories, and the Doe Defendants,
including, without limitation, those payments set forth on **Exhibit D** attached hereto and further
including payments made by HDL to taxing authorities for the benefit of the Shareholder
Defendants and the Doe Defendants pursuant to the Shareholders Agreement. Plaintiff reserves
the right to seek the avoidance and recovery of any and all additional 90 Day Preferential
Transfers that Plaintiff later discovers.

903.    The 90 Day Preferential Transfers were for or on account of an antecedent debt
owed by the Debtors to the D&O Defendants, the Galen Defendants, Bartlett, the Shareholder
Defendants, Helena Laboratories, and the Doe Defendants before the 90 Day Preferential
Transfers were made.

904.    The D&O Defendants, the Galen Defendants, Bartlett, the Shareholder
Defendants, Helena Laboratories, and the Doe Defendants were creditors of the Debtors within the
meaning of section 101(10)(A) of the Bankruptcy Code at the time the 90 Day Preferential
Transfers were made.

905.    The Debtors were insolvent at the time the 90 Day Preferential Transfers were
made within the meaning of section 101(32) of the Bankruptcy Code.

906.    The 90 Day Preferential Transfers enabled the D&O Defendants, the Galen Defendants, Bartlett, the Shareholder Defendants, Helena Laboratories, and the Doe Defendants, as creditors, to receive more than they would have received if: (i) the Debtors had not made such 90 Day Preferential Transfers; (ii) the Debtors' Chapter 11 Cases were converted to a case under Chapter 7 of the Bankruptcy Code; and (iii) the antecedent debts owed to the D&O Defendants, the Galen Defendants, Bartlett, the Shareholder Defendants, Helena Laboratories, and the Doe Defendants were paid to the extent provided by the Bankruptcy Code.

907.    By reason of the foregoing, the 90 Day Preferential Transfers are avoidable pursuant to section 547(b) of the Bankruptcy Code.

908.    Under Bankruptcy Code section 550, Plaintiff may recover a monetary judgment from the D&O Defendants, the Galen Defendants, Bartlett, the Mallory Trust, the Warnick Entity Defendants, the Shareholder Defendants, Helena Laboratories, and the Doe Defendants as initial, immediate and/or mediate transferees in an amount to be proved at trial.

## COUNT 52

**(Avoidance and Recovery of Preferential Transfers Under 11 U.S.C. §§547 and 550; Against the D&O Defendants, the Galen Defendants, Bartlett, the Mallory Trust, the Warnick Entity Defendants, the BlueWave Defendants, the BlueWave Transferee Defendants, Tipton Golias, Helena Laboratories, and the Doe Defendants)**

909.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

910.    Between ninety days and one year before the Petition Date, the Debtors made transfers (the "***One Year Preferential Transfers***") to or for the benefit of the D&O Defendants, the Galen Defendants, Bartlett, the BlueWave Defendants, Tipton Golias, Helena Laboratories, and the Doe Defendants, including, without limitation, those payments set forth on **Exhibit E** attached hereto and further including payments made by HDL to taxing authorities for the benefit of the Shareholder Defendants and the Doe Defendants pursuant to the Shareholders Agreement.

Plaintiff reserves the right to seek the avoidance and recovery of any and all additional One Year Preferential Transfers that Plaintiff later discovers.

911.    The One Year Preferential Transfers were for or on account of an antecedent debt owed by the Debtors to the D&O Defendants, the Galen Defendants, Bartlett, the BlueWave Defendants, Tipton Golias, Helena Laboratories, and the Doe Defendants before the One Year Preferential Transfers were made.

912.    The D&O Defendants, the Galen Defendants, Bartlett, the BlueWave Defendants, Tipton Golias, Helena Laboratories, and the Doe Defendants were creditors of the Debtors within the meaning of section 101(10)(A) of the Bankruptcy Code at the time the One Year Preferential Transfers were made.

913.    The D&O Defendants, the Galen Defendants, Bartlett, the BlueWave Defendants, Tipton Golias, Helena Laboratories, and the Doe Defendants were insiders of the Debtors within the meaning of sections 101(31)(B) and 101(31)(E) of the Bankruptcy Code at the time the One Year Preferential Transfers were made.

914.    The Debtors were insolvent at the time the One Year Preferential Transfers were made within the meaning of section 101(32) of the Bankruptcy Code.

915.    The One Year Preferential Transfers enabled the D&O Defendants, the Galen Defendants, Bartlett, the BlueWave Defendants, Tipton Golias, Helena Laboratories, and the Doe Defendants, as creditors, to receive more than they would have received if: (i) the Debtors had not made such One Year Preferential Transfers; (ii) the Debtors' Chapter 11 Cases were converted to a case under Chapter 7 of the Bankruptcy Code; and (iii) the antecedent debts owed to the D&O Defendants, the Galen Defendants, Bartlett, the BlueWave Defendants, Tipton

Golias, Helena Laboratories, and the Doe Defendants were paid to the extent provided by the Bankruptcy Code.

916.    By reason of the foregoing, the One Year Preferential Transfers are avoidable pursuant to section 547(b) of the Bankruptcy Code.

917.    Under Bankruptcy Code section 550, Plaintiff may recover a monetary judgment from the D&O Defendants, the Galen Defendants, Bartlett, the Mallory Trust, the Warnick Entity Defendants, the BlueWave Defendants, the BlueWave Transferee Defendants, Tipton Golias, Helena Laboratories, and the Doe Defendants as initial, immediate and/or mediate transferees in an amount to be proved at trial.

## COUNT 53

**(Breach of Statutory Fiduciary Duty – Va. Code § 13.1-690; Against the D&O Defendants, Rangarajan, Galen, and Bartlett)**

918.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

919.    The D&O Defendants, Rangarajan, Galen, and Bartlett were directors and/or officers of HDL and owed HDL fiduciary duties of due care and loyalty.

920.    As described in detail above, beginning in 2009 and continuing until the Petition Date, the Debtors were insolvent. As a result, the D&O Defendants, Rangarajan, Galen, and Bartlett owed fiduciary duties of due care and loyalty to the Debtors' creditors, including the Assigning Creditors.

921.    The D&O Defendants, Rangarajan, Galen, and Bartlett failed to discharge their duties and failed to act in accordance with good faith business judgment and in the best interest of the Debtors.

922.    As described in detail above, and as applicable during the period when they were directors and/or officers of the Debtors, the D&O Defendants and Rangarajan breached their

fiduciary duties of due care and loyalty to the Debtors and their creditors, including the
Assigning Creditors, by committing wrongful acts and omissions, and engaging in self-dealing,
including but not limited to entering into the BlueWave Agreement, establishing and making
payments pursuant to the P&H Program, establishing and implementing the Patient
Responsibility Collection Practice, engaging in the Covered Conduct, making the BlueWave
Payments, committing the Berkeley Related Misconduct, engaging in the Improper CYP2C19
Testing, establishing and making payments pursuant to the Consulting Program, engaging in the
G3 Transactions, making or permitting the Personal GeneNews Stock Purchases, engaging in the
IDL Transactions, engaging in the C3Nexus Transactions, making the payments for and
incurring obligations in connection with the Sponsorships, making and receiving the Shareholder
Distributions, approving and paying the D&O Compensation, agreeing to and making the
Rangarajan Buyout Payments, approving and executing the Mallory Separation Agreement,
incurring the obligation for the Mallory Separation Amount, and failing to obtain tolling
agreements or otherwise to preserve claims against the LR Individuals.

923.    As described in detail above, on or after early October 2014 when they became
directors, Galen and Bartlett breached their fiduciary duties of due care and loyalty to the
Debtors and their creditors, including the Assigning Creditors, by failing to make business
judgments and by otherwise committing wrongful acts and omissions, including but not limited
to, continuing the Patient Responsibility Collection Practice, making continued BlueWave
Payments, making continued payments in connection with the G3 Transactions, approving
certain of the IDL Transactions, engaging in certain of the C3Nexus Transactions, making and
receiving certain of the Shareholder Distributions, approving the Mallory Separation Agreement,

incurring the obligation for the Mallory Separation Amount, and failing to obtain tolling

agreements or otherwise to preserve claims against the LR Individuals.

924.    As a direct and proximate result of the foregoing breaches of fiduciary duty and

self-dealing, the Debtors and their creditors, including the Assigning Creditors, sustained

significant damages in excess of $600 million. Plaintiff is entitled to recover these damages

suffered by the Debtors and their creditors, including the Assigning Creditors, against the D&O

Defendants, Rangarajan, Galen, and Bartlett in an amount to be proved at trial.

