IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN RE:          HEALTH DIAGNOSTIC LABORATORY,          Case No. 15-32919
                INC., *et al*.,                        Chapter 11
                                                       (Jointly Administered)
                        Debtors.

## MEMORANDUM OPINION

Before the Court is the motion of the HDL Liquidating Trust Oversight Committee (the

"Oversight Committee") and Richard Arrowsmith ("Arrowsmith"), in his capacity as the interim

Liquidating Trustee of the HDL Liquidating Trust (collectively the "Movants"), to appoint a

permanent liquidating trustee (the "Motion to Appoint")[1] and the objection thereto (the

"Objection") filed by Helena Laboratories, Noel Bartlett ("Bartlett"), and Dr. Robert S. Galen

("Galen").[2]  Following discovery and briefing of the dispute, the Court conducted an evidentiary

hearing (the "Hearing") on March 15, 2018.[3]  Having taken the matter under advisement to afford

the parties an opportunity to supplement the record with the submission of excerpts from two

deposition transcripts, the Court now overrules the Objection and grants the Motion to Appoint.

This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law in

---

[1] *See* Motion to Appoint, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919 (Bankr. E.D. Va. Dec. 7, 2017), ECF No. 3581.

[2] *See* Objection, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919 (Bankr. E.D. Va. Dec. 18, 2017), ECF No. 3605.  Helena Laboratories, Bartlett, and Galen are collectively referred to as the "Objecting Parties."

[3] At the Hearing, both parties introduced exhibits labeled numerically.  In total there were 77 Exhibits and 21 Appendices, which are cited accordingly in this Opinion.

support of its decision in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules").[4]

## Facts

Health Diagnostic Laboratory, Inc. ("HDL") was a privately held health care company

headquartered in Richmond, Virginia, that operated an accredited, full-service clinical laboratory.

Under HDL's prepetition business model, physicians would send blood samples to HDL, which

provided lab testing of biomarkers for the indication of risk for cardiovascular disease, diabetes,

and other illnesses. HDL processed the lab tests and frequently billed the patient's private

insurance carrier or a Federal Health Care Program such as Medicare or Medicaid. Afterwards,

HDL would reimburse the referring physicians for the costs associated with collecting, processing,

and handling the blood samples that the physicians had sent to HDL for testing. HDL experienced

extraordinary growth from a startup company in 2009 to a company with $375 million in net

revenue for the fiscal year ending December 31, 2013.

In 2013, the United States Department of Justice ("DOJ") and United States Department

of Health and Human Services' Office of Inspector General ("HHS OIG") began investigating the

Debtors and their outside sales team in connection with HDL's business practices including its

payment of process and handling fees ("P&H fees") to the referring physicians (the "DOJ

Investigation"). HDL retained the law firm of Ropes & Gray LLP ("Ropes & Gray") to handle

the DOJ Investigation. On June 25, 2014, HHS OIG issued a special fraud alert (the "Special

---

[4] This is a contested matter governed by Bankruptcy Rules 9013 and 9014 (the "Contested Matter"). *See* Fed. R. Bankr. P. 9014(a). Certain rules under part VII of the Bankruptcy Rules are applicable to contested matters, including Bankruptcy Rule 7052. *See* Fed. R. Bankr. P. 9014(c). Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

Fraud Alert") advising that the payment of P&H fees to referring physicians could violate certain federal anti-kickback laws.  After the issuance of the Special Fraud Alert, HDL ceased paying P&H fees to physicians.

Galen and Bartlett joined the Board of Directors of HDL (the "Board") on October 8, 2014. The last quarter of 2014 was a turbulent period for HDL.  HDL was in the process of replacing its physician referral program with in-office phlebotomists, independent draw sites and lab-to-lab agreements as the means for obtaining blood samples.  The transition from an outside sales force was having an adverse impact on HDL's revenues, which declined by more than 47%.  HDL's CEO and president, LaTonya Mallory, had resigned, and the company was receiving negative press coverage.[5]

HDL engaged the professional services firm of Alvarez & Marsal ("A&M") to serve as a financial advisor in November 2014.  A&M is a well-respected business consulting company that offers turnaround support and performance improvement for large corporations throughout the world.  The A&M financial advisors who worked directly for the HDL account included David Schlissel ("Schlissel"), Andrew Thung ("Thung"), and Arrowsmith.[6]  Among other matters, A&M shared financial models with HDL, advised HDL on expense reductions, and attended meetings of HDL's Board.

In April 2015, HDL signed a settlement agreement with DOJ ("DOJ Settlement"), as well as a separate corporate integrity agreement with HHS OIG.  In the DOJ Settlement, HDL agreed

---

[5] *See* John Carreyrou and Tom McGinty, *A Fast-Growing Medical Lab Tests Anti-Kickback Law*, Wall St. J. (Sept. 8, 2014, 1:06 p.m.), https://www.wsj.com/articles/a-fast-growing-medical-lab-tests-anti-kickback-law-1410143403.

[6] While Schlissel and Thung devoted substantially all of their time to the engagement, only 10–20% of Arrowsmith's prepetition time was allotted to HDL.  *See* A&M's HDL Exec. Discussion, Ex. 2, at 5.

3

to pay $47 million to settle all the government's claims against it in connection with the referral P&H Fees.[7]   During this time, HDL's relationship with its prepetition secured lender, Branch Banking and Trust Company ("BB&T"), was deteriorating.  When HDL defaulted under its loan facilities with BB&T, BB&T discontinued HDL's borrowing ability and cut off HDL's access to its existing accounts.  With no ability to access its cash and with no alternative sources of financing immediately available, HDL was forced to file for bankruptcy.

