**IN THE UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 15-32919 (KRH) |
| **HEALTH DIAGNOSTIC** | ) | Chapter 11 |
| **LABORATORY, INC.**, *et al.*, | ) | |
| | ) | |
| Debtors.[1] | ) | |
| | ) | |

**NOTICE OF FILING OF SUPPLEMENTAL**
**EXIBITS TO MOTION OF THE LIQUIDATING TRUSTEE FOR**
**ORDER (I) AUTHORIZING THE TRANSFER OF DEBTORS' PATIENT**
**RECORDS TO METALQUEST, INC. AND (II) APPROVING THE PROPOSED**
**AGREEMENT BETWEEN THE LIQUIDATING TRUSTEE AND METALQUEST**

Richard Arrowsmith, in his capacity as the Liquidating Trustee (the "Liquidating Trustee")
of the HDL Liquidating Trust, by and through his counsel, hereby files this Notice of Filing of
Supplemental Exhibits (the "Notice") to the *Motion of the Liquidating Trustee for Order
Authorizing the Transfer of Debtors' Patient Records to MetalQuest, Inc. and (II) Approving the
Proposed Agreement Between the Liquidating Trustee and MetalQuest* (the "Motion") [Docket

---

[1] The Debtors along with the last four digits of their federal tax identification number, are Health Diagnostic
Laboratory, Inc. (0119), Central Medical Laboratory, LLC (2728), and Integrated Health Leaders, LLC (2434)
(referred to herein collectively as "HDL").

Robert S. Westermann (VSB No. 43294)          David I. Swan (VSB No. 75632)
Brittany B. Falabella (VSB No. 80131)          Allison P. Klena (VSB No. 96400)
Kollin G. Bender (VSB No.98912)               HIRSCHLER FLEISCHER, PC
HIRSCHLER FLEISCHER, PC                        1676 INTERNATIONAL DRIVE, SUITE 1350
The Edgeworth Building                         Tysons, Virginia 22102
2100 East Cary Street                          Telephone:  703.584.8900
Post Office Box 500                            Facsimile:   703.584.8901
Richmond, Virginia 23218-0500                  E-mail:  dswan@hirschlerlaw.com
Telephone: 804.771.9515                        aklena@hirschlerlaw.com
Facsimile:  804.644.0957
E-mail:      rwestermann@hirschlerlaw.com
             bfalabella@hirschlerlaw.com
             kbender@hirschlerlaw.com

*Counsel for Richard Arrowsmith, Liquidating
Trustee of the HDL Liquidating Trust*

No. 5855].[2]  The Liquidating Trustee files this Notice to inform interested parties of <u>Exhibit A</u> and <u>Exhibit B</u> attached to this Notice.

      **PLEASE TAKE FURTHER NOTICE** that on May 16, 2024, the Liquidating Trustee filed the Motion, seeking an order, inter alia, authorizing the Liquidating Trustee to transfer the Records to MetalQuest, Inc.

      **PLEASE TAKE FURTHER NOTICE** that on June 6, 2024, the Court entered an order (the "<u>Order</u>"), continuing the hearing on the Motion to June 11, 2024.  The Order further directed the appointment of a consumer privacy ombudsperson for the purpose of reviewing the proposed transfer of the Records.

      **PLEASE TAKE FURTHER NOTICE** that on May 30, 2024, the United States Trustee filed the Notice of Appointment of Consumer Privacy Ombudsperson [Docket No. 5865], appointing Elise S. Frejka (the "<u>Ombudsperson</u>") as the consumer privacy ombudsperson.

      **PLEASE TAKE FURTHER NOTICE** that attached to this Notice as <u>Exhibit A</u> is the Report of the Consumer Privacy Ombudsperson (the "<u>Report</u>").  This Report is timely filed pursuant to the Order.

      **PLEASE TAKE FURHTER NOTICE** that attached to this Notice as <u>Exhibit B</u> is the Business Associate Agreement, executed by and between the Liquidating Trustee and MetalQuest, Inc., which was recommended by the Ombudsperson in her Report.

*[Remainder of page intentionally left blank]*

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

Dated: June 10, 2024

Respectfully submitted,

*/s/ Kollin G. Bender*
Robert S. Westermann (VSB No. 43294)
Brittany B. Falabella (VSB No. 80131)
Kollin G. Bender (VSB No. 98912)
HIRSCHLER FLEISCHER, PC
The Edgeworth Building
2100 East Cary Street
Post Office Box 500
Richmond, Virginia 23218-0500
Telephone:  804.771.9515
Facsimile:  804.644.0957
E-mail:       rwestermann@hirschlerlaw.com
                  bfalabella@hirschlerlaw.com
                  kbender@hirschlerlaw.com

David I. Swan (VSB No. 75632)
Allison P. Klena (VSB No. 96400)
HIRSCHLER FLEISCHER, PC
1676 International Drive, Suite 1350
Tysons, Virginia 22102
Telephone:  703.584.8900
Facsimile:  703.584.8901
E-mail:       dswan@hirschlerlaw.com
                  aklena@hirschlerlaw.com

*Counsel for Richard Arrowsmith, Liquidating
Trustee of the HDL Liquidating Trust*

<u>Exhibit A</u>

The Report

IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| HEALTH DIAGNOSTIC | ) | Case No. 15-32919 (KRH) |
| LABORATORY, INC., *et al.*, | ) | |
| | ) | |
| DEBTORS. [1] | ) | |
| | ) | |

## REPORT OF THE CONSUMER PRIVACY OMBUDSMAN

Elise S. Frejka, CIPP/US[2], the consumer privacy ombudsman (the "Ombudsman")[3] in the

chapter 11 cases of Health Diagnostic Laboratory, Inc., Central Medical Laboratory, LLC, and

---

[1] The Debtors, along with the last four digits of their federal tax identification number, are Health Diagnostic Laboratory, Inc. (0119), Central Medical Laboratory, LLC (2728), and Integrated Health Leaders, LLC (2434).