## COUNT 54

**(Common Law Breach of Fiduciary Duty; Against the D&O Defendants, Rangarajan, Galen, and Bartlett)**

925.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

926.    The D&O Defendants, Rangarajan, Galen, and Bartlett were directors and/or

officers of HDL and owed HDL fiduciary duties of due care and loyalty.

927.    As described in detail above, beginning in 2009 and continuing until the Petition

Date, the Debtors were insolvent. As a result, the D&O Defendants, Rangarajan, Galen, and

Bartlett owed fiduciary duties of due care and loyalty to the Debtors' creditors, including the

Assigning Creditors.

928.    As described in detail above, and as applicable during the period when they were

directors and/or officers of the Debtors, the D&O Defendants and Rangarajan breached their

fiduciary duties of due care and loyalty to the Debtors and their creditors, including the

Assigning Creditors, by committing wrongful acts and omissions, and engaging in self-dealing,

including but not limited to entering into the BlueWave Agreement, establishing and making

payments pursuant to the P&H Program, establishing and implementing the Patient

Responsibility Collection Practice, engaging in the Covered Conduct, making the BlueWave

Payments, committing the Berkeley Related Misconduct, engaging in the Improper CYP2C19 Testing, establishing and making payments pursuant to the Consulting Program, engaging in the G3 Transactions, making or permitting the Personal GeneNews Stock Purchases, engaging in the IDL Transactions, engaging in the C3Nexus Transactions, making the payments for and incurring obligations in connection with the Sponsorships, making and receiving the Shareholder Distributions, approving and paying the D&O Compensation, agreeing to and making the Rangarajan Buyout Payments, approving and executing the Mallory Separation Agreement, incurring the obligation for the Mallory Separation Amount, and failing to obtain tolling agreements or otherwise to preserve claims against the LR Individuals.

929.    As described in detail above, on or after early October 2014 when they became directors, Galen and Bartlett breached their fiduciary duties of due care and loyalty to the Debtors and their creditors, including the Assigning Creditors, by failing to make business judgments and by otherwise committing wrongful acts and omissions, including but not limited to continuing the Patient Responsibility Collection Practice, making continued BlueWave Payments, making continued payments in connection with the G3 Transactions, approving certain of the IDL Transactions, engaging in certain of the C3Nexus Transactions, making and receiving certain of the Shareholder Distributions, approving the Mallory Separation Agreement, incurring the obligation for the Mallory Separation Amount, and failing to obtain tolling agreements or otherwise to preserve claims against the LR Individuals.

930.    As a result of their breaches of fiduciary duty and self-dealing, the D&O Defendants, Rangarajan, Galen, and Bartlett received benefits that the shareholders and creditors of HDL, including the Assigning Creditors, did not.

931.    As a direct and proximate result of the foregoing breaches of fiduciary duty and self-dealing, the Debtors and their creditors, including the Assigning Creditors, sustained significant damages in excess of $600 million. Plaintiff is entitled to recover these damages suffered by the Debtors and their creditors, including the Assigning Creditors, against the D&O Defendants, Rangarajan, Galen, and Bartlett in an amount to be proved at trial.

## COUNT 55

**(Violation of The Trust Fund Doctrine; Against the D&O Defendants, Rangarajan, Galen, Bartlett, the Shareholder Defendants, the BlueWave Defendants, the BlueWave Transferee Defendants, the Major Sales Contractor Defendants, Ryan, and the Doe Defendants)**

932.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

933.    As described in detail above, beginning in 2009 and continuing until the Petition Date, the D&O Defendants, Rangarajan, Galen, and Bartlett operated the Debtors while the Debtors were insolvent.

934.    During that time period, the D&O Defendants, Rangarajan, and the BlueWave Defendants engaged in self-dealing conduct and transactions, using their superior positions to obtain an undue and unjust advantage over the Debtors' existing creditors, including the Assigning Creditors.

935.    As described in detail above, beginning in 2009 and continuing through the Petition Date, the D&O Defendants, Rangarajan, and the BlueWave Defendants engaged in extensive self-dealing, illegal conduct, and worked in concert to provide an unjust advantage for themselves and their personal financial interests, in derogation of the Debtors' creditors, including the Assigning Creditors.

936.    Their misconduct includes, but is not limited to, entering into the BlueWave Agreement, establishing and making payments pursuant to the P&H Program, establishing and implementing the Patient Responsibility Collection Practice, engaging in the Covered Conduct,

169

making the BlueWave Payments, committing the Berkeley Related Misconduct, engaging in the Improper CYP2C19 Testing, establishing and making payments pursuant to the Consulting Program, engaging in the G3 Transactions, making or permitting the Personal GeneNews Stock Purchases, engaging in the IDL Transactions, engaging in the C3Nexus Transactions, making the payments for and incurring obligations in connection with the Sponsorships, making the Shareholder Distributions, approving and paying the D&O Compensation, agreeing to, making, and receiving the Rangarajan Buyout Payments, approving and executing the Mallory Separation Agreement, incurring the obligation for the Mallory Separation Amount, and failing to obtain tolling agreements or otherwise to preserve claims against the LR Individuals.

937.   As a result of those self-interested transactions and transfers, the D&O Defendants, Rangarajan, Galen, Bartlett, the Shareholder Defendants, the BlueWave Defendants, the BlueWave Transferee Defendants, the Major Sales Contractor Defendants, Ryan, and the Doe Defendants collectively received hundreds of millions of dollars. By way of example, such transactions and transfers include but are not limited to the receipt by the D&O Defendants and Rangarajan of the D&O Compensation of approximately $25 million, the receipt by the Shareholder Defendants of the Shareholder Distributions totaling approximately $124.7 million, the receipt by the BlueWave Defendants, and subsequently the BlueWave Transferee Defendants, of the BlueWave Payments totaling approximately $220 million, and the receipt by Rangarajan of the Rangarajan Buyout Payments totaling nearly $13 million.  In addition, the D&O Defendants and Rangarajan squandered tens of millions of dollars as a result of HDL's failed investments in G3, IDL and C3Nexus and authorized at least $46 million in illegal P&H Payments to HCPs.  Beginning in early October 2014, Galen and Bartlett squandered funds as a result of continuing to fund, and transactions related to, G3, IDL, and C3Nexus. All of these

transactions and resulting payments were tainted by self-dealing, and were also injurious to the

Debtors' creditors, including the Assigning Creditors, who were prejudiced in collection of their

claims by such transfers.

938.    All of the above actions and transfers proximately caused damages to the Debtors'

creditors, including the Assigning Creditors, who suffered injury and damage, including but

limited to the loss of assets that would otherwise have been available to satisfy their claims.

939.    In addition, all of the above actions and transfers severely hampered the Debtors'

creditors, including the Assigning Creditors, from receiving the payment they are due under the

customary order of distribution under the priorities of the Bankruptcy Code.  By virtue of their

actions and receipt of the above-described distributions, payments, and transfers, the D&O

Defendants, Rangarajan, Galen, Bartlett, the Shareholder Defendants, the BlueWave Defendants,

the BlueWave Transferee Defendants, the Major Sales Contractor Defendants, Ryan, and the

Doe Defendants received payments outside the prescribed order of distribution under the

Bankruptcy Code and severely harmed creditors, including the Assigning Creditors, by taking

corporate assets for themselves that should have been allocated to creditors.

940.    As a result of these Defendants' improper conduct, which defeated and impaired

creditors in the legitimate collection of their claims, Plaintiff is entitled to recover the damages

suffered by the Debtors' creditors, including the Assigning Creditors, in an amount to be proved

at trial.

## COUNT 56

**(Breach of Statutory Fiduciary Duty -- Va. Code § 13.1-690; Against Mallory)**

941.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

171

942.    As a director of HDL, Mallory owed HDL fiduciary duties of due care and loyalty, including a duty to disclose corporate opportunities to HDL and obtain HDL's consent to exploit corporate opportunities.

943.    As described in detail above, beginning in 2009 and continuing until the Petition Date, the Debtors were insolvent. As a result, Mallory owed fiduciary duties of due care and loyalty to the Debtors' creditors, including the Assigning Creditors.

944.    Mallory failed to discharge her fiduciary duties and failed to act in accordance with good faith business judgment and in the best interests of HDL.

945.    Mallory usurped the corporate opportunity of purchasing stock in GeneNews for herself in connection with the Personal GeneNews Stock Purchases, and did not provide that opportunity to HDL, thereby breaching her fiduciary duties owed to HDL.