On June 7, 2015 (the "Petition Date"), Health Diagnostic Laboratory, Inc., Central Medical Laboratory, LLC, and Integrated Health Leaders, LLC (collectively the "Debtors") commenced bankruptcy cases (the "Bankruptcy Cases") by each filing a separate voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia (the "Court").[8]

A&M's Healthcare Industry Group assisted HDL with its restructuring efforts in order to maximize the value of the Debtors' bankruptcy estates.  Following a Court-approved sale of substantially all of the Debtors' operating assets under section 363 of the Bankruptcy Code in

---

[7] On August 7, 2015, the United States of America filed a Complaint in Intervention in a consolidated whistleblower suit against several defendants including HDL, BlueWave, Floyd Calhoun Dent, III, Robert Bradford Johnson, and LaTonya Mallory (the "Qui Tam Action").  *See* Complaint in Intervention, *United States v. BlueWave Healthcare Consultants, Inc.*, No. 14-00230 (D.S.C. Aug. 7, 2015), ECF No. 75.  In that case, the jury found, *inter alia*, HDL guilty of violating the False Claims Act on 35,074 instances.  *See* Verdict Form, Qui Tam Action (Jan. 31, 2018), ECF No. 870.

[8] The Court entered an order on June 9, 2015, authorizing the joint administration of the chapter 11 Bankruptcy Cases. The Debtors were permitted to operate the business of HDL as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee was ever appointed under section 1104 of the Bankruptcy Code.  On June 16, 2015, the United States Trustee for the Eastern District of Virginia appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee") in accordance with section 1102 of the Bankruptcy Code.

September of 2015,[9] Arrowsmith assumed the role as the Debtors' chief restructuring officer ("CRO").[10]

The Court confirmed the Debtors' Modified Second Amended Plan of Liquidation (the "Plan")[11] by order entered on May 12, 2016 (the "Confirmation Order").[12]  The HDL Liquidating Trust was formed in accordance with the terms of the Plan on the Effective Date.[13]  The HDL Liquidating Trust is the successor of the Debtors and the Creditors' Committee.[14]  Arrowsmith was appointed as the interim liquidating trustee of the HDL Liquidating Trust (the "Liquidating Trustee").[15]

On September 16, 2016, Arrowsmith commenced an adversary proceeding by filing a complaint (the "D&O Complaint") against over 100 different defendants, including Galen and

---

[9] *See* Sale Order, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919 (Bankr. E.D. Va. Sept. 17, 2015), ECF No. 512.

[10] *See* Order Modifying the Retention of Alvarez & Marsal Healthcare Industry Group, LLC, Solely to Replace Martin McGahan as Chief Restructuring Officer for the Debtors with Richard Arrowsmith, Effective as of September 21, 2015, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919 (Bankr. E.D. Va. Oct. 29, 2015), ECF No. 627.

[11] *See* Plan, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919 (Bankr. E.D. Va. Mar. 25, 2016), ECF No. 995.

[12] *See* Confirmation Order, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919 (Bankr. E.D. Va. May 12, 2016), ECF No. 1095.  Among other things, the Confirmation Order substantively consolidated the Debtors, their bankruptcy estates, and the Bankruptcy Cases.  *See id.* ¶ 50.

[13] The Plan became effective on May 12, 2016 (the "Effective Date").  *See* Notice of Confirmation of Chapter 11 Plan at 1, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919 (Bankr. E.D. Va. May 14, 2016), ECF No. 1106.

[14] *See* Confirmation Order, *supra* note 12, ¶ 52.  Section 6.5(c)(12) of the Plan grants the Liquidating Trustee the power and charges the Liquidating Trustee with the duty of pursuing claims of the Debtors, the estates, and the Creditors' Committee identified in section 1.76 of the Plan.  *See* Plan, *supra* note 11, ¶ 6.5(c)(12).

[15] Mod. Liquidating Trust Agreement ¶ 8.1, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919 (Bankr. E.D. Va. March 25, 2016), ECF No. 999.  By order entered November 30, 2016, the Court extended the deadline for selecting the permanent Liquidating Trustee from 210 days after the Effective Date to November 13, 2017.  That deadline was further extended to January 2, 2018, by order entered June 22, 2017.  Entry of neither order was contested by the Objecting Parties or by any other party in interest in these Bankruptcy Cases.

Bartlett.[16]   The D&O Complaint included breach of fiduciary duty claims against Galen and

Bartlett for (i) authorizing prepetition payments to Global Genomics Group ("G3"),[17]

(ii) authorizing funding for C3Nexus,[18] and (iii) failing to extend a tolling agreement[19] with the

Debtors' prepetition law firm.

On December 7, 2017, the Oversight Committee and interim Liquidating Trustee filed the

Motion to Appoint.   The Movants requested that the Court appoint Arrowsmith as the permanent

liquidating trustee of the HDL Liquidating Trust pursuant to the selection process previously

conducted by the Oversight Committee.   The Objection was filed on December 18, 2017.   The

Objecting Parties argued that Arrowsmith had a conflict of interest that precludes him from serving

as the permanent liquidating trustee and necessitates the "appointment of a disinterested trustee

from [an] Agreed List."[20]   The Court held an initial hearing on the Motion to Appoint and the

Objection on December 21, 2017 (the "Initial Hearing on Motion to Appoint").   Both the Movants

---

[16] *See* Complaint, *Arrowsmith v. Mallory* (*In re Health Diagnostic Laboratory, Inc.*), No. 15-32919, APN 16-03271 (Bankr. E.D. Va. Sept. 16, 2016), ECF No. 1.   The D&O Complaint included claims against Galen and Bartlett for preferential transfers (Counts 51 and 52), breach of fiduciary duty (Counts 53 and 54), violation of the Trust Fund Doctrine (Count 55), unlawful distributions under state law (Count 61), corporate waste (Count 62), negligence (Count 63), gross negligence (Count 64), objections to proofs of claim and requests for allowance of administrative expenses (Count 75), and equitable subordination (Count 76). Counts 75 and 76 were brought against Galen, but not Bartlett.