[2] I am a Certified Information Privacy Professional (CIPP/US) credentialed by the International Association of Privacy Professionals and have been appointed the consumer privacy ombudsman by the United States Trustee Program in *In re Oberweis Dairy, Inc.*, No. 24-05385 (DDC) (Bankr. N.D.Il Apr. 12, 2024); *In re Endo International plc*, No. 22-22549 (JJG) (Bankr. S.D.N.Y. Aug. 16, 2022); *In re Fred's Inc.*, No. 19-11984 (CSS) (Bankr. D. Del. Sept. 9, 2019); *In re uBiome, Inc.*, No. 19-11938 (LSS) (Bankr. D. Del. Sept 4, 2019); *In re Insys Therapeutics, Inc.*, No. 19-11292 (JTD) (Bankr. D. Del. June 10, 2019); *In re Ditech Holding Corporation*, No. 19-10412 (JLG) (Bankr. S.D.N.Y. Feb. 11, 2019); *In re Sears Holdings Corporation*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 15, 2018); *In re Hooper Holmes, Inc.*, No. 18-23302 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2018); *In re Wall Street Languages Ltd.*, No. 18-11581 (SHL) (Bankr. S.D.N.Y. May 24, 2018); *In re Avaago, Inc.*, No. 17-12926 (MKV) (Bankr. S.D.N.Y. Oct. 19, 2017); *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Sept. 18, 2017); *In re Bristlecone, Inc.*, No. 17-50472 (BTB) (Bankr. D. Nev. Apr. 18, 2017); *In re Marbles Holdings LLC*, No. 17-03309 (TAB) (Bankr. N.D. Ill. Feb. 3, 2017); *In re The Wet Seal, LLC*, No. 17-10229 (CSS) (Bankr. D. Del. Feb. 2, 2017); *In re VoicePulse, Inc.*, No. 16-25075 (MBK) (Bankr. D.N.J. Aug. 5, 2016); *In re SFX Entm't, Inc.*, No. 16-10238 (MFW) (Bankr. D. Del. Feb. 1, 2016); *In re The Great Atlantic & Pacific Tea Co., Inc.*, No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 19, 2015); and *In re RadioShack Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Feb. 5, 2015). I was special counsel to the debtor and filed a declaration in support of the sale process in *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. Apr. 22, 2024) [Dkt. 128]; *In re Rite Aid Corporation*, No. 23-18993 (MBK) (Bankr. D.N.J. Oct. 16, 2023) [Dkt. No. 34]; *In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. June 4, 2023) [Dkt. No. 68]; *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 23, 2023) [Dkt. No. 29], *In re Le Tote, Inc.*, No. 20-33332 (KLP) (Bankr. E.D. Va. Feb. 17, 2020) [Dkt. No. 27], *In re Destination Maternity Corp.*, No. 19-12256 (BLS) (Bankr. D. Del. Oct. 25, 2019) [Dkt. No. 107], and *In re Pier 1 Imports, Inc.*, No. 20-30805 (KRH) (Bankr. E.D. Va. Feb. 17, 2020) [Dkt. No. 36]. In addition, while at Kramer Levin Naftalis & Frankel LLP, I represented the Prevailing Bidder of the ecommerce business and customer data in *In re Circuit City Stores, Inc.*, No. 08-35653 (KRH) (Bankr. E.D. Va. Nov. 11, 2008) and actively participated in the consumer privacy ombudsman process.

[3] See *Notice of Appointment of Consumer Privacy Ombudsman* [Dkt. No. 5865]; *Order (A) Continuing the Hearing on the Motion of the Liquidating Trustee for Order (I) Authorizing the Transfer of Debtors' Patient Records to MetalQuest, Inc. and (II) Approving the Proposed Agreement Between the Liquidating Trustee and MetalQuest and (B) Directing the Appointment of Consumer Privacy Ombudsperson for the Purpose of Reviewing the Proposed Transfer of the Records* [Dkt. No. 5871].

Integrated Health Leaders, LLC (collectively, the "Debtors") respectfully files this report (the

"Report")[4], to assist the United States Bankruptcy Court for the Eastern District of Virginia (the

"Bankruptcy Court") in its consideration of the facts, circumstances, and conditions of the

proposed transfer (the "Transfer") by Richard Arrowsmith, in his capacity as the Liquidating

Trustee of the HDL Liquidating Trust, of the Debtors' remaining patient records to MetalQuest,

Inc. ("MetalQuest") to the extent such Transfer contemplates the transfer of personally

identifiable information ("Personally Identifiable Information")[5] and protected health

information ("Protected Health Information")[6] of consumers.