946.    As a direct and proximate result of the foregoing breaches of fiduciary duty, the Debtors and their creditors, including the Assigning Creditors, sustained significant damages, including but not limited to the loss of millions of dollars of potential profit from the GeneNews stock.

947.    As a result of Mallory's breaches of fiduciary duty, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors, including the Assigning Creditors, against Mallory in an amount to be proved at trial.

## COUNT 57

### (Common Law Breach of Fiduciary Duty; Against Mallory)

948.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

949.    As a director of HDL, Mallory owed HDL fiduciary duties of due care and loyalty, including a duty to disclose corporate opportunities to HDL and obtain HDL's consent to exploit corporate opportunities.

950.    As described in detail above, beginning in 2009 and continuing until the Petition Date, the Debtors were insolvent. As a result, Mallory owed fiduciary duties of due care and loyalty to the Debtors' creditors, including the Assigning Creditors.

951.    Mallory failed to discharge her fiduciary duties and failed to act in accordance with good faith business judgment and in the best interests of HDL.

952.    Mallory usurped the corporate opportunity of purchasing stock in GeneNews for herself in connection with the Personal GeneNews Stock Purchases, and did not provide that opportunity to HDL, thereby breaching her fiduciary duty owed to HDL.

953.    As a direct and proximate result of the foregoing breaches of fiduciary duty, the Debtors and their creditors, including the Assigning Creditors, sustained significant damages, including but not limited to the loss of millions of dollars of potential profit from the GeneNews stock.

954.    As a result of Mallory's breaches of fiduciary duty, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors, including the Assigning Creditors, against Mallory in an amount to be proved at trial.

## COUNT 58

**(Aiding and Abetting Breach of Fiduciary Duty; Against the BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, Ryan, and the Doe Defendants)**

955.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

956.    To the extent that any of the BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, Ryan, and the Doe Defendants is found not to have had a fiduciary duty to the Debtors at the time of the conduct complained of herein, each such Defendant is nevertheless jointly and severally liable for having aided and abetted the breaches of fiduciary duty of due

care and loyalty by one or more of those other Defendants that did owe such fiduciary duties to the Debtors and/or their creditors, including the Assigning Creditors, at the relevant times.

957.    The BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, Ryan, and the Doe Defendants had actual knowledge of the fiduciary duties of due care and loyalty owed by the D&O Defendants, Rangarajan, Galen, and Bartlett and the breaches of fiduciary duty of due care and loyalty by the D&O Defendants, Rangarajan, Galen, and Bartlett described in Counts 53, 54, 56, and 57.

958.    The BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, Ryan, and the Doe Defendants gave substantial assistance, aided and abetted, and/or encouraged the D&O Defendants' repeated breaches of fiduciary duty and self-dealing, including without limitation, by implementing the P&H Program, the BlueWave Agreement, the Patient Responsibility Collection Practice, engaging in the Covered Conduct, wasting corporate assets through self-dealing and other transactions, engaging in the IDL Transactions, receiving excessive D&O Compensation, and receiving Shareholder Distributions.

959.    The BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, Ryan, and the Doe Defendants knew or should have known the nature of the injury to the Debtors and the Debtors' creditors, including the Assigning Creditors, brought about by such substantial assistance.

960.    The BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, Ryan, and the Doe Defendants directly or indirectly benefited from such breaches of fiduciary duty and self-dealing by reaping financial rewards to which they were not entitled.

961.    As a direct and proximate result of the foregoing breaches of fiduciary duty and self-dealing, the Debtors and their creditors, including the Assigning Creditors, sustained

significant damages in excess of $600 million, including but not limited to hundreds of millions of dollars of unpaid obligations.

962.    As a result of the aiding and abetting of the D&O Defendants' breaches of fiduciary duty by the BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, Ryan, and the Doe Defendants, Plaintiff is entitled to recover the damages suffered by the Debtors and the Assigning Creditors from them in an amount to be proved at trial.

## COUNT 59

**(Common Law Conspiracy; Against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, and the Doe Defendants)**

963.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

964.    Beginning with the formation of HDL, and through a continued and persistent course of conduct, the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, and the Doe Defendants, acted in concert, agreed, associated, mutually undertook, or combined to accomplish, by concerted action, unlawful, illegal, and oppressive acts that caused catastrophic injury and damage to the Debtors.

965.    These unlawful acts include, but are not limited to, entering into the BlueWave Agreement, establishing and making payments pursuant to the P&H Program, establishing and implementing the Patient Responsibility Collection Practice, engaging in the Covered Conduct, making the BlueWave Payments, committing the Berkeley Related Misconduct, engaging in the Improper CYP2C19 Testing, establishing and making payments pursuant to the Consulting Program, engaging in the G3 Transactions, making or permitting the Personal GeneNews Stock Purchases, engaging in the IDL Transactions, engaging in the C3Nexus Transactions, making the payments for and incurring obligations in connection with the Sponsorships, making and receiving the Shareholder Distributions, approving and paying the D&O Compensation, agreeing

to and making the Rangarajan Buyout Payments, approving and executing the Mallory Separation Agreement, incurring the obligation for the Mallory Separation Amount, and failing to obtain tolling agreements or otherwise to preserve claims against the LR Individuals.

966.    The D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, and the Doe Defendants intentionally combined to accomplish these unlawful purposes or, even if determined to be lawful purposes, these Defendants intentionally combined to accomplish them through illegal and unlawful means.

967.    As a direct and proximate result of the conspiracy and agreement among these Defendants, the Debtors and their creditors, specifically including the Assigning Creditors, sustained significant damages in excess of $600 million, including but not limited to hundreds of millions of dollars of unpaid obligations.

968.    As a result of the conspiracy, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors, including the Assigning Creditors, from the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, and the Doe Defendants in an amount to be proved at trial.

## COUNT 60

**(Statutory Business Conspiracy – Va. Code §§ 18.2-499 *et seq.; Against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, and the Doe Defendants)***

969.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

970.    Beginning with the formation of HDL, and through a continued and persistent course of conduct, the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, and the Doe Defendants acted in concert, agreed, associated, mutually undertook, or combined to accomplish, by concerted action, unlawful and oppressive acts that caused catastrophic injury and damage to the Debtors' businesses.

971.    These unlawful acts include, but are not limited to, entering into the BlueWave Agreement, establishing and making payments pursuant to the P&H Program, establishing and implementing the Patient Responsibility Collection Practice, engaging in the Covered Conduct, making the BlueWave Payments, committing the Berkeley Related Misconduct, engaging in the Improper CYP2C19 Testing, establishing and making payments pursuant to the Consulting Program, engaging in the G3 Transactions, making or permitting the Personal GeneNews Stock Purchases, engaging in the IDL Transactions, engaging in the C3Nexus Transactions, making the payments for and incurring obligations in connection with the Sponsorships, making and receiving the Shareholder Distributions, approving and paying the D&O Compensation, agreeing to and making the Rangarajan Buyout Payments, approving and executing the Mallory Separation Agreement, incurring the obligation for the Mallory Separation Amount, and failing to obtain tolling agreements or otherwise to preserve claims against the LR Individuals.

972.    These Defendants' unlawful acts, undertaken willfully, intentionally, purposefully and without lawful justification, have injured and continue to injure the Debtors' businesses and those of their creditors, including the Assigning Creditors.

973.    These Defendants' wrongful conduct was aimed directly at damaging the Debtors' businesses and those of their creditors, including the Assigning Creditors.

974.    The Defendants' wrongful conduct constitutes a violation of the Virginia Business Conspiracy Act ("***VBCA***").

975.    As a direct and proximate result of the conspiracy and agreement among the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, and the Doe Defendants, the Debtors and the Assigning Creditors sustained significant

damages in excess of $600 million, including but not limited to hundreds of millions of dollars of unpaid obligations.

976.    The Debtors and the Assigning Creditors, acting through Plaintiff, are entitled to recover three times the damages they sustained and continue to sustain as a result of the conspiracy, in addition to reasonable attorneys' fees and expenses pursuant to the VBCA.

977.    As a result of the conspiracy, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors, including the Assigning Creditors, from the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, and the Doe Defendants in an amount to be proved at trial.

## COUNT 61

### (Unlawful Distributions -- Va. Code §§ 13.1-653 and 13.1-690; Against Mallory, McConnell, Warnick, Galen, and Bartlett)

978.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

979.    Mallory, McConnell, Warnick, Galen, and Bartlett were directors of HDL.

980.    As set forth above, in violation of Va. Code § 13.1-653 and without complying with Va. Code § 13.1-690, Mallory, McConnell, Warnick, Galen, and Bartlett caused the Shareholder Distributions to be made to the Shareholders at a time when, after giving effect to all such Shareholder Distributions, HDL would be unable to pay its debts as they became due in the usual course of business.