[17] G3 was a non-debtor subsidiary in which HDL owned a 50% interest.   It was formed in 2012 to discover genetic biomarkers to detect human susceptibility to cardiovascular disease.

[18] C3Nexus was a limited liability company in which the Debtors had no ownership interest but to which the Debtors had loaned money and dedicated resources.   It provided home care for cardiovascular and chronic care patients who were recently discharged from the hospital.

[19] A tolling agreement is "[a]n agreement between a potential plaintiff and a potential defendant by which the defendant agrees to extend the statutory limitations period on the plaintiff's claim . . . ." BLACK'S LAW DICTIONARY (10th ed. 2014), tolling agreement.   HDL had a tolling agreement in place with its counsel, LeClairRyan, relating to claims arising out of an opinion letter LeClairRyan had provided to HDL (the "Tolling Agreement").   The Tolling Agreement was set to expire soon after Galen and Bartlett joined the Board.

[20] *See* Objection, *supra* note 2, at 8.

6

and the Objecting Parties asked the Court to schedule the Contested Matter for an evidentiary hearing and allow for limited discovery.  The Court entered an Order Adjourning Motion for the Appointment of a Permanent Liquidating Trustee (the "Adjournment Order"), which set the March 15, 2018 Hearing.[21]  The Court requested the parties to brief the issue of what standard should be applied in determining whether Arrowsmith should be appointed on a permanent basis (the "Determination Issue").[22]

## Jurisdiction and Venue

The Court has subject matter jurisdiction over this Contested Matter pursuant to 28 U.S.C. §§ 157 and 1334 and the General Order of Reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), as it concerns issues integral to the administration of the Debtors' Bankruptcy Cases.  Venue is appropriate in this Court pursuant to 28 U.S.C. § 1408.

## Discussion

The Objecting Parties maintain that, because Arrowsmith served as a prepetition financial advisor for HDL, participated in meetings of HDL's Board, and functioned as the Debtors' chief restructuring officer, Arrowsmith is disqualified from serving as Liquidating Trustee of the HDL Liquidating Trust and fiduciary for the Liquidating Trust Beneficiaries.[23]  Galen and Bartlett do not suggest that a prepetition financial advisor or a bankruptcy appointed CRO could never serve

---

[21] *See* Adjournment Order, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919 (Bankr. E.D. Va. Jan. 3, 2018), ECF No. 3638.

[22] *See id.* at 2.

[23] The "Liquidating Trust Beneficiaries" include the holders of Allowed Class 3 Claims, Class 4 Claims, and Class 5 Interests.  *See* Plan, *supra* note 11, ¶ 1.69.

as a post-confirmation liquidating trustee.  They concede there would be no problem if Arrowsmith were pursuing claims only against third parties.  They take umbrage with the fact that Arrowsmith is suing them for acts they claim were undertaken based upon advices he gave them as members of HDL's Board.  Arrowsmith contends that he gave no such advices.  Before delving into the factual dispute, the Court will address first the Determination Issue.  Remarkably, few cases have touched directly upon the legal standard applicable to the appointment of a trustee for a post-confirmation liquidating trust.

It is well established that a trustee of a post-confirmation liquidating trust differs from a chapter 11 trustee appointed by a court under 11 U.S.C. § 1104.  Section 1104 of the Bankruptcy Code only applies to trustees appointed "*before* confirmation of a plan."  *See* 11 U.S.C. § 1104(a) (emphasis added).  The Liquidating Trustee was appointed pursuant to the Court's Confirmation Order.  *See* Confirmation Order, *supra* note 12.  As the Liquidating Trustee was not appointed "before confirmation of a plan" but rather was appointed as a result of confirmation of the Debtors' Plan, the Liquidating Trustee falls outside the ambit of section 1104 of the Bankruptcy Code.  *See* 11 U.S.C. § 1104(a).

A liquidating trustee is a "representative of the estate" appointed under 11 U.S.C. § 1123(b)(3)(B).  *See United States v. Bond*, 762 F.3d 255, 260–61 (2d Cir. 2014); *McFarland v. Leyh* (*In re Tex. Gen. Petroleum Corp.*), 52 F.3d 1330, 1334–35 (5th Cir. 1995); *Greif & Co. v. Shapiro* (*In re W. Funding Inc.*), 550 B.R. 841, 850 (B.A.P. 9th Cir. 2016), *aff'd*, 705 F. App'x 600 (9th Cir. 2017); *BC Liquidating, LLC v. Weinstein* (*In re BC Funding, LLC*), 519 B.R. 394, 409–10 (Bankr. E.D.N.Y. 2014).  Section 1123 of the Bankruptcy Code governs generally the

contents of a chapter 11 plan.[24]   Subsection (b)(3)(B) of section 1123 of the Bankruptcy Code

allows a chapter 11 plan to provide for the "enforcement . . . by a *representative of the estate*

*appointed for such purpose*, of any [ ] claim" belonging to the debtor or to the estate.   *See* 11 U.S.C.