---

[4]  The Ombudsman shared a draft of this Report with the Liquidating Trustee and his counsel on June 9, 2024.

[5]  The term "PII" means—

   (A) if provided by an individual to the debtor in connection with obtaining a product or a service from the
   debtor primarily for personal, family, or household purposes—

      (i)   the first name (or initial) and last name of such individual, whether given at birth or time of adoption,
            or resulting from a lawful change of name;
      (ii)  the geographical address or a physical place of residence of such individual;
      (iii) an electronic address (including an e-mail address) of such individual;
      (iv)  a telephone number dedicated to contacting such individual at such physical place of residence;
      (v)   a social security account number issued to such individual; or
      (vi)  the account number of a credit card issued to such individual[.]

   11 U.S.C. § 101(41A).

[6]  The privacy of a consumer's individually identifiable health information is regulated by the Health Insurance
   Portability and Accountability Act of 1996 ("HIPAA"), the Health Information Technology for Economic and
   Clinical Health Act ("HITECH Act"), 45 C.F.R. § 164.504, and various regulations promulgated under those
   laws, including the Modifications to the HIPAA Privacy, Security, Enforcement, and Breach Notification Rules
   under the Health Information Technology for Economic and Clinical Health Act and the Genetic Information
   Nondiscrimination Act; Other Modifications to the HIPAA Rules (the "Omnibus Rule"), 78 Fed. Reg. 5566 (Jan.
   25, 2013).  The term Protected Health Information is defined in the Privacy Rule issued under HIPAA to mean
   any health information that identifies, or reasonably could be used to identify, an individual, and that relates to the
   physical or mental health or condition of the individual, the provision of health care to the individual, or the
   payment for the provision of health care to the individual, in each case if maintained or transmitted by a
   healthcare provider or other "Covered Entity," other than certain limited exceptions.  45 C.F.R. § 160.103.

<u>**FACTUAL AND PROCEDURAL BACKGROUND**</u>

1.      On June 7, 2015, each of the Debtors filed with the Bankruptcy Court a voluntary

petition for relief under chapter 11 of title 11 of the United States Code, as amended (the

"<u>Bankruptcy Code</u>"), commencing the jointly administered Chapter 11 cases, styled *In re:*

*Health Diagnostic Laboratory, Inc., et. al*.

2.      On May 12, 2016, the Bankruptcy Court entered an *Order Confirming the*

*Debtors' Second Amended Plan of Liquidation* [Dkt. No. 1095] (the "<u>HDL Confirmed Plan</u>"),

providing for the appointment of the Liquidating Trustee on the Effective Date of the HDL

Confirmed Plan and Richard Arrowsmith was appointed as the Liquidating Trustee.

3.      Under the terms of the HDL Confirmed Plan and the LT Agreement, the

Liquidating Trustee has the power to administer the affairs of the estate and is responsible for

storing, maintaining, and preserving all books and records, whether in hard copy or electronic

form, pertaining to the Debtors' assets.

4.      On May 16, 2024, the Liquidating Trustee filed the *Motion of the Liquidating*

*Trustee for Order (I) Authorizing the Transfer of Debtors' Patient Records to MetalQuest, Inc.*

*and (II) Approving the Proposed Agreement Between the Liquidating Trustee and MetalQuest*

(the "<u>Motion</u>") [Dkt. No. 5855].  At the initial hearing on the Motion, the Bankruptcy Court

directed the appointment of a consumer privacy ombudsman and thereafter directed the

Ombudsman to address "whether the transfer of the Records proposed by the Trustee . . .

adequately protects Protected Health Information in accordance with Applicable Medical

Records Law[.]".  <u>See</u> ¶ 3, *Order (A) Continuing the Hearing on the Motion of the Liquidating*

*Trustee for Order (I) Authorizing the Transfer of Debtors' Patient Records to MetalQuest, Inc.*

*and (II) Approving the Proposed Agreement Between the Liquidating Trustee and MetalQuest*

*and (B) Directing the Appointment of Consumer Privacy Ombudsperson for the Purpose of*
*Reviewing the Proposed Transfer of the Records* [Dkt. No. 5871].

5.      The Liquidating Trustee is currently storing approximately 6,746 boxes at three

different warehouses managed by Iron Mountain, Inc. ("Iron Mountain"). 6,600 boxes are stored

in an Iron Mountain warehouse located in Sandston, Virginia, 128 are stored in an Iron Mountain

warehouse located in Odenton, Maryland, and 18 boxes are stored in an Iron Mountain

warehouse located in  Norfolk, Virginia (collectively, the "Warehouses"). These records (the

"Medical Records") contain information related to patients and their medical history and thus

contain Protected Health Information.