981.    As set forth above, in violation of Va. Code § 13.1-653 and without complying with Va. Code § 13.1-690, Mallory, McConnell, Warnick, Galen, and Bartlett caused all or certain of the Shareholder Distributions to be made to the Shareholders at a time when, after giving effect to such Shareholder Distributions, HDL's total assets would be less than its total liabilities.

178

982.    Pursuant to Va. Code §§ 13.1-653, 13.1-690, and 13.1-692, Mallory, McConnell, Warnick, Galen, and Bartlett are personally liable for the unlawful Shareholder Distributions they approved.

983.    Plaintiff is entitled to recover the unlawful Shareholder Distributions from Mallory, McConnell, Warnick, Galen, and Bartlett in such amounts to be proved at trial.

## COUNT 62

### (Corporate Waste; Against the D&O Defendants, Rangarajan, Galen, and Bartlett)

984.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

985.    The D&O Defendants and Rangarajan, as applicable during the period when they were directors and/or officers of the Debtors, wasted valuable corporate assets as a result of entering into the BlueWave Agreement, establishing and making payments pursuant to the P&H Program, establishing and implementing the Patient Responsibility Collection Practice, engaging in the Covered Conduct, making the BlueWave Payments, committing the Berkeley Related Misconduct, establishing and making payments pursuant to the Consulting Program, engaging in the G3 Transactions, engaging in the IDL Transactions, engaging in the C3Nexus Transactions, making the payments for and incurring obligations in connection with the Sponsorships, making and receiving the Shareholder Distributions, approving and paying the D&O Compensation, agreeing to and making the Rangarajan Buyout Payments, incurring the obligation for the Mallory Separation Amount, and failing to obtain tolling agreements or otherwise to preserve claims against the LR Individuals.

986.    As described in detail above, on or after early October 2014 when they became directors, Galen and Bartlett wasted valuable corporate assets as a result of continuing the Patient Responsibility Collection Practice, making continued BlueWave Payments, making continued payments in connection with the G3 Transactions, approving certain of the IDL Transactions,

179

engaging in certain of the C3Nexus Transactions, making and receiving certain of the Shareholder Distributions, approving the Mallory Separation Agreement, incurring the obligation for the Mallory Separation Amount, and failing to obtain tolling agreements or otherwise to preserve claims against the LR Individuals.

987.    As a direct and proximate result of this waste of corporate assets, the Debtors and their creditors, including the Assigning Creditors, sustained significant damages in excess of $600 million, including but not limited to the loss of valuable assets of the Debtors as set forth in detail above.

988.    As a result of this waste of corporate assets, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors, including the Assigning Creditors, from the D&O Defendants, Rangarajan, Galen, and Bartlett in an amount to be proved at trial.

<u>COUNT 63</u>

**(Negligence; Against the D&O Defendants, Rangarajan, Galen, and Bartlett)**

989.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

990.    At all times relevant herein, the D&O Defendants, Rangarajan, Galen, and Bartlett owed the Debtors and their creditors, including the Assigning Creditors, a duty of reasonable care, including a duty not to negligently damage the Debtors or their creditors, including the Assigning Creditors, or their respective business or assets.

991.    The D&O Defendants and Rangarajan, as applicable during the period when they were directors and/or officers of the Debtors, breached their duty of care as a result of entering into the BlueWave Agreement, establishing and making payments pursuant to the P&H Program, establishing and implementing the Patient Responsibility Collection Practice, engaging in the Covered Conduct, making the BlueWave Payments, committing the Berkeley Related Misconduct, establishing and making payments pursuant to the Consulting Program, engaging in

the G3 Transactions, engaging in the IDL Transactions, engaging in the C3Nexus Transactions, making the payments for and incurring obligations in connection with the Sponsorships, making and receiving the Shareholder Distributions, approving and paying the D&O Compensation, agreeing to and making the Rangarajan Buyout Payments, incurring the obligation for the Mallory Separation Amount, and failing to obtain tolling agreements or otherwise to preserve claims against the LR Individuals.

992.    As described in detail above, on or after early October 2014 when they became directors, Galen and Bartlett breached their duty of care as a result of continuing the Patient Responsibility Collection Practice, making continued BlueWave Payments, making continued payments in connection with the G3 Transactions, approving certain of the IDL Transactions, engaging in certain of the C3Nexus Transactions, making and receiving certain of the Shareholder Distributions, approving the Mallory Separation Agreement, incurring the obligation for the Mallory Separation Amount, and failing to obtain tolling agreements or otherwise to preserve claims against the LR Individuals.

993.    It was reasonably foreseeable that, by engaging in the acts set forth above, the Debtors and their creditors, including the Assigning Creditors, would suffer injury and damage.

994.    As a direct and proximate result of the negligence by the D&O Defendants, Rangarajan, Galen, and Bartlett, the Debtors and their creditors, including the Assigning Creditors, sustained damages in excess of $600 million.

995.    As a result of the negligence by the D&O Defendants, Rangarajan, Galen, and Bartlett, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors, including the Assigning Creditors, from them in an amount to be proved at trial.

## COUNT 64

**(Gross Negligence; Against the D&O Defendants, Rangarajan, Galen, and Bartlett)**

996.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

997.    At all times relevant herein, the D&O Defendants, Rangarajan, Galen, and Bartlett owed the Debtors a duty of reasonable care, including a duty not to negligently damage the Debtors or their creditors, including the Assigning Creditors, or their respective business or assets.

998.    The D&O Defendants and Rangarajan, as applicable during the period when they were directors and/or officers of the Debtors, breached their duty of care by entering into the BlueWave Agreement, establishing and making payments pursuant to the P&H Program, establishing and implementing the Patient Responsibility Collection Practice, engaging in the Covered Conduct, making the BlueWave Payments, committing the Berkeley Related Misconduct, establishing and making payments pursuant to the Consulting Program, engaging in the G3 Transactions, engaging in the IDL Transactions, engaging in the C3Nexus Transactions, making the payments for and incurring obligations in connection with the Sponsorships, making and receiving the Shareholder Distributions, approving and paying the D&O Compensation, agreeing to and making the Rangarajan Buyout Payments, incurring the obligation for the Mallory Separation Amount, and failing to obtain tolling agreements or otherwise to preserve claims against the LR Individuals.

999.    As described in detail above, on or after early October 2014 when they became directors, Galen and Bartlett breached their duty of care as a result of continuing the Patient Responsibility Collection Practice, making continued BlueWave Payments, making continued payments in connection with the G3 Transactions, approving certain of the IDL Transactions, engaging in certain of the C3Nexus Transactions, making and receiving certain of the

Shareholder Distributions, approving the Mallory Separation Agreement, incurring the obligation for the Mallory Separation Amount, and failing to obtain tolling agreements or otherwise to preserve claims against the LR Individuals.

1000.  It was reasonably foreseeable that, by engaging in the acts set forth above, the Debtors and their creditors, including the Assigning Creditors, would suffer injury and damage.

1001.  The conduct by the D&O Defendants, Rangarajan, Galen, and Bartlett showed such indifference to others, including the Debtors and their creditors, including the Assigning Creditors, that it constituted an utter disregard of caution amounting to a complete neglect of the rights of others.

1002.  As a direct and proximate result of the gross negligence by the D&O Defendants, Rangarajan, Galen, and Bartlett, the Debtors and their creditors, including the Assigning Creditors, suffered damages in excess of $600 million.

1003.  As a result of the gross negligence by the D&O Defendants, Rangarajan, Galen, and Bartlett, Plaintiff is entitled to recover the damages suffered by the Debtors and their creditors, including the Assigning Creditors, from them in an amount to be proved at trial.

## COUNT 65

### (Assumpsit; Against All Defendants)

1004.  Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

1005.  The Defendants have been unjustly enriched at the expense of the Debtors and their creditors, including the Assigning Creditors, by receipt and subsequent transfers of the Shareholder Distributions, the BlueWave Payments, the D&O Compensation, the Rangarajan Buyout Payments, the Mallory Payment, and the Golias Double Payment, due to the extensive wrongful conduct described above.

1006.    The Defendants are in possession of money which, in equity and good conscience, does not belong to them.

1007.    In equity and good conscience, the Defendants should not retain the money and it should be turned over to Plaintiff in an amount to be proved at trial.