§ 1123(b)(3)(B) (emphasis added).[25]   The powers and duties of a "representative of the estate,"

such as a liquidating trustee, are dictated by such operative documents as the confirmation order,

chapter 11 plan, and any applicable trust instruments.   *See Grede v. Bank of N.Y. Mellon*, 598 F.3d

899, 901–02 (7th Cir. 2010) ("Although the terms of the Bankruptcy Code govern the permissible

duties of a trustee *in* bankruptcy, the terms of the plan of reorganization (and of the trust

instrument) govern the permissible duties of a trustee *after* bankruptcy.") (emphasis in original);

*In re Health Diagnostic Lab., Inc.*, 2017 WL 4457609 at *5 (Bankr. E.D. Va. Oct. 4, 2017) ("The

terms of a confirmed plan govern the permissible duties of a trustee following bankruptcy."); *In re*

*BC Funding LLC*, 519 B.R. at 410 ("[T]he authority and power of an estate representative

appointed pursuant to section 1123(b)(3) derives solely from the confirmed plan, confirmation

order, and any operative documents adopted by reference into the plan and confirmation order.").

In the case at bar, the Confirmed Plan, the Confirmation Order, and the Liquidating Trust

Agreement set forth the powers and duties of the Liquidating Trustee.[26]   The Liquidating Trustee

---

[24] Subsection (a) of section 1123 of the Bankruptcy Code sets forth certain mandatory provisions a plan must include, while subsection (b) of section 1123 recites various permissible provisions a plan may include.

[25] Section 1123(b)(3)(B) of the Bankruptcy Code refers separately to the debtor, the trustee, or a representative of the estate in distinguishing between the three entities that may be charged with post-confirmation responsibility for enforcing claims belonging to the bankruptcy estate.   *See, e.g.*, *Bond*, 762 F.3d at 260 ([A] Liquidating Trustee . . . is not a "trustee" as that word is used in [section 1104 of the Bankruptcy Code].").

[26] *See* Confirmation Order, *supra* note 12; Plan, *supra* note 11; Mod. Liquidating Trust Agreement, *supra* note 15, ¶ 1.3.

is the "representative of the estate" tasked with enforcing claims held by the Debtors' bankruptcy estates.  *See* 11 U.S.C. § 1123(b)(3)(B); Plan, *supra* note 11, ¶ 6.5(c)(12).

A liquidating trustee of a post-confirmation liquidating trust is not subject to the "disinterested person" requirement set forth in section 1104(d) of the Bankruptcy Code.[27]  The plain language employed in sections 1104(d) and 1123(b)(3)(B) of the Bankruptcy Code does not require it.  Creditors often find that it is beneficial to have a person with knowledge and familiarity of the debtor's business serve as the liquidating trustee in order to efficiently wind down the debtor's business and liquidate the estate for their ultimate benefit.  Imposition of a "disinterested person" standard is an unnecessary constraint.  Its application may eliminate the most capable and the most desirable individuals from participating as liquidating trustee simply due to "insider" status.

Arrowsmith was lawfully chosen as the Liquidating Trustee.  Courts generally defer to the plan confirmation process for the selection of an appropriate liquidating trustee.  In the case at bar, the initial selection was made by the Debtors, as the plan proponent.  The Plan, as required by section 1129(a)(5) of the Bankruptcy Code, disclosed the identity of the proposed successor to the debtor following confirmation.  *See* 11 U.S.C. § 1129(a)(5).  Section 1.74 of the Debtors' Plan provided for the appointment of Arrowsmith as Liquidating Trustee of the HDL Liquidating Trust

---

[27] A "disinterested person" means a person that:
     (A) is not a creditor, an equity security holder, or an insider;
     (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and
     (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.
11 U.S.C. § 101(14).

on an interim basis.[28]  The creditors, by voting overwhelmingly in favor of confirmation of the

Debtors' proposed Plan, approved the Debtors' selection.   As the Liquidating Trustee is the

successor of the Creditors' Committee,[29] the Court applied the legal standard applicable to the

approval of a financial advisor to a committee of creditors under 11 U.S.C. § 1103(b) of the

Bankruptcy Code when it entered its Confirmation Order approving the selection of Arrowsmith

as Liquidating Trustee.[30]  The Court was satisfied from the evidence presented at the confirmation

hearing that the appointment of Arrowsmith as interim Liquidating Trustee was consistent with

the interests of the Debtors' creditors and equity interest holders in all respects.  Arrowsmith was

found to be well qualified to facilitate the efficient liquidation and dissolution of the Debtors'

bankruptcy estates.  The Court determined that he did not have any interest adverse to the Debtors'

bankruptcy estates on account of his prior relationships as a prepetition financial advisor for HDL

and as the Debtors' postpetition CRO.   All parties in interest supported the appointment of

Arrowsmith as interim Liquidating Trustee at the confirmation hearing, including the Objecting

Parties (two of whom voted favorably as members of the Debtors' Board to sponsor the Plan).[31]

---

[28] *See* Plan, *supra* note 11, ¶ 1.74.

[29] Section 6.5(c)(23) of the Plan states that the Liquidating Trustee is the "successor of the Debtors and the Creditors' Committee for all purposes . . . ."  *See id.* ¶ 6.5(c)(23).

[30] Section 1103(a) of the Bankruptcy Code permits a committee of creditors appointed under 11 U.S.C. § 1102(a) to employ financial advisors "with the court's approval."   While such financial advisors do not need to meet the disinterested person standard, they cannot, while employed by the committee, represent any other entity having an adverse interest in connection with the bankruptcy case.   *See* 11 U.S.C. § 1103(b); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1103.04 (Richard Levin & Henry J. Sommer eds., 16 ed.) (Section 1103(b) of the Bankruptcy Code "preclude[s] attorneys and accountants retained by a committee from simultaneously representing another entity in a chapter 11 case if that entity holds an interest adverse to the [bankruptcy] estate.").