6.      According to the Liquidating Trustee, the Debtors were a medical care provider

and as a "Covered Entity Health Care Provider" are subject to applicable federal and state laws

concerning access, storage, transfer, and disposition of Protected Health Information including

the HIPPA Privacy and Security Rules, 45 C.F.R. Parts 160 and 164, as amended ("HIPPA

Privacy and Security Rules"), as well Medicare and Medicaid programs under Title XVIII and

Title XIX of the Social Security Act ("Medicare and Medicaid Law"), and § 32.1-127.1:03 of the

Virginia Code and Virginia Administrative Code Title 12 § 5-410-370 (the "Virginia Law" and

collectively with HIPPA, HIPPA Privacy and Security Rules, and Medicare and Medicaid Law,

the "Applicable Medical Record Laws"). The Applicable Medical Records Laws require that the

Liquidating Trustee store and maintain patient records for at least ten (10) years (the "Retention

Period"). 4,392 of the boxes of Records have dates of service longer than ten (10) years and can

be destroyed; 2,354 boxes of Records have dates of services less than ten (10) years and must be

maintained.

7.      The Liquidating Trustee has engaged MetalQuest to (a) index the Records[7]; (b) create a website for former patients to request[8] copies of their Records; and (c) destroy the Records at the expiration of the applicable Retention Period.

8.      MetalQuest is a company that maintains hard copy and digital records for organizations in accordance with the applicable federal and state law regulations through the end of their information life cycle.  MetalQuest specializes in medical practice closings and healthcare bankruptcies.  The company has been involved in numerous healthcare bankruptcy cases across the country and has experience in Chapter 11 and Chapter 7 cases including, *In re Bells-Savoy Community Emergency Services, Inc.*, Case No. 23-41705-ELM (Bankr. N.D. Tex.), *In re Aesthetic Plastic Surgery Center, L.P.*, Case No. 22-33749-CML (Bankr. S.D. Tex.), and *In re San Diego Hospice & Palliative Care Corporation*, Case No. 13-10079-MM11 (Bankr. S.D. Cal.).

9.      The Bankruptcy Court will consider the Motion at a hearing on June 11, 2024.

**REVIEW OF THE DEBTORS' PRIVACY POLICIES AND PRACTICES**

10.      In performing her duties, the Ombudsman was hampered by the limited availability of information given the passage of time but has relied upon and reviewed, among other things, the following:

     a.   Searches of the Debtors' website utilizing the Internet Archive Wayback Machine (http://waybackmachine.org) to review archived versions of the company's website.  Ordinarily, this research discloses a company's privacy policy and allows the Ombudsman to track the evolution of that policy as consumer privacy demands change, companies introduce the now common

---

[7]  The Ombudsman understands that Iron Mountain has not catalogued the Records and that the proposal with MetalQuest would result in the more efficient management of the Records and an actual ability to easily retrieve the Records if requested by a former patient.

[8]  To the best of the Liquidating Trustee's knowledge, information, and belief, no patient has requested Records since the Liquidating Trustee's appointment.  The Ombudsman was advised by the Liquidating Trustee that there were very few, if any, requests for Records made to the Debtors prior to confirmation of the HDL Confirmed Plan.

practice of permitting a sale of Personally Identifiable Information to unaffiliated third parties as part of a larger business transaction, and state data protection laws are enacted.  The Ombudsman's research indicates that the Debtors did not have a public facing privacy policy.  HEALTH DIAGNOSTIC LABORATORY, https://web.archive.org/web/20150921140821/http://www.hdlabinc.com/ (last visited June 8, 2024).   However, Applicable Medical Records Laws and HIPAA govern the transfer and sale of the Records even in the absence of a privacy policy.

b.  Telephonic and email discussions and exchanges with the Liquidating Trustee and his counsel;

c.  The Motion, the Agreement between the Liquidating Trustee and MetalQuest, the transcript of the hearing held on May 23, 2024; and the Asset Purchase Agreement between the Debtors, as sellers, and True Health Diagnostics, LLC, as Buyer dated September 29, 2015;

d.  Research and review of case law, commentaries, and court orders from bankruptcy cases involving the sale of Personally Identifiable information and Protected Health Information;

e.  Applicable United States federal and state privacy laws, regulations, enforcement actions, guidance and industry best practices.

## ANALYSIS AND RECOMMENDATIONS

11.     Section 363(b)(1) of the Bankruptcy Code governs a debtor's ability to "use, sell, or lease" Personally Identifiable Information, including Protected Health Information.  Generally, a debtor may not sell or lease Personally Identifiable Information if, at the time of the commencement of a bankruptcy case, the debtor's privacy policy prohibits the transfer of Personally Identifiable Information to unaffiliated entities.[9]  Notwithstanding this general prohibition, a sale is permitted, pursuant to section 363(b)(1)(B) of the Bankruptcy Code, if:

> after the appointment of a consumer privacy ombudsman, the court approves the sale (i) giving consideration to the facts, circumstances, and conditions of the sale and (ii)

---

[9] See 11 U.S.C. § 363(b)(1).

finding that no showing was made that the sale would
violate applicable nonbankruptcy law.[10]

12.     Here, the Debtors do not appear to have had a public facing privacy policy, but

the sale or transfer of Protected Health Information is governed by Applicable Medical Records

Laws.

13.     Under § 164.508 of the Privacy Rule of HIPAA, a "Covered Entity" may use and

disclose Protected Health Information for purposes not otherwise permitted under that rule, if the

covered entity has obtained written authorization from the subject of the Protected Health

Information.  Similarly, under section 13405(d)(1) of the HITECH Act, a covered entity may not

receive direct or indirect remuneration in exchange for the disclosure of Protected Health

Information unless the covered entity had obtained an authorization consistent with § 164.508.