## COUNT 66

### (Unjust Enrichment; Against All Defendants)

1008.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

1009.    The Debtors and/or the Assigning Creditors conferred a benefit on the Defendants through, as applicable, the Shareholder Distributions, the BlueWave Payments, the D&O Compensation, the Rangarajan Buyout Payments, the Mallory Payment, and the Golias Double Payment and their subsequent transfers.

1010.    Defendants knew that they received a benefit and should reasonably have expected to repay the Debtors and/or the Assigning Creditors.

1011.    Defendants accepted or retained the benefits without paying for its value.

1012.    Allowing the Defendants to retain the benefits they received would be unjust and result in unjust enrichment.

1013.    The Debtors and the Assigning Creditors have no adequate remedy at law.

1014.    As a direct and proximate result of the foregoing wrongful acts, the Debtors and the Assigning Creditors sustained significant damages, including but not limited to the amount of the Shareholder Distributions, the BlueWave Payments, the D&O Compensation, the Rangarajan Buyout Payments, the Mallory Payment, and the Golias Double Payment.

1015.    As a result of the Defendants' unjust enrichment, Plaintiff is entitled to recover the damages suffered by the Debtors and the Assigning Creditors in an amount to be proved at trial.

## COUNT 67

**(Fraud Committed Upon Assigning Creditors; Against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants)**

1016.   Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

1017.   The D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants made false representations of material fact, including without limitation, that the claims HDL presented to Aetna and Cigna were for medically necessary tests, that the amounts charged for the tests included a co-pay, co-insurance, or deductible amount that HDL intended to collect from patients, that HDL's business was conducted in accordance with the AKS and other healthcare law, and that the representations regarding HDL's financial condition were accurate.

1018.   The D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants made such misrepresentations intentionally and knowingly with the intent to mislead and induce the Debtors' creditors, specifically including the Assigning Creditors, into making payments to HDL, and in turn to BlueWave, and into extending unsecured credit to HDL for goods and services Assigning Creditors provided.

1019.   In justifiable reliance on the misrepresentations by the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants, the Assigning Creditors made such payments to HDL, and in turn to BlueWave, and extended unsecured credit to HDL for goods and services that the Assigning Creditors provided.

1020.   As a direct and proximate result of the foregoing misrepresentations, the Assigning Creditors sustained significant damages, including but not limited to millions of dollars in payments made and unsecured credit extended.

1021.   As a result of the justifiable reliance by the Assigning Creditors on these misrepresentations by the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants, Plaintiff is entitled to recover the damages suffered by the Assigning Creditors in an amount to be proved at trial.

## COUNT 68

**(Constructive Fraud Committed Against Assigning Creditors; Against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants)**

1022.   Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

1023.   The D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants made false representations of material fact, including without limitation, that the claims HDL presented to Aetna and Cigna were for medically necessary tests, that the amounts charged for the tests included a co-pay, co-insurance, or deductible amount that HDL intended to collect from patients, that HDL's business was conducted in accordance with the AKS and other healthcare law, and that the representations regarding HDL's financial condition were accurate.

1024.   Pleading in the alternative, the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants negligently made such misrepresentations to the Assigning Creditors, inducing them into making payments to HDL, and in turn to BlueWave, and into extending unsecured credit to HDL for goods and services that the Assigning Creditors provided.

1025.   In justifiable reliance on the misrepresentations by the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants, the Assigning Creditors made such payments to HDL, and in turn to BlueWave, and extended unsecured credit to HDL for goods and services Assigning Creditors provided.

1026.   As a direct and proximate result of the foregoing misrepresentations, the Assigning Creditors sustained significant damages, including but not limited to millions of dollars in payments made and unsecured credit extended.

1027.   As a result of the justifiable reliance by the Assigning Creditors on these misrepresentations by the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants, Plaintiff is entitled to recover the damages suffered by the Assigning Creditors in an amount to be proved at trial.

## COUNT 69

**(Tortious Interference With Contracts of Assigning Creditors; Against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants)**

1028.   Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

1029.   The Aetna and Cigna plan agreements with HCPs covering patients of the HCPs were valid and enforceable contracts that existed between those parties.

1030.   The contracts between the other Assigning Creditors and HDL were also valid and enforceable contracts.

1031.   The D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants knew about these contracts and their respective terms.

187

1032.  The D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants intentionally interfered with the contractual relationships between (a) Aetna and Cigna, respectively, on the one hand, and the HCPs and their covered patients, respectively, on the other hand, and (b) between the other Assigning Creditors, on the one hand, and HDL, on the other hand, by improper means, including but not limited to implementing the P&H Program, the BlueWave Agreement, and the Patient Responsibility Collection Practice.

1033.  The intentional interference with these contracts by the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants directly and proximately caused the material breach of these contracts.

1034.  As a direct and proximate result of the intentional interference with these contracts by the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants, Aetna and Cigna, together with the other Assigning Creditors, sustained significant damages, including but not limited to millions of dollars in payments made and unsecured credit extended.

1035.  As a result of the intentional interference with these contracts by the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants, Plaintiff is entitled to recover the damages suffered by the Assigning Creditors in an amount to be proved at trial.

## COUNT 70

**(Tortious Interference With Existing Contract, Contract Expectancy, Prospective Business Relationship and Economic Advantage of Assigning Creditors; Against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants)**

1036.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

1037.    The Assigning Creditors had valid contractual relationships with the Debtors and with HCPs, both existing and prospective, and/or had contractual expectancy, prospective business relationships or economic advantage as a result of these relationships.

1038.    The D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants knew, or should have known, of the Assigning Creditors' relationships with the Debtors and these other parties and their continued business expectancy, prospective business relationships and economic advantage.

1039.    The D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants intentionally and wrongfully interfered with these contractual relationships, contractual expectancy, prospective business relationships and economic advantage.

1040.    Absent the intentional misconduct by the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants, the Assigning Creditors would have continued in these relationships and/or would have otherwise realized their business expectancy.

1041.    As a direct and proximate result of the intentional interference with the Debtors' business relationships by the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the

Doe Defendants, the Assigning Creditors sustained significant damages, including but not limited to loss of business and revenues.

1042. As a result of the intentional interference with the Assigning Creditors' business relationships by the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants, Plaintiff is entitled to recover the damages suffered by the Assigning Creditors in an amount to be proved at trial.

## COUNT 71

**(Fraud, Tortious Interference with Business and Contractual Relations, Civil Conspiracy and Unjust Enrichment Claims Asserted by Assigning Creditor Aetna; Against The D&O Defendants, Rangarajan, and the BlueWave Defendants)**

1043. Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

1044. Plaintiff has been assigned the right to pursue the Aetna Litigation pending in the United States District Court for the Eastern District of Pennsylvania.

1045. Plaintiff repeats and realleges the allegations set forth in the Amended Aetna Complaint, a copy of which is attached hereto marked as **Exhibit F**, by this reference.

1046. In addition, Plaintiff repeats and realleges the allegations set forth in the Amended Aetna Complaint by this reference as against McConnell, Warnick, and Rangarajan, in addition to the allegations set forth in the Amended Aetna Complaint as against Mallory.

1047. As a direct and proximate result of the wrongful acts of the D&O Defendants, Rangarajan, and the BlueWave Defendants set forth in the Amended Aetna Complaint and in this Count, which include (i) fraud against Aetna, (ii) tortious interference with Aetna's business and contractual relations, (iii) civil conspiracy which harmed Aetna and (iv) unjust enrichment by illegally retaining funds paid by Aetna, Plaintiff is entitled to recover the damages suffered by

Aetna against Mallory, McConnell, Warnick, Rangarajan, and the BlueWave Defendants in an amount to be proved at trial.

### COUNT 72

**(Common Law Conspiracy Asserted by the Assigning Creditors; Against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants)**

1048.   Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

1049.   Beginning with the formation of HDL, and through a continued and persistent course of conduct, the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants, acted in concert, agreed, associated, mutually undertook, or combined to accomplish, by concerted action, unlawful, illegal, and oppressive acts that caused major injury and damage to the Assigning Creditors.

1050.   These unlawful acts include, but are not limited to, entering into the BlueWave Agreement, establishing and making payments pursuant to the P&H Program, establishing and implementing the Patient Responsibility Collection Practice, and making knowing and negligent misrepresentations of fact to the Assigning Creditors regarding the true nature of these business practices, including that the amounts charged for HDL's tests included a co-pay, co-insurance, or deductible amount that HDL intended to collect from patients, that HDL's business and the sales of HDL tests by the Major Sales Contractor Defendants and the BlueWave Sales Representative Defendants were conducted in accordance with the AKS and other healthcare law, and that the HDL tests the Major Sales Contractor Defendants and the BlueWave Sales Representative Defendants sold were medically necessary.