[31]  The Court expressed serious concern at the Initial Hearing on Motion to Appoint as to why the Objection to Arrowsmith servicing as Liquidating Trustee was filed so late into the Debtors' liquidation.  *See* Hrg. Tr. of Dec. 21, 2017 48:24–49:3 (The Court: "[Y]ou raised very, very serious allegations – why I wouldn't have been alerted to this prior to today . . . . I mean, the plan was confirmed in May of '16. And here we are at the end of 2017, and I'm being told this for the first time.").  Nonetheless, the Court believed that the allegations, if proven true, were serious enough to warrant an evidentiary hearing on the matter.

The Court will not now substitute a different standard pertaining to the selection of a permanent Liquidating Trustee.[32] It will not impose a "disinterestedness" requirement for the appointment.[33]

There is no need to adopt a different standard for the appointment of a permanent Liquidating Trustee because the Plan makes no distinction between the powers and duties that the interim Liquidating Trustee has from those possessed by the permanent Liquidating Trustee.[34] The Plan provides that the Liquidating Trustee is, among other things, "authorized, empowered and directed to take all actions necessary . . . exercise and fulfill the duties and obligations arising hereunder, including . . . (12) [t]o investigate, . . . prosecute and/or settle . . . any Litigation Claims . . . ."[35] The HDL Liquidating Trust has a duration of five years.[36] Arrowsmith has now served in the capacity of interim Liquidating Trustee for almost two of those years. During that

---

[32] The Liquidating Trust Agreement, which is incorporated into the Plan, explicitly provides that any professionals employed by the Liquidating Trustee, inclusive of the Liquidating Trustee's firm, need not be "disinterested" as that term is defined in the Bankruptcy Code. *See* Mod. Liquidating Trust Agreement, *supra* note 15, ¶ 4.6 ("The Liquidating Trust Professionals need not be "disinterested" as that term is defined in the Bankruptcy Code and may include, without limitation, the Liquidating Trustee's firm (should the Liquidating Trustee be a part of a professional services firm) . . . .").

[33] The Objecting Parties cite two chapter 11 confirmation opinions, which they maintain, imposed a disinterestedness requirement on post-confirmation liquidating trustees. *See In re Provident Royalties, LLC*, 2010 Bankr. LEXIS 1947, *34–35 (Bankr. N.D. Tex. June 10, 2010); *In re WRN 1301, Inc.*, 2007 Bankr. LEXIS 4691, at *15–16 (Bankr. E.D. Tex. May 24, 2007). Those cases did not cite any authority supporting the imposition of a disinterestedness requirement and did not discuss any rationale for its inclusion. To the contrary, the requirement does not appear to be one imposed at all. The provision simply appears as a factual recitation in the court's confirmation order. The issue was not controverted. To the contrary, the court found that "no party . . . raised any issue disputing [the named liquidating trustee's] qualifications or appropriateness to serve as the Trustee." *In re WRN 1301, Inc.*, 2007 Bankr. LEXIS 4691 at *16. The Court does not find this precedent persuasive on the Determination Issue.

[34] Section 1.74 of the Plan states: "For the avoidance of doubt, as used in this Plan, the term Liquidating Trustee means the interim Liquidating Trustee and any permanent Liquidating Trustee." *See* Plan, *supra* note 11, ¶ 1.74.

[35] *See id.* ¶ 6.5(c). Litigation Claims are those identified on Exhibit A attached to the Plan. *See id.* ¶ 1.76. They include all "Causes of Action arising out of or related to the Debtors or their business practices against the D&Os." *See id.*, Ex. A.

[36] *See id.* ¶ 6.4(d).

time, Arrowsmith has been busy winding down the Debtors' business, liquidating assets, and

commencing thousands of adversary proceedings to recover Litigation Claims on behalf of the

HDL Liquidating Trust.

The Liquidating Trust Agreement does contemplate the appointment of a successor

permanent Liquidating Trustee.[37]  The Debtors, as settlors of the HDL Liquidating Trust, delegated

their authority to appoint the permanent Liquidating Trustee to the Oversight Committee.[38]  The

Oversight Committee was provided with an Agreed List of potential candidates from which it

could select the permanent Liquidating Trustee.[39]  If the appointment of a permanent Liquidating

Trustee from the Agreed List proved to be impracticable, then the Confirmation Order, the

Confirmed Plan, and the Trust Agreement all provide that the Oversight Committee may "seek

---

[37] The form of the Liquidating Trust Agreement was approved by the Court and the Debtors were specifically authorized to effectuate it.  *See* Confirmation Order, *supra* note 12, ¶ 54.  The Trust Agreement contains the following provision regarding the appointment of a permanent liquidating trustee:

> Liquidating Trustee. The Liquidating Trustee initially on an interim basis shall be Richard Arrowsmith, who will be retained as of the Effective Date, as the Liquidating Trustee of the Liquidating Trust in accordance with this Agreement; provided, however, that the Liquidating Trust Oversight Committee must select a permanent Liquidating Trustee from the Agreed List, and such permanent Liquidating Trustee must be in position before the expiration of 210 days after the Effective Date; provided, further, that if after commercially reasonable efforts of the Liquidating Trust Oversight Committee, appointment of a permanent Liquidating Trustee from the Agreed List no longer is practicable, the Liquidating Trust Oversight Committee shall be permitted to seek relief from the Bankruptcy Court, upon notice to parties in interest and an opportunity to be heard, to appoint an appropriate permanent Liquidating Trustee who is not from the Agreed List. For the avoidance of doubt, as used in the Plan and this Agreement, the term Liquidating Trustee means the interim Liquidating Trustee and any permanent Liquidating Trustee.

Mod. Liquidating Trust Agreement, *supra* note 15, ¶ 8.1 (emphasis in original).