The Omnibus Rule added § 164.502(a)(5)(ii) to the Privacy Rule, which permits the disclosure of

Protected Health Information without a prior written authorization in certain limited

circumstances, including a sale or transfer of Protected Health Information.  Specifically, when a

"Covered Entity" seeks to transfer Protected Health Information pursuant to a sale, transfer,

merger or consolidation with another "Covered Entity," written consent of a consumer is not

required.[11]  The proposed transfer of the Records to MetalQuest is therefore permitted by

applicable nonbankruptcy law.  After discussions with both MetalQuest and the Liquidating

Trustee, the Ombudsman has recommended that the Liquidating Trustee enter into a business

associate agreement with MetalQuest.  A business associate agreement is an agreement between

a "Covered Entity" and an associate that receives Protected Health Information from the

"Covered Entity" and defines the relationship to ensure that the business associate will

---

[10] See 11 U.S.C. § 363(b)(1)(B).

[11] See 45 C.F.R. § 164.502(a)(5)(ii).

appropriately safeguard the Protected Health Information.  The Ombudsman believes that this added layer of protection more than protects consumers and their privacy and provides the Liquidating Trustee with additional protections while at the same time advancing the Liquidating Trustee's goal of concluding his administration of the Liquidating Trust.

14.    The Ombudsman does not believe that notice to former patients of the transfer of the Records to MetalQuest would provide any additional benefit or protection to consumers given the passage of time and the Liquidating Trustee's representation that no former patient has requested records during the almost 8 years the HDL Liquidating Trust has been the custodian of the Records.  Moreover, to the extent a former patient does need her Records, MetalQuest intends to index the Records and create a website for former patients to request copies of their Records thus continuing to make available the Records if needed until the expiration of the relevant retention period.  As such, the Ombudsman is satisfied that patient needs will be adequately met if the Motion is granted.

Dated: New York, New York
        June 10, 2024

_____
Elise S. Frejka
*Consumer Privacy Ombudsman*
Frejka PLLC
415 East 52nd Street | Suite 3
New York, New York 10022
(212) 641-0800

<u>Exhibit B</u>

The Business Associate Agreement



### BUSINESS ASSOCIATE AGREEMENT

This Business Associate Agreement ("<u>Agreement</u>"), effective on the date in which an order entered by the United States Bankruptcy Court for the Eastern District of Virginia approving the *Information Management Services and Trust Agreement,* signed by the Parties on May 14, 2024 (the "<u>Trust Agreement</u>"), becomes a final and non-appealable order ("<u>Effective Date</u>"), is entered into by and between MetalQuest, Inc. ("<u>Business Associate</u>"), with an address at 4900 Spring Grove Avenue, Cincinnati, Ohio 45432-1900 and the Liquidating Trustee of the HDL Liquidating Trust ("<u>Liquidating Trustee</u>" or "<u>Covered Entity</u>"), with an address at Hirschler Fleischer, P.C. c/o Robert S. Westermann, 2100 East Cary Street P.O. Box 500 Richmond, VA 23223 (each a "<u>Party</u>" and collectively the "<u>Parties</u>").

<u>BACKGROUND:</u>

Liquidating Trustee is a Covered Entity, as defined by the federal Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191 ("<u>HIPAA</u>"), the Health Information Technology for Economic and Clinical Health Act, Title XIII of the American Recovery and Reinvestment Act of 2009 ("<u>HITECH Act</u>") and related regulations promulgated by the Secretary ("<u>HIPAA Regulations</u>"). Covered Entity complies with the HIPAA Privacy and Security Rules and the HITECH Act and requires that Business Associates of Covered Entity agree to and comply with said rules and regulations as condition of doing business with Covered Entity.

<u>WITNESSETH:</u>

WHEREAS, Business Associate and its employees, affiliates, agents or representatives may access paper and/or electronic records containing PHI in carrying out their obligations to Covered Entity; and

WHEREAS, the Parties desire to enter into this Agreement to protect PHI and EPHI, and to amend any agreements between them, whether oral or written, with the execution of this Agreement;

NOW, THEREFORE, for and in consideration of the premises and mutual covenants and agreements contained herein the parties agree as follows:

1.    **Definitions**

    1.1    <u>General</u>. Terms used, but not otherwise defined, in this Business Associate Agreement shall have the same meaning given to those terms by HIPAA, the HITECH Act and HIPAA Regulations as in effect or as amended from time to time.

    1.2    <u>Specific</u>.

        1.2.1    <u>Breach</u>. "Breach" shall have the same meaning as the term "breach" in the HITECH Act, Section 13400(1).

        1.2.2    <u>Covered Entity</u>. "Covered Entity" shall have the same meaning as the term "covered entity" in 45 CFR § 160.103.

        1.2.3    <u>Electronic Health Record</u>. "Electronic Health Record" shall have the same

meaning as the term "electronic health record" in the HITECH Act, Section 13400(5).

1.2.4    <u>Electronic Protected Health Information.</u> "Electronic Protected Health Information" shall have the same meaning as the term "electronic protected health information" in 45 CFR § 160.103, limited to the information that Business Associate created, received, maintains, or transmits from or on behalf of Business Associate or a Covered Entity.