1051.   The D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants

191

intentionally combined to accomplish these unlawful purposes or, even if determined to be lawful purposes, these Defendants intentionally combined to accomplish them through illegal and unlawful means.

1052.   As a direct and proximate result of the conspiracy and agreement among these Defendants, the Assigning Creditors sustained significant damages, including but not limited to millions of dollars in unsecured credit extended and inflated and fraudulent claims paid to HDL.

1053.   As a result of the conspiracy, Plaintiff is entitled to recover the damages suffered by the Assigning Creditors from the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants in an amount to be proved at trial.

## COUNT 73

**(Statutory Business Conspiracy Asserted by the Assigning Creditors – Va. Code §§ 18.2-499 *et seq.*; Against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants)**

1054.   Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

1055.   Beginning with the formation of HDL, and through a continued and persistent course of conduct, the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants acted in concert, agreed, associated, mutually undertook, or combined to accomplish, by concerted action, unlawful and oppressive acts that caused major injury and damage to the Assigning Creditors' businesses.

1056.   These unlawful acts include, but are not limited to, entering into the BlueWave Agreement, establishing and making payments pursuant to the P&H Program, establishing and implementing the Patient Responsibility Collection Practice, and making knowing and negligent

192

misrepresentations of fact to the Assigning Creditors regarding the true nature of these business practices, including that the amounts charged for HDL's tests included a co-pay, co-insurance, or deductible amount that HDL intended to collect from patients, that HDL's business and the sales of HDL tests by the Major Sales Contractor Defendants and the BlueWave Sales Representative Defendants were conducted in accordance with the AKS and other healthcare law, and that the HDL tests the Major Sales Contractor Defendants and the BlueWave Sales Representative Defendants sold were medically necessary.

1057.   These Defendants' unlawful acts, undertaken willfully, intentionally, purposefully and without lawful justification, have injured and continue to injure the Assigning Creditors' businesses.

1058.   These Defendants' wrongful conduct was aimed directly at damaging the Assigning Creditors' businesses.

1059.   The Defendants' wrongful conduct constitutes a violation of the Virginia Business Conspiracy Act ("*VBCA*").

1060.   As a direct and proximate result of the conspiracy and agreement among the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants, the Assigning Creditors sustained significant damages, including but not limited to millions of dollars in unsecured credit extended and inflated and fraudulent claims paid to HDL.

1061.   The Assigning Creditors, acting through Plaintiff, are entitled to recover three times the damages they sustained and continue to sustain as a result of the conspiracy, in addition to reasonable attorneys' fees and expenses pursuant to the VBCA.

1062.    As a result of the conspiracy, Plaintiff is entitled to recover the damages suffered

by the Assigning Creditors from the D&O Defendants, Rangarajan, the BlueWave Defendants,

the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the

Doe Defendants in an amount to be proved at trial.

## COUNT 74

**(Declaratory Relief Under 28 U.S.C. §§ 2201-2202 and Fed.R.Bankr.P. 7001 Declaring
BlueWave Agreement to be Illegal and Unenforceable Pursuant to Ga. Code Ann. § 13-8-1
and Other Applicable Law; Against BlueWave)**

1063.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

1064.    The BlueWave Agreement provides that it is governed by the laws of the State of

Georgia.

1065.    An actual and genuine controversy exists as to whether the BlueWave Agreement

is illegal, unenforceable, and void under Georgia law.

1066.    The underlying purpose and object of the BlueWave Agreement violated the AKS

for the reasons set forth in detail above.

1067.    The BlueWave Agreement is an illegal contract that is void pursuant to Ga. Code

Ann. § 13-8-1 and other applicable law.

1068.    Plaintiff is entitled to a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and

2202 and Fed.R.Bankr.P. 7001 that the BlueWave Agreement is illegal, unenforceable, and void

in its entirety, and that BlueWave's proof of claim for any amounts owed under the BlueWave

Agreement, Claim No. 1056, should be disallowed in its entirety.

## COUNT 75

**(Objections to Proofs of Claims and Requests for Allowance of Administrative Expenses Under 11 U.S.C. §§ 502(b)(7), 502(d), 502(e), 503, and 507; Against the Mallory Defendants, the McConnell Defendants, Warnick, Rangarajan, the Galen Defendants, Ryan, BlueWave, Helena Laboratories, the Golias Family Shareholders, Petersen, Mayes, Tessler, Oates, and the Doe Defendants)**

1069.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

1070.    Certain of the Defendants have filed one or more proofs of claim for unsecured and/or administrative claims, or applications for orders allowing administrative expense claims, against the Debtors, or the Debtors filed such claims on behalf of such Defendants, and/or the Debtors scheduled such claims, including the Mallory Separation Amount, as set forth on **Exhibit G** (collectively, and as such may hereafter be amended, the "***Defendant Claims***"). In addition, with respect to the requests for an order allowing administrative expense claim filed by McConnell and Warnick, Plaintiff incorporates herein by this reference the combined objection filed to such applications [Docket No. 1253] (the "***Combined Objection***"). Plaintiff requests that this Court take judicial notice of the Defendant Claims and the Combined Objection on file with this Court.

1071.    As a result of the Defendants' breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, receipt of fraudulent and preferential transfers, inequitable conduct, conspiracy, and other wrongdoing, pursuant to Bankruptcy Code sections 502(b)(7), 502(d), 502(e), 503, and 507, the Court should (i) deny Defendants any right of set-off or recoupment against the claims asserted by Plaintiff in this litigation, and/or (ii) disallow each of the Defendant Claims against the Debtors in their entirety, including without limitation, each of the Defendant Claims seeking contribution or indemnity from any of the Debtors, until all other claims against the Debtors have been satisfied in full.

195

1072.   The BlueWave Agreement is illegal, unenforceable, and void in its entirety pursuant to Ga. Code Ann. § 13-8-1 and other applicable law and BlueWave's proof of claim for any amounts owed under the BlueWave Agreement, Claim No. 1056, should be disallowed in its entirety.

1073.   The Mallory Separation Claim exceeds the limitation imposed under Bankruptcy Code section 502(b)(7). If not disallowed in its entirety for the reasons set forth above, the Mallory Separation Claim should, at a minimum, be disallowed to the extent it exceeds such limitations.

**COUNT 76**

**(Equitable Subordination Under 11 U.S.C. § 510(c); Against the Mallory Defendants, the McConnell Defendants, Warnick, Rangarajan, the Galen Defendants, Ryan, BlueWave, Helena Laboratories, the Golias Family Shareholders, Petersen, Mayes, Tessler, Oates, and the Doe Defendants)**

1074.   Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

1075.   The wrongdoing and inequitable conduct of each Defendant as described above injured unsecured and other creditors and necessitates that the Defendant Claims be subordinated to the claims of all other creditors of the Debtors pursuant to Bankruptcy Code section 510(c) and the equitable powers of the Court.

1076.   As a result of the Defendants' breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, receipt of fraudulent and preferential transfers, inequitable conduct, conspiracy, and other wrongdoing, pursuant to Bankruptcy Code section 510(c), the Court should equitably subordinate each of the Defendant Claims in their entirety, including without limitation, each of the Defendant Claims seeking contribution or indemnity from any of the Debtors, until all other claims against the Debtors have been satisfied in full.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests entry of judgment on the Complaint as follows:

A.        On Counts 1 through 2, awarding Plaintiff judgment, pursuant to sections 548 and 550 of the Bankruptcy Code, against the Shareholder Defendants, the Mallory Trust, and the Doe Defendants avoiding the Debtors' transfers of the Shareholder Distributions and awarding Plaintiff monetary judgment against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants, jointly and severally, in an amount to be proved at trial;

B.        On Counts 3 through 4, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, 28 U.S.C. § 3304, against the Shareholder Defendants, the Mallory Trust, and the Doe Defendants avoiding the Debtors' transfers of the Shareholder Distributions and awarding Plaintiff monetary judgment against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants, jointly and severally, in an amount to be proved at trial;

C.        On Counts 5 through 6, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, Va. Code §§ 55-80 and 55-81, against the Shareholder Defendants, the Mallory Trust, and the Doe Defendants avoiding the Debtors' transfers of the Shareholder Distributions and awarding Plaintiff monetary judgment against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants, jointly and severally, in an amount to be proved at trial;