[38] The Oversight Committee of the HDL Liquidating Trust was created under the terms of the Liquidating Trust Agreement.  It is comprised of former members of the Creditors' Committee and the holders of the two largest class 3 claims. The members of the Oversight Committee are sophisticated and experienced business people.  The Oversight Committee is responsible for monitoring and supervising the performance of the Liquidating Trustee.  *See id.* ¶¶ 2.1–2.2.

[39] The Agreed List ("Agreed List") "means the list agreed upon by the Creditors' Committee and the Debtors that will consist of the three candidates proposed by the Debtors already agreed to by counsel to the Creditors' Committee, plus up to three candidates proposed by the Creditors' Committee who are acceptable to the Debtors."  *See* Plan, *supra* note 11, ¶ 1.4.

relief from the Bankruptcy Court . . . to appoint an *appropriate* permanent Liquidating Trustee who is not from the Agreed List."[40]

The Oversight Committee made the determination, in the exercise of its reasonable business judgment undertaken after commercially reasonable efforts, that it was no longer practical to appoint a permanent Liquidating Trustee from the Agreed List.  The Oversight Committee considered such things as the passage of time since the Debtors' Plan had been confirmed, the departure of all the Debtors' former employees, the institutional knowledge possessed by the interim Liquidating Trustee, and the cost and disruption of replacing the interim Liquidating Trustee.  The Oversight Committee was confident that Arrowsmith would be the best person for the job based on the Oversight Committee's experience working with him in his capacity as interim Liquidating Trustee and as the Debtors' CRO during the bankruptcy proceedings.[41]  No party in interest objected to the appointment of the interim Liquidating Trustee as the permanent Liquidating Trustee except the three Objecting Parties, which coincidently are named defendants in the D&O Complaint brought by the interim Liquidating Trustee to recover Litigation Claims for the benefit of Liquidating Trust Beneficiaries ("the D&O Adversary Proceeding").[42]  The Court finds that not only was the replacement of the interim Liquidating Trustee no longer practical, but also that it is in the best interest of the Liquidating Trust Beneficiaries to name Arrowsmith as the

---

[40] Mod. Liquidating Trust Agreement, *supra* note 15, ¶ 8.1.  The evidence at the Hearing established that this language was inserted into the Plan by Debtors' counsel on HDL's behalf to make the Oversight Committee's selection of Arrowsmith as permanent Liquidating Trustee a likely possibility based upon commercial considerations.

[41] One of the co-chairs of the Oversight Committee testified that they chose Arrowsmith because: "the whole point that we kind of embraced him coming in as a compromise is because he knew the ins and outs of the operations of this company.  He knew which way and how to ferret things out, so we could get to the recoveries that we need to in this case."  Tr. 244:16–20.

[42] Complaint, *supra* note 16.

permanent Liquidating Trustee, given his exposure to the industry, his knowledge about HDL, and his familiarity with the Litigation Claims.  No evidence presented by the Objecting Parties at the Hearing suggested that the interim Liquidating Trustee was no longer an *appropriate* fiduciary.[43] The Court finds that Arrowsmith was appointed by the Oversight Committee as the permanent Liquidating Trustee pursuant to a valid, commercially reasonable selection process.

Under any standard applied to the appointment of a post-confirmation liquidating trustee, the Court finds that Arrowsmith does not suffer from any debilitating conflicts of interest that would preclude him from being appointed the permanent Liquidating Trustee.  The Objecting Parties have failed to prove that Arrowsmith or A&M gave any of the affirmative advices set forth in the Objection.   The purported affirmative advices alleged in the Objection concern: (1) prepetition solvency representations; (2) HDL's prepetition funding of G3; (3) HDL's prepetition funding of C3Nexus; (4) the Board's failure to extend a tolling agreement with HDL's prepetition law firm LeClairRyan; (5) representations of medical necessity made in a declaration provided in the first day motions; and (6) testimony offered by Arrowsmith that the Board always listened to the advice that he gave.

The Objecting Parties' allegation that A&M provided financial analyses and advice at Board meetings showing that HDL was solvent turns out to be inaccurate.  Nothing in the minutes of the Board substantiates this claim.  The Objecting Parties' major contention centers on the DOJ

---

[43] It is uncontroverted that the Liquidating Trustee has complied with his fiduciary duty at all stages of these Bankruptcy Cases, including by filing the D&O Complaint, negotiating the sale of real property, reaching multi-million dollar settlements, and filing over fourteen hundred adversary proceedings to avoid fraudulent and preferential transfers.  Courts are generally reluctant to remove a trustee appointed by a settlor for known grounds existing at the time of the trust's creation.  *See, e.g.*, *Caldwell v. Hanes* (*In re Hanes*), 214 B.R. 786, 816 (Bankr. E.D. Va. 1997).  That reluctance becomes compelling when none of the alleged grounds for removal demonstrate an actual or potential bias against the Liquidating Trust Beneficiaries.

Settlement.  The evidence established, however, that the DOJ Settlement was negotiated prior to A&M's engagement.[44]  Ropes & Gray assisted HDL in negotiating the DOJ settlement.  The "ability to pay" analysis, about which the Objecting Parties complain, was not prepared or reviewed by A&M.  Rather, Ropes & Gray engaged the professional services firm of Duff & Phelps ("Duff & Phelps") to perform the financial analysis it required for the DOJ settlement.[45]  Duff & Phelps prepared the "ability to pay" analysis that became part of the DOJ settlement.  A&M later opined as to HDL's inability to adhere to that payment schedule.  A&M did not make any contribution to the underlying DOJ Settlement.[46]

A&M never rendered any opinion that HDL was solvent.  To the contrary, A&M repeatedly advised HDL that it had significant liquidity issues.  It recommended against signing an extension of the Debtors' loan agreement with BB&T due to a solvency representation contained in the agreement.  On March 5, 2015, A&M provided a presentation at a meeting of HDL's Board stating that "HDL is *insolvent*" and that without "extension from BB&T or immediate capital infusion" there would be "no access to cash to fund payroll in several weeks (mid to late March)."[47]  A&M's financial analysis consistently showed that HDL had significant liquidity issues.  There is no

---

[44] *See* Arrowsmith Dep., App. 1, 75:4–7.