1.2.5    <u>Individual</u>. "Individual" shall have the same meaning as the term "individual" in 45 CFR § 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 CFR § 164.502(g).

1.2.6    <u>Privacy Rule</u>. "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR Part 160 and Part 164.

1.2.7    <u>Protected Health Information</u>. "Protected Health Information" shall have the same meaning as the term "protected health information "in 45 CFR 160.103, limited to the information created or received by Business Associate from or on behalf of Business Associate or a Covered Entity.

1.2.8    <u>Required By Law.</u> "Required by Law" shall have the same meaning as the term "required by law" in 45 CFR 164.103.

1.2.9    <u>Secretary</u>. "Secretary" shall mean the Secretary of the U.S. Department of Health and Human Services or his designee.

1.2.10   <u>Security Rule</u>. "Security Rule" shall mean the Security Standards at 45 CFR Part 160 and Part 164.

1.2.11   <u>Services Agreement</u>. "Services Agreement" shall mean any present or future agreements, either written or oral, including, but not limited to, the Trust Agreement between Business Associate and Covered Entity under which BusinessAssociate provides services to Covered Entity or its clients which involve the use or disclosure of Protected Health Information. The Business Associate Agreement is amended by and incorporates the terms of this Business Associate Agreement.

1.2.12   <u>Unsecured Protected Health Information</u>. "Unsecured Protected Health Information" shall have the same meaning as the term "unsecured protected health information" in the HITECH Act, Section 13402(h) (1).

2.    **Permitted Uses and Disclosures**. Business Associate agrees not to use or disclose Protected Health Information other than as permitted or required by the Business Associate Agreement or as Required by Law. Notwithstanding the foregoing sentence, Business Associate agrees to adhere to the terms and conditions of any Business Associate agreements between Business Associate and any Covered Entity which apply to Protected Health Information and all present and future provisions of HIPAA, the HITECH Act and HIPAA Regulations that relate to the privacy and security of Protected Health Information and that are applicable to Covered Entity and/or Business Associate. Business Associate represents and warrants that he/she/it is familiar with the requirements of HIPAA or HITECH Act regarding Business Associates and Business Associate agreements. Business Associate shall comply with the provisions of this Business Associate Agreement related to privacy and security of PHI and all present and future provisions of HIPAA, the HITECH Act and HIPAA Regulations that relate to the privacy and security of

PHI that are applicable to Covered Entity and/or Business Associate.

2.1 <u>Services Agreement</u>. The terms of this Business Associate Agreement are hereby incorporated into the Services Agreement (including present and future agreements). In the event of conflict between the terms of the Services Agreement and this Agreement, the terms and conditions of this Business Associate Agreement shall govern. The Services Agreement together with this Agreement constitutes the entire agreement between the parties with respect to the subject matter contained herein.

2.2 <u>Use and Disclosure of PHI to Provide Services</u>. The Business Associate will not use or further disclose PHI or EPHI (as such terms are defined in the HIPAA Privacy and Security Rules) other than as permitted or required by the terms of the Services Agreement or as Required By Law, provided that such use or disclosure would not violate HIPAA, the HITECH Act or HIPAA Regulations if done by Business Associate or a Covered Entity, or the minimum necessary policies and procedures of the Business Associate. Except as otherwise provided in this document, the Business Associate may make any and all uses of PHI necessary to perform its obligations under the applicable Services Agreement. All other uses not authorized by this Agreement are prohibited.

3. **Additional Business Associate Activities**. Except as otherwise limited in this Agreement, the Business Associate may also:

3.1 use PHI in its possession for its proper management and administration and/or to fulfill any present or future legal responsibilities of the Business Associate, provided that such uses are permitted under state and federal privacy and security laws.

3.2 disclose PHI in its possession for the purpose of its proper management and administration and/or to fulfill any present or future legal responsibilities of the Business Associate. Business Associate represents to Covered Entity that (i) any disclosure it makes is Required by Law, and (ii) the Business Associate will obtain reasonable written assurances from any person to whom the PHI will be disclosed that the PHI will be held confidentially and used or further disclosed only as Required by Law or for the purpose for which it was disclosed to the person, that any such person agrees to be governed by the same restrictions and conditions contained in this Agreement, and that such person will notify the Covered Entity of any instances of which it is aware in which the confidentiality of the PHI has been breached.

4. **Business Associate Covenants**. Business Associate agrees to:

4.1 use or further disclose only the minimum necessary PHI in performing the activities called for under the Services Agreement;

4.2 not to use or further disclose PHI except as permitted under this Agreement, the HIPAA Privacy Rule and Security Rule, and applicable State law, each as amended from time to time;

4.3 use appropriate safeguards to prevent the use or disclosure of PHI other than as provided for in this Agreement. Without limiting the generality of the foregoing, Business Associate will: implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of Electronic Protected Health Information as required by the Security Rule; and ensure that any agent, including a subcontractor, to whom Business Associate provides Electronic Protected Health Information agrees to implement reasonable and appropriate safeguards to protect Electronic Protected Health

Information;