D.        On Counts 7 through 8, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, Texas Bus. & Com. Code §§ 24.001 et seq., Georgia Code §§ 18-2-70 et seq., Alabama Code §§ 8-9A-1 et seq., West Virginia Code §§ 40-

1A-1 et seq., Revised Code of Washington § 19.40.011 et seq., and Minnesota Statutes §§ 513.41 et seq., against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants avoiding the Debtors' transfers of the Shareholder Distributions and awarding Plaintiff monetary judgment against the Shareholder Defendants, the Mallory Trust, and the Doe Defendants, jointly and severally, in an amount to be proved at trial;

   E.  On Counts 9 through 10, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, S.C. Code § 27-23-10, against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants avoiding the Debtors' transfers of the Shareholder Distributions and awarding Plaintiff monetary judgment against the Shareholder Defendants, the Mallory Trust, and the Doe Defendants, jointly and severally, in an amount to be proved at trial;

   F.  On Counts 11 through 12, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, New York Debtor Creditor Law §§ 273-276, against the Shareholder Defendants, the Mallory Trust, and the Doe Defendants avoiding the Debtors' transfers of the Shareholder Distributions and awarding Plaintiff monetary judgment against the Shareholder Defendants, the Mallory Trust, the Warnick Entity Defendants, and the Doe Defendants, jointly and severally, in an amount to be proved at trial;

   G.  On Counts 13 through 14, awarding Plaintiff judgment, pursuant to sections 548 and 550 of the Bankruptcy Code, against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants avoiding the D&O Compensation and awarding Plaintiff monetary judgment against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants, jointly and severally, in an amount to be proved at trial;

H.      On Counts 15 through 16, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, 28 U.S.C. § 3304, against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants avoiding the D&O Compensation and awarding Plaintiff monetary judgment against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants, jointly and severally, in an amount to be proved at trial;

I.      On Counts 17 through 18, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, Va. Code §§ 55-80 and 55-81, against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants avoiding the D&O Compensation and awarding Plaintiff monetary judgment against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants, jointly and severally, in an amount to be proved at trial;

J.      On Counts 19 through 20, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, Revised Code of Washington § 19.40.011 et seq. and Minnesota Statutes §§ 513.41 et seq., against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants avoiding the D&O Compensation and awarding Plaintiff monetary judgment against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants, jointly and severally, in an amount to be proved at trial;

K.      On Count 21, awarding Plaintiff judgment, pursuant to sections 548(a)(1)(B)(i) and (ii)(IV) and 550 of the Bankruptcy Code, against Mallory, the Mallory Trust, McConnell,

Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants avoiding the D&O Compensation and awarding Plaintiff monetary judgment against Mallory, the Mallory Trust, McConnell, Warnick, the Warnick Entity Defendants, Rangarajan, Ryan, and the Doe Defendants, jointly and severally, in an amount to be proved at trial;

L.     On Count 22, awarding Plaintiff judgment, pursuant to sections 548(a)(1)(B)(i), 548(a)(1)(B)(ii)(I), (ii)(II), (ii)(III) and (ii)(IV) and 550 of the Bankruptcy Code, against Mallory avoiding the obligation to pay the Mallory Separation Amount and disallowing the scheduled claim therefor, and the Debtors' transfers made under the Mallory Separation Agreement, and awarding Plaintiff judgment against Mallory and the Mallory Trust thereon;

M.     On Counts 23 through 24, awarding Plaintiff judgment, pursuant to sections 548 and 550 of the Bankruptcy Code, against Rangarajan avoiding the Debtors' transfers of the Rangarajan Buyout Payments and awarding Plaintiff monetary judgment against Rangarajan in an amount to be proved at trial;

N.     On Counts 25 through 26, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, 28 U.S.C. § 3304, against Rangarajan avoiding the Debtors' transfers of the Rangarajan Buyout Payments and awarding Plaintiff monetary judgment against Rangarajan in an amount to be proved at trial;

O.     On Counts 27 through 28, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, Va. Code §§ 55-80 and 55-81, against Rangarajan avoiding the Debtors' transfers of the Rangarajan Buyout Payments and awarding Plaintiff monetary judgment against Rangarajan in an amount to be proved at trial;

P.      On Count 29, awarding Plaintiff judgment recharacterizing the March 1, 2010 Note and all transfers made by Tipton Golias to the Debtors pursuant to the March 1, 2010 Note as equity, and recharacterizing the Golias Double Payment as an equity distribution;

Q.      On Count 30, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, 28 U.S.C. § 3304, against Tipton Golias avoiding the Golias Double Payment and awarding Plaintiff monetary judgment against Tipton Golias in an amount to be proved at trial;

R.      On Count 31, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, Va. Code § 55-81, against Tipton Golias avoiding the Golias Double Payment and awarding Plaintiff monetary judgment against Tipton Golias in an amount to be proved at trial;

S.      On Count 32, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, Texas Bus. & Com. Code §§ 24.001 et seq., against Tipton Golias avoiding the Golias Double Payment and awarding Plaintiff monetary judgment against Tipton Golias in an amount to be proved at trial;

T.      On Count 33, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, New York Debtor and Creditor Law §§273 and 274, against Tipton Golias avoiding the Golias Double Payment and awarding Plaintiff monetary judgment against Tipton Golias in an amount to be proved at trial;

U.      On Count 34, awarding Plaintiff judgment recharacterizing the February 4, 2014 Note and all transfers made by Mallory and/or the Mallory Trust to the Debtors pursuant to the February 4, 2014 Note as equity, and recharacterizing the Mallory Payment as an equity distribution;

V.      On Count 35, awarding Plaintiff judgment, pursuant to sections 548 and 550 of the Bankruptcy Code, against Mallory and the Mallory Trust avoiding the Mallory Payment and awarding Plaintiff monetary judgment against Mallory and the Mallory Trust in an amount to be proved at trial;

W.      On Count 36, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, Va. Code § 55-81, against Mallory and the Mallory Trust avoiding the Mallory Payment and awarding Plaintiff monetary judgment against Mallory and the Mallory Trust in an amount to be proved at trial;

X.      On Counts 37 through 38, awarding Plaintiff judgment, pursuant to sections 548 and 550 of the Bankruptcy Code, against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants avoiding the Debtors' transfers of the BlueWave Payments and awarding Plaintiff monetary judgment against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, jointly and severally, in an amount to be proved at trial;

Y.      On Counts 39 through 40, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, 28 U.S.C. § 3304, against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants avoiding the Debtors' transfers of the BlueWave Payments and awarding Plaintiff monetary judgment against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, jointly and severally, in an amount to be proved at trial;

Z.      On Counts 41 through 42, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, Va. Code §§ 55-80 and 55-81, against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe

Defendants avoiding the Debtors' transfers of the BlueWave Payments and awarding Plaintiff monetary judgment against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, jointly and severally, in an amount to be proved at trial;

AA.    On Counts 43 through 44, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, Texas Bus. & Com. Code §§ 24.001 et seq., Georgia Code §§ 18-2-70 et seq., Alabama Code §§ 8-9A-1 et seq., West Virginia Code §§ 40-1A-1 et seq., against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants avoiding the Debtors' transfers of the BlueWave Payments and awarding Plaintiff monetary judgment against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, jointly and severally, in an amount to be proved at trial;

BB.    On Counts 45 through 46, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, S.C. Code § 27-23-10, against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants avoiding the Debtors' transfers of the BlueWave Payments and awarding Plaintiff monetary judgment against the BlueWave Defendants, the BlueWave Transferee Defendants, and the Doe Defendants, jointly and severally, in an amount to be proved at trial;

CC.    On Counts 47 through 48, awarding Plaintiff judgment, pursuant to section 544(b) of the Bankruptcy Code and, as applicable, 28 U.S.C. § 3304, against BlueWave, avoiding the obligations under the BlueWave Agreement and disallowing the BlueWave proof of claim therefor, Claim No. 1056, and awarding Plaintiff judgment against BlueWave thereon;

DD.    On Counts 49 through 50, awarding Plaintiff judgment, pursuant to section 544(b) of the Bankruptcy Code and, as applicable, Va. Code §§ 55-80 and 55-81, against BlueWave,

avoiding the obligations under the BlueWave Agreement and disallowing the BlueWave proof of claim therefor, Claim No. 1056, and awarding Plaintiff judgment against BlueWave thereon;