[45] *See id.* ("[T]he settlement was done before A&M landed on the ground. And it was done because Duff & Phelps had prepared a projection that was given to the DOJ.").

[46] *See id.*  HDL's decision to sign the DOJ settlement agreement was not based upon advice obtained from A&M that HDL was solvent.  To the contrary, the company executed the settlement agreement despite the fact that "A&M was on record with HDL that HDL was insolvent."  *See id.* at 179:19–21, 179:23.  No one at A&M was "asked to weigh in on the settlement agreement."  *See id.* at 115:24–116:1, 116:3, 180:7–11.  While A&M later assisted in updating HDL's financial projections to show that HDL needed relief on the DOJ payment schedule that the Debtors had negotiated, the company provided the underlying financial information to A&M.  The purpose of the updated projections was to demonstrate to the DOJ that HDL had serious liquidity issues.

[47] *See* A&M's HDL Financial Update Mar. 5, 2015, Ex. 38, at 2 (emphasis added).

16

evidence that A&M ever rendered an opinion to the contrary during its engagement.  The Court finds that Arrowsmith is not conflicted because of any financial advice A&M provided to HDL.

Similarly, there is no evidence that A&M failed to advise the Objecting Parties about HDL's investments in G3 and C3Nexus.  A&M was never asked to render such investment advice.[48]  The minutes of the Board meetings reflect that the decision-making process for both G3 and C3Nexus was driven without input from A&M.

The Objecting Parties assertion that Arrowsmith has a conflict of interest because some unidentified person, allegedly from A&M, made a passing comment during the Debtors' April 23, 2015 Board meeting that HDL should not waste time or money on the Tolling Agreement.  The evidence established at the Hearing refuted this contention.  The minutes from the Board meeting make no reference to any such comment.  Furthermore, HDL had engaged an outside law firm in April of 2015 to negotiate an extension of the Tolling Agreement with LeClairRyan.  Bartlett testified at the Hearing that he was engaged in union negotiations at the time and was too distracted to deal with the matter personally.[49]  He turned the matter over to his own personal counsel who dealt with HDL's outside law firm on his behalf.[50]  Neither Bartlett nor his personal counsel consulted A&M on the matter.  No one at A&M had any role in negotiating the extension of the Tolling Agreement.

The Objecting Parties next claim that Arrowsmith is conflicted because a First Day Declaration given by a fellow member of A&M, Martin McGahan, "extolled the medical

---

[48] Arrowsmith Dep., App. 1, 30:19–31:16.

[49] *See* Tr. 136:1–13.

[50] *See id.*

usefulness of HDL's preventive testing."[51]  The Objecting Parties suggest that this representation

is at odds with the allegations set forth in the D&O Complaint.[52]  The First Day Declaration states

clearly on its face that the statement was based upon "information provided to [McGahan] by

executive officers of HDL, Inc., employees of the organization and outside professional

advisors . . . ."[53]  The Court was well aware at the time that McGahan was a financial consultant –

not a scientist or physician.  The Court assumed that McGahan, as the declaration made clear, had

reasonably relied upon the knowledge of others in subject matter areas outside his expertise.  The

evidence presented at the Hearing showed that HDL's bankruptcy counsel drafted the portions of

the First Day Declaration pertaining to medical testing.[54]  Arrowsmith had no input regarding that

particular representation in the First Day Declaration.[55]

Finally, the Objecting Parties argue that Arrowsmith is conflicted because he testified at a

hearing conducted on the October 22, 2015 in connection with the motion of the Creditors'

Committee for a Bankruptcy Rule 2004 examination that the Board always listened to the advice

that he gave.  The attributed testimony has been taken and used out of context.  The testimony was

elicited in a redirected examination conducted by Debtors' counsel in response to questions from

the Creditors' Committee regarding postpetition activities of the Debtors' Board.  It is clear that

---

[51] *See* Declaration of Martin McGahan, Chief Restructuring Officer of Health Diagnostic Laboratory, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919 (Bankr. E.D. Va. June 7, 2015), ECF No. 4 (the "First Day Declaration").

[52] The Objecting Parties assume, without citing any legal authority therefor, that the conduct of the members of A&M can be imputed to Arrowsmith.

[53] *See* First Day Declaration, *supra* note 51, at 2–3 ¶ 4.

[54] Tr. 227:12–15.

[55] Arrowsmith Dep., App. 1, 103:11–17.

18

Arrowsmith was referring to advice he had given during the postpetition period. The testimony has no bearing on allegations concerning prepetition misconduct set forth in the D&O Complaint.