4.4    report to Covered Entity any security incident (as defined by the Security Rule) of
which Business Associate becomes aware and any Breach, or use or disclosure of PHI
not permitted by this Agreement within three (3) days following the discovery of such
use or disclosure. A Breach is considered "discovered" as of the first day on which the
Breach is known, or reasonably should have been known, to Business Associate or any
employee, officer or agent of Business Associate, other than the individual committing
the Breach. Any notice of a Security Incident or Breach of Unsecured Protected Health
Information shall include the identification of each Individual whose Protected Health
Information has been, or is reasonably believed by Business Associate to have been,
accessed, acquired, or disclosed during such Security Incident or Breach as well as any
other relevant information regarding the Security Incident or Breach;

4.5    mitigate, to the extent practicable, any harmful effect that is known to Business
Associate of a use or disclosure of PHI by Business Associate or its employees, officers
or agents in violation of the requirements of this Agreement (including, without
limitation, any Security Incident or Breach of Unsecured Protected Health
Information). Business Associate agrees to reasonably cooperate and coordinate with
Covered Entity in the investigation of any violation of the requirements of this
Agreement and/or any Security Incident or Breach. Business Associate shall also
reasonably cooperate and coordinate with Covered Entity in the preparation of any
reports or notices to the Individual, a regulatory body or any third party required to
be made under HIPAA, HIPAA Regulation, the HITECH Act, or any other federal or State
laws, rules or regulations, provided that any such reports or notices shall be subject to
the prior written approval of Covered Entity;

4.6    shall ensure that any of its agents, including any subcontractor, to whom it provides PHI
received from, or created or received by, Business Associate on behalf of a Business
Associate or a Covered Entity agrees to all of the same restrictions and conditions
contained that apply to PHI pursuant to this Agreement;

4.7    maintain the integrity of any PHI transmitted by or received from Covered Entity;

4.8    represents and warrants that all of its employees, agents, representatives, and
members of its workforce, whose services may be used to fulfill obligations under this
Agreement are or shall be appropriately informed of the terms of this Agreement and
are under legal obligations to the Business Associate, by contract or otherwise,
sufficient to enable the a to comply with all provisions of this Agreement;

4.9    comply with Business Associate policies and procedures with respect to the privacy
and security of PHI and other Covered Entity records, as well as policies and
procedures with respect to access and use of Covered Entity's equipment and
facilities; and

4.10   provide the rights of access, amendment, and accounting as set forth in **Sections 5, 6
and 8**.

5.    **Access to PHI**. Upon receipt of a request by Covered Entity for access to PHI about an
Individual contained in a Designated Record Set, as such term is defined in the HIPAA Privacy
Rule, the Business Associate shall in the time and manner reasonably requested by Covered
Entity, make available to Covered Entity, or, as directed by a Business Associate, to a Covered
Entity or an Individual to whom such PHI relates or his or her authorized representative, such

4

PHI for so long as such information is maintained in the Designated Record Set as defined in 45CFR 164.524. In the event any Individual requests access to PHI directly from the Business Associate, the Business Associate shall, within three (3) days, forward such request to Covered Entity. Any denials of access to the PHI requested shall be the responsibility of Business Associate.

6.   **Amendment of PHI**. Upon receipt of a request from Covered Entity for the amendment of Individual's PHI or a record regarding an Individual contained in a Designated Record Set, the Business Associate agrees to make any amendment(s) to Protected Health Information in a Designated Record Set that Business Associate or a Covered Entity directs or agrees to pursuant to 45 CFR 164.526, and in the time and manner reasonably requested by Business Associate or a Covered Entity.

7.   **Accountings**. Business Associate agrees to document such disclosures of Protected Health Information and information related to such disclosures as would be required for Covered Entities to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with HIPAA, HIPAA Regulations and the HITECH Act.

8.   **Requests for Accounting for Disclosures of PHI**. Upon receipt of a request by Covered Entity to the Business Associate, the Business Associate shall make available to Covered Entity, or at the direction of Covered Entity, to a Covered Entity or an Individual, in the time and manner reasonably requested by Covered Entity, such information as is in the Business Associate's possession and is required for Covered Entity to make the accounting required by 45 CFR 164.528. In the event the request for an accounting is delivered directly to the Business Associate, the Business Associate shall, within three (3) days, forward the request to Covered Entity.

9.   **Access to Books and Records Regarding PHI**. Business Associate agrees to make its internal practices, books, and records, including policies and procedures and PHI relating to the use and disclosure of PHI received from, or created or received by the Business Associate on behalf of Covered Entity available to Covered Entity, or the request of Business Associate to a Covered Entity  or to the Secretary, in a time and manner reasonably requested by Business Associate or designated by the Secretary, for purposes of Secretary determining the Business Associate or Covered Entity's compliance with the Privacy Rule.

10.  **Term.** Unless otherwise terminated as provided in **Section 12**, this Agreement shall become effective on the Effective Date and shall terminate when all of the PHI provided by Covered Entity or a Covered Entity to Business Associate, or created or received by Business Associate on behalf of Business Associate or a Covered Entity, is destroyed or returned to Business Associate, or, if it is infeasible to return or destroy Protected Health Information, protections are extended to such information, in accordance with the termination provisions in this Section.