EE.    On Count 51, awarding Plaintiff judgment, pursuant to sections 547 and 550 of the Bankruptcy Code, against the D&O Defendants, the Galen Defendants, Bartlett, the Mallory Trust, the Shareholder Defendants, Helena Laboratories, and the Doe Defendants avoiding the Debtors' transfers of the 90 Day Preferential Transfers to the D&O Defendants, the Galen Defendants, Bartlett, the Mallory Trust, the Shareholder Defendants, Helena Laboratories, and the Doe Defendants and awarding Plaintiff monetary judgment against the D&O Defendants, the Galen Defendants, Bartlett, the Mallory Trust, the Warnick Entity Defendants, the Shareholder Defendants, Helena Laboratories, and the Doe Defendants, jointly and severally, in an amount to be proved at trial;

FF.    On Count 52, awarding Plaintiff judgment, pursuant to sections 547 and 550 of the Bankruptcy Code, against the D&O Defendants, the Galen Defendants, Bartlett, the Mallory Trust, the BlueWave Defendants, the BlueWave Transferee Defendants, Tipton Golias, Helena Laboratories, and the Doe Defendants avoiding the Debtors' transfers of the One Year Preferential Transfers to the D&O Defendants, the Galen Defendants, Bartlett, the Mallory Trust, the BlueWave Defendants, the BlueWave Transferee Defendants, Tipton Golias, Helena Laboratories, and the Doe Defendants and awarding Plaintiff monetary judgment against the D&O Defendants, the Galen Defendants, Bartlett, the Mallory Trust, the Warnick Entity Defendants, the BlueWave Defendants, the BlueWave Transferee Defendants, Tipton Golias, Helena Laboratories, and the Doe Defendants, jointly and severally, in an amount to be proved at trial;

GG.     On Counts 53 and 54, awarding Plaintiff judgment against the D&O Defendants, Rangarajan, Galen, and Bartlett, jointly and severally, for damages caused to the Debtors and their creditors, including the Assigning Creditors, as a result of the breaches of their fiduciary duties and self-dealing in an amount to be proved at trial;

HH.     On Count 55, awarding Plaintiff judgment against the D&O Defendants, Rangarajan, Galen, Bartlett, the Shareholder Defendants, the BlueWave Defendants, the BlueWave Transferee Defendants, the Major Sales Contractor Defendants, Ryan, and the Doe Defendants, jointly and severally, for damages caused to the Debtors and their creditors, including the Assigning Creditors, in violation of the trust fund doctrine in an amount to be proved at trial;

II.     On Counts 56 and 57, awarding Plaintiff judgment against Mallory for damages caused to the Debtors and their creditors, including the Assigning Creditors, as a result of Mallory's breaches of fiduciary duty and usurpation of corporate opportunity in an amount to be proved at trial;

JJ.     On Count 58, awarding Plaintiff judgment against the BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, Ryan, and the Doe Defendants, jointly and severally, for damages caused to the Debtors and their creditors, including the Assigning Creditors, as a result of their aiding and abetting breaches of fiduciary duties and self-dealing in an amount to be proved at trial;

KK.     On Count 59, awarding Plaintiff judgment against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, and the Doe Defendants, jointly and severally, for damages caused to the Debtors and their creditors, including the Assigning Creditors, as a result of the conspiracy in an amount to be proved at trial;

LL.     On Count 60, awarding Plaintiff judgment against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, Cobalt, and the Doe Defendants, jointly and severally, pursuant to the VBCA, for three times the damages caused to the Debtors and their creditors, including the Assigning Creditors, as a result of the conspiracy, in addition to reasonable attorneys' fees and expenses, in an amount to be proved at trial;

MM.     On Count 61, awarding Plaintiff judgment against the D&O Defendants, Galen, and Bartlett, jointly and severally, for the amount of the unlawful distributions made, plus interest, in an amount to be proved at trial;

NN.     On Count 62, awarding Plaintiff judgment against the D&O Defendants, Rangarajan, Galen, and Bartlett for damages caused to the Debtors and their creditors, including the Assigning Creditors, as a result of corporate waste in an amount to be proved at trial;

OO.     On Counts 63 through 64, awarding Plaintiff judgment against the D&O Defendants, Rangarajan, Galen, and Bartlett for damages caused to the Debtors and their creditors, including the Assigning Creditors, as a result of their negligence and gross negligence in an amount to be proved at trial;

PP.     On Counts 65 and 66, awarding Plaintiff judgment against all Defendants for turnover of money which, in equity and good conscience, does not belong to them, based on the doctrines of assumpsit and unjust enrichment, in an amount to be proved at trial;

QQ.     On Counts 67 through 68, awarding Plaintiff judgment against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants for damages caused to the

Debtors and their creditors, including the Assigning Creditors, as a result of their fraud and constructive fraud in an amount to be proved at trial;

RR.    On Counts 69 through 70, awarding Plaintiff judgment against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants for damages caused to the Assigning Creditors as a result of their tortious interference with contracts, contractual relationships, contractual expectancy, prospective business relationships and economic advantage, in an amount to be proved at trial;

SS.    On Count 71, awarding Plaintiff judgment against the D&O Defendants, Rangarajan, and the BlueWave Defendants for damages caused to Aetna as set forth in the Aetna Litigation and Amended Aetna Complaint in an amount to be proved at trial;

TT.    On Count 72, awarding Plaintiff judgment against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants, jointly and severally, for damages caused to the Assigning Creditors as a result of the conspiracy in an amount to be proved at trial;

UU.    On Count 73, awarding Plaintiff judgment against the D&O Defendants, Rangarajan, the BlueWave Defendants, the Major Sales Contractor Defendants, the BlueWave Sales Representative Defendants, and the Doe Defendants, jointly and severally, pursuant to the VBCA, for three times the damages caused to the Assigning Creditors as a result of the conspiracy, in addition to reasonable attorneys' fees and expenses, in an amount to be proved at trial;

VV.    On Count 74, for declaratory relief that the BlueWave Agreement is illegal, unenforceable, and void in its entirety pursuant to Ga. Code Ann. § 13-8-1 and other applicable

law, and BlueWave's proof of claim for any amounts owed under the BlueWave Agreement, Claim No. 1056, should be disallowed in its entirety;

WW.   On Count 75, awarding Plaintiff judgment, pursuant to sections 502(b)(7), 502(d), and 502(e) of the Bankruptcy Code, against the Mallory Defendants, the McConnell Defendants, Warnick, Rangarajan, the Galen Defendants, Ryan, BlueWave, Helena Laboratories, the Golias Family Shareholders, Petersen, Mayes, Tessler, Oates, and the Doe Defendants (i) denying such Defendants any right of set-off or recoupment against the claims asserted by Plaintiff in this litigation, (ii) disallowing each of the Defendant Claims against the Debtors, and/or (iii) at a minimum, disallowing the Mallory Separation Claim to the extent it exceeds the limitations in section 502(b)(7) of the Bankruptcy Code;

XX.    On Count 76, awarding Plaintiff judgment, pursuant to section 510(c) of the Bankruptcy Code, against the Mallory Defendants, the McConnell Defendants, Warnick, Rangarajan, the Galen Defendants, Ryan, BlueWave, Helena Laboratories, the Golias Family Shareholders, Petersen, Mayes, Tessler, Oates, and the Doe Defendants equitably subordinating each of the Defendant Claims in their entirety until all other claims against the Debtors have been satisfied in full;

YY.    Awarding Plaintiff interest, costs, and attorney's fees; and

ZZ.     Granting Plaintiff such other and further relief as the Court deems just and proper.

Dated: September 16, 2016

_/s/ Cullen D. Speckhart_
Cullen D. Speckhart (VSB No. 79096)
**WOLCOTT RIVERS GATES**
919 E. Main Street
Richmond, VA 23219
200 Bendix Road, Ste. 300
Virginia Beach, VA 23452
Telephone: (757) 497-6633
Direct: (757) 470-5566
Email: cspeckhart@wolriv.com

Douglas P. Lobel (VSB No. 42329)
**COOLEY LLP**
11951 Freedom Drive
Reston, VA  20190-5656
Telephone: (703) 456-8000
Direct; (703) 456-8019
Email: dlobel@cooley.com

Richard S. Kanowitz (admitted pro hac vice)
**COOLEY LLP**
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Email: rkanowitz@cooley.com

*Counsel to Plaintiff Richard Arrowsmith,
Liquidating Trustee of the HDL Liquidating
Trust*

136811078 v1

209

Please be advised that the following paragraphs have been redacted from the above Complaint and will be filed under seal:

¶¶3-36

¶¶177-205

¶¶220-236