As it became apparent that the affirmative advices alleged in the Objection were not supported by the factual evidence, the position of the Objecting Parties morphed somewhat from a "detrimental reliance based on affirmative advices" objection into a "silence implies agreement" objection.[56] The Objecting Parties suffer from the mistaken impression that there is no distinction between them, as members of HDL's Board, and HDL.[57]  HDL was A&M's client, not the members of the Debtors' Board.  A&M owed no duty to the Objecting Parties.  Perhaps the fact that the Objecting Parties were not equipped with information regarding the prepetition advice A&M did give to HDL is best explained by the terms of the engagement letter dated November 17, 2014, between HDL and A&M (the "Engagement Letter"), which specifically required A&M to communicate exclusively with HDL's Responsible Officers, defined as HDL's Chief Executive Officer, Joseph McConnell, and HDL's Corporate Counsel, Douglas Sbertoli.[58]  The Objecting Parties had no right to expect A&M to give them unsolicited financial advice.  The Engagement Letter clearly denies third-party beneficiary status to the Objecting Parties.[59]  The Court finds that

---

[56] Testimony offered by the Objecting Parties illustrates this new position that A&M's silence on issues constituted agreement.  *See, e.g.*, Tr. 158:7–9 ("And if [A&M] disagree[d], or they thought there was something incorrect, I expected them to bring it up to us so that we could rectify it.").

[57] For example, the Objecting Parties complain in their memorandum filed in support of their objection that after working "hand-in-glove with HDL and its Board, developing a relationship of trust and confidence, [Arrowsmith] switched teams. . . . [I]nstead of waiting for the appointment of [an] independent, permanent trustee, Mr. Arrowsmith himself decided to sue Dr. Galen and Mr. Bartlett for actions they took and decisions they made while Mr. Arrowsmith [was] advising HDL and its Board."  *See* Supplemental Memorandum in Opposition to Memorandum filed by Richard Arrowsmith at 3–4, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919 (Bankr. E.D. Va. Feb. 22, 2018), ECF No. 3760.

[58] *See* Engagement Letter, Ex. 1, at 1, 3.

[59] *See id.* at 5 ¶ 7.

there exists no disabling conflict that would prevent Arrowsmith from serving permanently as the Liquidating Trust's fiduciary based upon any of the theories advanced by the Objecting Parties.

The recitation of alleged anticipatory conflicts is also of no moment.[60]  The Liquidating Trustee has available to him procedures for the resolution of any potential conflicts that could arise in the future.  The Liquidating Trust Agreement provides that "if the Liquidating Trustee believes that he is conflicted or has a good faith doubt as to any action that should be taken under the Plan, he is authorized to (a) cease performance under the Liquidating Trust Agreement until the disagreement has been resolved; (b) file an interpleader suit; or (c) file any other appropriate motion for relief with the Court.[61]  The fact that some unknown conflict could present itself at some future date does not disqualify Arrowsmith from serving as Liquidating Trustee.

Moreover, appropriate safeguards have been established for the protection of the Liquidating Trust Beneficiaries in the event some unresolved conflict of interest does occur in the future.  The Liquidating Trust Agreement imposes liability on the Liquidating Trustee for "bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud or self-dealing . . . ."[62]  The Plan and the Liquidating Trust Agreement provide for supervision of the Liquidating Trustee by the independent Oversight Committee.  Charged with fiduciary duties, the Oversight Committee is responsible for providing "general oversight and direction to the Liquidating Trustee."[63]  The Oversight Committee is authorized to remove the Liquidating Trustee

---

[60] The Objecting Parties suggest that Arrowsmith might become a witness in the D&O Adversary Proceeding at some future date, and that he might be forced either to disavow some advice he affirmatively did provide or to contradict some allegation he advanced in the D&O Adversary Proceeding.  *See* Objection, *supra* note 2, at 2.

[61] Mod. Liquidating Trust Agreement, *supra* note 15, ¶ 4.8.

[62] *Id.* ¶ 4.5.

[63] *See* Plan, *supra* note 11, ¶ 1.73; *see also* Mod. Liquidating Trust Agreement, *supra* note 15, ¶ 2.2.

with or without cause.[64]  Ultimately, however, both the Oversight Committee and the Liquidating Trustee remain subject to the ongoing control of the Court.[65]  The Plan and the Liquidating Trust Agreement provide adequate measures to assure that the Liquidating Trustee will fulfill his fiduciary obligations owed—not to the Objecting Parties—but to the Liquidating Trust Beneficiaries.

## Conclusion

The Oversight Committee took commercially reasonable efforts in selecting Arrowsmith as the permanent Liquidating Trustee.  The Court finds no reason to question the sound business judgment exercised by the Oversight Committee.  Arrowsmith has performed well in his capacity as interim Liquidating Trustee.  Arrowsmith has complied with his fiduciary obligations with dispatch, integrity, and determination.  Given his intimate involvement in the Bankruptcy Cases, the Court agrees with the Oversight Committee that Arrowsmith is the most practicable and economically prudent choice to serve as permanent Liquidating Trustee.  The Court finds no evidentiary support for any of the disqualifying conflicts alleged by the Objecting Parties.  The Court finds that Arrowsmith holds no interest materially adverse to the interest of the Liquidating Trust Beneficiaries.  *See* 11 U.S.C. § 1103(b).  The Objecting Parties have not established a set of facts sufficient to bar the appointment of Arrowsmith as permanent Liquidating Trustee.  Accordingly, the Court will overrule the Objection and grant the Motion of the Oversight

---

[64] Mod. Liquidating Trust Agreement, *supra* note 15, ¶ 8.3.

[65] The Court retains jurisdiction to "resolve any disputes arising under or related to the implementation, execution, consummation or interpretation of the Plan."  *See* Confirmation Order, *supra* note 12, ¶ 65(f).

Committee and Interim Liquidating Trustee to Appoint Arrowsmith as the permanent Liquidating

Trustee of the Liquidating Trust.[66]

ENTERED: ___April 3, 2018_____

___/s/ Kevin R. Huennekens_____
UNITED STATES BANKRUPTCY JUDGE

Entered on Docket:  April 3, 2018

---

[66] As the Court has overruled the Objection on substantive grounds, the Court need not consider the alternative arguments advanced by the Movants under the doctrine of laches.