11.  **Termination**

11.1  <u>Termination by Covered Entity</u>. As provided for under 45 CFR 164.504(e)(2)(iii), Covered Entity may immediately terminate this Agreement, all relevant Services Agreement(s) and any related agreements if Covered Entity makes the determination that Business Associate has breached a material term of this Agreement. Alternatively, and in the sole discretion of Covered Entity, Covered Entity may choose to provide Business Associate with written notice of the existence of the breach and provide Business Associate an opportunity to cure said breach upon mutually agreeable terms. Failure by Business Associate to cure said breach or violation in the manner set forth above shall be grounds for immediate termination of the Services Agreement by

5

Covered Entity. If cure or termination is not feasible, Covered Entity shall report the problem to the Secretary.

12. **Disposition of PHI Upon Termination/Effect of Termination**. Upon termination pursuant to Section 11, Business Associate agrees to return to Covered Entity or destroy all PHI received from Covered Entity or a Covered Entity, or created or received by Business Associate on behalf of Covered Entity or a Covered Entity pursuant to 45 CFR§ 164.504(e)(2)(I). This provision shall apply to PHI that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the PHI. Prior to doing so, the Business Associate further agrees to recover any PHI in the possession of its subcontractors or agents. If it is not feasible for the Business Associate to return or destroy all PHI, the Business Associate will notify Covered Entity in writing. Such notification shall include: (i) a statement that the Business Associate has determined that it is infeasible to return or destroy the PHI in its possession, and (ii) the specific reasons for such determination. Upon mutual agreement of the parties that return or destruction of Protected Health Information is infeasible, Business Associate further agrees to extend any and all protections, limitations and restrictions contained in this Agreement to the Business Associate's use and/or disclosure of any PHI retained after the termination of this Agreement, and to limit any further uses and/or disclosures of PHI to the purposes that make the return or destruction of the PHI not feasible, for so long as Business Associate maintains such PHI. This Section 12 shall survive the termination of the Services Agreement or this Agreement.

13. **Permissible Requests by Covered Entity**. Except as set forth in Sections 3 and 4 of this Agreement, Covered Entity shall not request Business Associate to use or disclose  Protected Health Information in any manner that would not be permissible under the Privacy Rule if done by the Covered Entity.

14. **Regulatory References**. A reference in this Business Associate Agreement to a section in HIPAA, HIPAA Regulations or the HITECH Act means the section as in effect or as amended or modified from time to time, including any corresponding provisions of subsequent superseding laws or regulations.

15. **Amendments/Waiver**. Except as set forth herein, this Agreement may not be modified, nor shall any provision be waived or amended, except in a writing duly signed by authorized representatives of the Parties. Upon enactment of any law, regulation, court decision or relevant government publication and/or interpretive policy affecting the use or disclosure of PHI, Covered Entity, by written notice to Business Associate may amend this Agreement in such manner as Covered Entity deems necessary to comply with same. The failure of either Party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or the right of either Party thereafter to enforce each and every such provision.

16. **Notices**. Any notice required or permitted under this Agreement shall be given in writing and delivered by hand, via a nationally recognized overnight delivery services (e.g., Federal Express), or via registered mail or certified mail, postage pre-paid and return receipt requested, to the following:

Business Associate:          MetalQuest, Inc.
                             P.O. Box 46364
                             Cincinnati, OH 45246
                             Attn: William L. Jansen
                             President

6

Covered Entity:                      Richard Arrowsmith, Liquidating Trustee of the
                                     HDL Liquidating Trust
                                     Hirschler Fleischer, P.C.
                                     2100 East Cary Street, P.O. Box 500
                                     Richmond, VA 23223
                                     Attn: Robert S. Westermann, Esq.

Notice of a change in address of one of the parties shall be given in writing to the other party as provided above.

17.    **Counterparts/Facsimiles**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original. Facsimile copies hereof shall be deemed to be originals.

18.    **Choice of Law**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Ohio except to the extent federal law applies. The parties hereby submit to the jursdiction of the courts located in the State of Ohio, Hamilton County including any appellate court thereof.

19.    **Indemnification**. Business Associate agrees to indemnify, defend and hold harmless Covered Entity and it owners, employees, directors/trustees, members, professional staff, representatives and agents (collective, the "Indemnitees") from and against any and all claims (whether in law or in equity), obligations, actions, causes of action, suits, debts, judgments, losses, fines, penalties, damages, expenses (including attorney's fees), liabilities, lawsuits or costs incurred by the Indemnitees which arrive or result from a breach of the terms and conditions of this Business Associate Agreement or a violation of HIPAA, the HITECH Act or HIPAA Regulations by Business Associate or its employees or agents. Business Associate's indemnification obligations hereunder shall not be subject to any limitations of liability or remedies in the Services Agreement.

20.    **Third Party Beneficiaries**. Nothing in this Agreement shall be construed to create any third party beneficiary rights in any person.

21.    **Interpretation**. Any ambiguity in this Agreement shall be resolved to permit Business Associate and its client Covered Entities to comply with HIPAA, HIPAA Regulations and the HITECH Act.

[Signature Page Follows]

7

**INTENDING TO BE LEGALLY BOUND**, the Parties hereto have duly executed this Agreement as of the Effective Date.

**Business Associate**

Signed:          _William L. Jansen_

Print  Name:     _William L. Jansen_

Title:           _President & CEO_


**Covered Entity**

Signed:          _Richard Arrowsmith_

Print Name:      _Richard Arrowsmith_

Title:           _Liquidating Trustee_